CAUSE NO. _____-_____

| | | |
|---|---|---|
| ULTRA PREMIUM SERVICES, LLC, | § | IN THE DISTRICT COURT OF |
| IPSCO TUBULARS INC., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, TEXAS |
| TUBNAYA METALLURGICHESKAYA | § | |
| KOMPANIYA, | § | ___ JUDICIAL DISTRICT |
| | § | |
| *Defendant.* | | |

## PLAINTIFFS' VERIFIED ORIGINAL PETITION AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs Ultra Premium Services, LLC ("Ultra") and IPSCO Tubulars, Inc. ("IPSCO Tubulars" and, collectively with Ultra, "IPSCO") file this Verified Original Petition and Application for Temporary Restraining Order and Temporary and Permanent Injunctive Relief against Tubnaya Metallurgicheskaya Kompaniya ("TMK") and allege as follows:

### DISCOVERY CONTROL PLAN

1.     Plaintiffs intend to conduct discovery under Level 3 of Texas Rule of Civil Procedure 190.4 and affirmatively pleads that this suit is not governed by the expedited-actions process of Texas Rule of Civil Procedure 169 because plaintiffs request injunctive relief.

### CLAIM FOR RELIEF

2.     Plaintiffs seek nonmonetary relief and attorney's fees.

### PARTIES

3.     Plaintiff Ultra is a Delaware limited liability company with a principal place of business at 10120 Houston Oaks Drive, Houston, Texas 77064.

4. Plaintiff IPSCO Tubulars is a Delaware corporation with a principal place of business at 10120 Houston Oaks Drive, Houston, Texas 77064.

5. Defendant TMK—whose full name is Трубная Металлургическая Компания or, Romanized, Tubnaya Metallurgicheskaya Kompaniya, which in English translates to "Pipe Metallurgical Co."—is a Russian corporation based in Moscow, Russia, with an address of 40/2a Pokrovka Street, Moscow, 105062, Russia.

### VENUE AND JURISDICTION

6. This court has jurisdiction pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 17.043, which provides long-arm jurisdiction over any "action arising from a nonresident's business in this state." Specifically, this action arises from TMK's business in Texas because TMK, a Russian company, has "contract[ed] by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state." Tex. Civ. Prac. & Rem. Code Ann. § 17.042.

7. Venue is proper in Harris County under Texas Civil Practice & Remedies Code section 15.002 because it is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred; it is also the county in which the plaintiff resided at the time of the accrual of the cause of action. *See* Tex. Civ. Prac. & Rem. Code § 15.002(a)(4).

### FACTS

8. IPSCO designs and produces connections for steel tubular goods used in oil and gas wells. It owns several patents and patent-pending applications and has knowledge of confidential design information, trademarks, and other intellectual property related to the manufacturing and threading of these connections. IPSCO is one of the largest producers in the United States of steel tubular products for use in oil and gas wells, pipelines, structural applications, and other purposes.

2

9. IPSCO's designed connections include proprietary and patented characteristics that, when manufactured on steel tubulars used in oil and gas wells (these tubulars are known as Oil Country Tubular Goods or "OCTG"), are used to connect one piece of OCTG to another. OCTG is generally purchased by operators of drilling rigs engaged in the exploration for, and production of, oil and natural gas. The IPSCO-designed connections are highly engineered products, which take years and significant financial investment to develop.

10. TMK, a Russian corporation, is one of the world's leading producers of tubular products for the oil and gas industry, with the largest share of its sales dedicated to OCTG. TMK is a national leader in Russia with 23 percent of the market share in that country, including 63 percent of the national seamless OCTG market. TMK caters to customers in the global oil industry, which makes up 78 percent of TMK's customer base. TMK's clients include leading oil and gas companies, including Saudi Aramco, Gazprom, Transneft, Lukoil, and many other global oil and gas companies. TMK has numerous plants throughout Russia, including plants in: Volzhsky, Volgograd Region; Polevskoy, Sverdlovsk Region; Kamensk-Uralsky, Sverdlovsk Region; Taganrog, Rostov Region; Orsk, Orenburg Region; Ekaterinburg, Sverdlovsk Region. TMK also has a plant in Uralsk, Western Kazakhstan Region, Kazakhstan.

**Relationship between TMK and IPSCO**

11. TMK and IPSCO have historically had a close working relationship. Until January 2020, IPSCO was a wholly owned subsidiary of TMK. On January 3, 2020, TMK—led by Chairman Dmitry Pumpyanskiy—sold 100 percent of the shares of TMK to Tenaris S.A. ("Tenaris"), a global leader in the OCTG industry. In a press release, Mr. Pumpyanskiy lauded the transaction, saying that TMK is "pleased with the successful closing of the transaction, which was executed in line with TMK's current strategy and will bring the value for TMK's

shareholders." TMK, *TMK Closed Sale of 100% of IPSCO Tubulars Inc. Shares to Tenaris* (Jan. 3, 2020), https://www.tmk-group.com/media_en/news/77/1142/20200103_TMK_IPSCO_sale.pdf.

**The Licensing Agreements**

12.     IPSCO has entered into a series of Licensing Agreements (the "Licensing Agreements") with TMK. *See* Ex. A (2020 Licensing Agreement); Ex. B (2018 Manufacturing Agreement); Ex. C (2018 Sales and Marketing Agreement). Each of these Licensing Agreements were negotiated and entered into in Houston, Texas.

13.     Under these Licensing Agreements, IPSCO gave TMK a license to thread, repair, and convert IPSCO's products and accessory equipment at "Authorized Facilities"[1] located in the Russian Federation and Kazakhstan. Ex. A, 2020 Licensing Agreement §§ 2.1.1, 2.1.2; Ex. B, 2018 Manufacturing Agreement § 2.1. The Licensing Agreements also gave TMK permission to sell the threaded, repaired, and converted products and accessory equipment throughout the Russian Federation and Kazakhstan. Ex. A, 2020 Licensing Agreement §§ 2.1.3, 2.1.4; Ex. C, 2018 Sales and Marketing Agreement § 2.1.

14.     TMK's rights to manufacture and sell IPSCO technology under the Licensing Agreements extend to a wide range of IPSCO products: the ULTRA FJ, the ULTRA SF, the ULTRA FX, the ULTRA QX, the ULTRA CX, the ULTRA GX, the TORQ SFW,[2] the TORQ

---

[1] Schedule B of the 2020 Licensing Agreement lists the "Authorized Facilities": the "Volzhsky Pipe Plant"; the "Taganrog Metallurgical Plant"; the "Sinarsky Pipe Plant"; the "Orsky Machine Building Plant"; "TMK-Kaztubprom"; and a pipe maintenance facility in the Samotlorsk oil field in Khanty-Mansi Autonomous Okrug-Yugra. *See* Ex. A, 2020 Licensing Agreement p. 34.

[2] The TORQ SFW is also known as the SF TORQ.

QXW,[3] the ULTRA DQX, and the TORQ DQW.[4] *See* Ex. A, 2020 Licensing Agreement 46. Before selling IPSCO to Tenaris, TMK's entire high-torque, wedge-type portfolio consisted of IPSCO's TORQ series, which TMK licensed from IPSCO.

15.     In the Licensing Agreements, TMK acknowledged that it would receive IPSCO's proprietary information, which TMK needed in order to thread, repair, and convert IPSCO's products.  TMK agreed to protect the secrecy of this proprietary information and specifically promised to: "(i) hold in strict confidence, and not disclose to any person other than . . . an Authorized Licensee Employee . . . any Confidential Information provided or made available by the other Party; . . . (ii) use any such Confidential Information exclusively for the purposes contemplated in this Agreement and for no other purposes; and (iii) protect all such Confidential Information against unauthorized disclosure." *Id.* § 4.2; *see also* Ex. B, 2018 Manufacturing Agreement §§ 6.2, 6.3 (providing that TMK cannot "use the Confidential Information for itself or others or disclose any Confidential Information to others, without first obtaining the prior written consent of ULTRA" and that TMK must "use such Confidential Information for the sole and limited purpose of exercising its rights and performing its obligations" under the Licensing Agreements); Ex. C, 2018 Sales and Marketing Agreement § 7 (same).

**TMK Breaches the Licensing Agreements by Misappropriating IPSCO's TORQ QXW**

16.     In April 2020, IPSCO learned that TMK was developing new products that were nearly identical to the products that IPSCO had licensed to TMK.  Tenaris and IPSCO discovered a publicly available TMK brochure advertising a new "TMK UP Moment" line of TMK products.

---

[3] The TORQ QXW is also known as the QX TORQ.

[4] The TORQ DQW is also known as the DQX TORQ.

17.     That brochure's section for the "TMK UP Moment" product shows that the connection is nearly identical to IPSCO's QXW product (see Image A), which IPSCO licensed to TMK under the Licensing Agreements.  Both connections are threaded and coupled with standard coupling outer diameters.  *See* Ex. D, Juarez Decl. ¶ 18; *compare* Ex. D-1 at 8, 10 (TMK UP Moment), *with* Exs. D-7 through D-9 (QXW).[5]  Additionally, both connections feature a wedge thread design, deep stabbing, fatigue endurance, extreme torque capacity, high bending capacity, and fast make-up.  *See* Ex. D, Juarez Decl. ¶ 18; *compare* Ex. D-1 at 12 (TMK UP Moment), *with* Ex. D-5 at 2-3 (QXW).  Moreover, both connections have the same sealing systems, which is the system by which the connection prevents leakage of the gas or fluid going through the pipe.  *See* Ex. D, Juarez Decl. ¶ 18.  On both connections, the "pins"—the two threaded connections facing one another—use a spherical seal, which is rounded.  On both connections, the "coupling"—the outer sleeve encasing the pins—uses a conical seal, which is angular.  *See* Ex. D, Juarez Decl. ¶ 18; *compare* Ex. D-1 at 8-11 (TMK UP Moment), *with* Ex. D-5 at 1-3 (QXW).



**IMAGE A: IPSCO's TORQ QXW (Left) vs. TMK UP Moment (Right)**

---

[5] Unless otherwise noted, all pin cites to Exhibits D-1 through D-13 reference the page numbers affixed by counsel in the bottom center of the respective exhibit page.

18.     Tellingly, the TMK brochure's cross-section of the TMK UP Moment connection is directly copied from IPSCO's marketing brochure for the QXW (see Image B).  *Compare* Ex. D-1 at 11, *with* Ex. D-5 at 3.  It is highly unusual for a company to copy and paste another company's marketing material in advertising its own line of products.  Ex. D, Juarez Decl. ¶ 19.



**IMAGE B: IPSCO's TORQ QXW Marketing Brochure (Left) vs. TMK UP Moment Propaganda (Right)**

19.     After discovering this initial brochure, Tenaris and IPSCO discovered additional publicly available TMK materials—from a TMK presentation given in 2019—showing that the TMK UP Moment line of products was nearly identical to the products that IPSCO had licensed to TMK.  Ex. D, Juarez Decl. ¶ 20.  One of the slides in that presentation shows another cross section of the TMK UP Moment.  Ex. D-2 at 9.  That cross section shows a zoomed-in depiction

of the clearance between the root of the connection's coupling and the crest of the connection's pins (see Image C).



**IMAGE C: IPSCO's TORQ QXW Thread Clearance (Left) vs. TMK UP Moment Thread Clearance (Right)**

20. This clearance is a characteristic feature of IPSCO's TORQ products designed through highly confidential means. The tolerances that IPSCO uses to develop the thread clearances for this design are closely guarded trade secrets. The clearances allow for dope relief to ensure a smooth connection. It is unlikely that TMK would have independently developed this feature without the use of IPSCO's confidential information, to which TMK had access under the Licensing Agreements. *See* Ex. D, Juarez Decl. ¶ 21; *compare* Ex. D-2 at 9, *with* Ex. D-6 (QXW thread clearance).

21. Moreover, TMK has demonstrated the close similarity between its TMK UP Moment products and the products that IPSCO licensed to TMK in publicly available articles discussing the TMK UP Moment technology. *See* Exs. D-3, D-4. These articles reveal that the TMK UP Moment has performance characteristics that are nearly identical to IPSCO's TORQ QXW. *See* Ex. D, Juarez Decl. ¶ 22; Ex. D-3 at 9 (picture 8); Ex. D-4 at 18 (picture 8). For example, the operating torque for the TMK UP Moment in the 177.8 mm x 10.36 mm P110 size and grade is 61 kH-M (equivalent to 61,000 N-m), and the operating torque for the 177.8 mm x 10.36 mm P110 size of IPSCO's QXW is 65,100 N-m. *Compare* Ex. D-7 (QXW "operating torque" value), *with* Ex. D-3 at 9 (TMK UP Moment operating torque), and Ex. D-4 at 18 (same);

*see also* Ex. D, Juarez Decl. ¶ 22. It is unlikely that TMK would have arrived at nearly identical torque values if it had independently developed these products. *See* Ex. D, Juarez Decl. ¶ 22.

22. Moreover, both connections feature gas sealability and identical tension/compression efficiency values of 100%/100%. *Compare* Ex. 7 (QXW values for tension and compression efficiencies), *with* Ex. 3 at 8, and Ex. 4 at 18 (TMK UP Moment values); *see also* Ex. D, Juarez Decl. ¶ 23. It is unlikely that the TMK UP Moment connection would have such similar performance characteristics to IPSCO's unless TMK copied IPSCO's key aspects of IPSCO's QXW connection. *See* Ex. D, Juarez Decl. ¶ 23.

23. Because both connections have nearly identical performance characteristics, they both fill the same application needs, including: running casing with rotation, rotation while cementing, drilling with casing, and extended-reach wells. *Compare* Ex. D-5 at 2-3 (QXW), *with* Ex. D-1 at 8, 12 (TMK UP Moment); *see also* Ex. D, Juarez Decl. ¶ 24. This means that the products are in direct competition in the market with one another. Ex. D, Juarez Decl. ¶ 24.

24. In addition to these publicly available sources, IPSCO has also learned about the close similarity between these two products through word of mouth in the industry. In May 2020, a former employee of IPSCO reported that TMK was threading samples for the TMK UP Moment and that the connection looked identical to QXW. Specifically, the former IPSCO employee added that Pavel Ponomarenko of TMK stated that TMK "reverse engineered" the QXW in creating the TMK UP Moment and that the TMK UP Moment used four passes to thread the connection, exactly identical to QXW. *See* Ex. D, Juarez Decl. ¶ 25. Because the tolerances necessary to manufacture IPSCO's QXW connection are so precise (to the thousands of an inch) and are difficult to measure accurately, it is unlikely that TMK could have reversed engineered the TMK UP Moment to achieve the advertised performance characteristics that purportedly match up so

closely to IPSCO's TORQ QXW connection. *See id.* at ¶¶ 25–26. Moreover, TMK was threading a 9 5/8" size TMK UP Moment, but IPSCO had never sold this size of its TORQ QXW in the market. Therefore, TMK could not possibly have obtained a suitable product from the market for reverse engineering. The only way TMK would developed the 9 5/8" inch size TMK UP Moment would have been to use the confidential information IPSCO provided to TMK under the License Agreement. *See id.*

25.     In addition to the TMK UP Moment, TMK has developed a product called the TMK UP Moment GT. Because of the TMK UP Moment GT's close similarity to the TMK UP Moment, which is itself closely similar to the TORQ QXW, the TMK UP Moment GT is also likely derived from the TORQ QXW. *See* Ex. D, Juarez Decl. ¶ 27.

**TMK Breaches the Licensing Agreements by Misappropriating IPSCO's TORQ SFW**

26.     After discovering TMK's misappropriation of the TORQ QXW, Tenaris and IPSCO also discovered evidence that TMK has misappropriated IPSCO's TORQ SFW, starting with images of TMK's UP Moment SFL, with threads and a sealing system that appear identical to IPSCO's TORQ SFW:



**IMAGE D: IPSCO's TORQ SFW (Left) vs. TMK UP Moment SFL (Right)**

27.     Both connections are semi-flush connections designed for gas sealability and high torque.  Both connections feature a wedge thread design, deep stabbing, and fast make-up.  *See* Ex. D, Juarez Decl. ¶ 29.

28.     Tenaris and IPSCO have learned through word of mouth in the industry that TMK promotes these connections with specifications for their structure that are nearly identical to IPSCO's TORQ SFW.  The TORQ SFW's outer diameter is approximately 3.5% over the pipe body, whereas the TMK UP Moment SFL's outer diameter is a nearly identical 4% over the pipe body.  *See* Ex. D, Juarez Decl. ¶ 30.

29.     Tenaris and IPSCO have also learned that the TORQ SFW and TMK UP Moment SFL also have nearly identical tension/compression efficiency values.  The TORQ SFW's is 90%/90% whereas the TMK UP Moment SFL's is 85%/85%.  *See* Ex. D, Juarez Decl. ¶ 31.

30.     As with the TMK UP Moment, the TMK UP Moment SFL also reportedly features a thread gap between the pin crest and the box root, a characteristic feature of IPSCO's TORQ products that requires the use of precise, trade secret tolerances to be effective.  *See* Ex. D, Juarez Decl. ¶ 32.  Additionally, both connections feature two threaded steps with a sealing system in

between. The sealing systems are identical, as both are composed of a spherical seal on both the pin and box with a thread compound relief groove at each side of the sealing system.

31. Both connections share the same application features, including: running casing with rotation, rotation while cementing, drilling with casing, and extended-reach wells. *See* Ex. D, Juarez Decl. ¶ 33.

32. In addition to the TMK UP Moment SFL, TMK has developed a product called the TMK UP Moment FL. Because of the TMK UP Moment FL's close similarity to the TMK UP Moment SFL and TMK UP Moment GT, which are themselves closely similar to the TORQ SFW and TORQ QXW, Ex. D, Juarez Decl. ¶ 34, the TMK UP Moment FL is also likely derived from the TORQ SFW and TORQ QXW.

**Impossibility of Independent Development**

33. In addition to the overwhelming similarities between the IPSCO and TMK products, there is another reason it is not possible that TMK designed or manufactured its new products without using IPSCO's drawings, inserts, and other confidential information. TMK was IPSCO's parent company for many years until January of 2020. If TMK had been developing its own products before this time, IPSCO would have known about this development through monthly development meetings in which both companies discussed ongoing projects. But TMK never mentioned any high torque development. That means that TMK would have started development in January 2020 at the earliest. But, based on the information from Pavel Ponomarenko, TMK was threading samples for the TMK UP Moment as early as May 2020. *See* Ex. D, Juarez Decl. ¶¶ 35-38.

34. If TMK independently developed these products, it would have taken them years to design each of these products, let alone all four. It is not conceivable that TMK independently

designed and commercialized these products within a few months. That is especially true when considering the fact that TMK engineers do not have any experience with wedge thread products. *See* Ex. D, Juarez Decl. ¶ 38. It would take years of education and experience just to understand these connections, let alone design them from scratch.

35. That is also especially true when considering the fact that TMK engineers do not have any experience with integral connections. Integral connections are those like the TMK UP Moment SFL, which consists of a single pin and a single box, as opposed to connections like the TMK UP Moment and Moment GT, which consist of two pins and one coupling. The development of the TMK UP Moment SFL, therefore, would have been particularly difficult for TMK because its engineers have no experience with these types of connections. *See* Ex. D, Juarez Decl. ¶ 39.

36. Connections like the ones at issue here have dozens of critical dimensions and tolerances (to the thousandths of an inch) in their proprietary threading and wedge designs. The tolerances, which are ranges that specify how much a specific dimension can vary from its nominal value, make a trade-off between performance and affordability: if the tolerance is too broad, it is impossible for the designer to guarantee the customer a certain performance standard, but if the tolerance is too narrow, it significantly increases the cost of manufacturing because there are more connections that must be rejected for failure to meet the tolerance. *See* Ex. D, Juarez Decl. ¶ 40.

37. Design engineers show and communicate these critical dimensions to manufacturers and others primarily through drawings, design models, and sketches; not by oral communications or by examining physical connections. Indeed, because these connections have so many intricate dimensions—and those dimensions are allowed to vary within a specified tolerance—and all these dimensions and tolerances are kept confidential, reverse engineering of an identical design is nearly impossible. *See* Ex. D, Juarez Decl. ¶ 41.

38.     Even if it were possible to reverse engineer a connection by looking at the finished connection product, that reverse engineering would not produce the inserts that are required for manufacturing high-torque wedge connections.  It is therefore more likely that TMK used the confidential inserts provided by IPSCO under the confidentiality provisions of the Licensing Agreements than from reverse engineering a finished connection.  *See* Ex. D, Juarez Decl. ¶ 42.

**TMK's Threatened Marketing of the Misappropriating Products**

39.     TMK is a direct competitor with IPSCO and its new parent company Tenaris, and TMK often competes with these companies for the same customers.  Thus, TMK's threatened use of IPSCO's confidential, proprietary information in developing and marketing its own products threatens to harm IPSCO.  *See* Ex. D, Juarez Decl. ¶¶ 43-44.

40.     TMK's intent to profit illicitly from IPSCO's sterling reputation in the marketplace is evidenced by more than just TMK's creation of products that are nearly identical to the ones that IPSCO spent significant time and resources to develop.  Even TMK's naming of these products highlights TMK's efforts to ride IPSCO's coattails.  When IPSCO was owned by TMK, IPSCO branded its products with the acronym "UP" which stood for Ultra Premium, a fully owned subsidiary of IPSCO Tubulars.  *See* Ex. D, Juarez Decl. ¶ 45.

41.     After TMK sold IPSCO to Tenaris, TMK also continued using the "UP" moniker to brand its own products.  *See* Ex. D, Juarez Decl. ¶ 46.

42.     The TMK UP Moment series thus appears to have been purposefully branded to be confusingly similar to the manner in which IPSCO's products were branded, at least prior to the acquisition.  For example, the previously used brand name for IPSCO's TORQ SFW, the TMK UP TORQ SFW, is very similar to the TMK UP Moment SFL.  *See* Ex. D, Juarez Decl. ¶ 47.

43.     This is especially true when considering that the engineering definitions for "torque" and "moment" are identical.  The two terms are often used interchangeably.  Given the historical relationship of TMK and IPSCO, the historical use of the UP brand, and the uncanny similarities between IPSCO's TORQ and the TMK UP Moment product designs and branding, it appears TMK is trying to sell products manufactured and branded very similarly to products they have sold.  *See* Ex. D, Juarez Decl. ¶ 48.

44.     After Tenaris acquired IPSCO, Tenaris acquired the rights to several domain names, including: tmkup.com, tmkup.info, tmkup.net, and tmkup.org.  Since the acquisition, TMK has contacted IPSCO's IT department numerous times to request the transfer of the tmkup domains to TMK.  IPSCO has not effected this transfer after confirming with its technical sales and marketing divisions that TMK's continued use of UP would create confusion among customers who know the history of UP as an acronym for Ultra Premium.  *See* Ex. D, Juarez Decl. ¶ 49.

### COUNT I—VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT (TUTSA) TEXAS CIVIL PRACTICE AND REMEDIES CODE § 134A.001

45.     IPSCO incorporates all other allegations set forth in this Petition.

46.     Pursuant to the Licensing Agreements, IPSCO gave TMK access to its confidential and proprietary information.  This confidential and proprietary information constitutes trade secrets within the meaning of the TUTSA.

47.     IPSCO has invested and spent significant effort, energy, resources and time developing these trade secrets, which derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  The IPSCO products take years and significant financial resources to develop.

48.    IPSCO has taken reasonable steps to maintain the confidentiality of its confidential, proprietary, and trade secret information.  All of the parties' Licensing Agreements contained confidentiality provisions.  Furthermore, IPSCO required TMK to maintain written agreements prohibiting the disclosure of IPSCO's confidential, proprietary and trade secret information with all individuals involved in the use or exploitation of IPSCO's confidential, proprietary, and trade secret information.    Additionally, IPSCO strictly controls physical access to its offices and facilities and maintains its confidential information, including drawings and other sensitive technical information, on separate servers to which access is carefully restricted.

49.    TMK gained access to IPSCO's trade secrets only after it signed the Licensing Agreements and was subject to confidentiality and contractual obligations to protect IPSCO's information.  TMK had a duty to maintain the secrecy of and limit the use of IPSCO's trade secrets.

50.    TMK has misappropriated IPSCO's trade secrets by improperly using the trade secrets, including violations of obligations under the Licensing Agreements and under Texas state law.  TMK knew or had reason to know that its use of IPSCO's trade secrets was improper because it had a duty to limit the use of IPSCO's trade secrets.  And TMK did not have express or implied consent from IPSCO to use its trade secrets to manufacture a competing line of products.

51.    The use of IPSCO's trade secrets without its consent irreparably harms IPSCO.  Indeed, TMK agreed that because any breaches of its obligations to protect IPSCO's Confidential Information "may cause irreparable harm" to the disclosing party, the disclosing party "shall be entitled to, in addition to any other remedies available to it, injunctive relief enjoining the Receiving Party's action in breach of such provision."  Ex. A, 2020 Licensing Agreement § 4.2(d); Ex. B, 2018 Manufacturing Agreement § 6.2; Ex. C, 2018 Sales and Marketing Agreement § 7.2.

52.     TMK's actions as described constitute a misappropriation within the meaning of TUTSA and entitle IPSCO to injunctive and equitable relief to protect itself against the actual or threatened misappropriation of its trade secrets.  Misappropriation causes damage to IPSCO and, unless restrained, will further damage IPSCO, the nature and extent of which may not be able to be proven with certainty, irreparably injuring IPSCO, leaving it without a remedy at law if such injunctive or equitable relief is not issued.

53.     Accordingly, preliminary and permanent injunctive relief, including the seizure of property necessary to prevent the propagation or dissemination of IPSCO's trade secrets, is necessary to prevent irreparable harm and further disclosure and misuse of IPSCO's trade secrets.

### COUNT II—BREACH OF CONTRACT

54.     IPSCO incorporates its allegations set forth above.

55.     The Licensing Agreements are valid, enforceable contracts.

56.     IPSCO has complied with and performed under the Licensing Agreements, primarily from IPSCO's facilities in Houston, Texas.

57.     In the Licensing Agreements, TMK warranted and acknowledged that it was prohibited from using IPSCO's confidential and/or trade secret information for itself or others. Ex. A, 2020 Licensing Agreement § 4; Ex. B, 2018 Manufacturing Agreement § 6; Ex. C, 2018 Sales and Marketing Agreement § 7.

58.     TMK has breached the Licensing Agreements by manufacturing IPSCO Licensed Products as TMK products: the TMK UP Moment; the TMK UP Moment GT; the TMK UP Moment SFL; and the TMK UP Moment FL.

59.     Because money damages are insufficient to make whole and adequately protect IPSCO against further harm, IPSCO is entitled to specific performance of the Licensing

Agreements, including the Confidentiality and Non-Use provisions, and preliminary and permanent injunctive relief prohibiting any further breaches of the Licensing Agreements by TMK.

### APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION

60.     IPSCO incorporates the factual allegations contained in this Petition.

61.     As explained above, TMK has misappropriated IPSCO's trade secrets and breached TMK's Licensing Agreements with IPSCO by using IPSCO's confidential, proprietary information to develop its own competing line of nearly identical products.

62.     If IPSCO does not secure temporary and permanent relief, IPSCO will suffer irreparable harm.  TMK acknowledges this irreparable harm in each of the Licensing Agreements and expressly recognizes that, in the case of TMK's breach of the Licensing Agreements' confidentiality provisions, IPSCO "shall be entitled to, in addition to any other remedies available to it, injunctive relief enjoining the Receiving Party's action in breach of such provision." Ex. A, 2020 Licensing Agreement § 4.2(d).  The 2020 Licensing Agreement further clarifies TMK's acknowledgment that any "unauthorized use" of the licensed technology "shall result in immediate or irreparable damage to" ULTRA, that that "damage is not adequately compensable in damages," and that TMK "waives . . . any defense it may have against the issuance of such injunction." *Id.* § 10.8; *see also* Ex. A, 2020 Licensing Agreement § 10.5(c) ("a non-breaching Party shall be entitled to injunctive relief enjoining a breaching Party's action in breach of this Agreement"); Ex. B, 2018 Manufacturing Agreement §§ 6.2, 13.3 ("In the event Licensee breaches any material term of this Agreement, ULTRA shall be entitled to equitable relief by way of temporary and permanent injunction . . . ."); Ex. C, 2018 Sales and Marketing Agreement §§ 7.2, 14.3 (same).

63.     TMK's contractual acknowledgement of irreparable harm aligns with the holdings of Texas state and federal courts, which have held that "threatened disclosure or use of trade secrets

. . . constitute irreparable injury as a matter of law." *Williams v. Compressor Eng'g Corp.*, 704 S.W.2d 469, 471 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (citing *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503 (5th Cir. 1982)); *see also Chevron U.S.A., Inc. v. Guajardo*, CV H-17-1549, 2017 WL 2265694, at *2 (S.D. Tex. May 24, 2017) ("The damages occasioned by a case involving breach of confidentiality and misappropriation of trade secrets is, by its nature, irreparable and not susceptible of adequate measurement for remedy at law."). As explained above, TMK has threatened to disclose and use—and is already using—IPSCO's trade secrets.

64.    Moreover, IPSCO faces irreparable injury in the form of economic losses that are difficult to quantify. *Universal Health Services, Inc. v. Thompson*, 24 S.W.3d 570, 578 (Tex. App.—Austin 2000, no pet.) (finding irreparable injury when damages are "incapable of calculation"). Specifically, IPSCO faces the loss of customers and market share to TMK, which Texas state and federal courts have held to constitute an irreparable injury. *E.g., Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 293 (Tex. App.—Beaumont 2004, no pet.) (upholding a temporary injunction where plaintiff presented testimony that the impact of an employee's use of confidential customer information is difficult to quantify because it was impossible to ascertain when the customer would be poached); *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009) ("The use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm.").

65.    Finally, TMK's misappropriation of IPSCO's trade secrets threatens to create customer confusion and thereby ruin IPSCO's goodwill with its customers. As explained above, TMK and IPSCO have had a long working relationship. Before Tenaris's acquisition of IPSCO, all of TMK's sales of wedge-type, high-torque connections were from the products licensed to TMK by IPSCO. Because TMK's misappropriating products are identical to IPSCO's, it is highly

likely that customers will mistakenly think that the misappropriating products were designed by IPSCO. But IPSCO would have no control over the quality of these products. A defective product incorrectly associated with IPSCO would irreparably harm IPSCO by ruining the goodwill that IPSCO has built up with its customers. *E.g., RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at *16 (Tex. App.—Austin Mar. 3, 2006, no pet.) ("Because it is difficult to assign a dollar value to loss of customer goodwill and clientele, it constitutes an irreparable injury.").

66.     Because IPSCO can establish a probable right to recovery and a probable injury, injunctive relief is proper.[6]

67.     Pursuant to Rule 680 of the Texas Rules of Civil Procedure, IPSCO requests that this Court issue a temporary restraining order, temporary injunction, and permanent injunction:

   a.   Precluding TMK from marketing, testing, advertising, or offering for sale the TMK UP Moment, the TMK UP Moment GT, the TMK UP Moment SFL, and the TMK UP Moment FL;

   b.   Precluding TMK from marketing, testing, advertising, or offering for sale any product with the "UP" moniker in its name;

   c.   Precluding TMK from disclosing to any person other than an Authorized Licensee Employee, as defined in the Licensing Agreements, any Confidential Information provided or made available by IPSCO;

---

[6] While the 2020 Licensing Agreement provides that disputes under the Agreement "shall be finally resolved by arbitration administered by the ICC," the Agreement is clear that "[e]ach Party reserves the right to seek relief from any courts in any country or jurisdiction to . . . obtain preliminary injunctive orders to protect rights before the constitution of the arbitration tribunal in any such arbitration proceeding . . . [and] seek any and all specific performance reliefs before the constitution of the arbitration tribunal." Ex. A, 2020 Licensing Agreement § 14.2.

d.  Precluding TMK from using any such Confidential Information for any purpose other than those contemplated in the Licensing Agreements; and

e.  Requiring TMK to protect all such Confidential Information against unauthorized disclosure.

## JURY DEMAND

68.  IPSCO demands a jury trial and tenders the appropriate fee with this petition.

## CONDITIONS PRECEDENT

69.  All conditions precedent to IPSCO's claim for relief have been performed or have occurred.

## REQUEST FOR DISCLOSURE

70.  Under Texas Rule of Civil Procedure 194, plaintiff requests that defendant disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## PRAYER

71.  IPSCO respectfully requests that this Court:

a.  Issue a temporary restraining order, temporary injunction, and permanent injunction:

i.  Precluding TMK from marketing, testing, advertising, or offering for sale the TMK UP Moment, the TMK UP Moment GT, the TMK UP Moment SFL, and the TMK UP Moment FL;

ii.  Precluding TMK from marketing, testing, advertising, or offering for sale any product with the "UP" moniker in its name;

iii.  Precluding TMK from disclosing to any person other than an Authorized Licensee Employee, as defined in the Licensing Agreements, any Confidential Information provided or made available by IPSCO;

21

iv. Precluding TMK from using any such Confidential Information for any purpose other than those contemplated in the Licensing Agreements; and

v. Requiring TMK to protect all such Confidential Information against unauthorized disclosure.

b. Award plaintiffs reasonable attorneys' fees; and

c. Award all other relief the Court deems just and appropriate.

Dated: January 28, 2021

Respectfully submitted,

BAKER BOTTS L.L.P.

By: _/s/ Tynan Buthod_
     Tynan Buthod
     Attorney-In-Charge
     State Bar No. 03513500
     Paul R. Elliott
     State Bar No. 06547500
     Brenton H. Cooper
     State Bar No. 24109751
     910 Louisiana St.
     Houston, Texas 77002
     Tel: (713) 229-1234
     Fax: (713) 229-1522
     ty.buthod@bakerbotts.com
     paul.elliott@bakerbotts.com
     brent.cooper@bakerbotts.com

ATTORNEYS FOR ULTRA PREMIUM SERVICES, LLC, AND IPSCO TUBULARS, INC.

## CERTIFICATE OF SERVICE

Immediately upon filing this Petition and Application for TRO and Temporary and Permanent Injunctive Relief and Exhibits (the "Petition"), below-signed counsel for Plaintiffs provided notice to TMK by sending a copy of the Petition to: S.A. Rekin of TMK (RekinSA@tmk-group.com); and Ryan Maierson (ryan.maierson@lw.com) and John Greer (john.greer@lw.com), both of Latham Watkins LLP.

_/s/ Tynan Buthod_
Tynan Buthod

**PREMIUM CONNECTIONS TECHNOLOGY LICENSE AGREEMENT**

**by and between**

**ULTRA PREMIUM SERVICES L.L.C.**

**and**

**PAO TMK**

**Dated January 2, 2020**

# TABLE OF CONTENTS

**ARTICLE 1.     DEFINITIONS** ................................................................................................4

SECTION 1.1     DEFINITIONS; INTERPRETATION ............................................................4

**ARTICLE 2.     LICENSE GRANT** ..........................................................................................5

SECTION 2.1     LICENSE GRANT ..................................................................................5
   Subsection 2.1.1     Threading, Repair and Conversion of Products ................................5
   Subsection 2.1.2     Threading, Repair and Conversion of Accessory Equipment.............5
   Subsection 2.1.3     Sale of Threaded, Repaired or Converted Products...........................5
   Subsection 2.1.4     Sale of Threaded, Repaired or Converted Accessory Equipment.......5
   Subsection 2.1.5     Restrictions ......................................................................................5
SECTION 2.2     INFRINGEMENTS .................................................................................5
SECTION 2.3     AUTHORIZED FACILITIES ....................................................................7

**ARTICLE 3.     ROYALTY PAYMENTS**.................................................................................7

SECTION 3.1     ROYALTIES ........................................................................................7
SECTION 3.2     PAYMENTS .........................................................................................7
SECTION 3.3     TAXES ................................................................................................8
SECTION 3.4     RECORDS ............................................................................................8
SECTION 3.5     REPORTS .............................................................................................9
SECTION 3.6     RIGHT TO AUDIT .................................................................................9

**ARTICLE 4.     CONFIDENTIAL INFORMATION** ............................................................10

SECTION 4.1     DELIVERY AND HANDLING OF PROPRIETARY DOCUMENTATION ...........10
SECTION 4.2     USE AND NON-DISCLOSURE OF CONFIDENTIAL INFORMATION .............11
SECTION 4.3     DESIGNATION OF TECHNICAL REPRESENTATIVES ................................13

**ARTICLE 5.     PRODUCTS MARKING**................................................................................13

SECTION 5.1     OBLIGATION TO MARK ......................................................................13
SECTION 5.2     USE OF TRADEMARKS ........................................................................13

**ARTICLE 6.     BUSINESS AND TECHNICAL INFORMATION; TOOLING AND GAUGES; TRAINING OF PERSONNEL; IMPROVEMENTS** ...................................................................13

SECTION 6.1     OBLIGATION TO PROVIDE BUSINESS AND TECHNICAL INFORMATION .......13
SECTION 6.2     TOOLING AND GAUGES ......................................................................14
SECTION 6.3     RIGHT TO INSPECT GAUGES AND GAUGES RECALIBRATION ..................14
SECTION 6.4     TRAINING OF PERSONNEL ...................................................................15
SECTION 6.5     AVAILABILITY OF SPECIALISTS ..........................................................15
SECTION 6.6     FIELD SERVICE ...................................................................................16
SECTION 6.7     MAINTENANCE OF CONFIDENTIAL INFORMATION, GAUGES AND TOOLING ....16
SECTION 6.8     MATERIAL BREACH OF MAINTENANCE AND NON-DISCLOSURE OBLIGATION ...........16
SECTION 6.9     SALES LITERATURE .............................................................................16
SECTION 6.10    LICENSEE GROUP IMPROVEMENTS ......................................................17

**ARTICLE 7.     PRODUCT QUALITY AND PERFORMANCE**.............................................17

SECTION 7.1     COMPLIANCE OBLIGATIONS ...............................................................17
SECTION 7.2     CERTIFICATION TO THREAD AND REPAIR .............................................18
SECTION 7.3     LICENSEE GROUP EVALUATION ..........................................................18
SECTION 7.4     OBLIGATION TO PROVIDE ACCESS TO THE LICENSEE GROUP'S FACILITIES ........18
SECTION 7.5     QUALITY PROBLEMS ..........................................................................18

**ARTICLE 8.     WARRANTY** .................................................................................................19

SECTION 8.1     WARRANTY ........................................................................................19
SECTION 8.2     EXCLUSION OF TOOLING ....................................................................19

SECTION 8.3    WARRANTY TO CUSTOMERS .................................................................19

**ARTICLE 9.    INDEMNIFICATION .........................................................................20**

**ARTICLE 10.    TERM AND TERMINATION .............................................................21**

SECTION 10.1    TERM ....................................................................................................21
SECTION 10.2    LACK OF USE OF THE TECHNOLOGY .............................................21
SECTION 10.3    COMPLETION OF PENDING WORKS BY THE LICENSEE GROUP ..........21
SECTION 10.4    INSOLVENCY .......................................................................................21
SECTION 10.5    TERMINATION FOR DEFAULT ...........................................................21
SECTION 10.6    CHANGE OF CONTROL .......................................................................22
SECTION 10.7    EFFECT OF TERMINATION .................................................................22
SECTION 10.8    DAMAGES AND INJUNCTIONS ...........................................................23

**ARTICLE 11.    NOTICES .................................................................................................23**

**ARTICLE 12.    APPROVALS ...........................................................................................23**

SECTION 12.1    ECONOMIC SANCTIONS AND EXPORT CONTROLS COMPLIANCE ........23
SECTION 12.2    REGISTRATION OF THE AGREEMENT ...............................................25
SECTION 12.3    COOPERATION TO OBTAIN APPROVALS AND LICENSES ..................25
SECTION 12.4    THIRD PARTY BENEFICIARY ...........................................................25

**ARTICLE 13.    FORCE MAJEURE ................................................................................25**

**ARTICLE 14.    GOVERNING LAW; DISPUTE RESOLUTION ............................26**

SECTION 14.1    GOVERNING LAW ...............................................................................26
SECTION 14.2    DISPUTE RESOLUTION .......................................................................26

**ARTICLE 15.    ASSIGNMENT, SUBLICENSING AND SUB-CONTRACTING ..........26**

SECTION 15.1    ASSIGNMENT. NO SUB-LICENSING OR SUB-CONTRACTING BY LICENSEE ..................26

**ARTICLE 16.    BUSINESS INTEGRITY AND TRANSPARENCY – CONFLICT OF INTERESTS 27**

**ARTICLE 17.    MISCELLANEOUS ...............................................................................28**

SECTION 17.1    SEVERABILITY ...................................................................................28
SECTION 17.2    NON WAIVER .....................................................................................28
SECTION 17.3    ENTIRE AGREEMENT .........................................................................28
SECTION 17.4    CHOICE OF LANGUAGE .....................................................................28

Unofficial Copy Office of Maryann Burgess District Clerk

## PREMIUM CONNECTIONS TECHNOLOGY LICENSE AGREEMENT

This Premium Connections Technology License Agreement (this "Agreement") is entered into on and as of January 2, 2020 (the "Effective Date"), by and between ULTRA Premium Services L.L.C., a corporation organized and existing under the laws of the State of Delaware, United States of America, having its principal place of business at 10120 Houston Oaks Drive, Houston, Texas 77064, United States of America ("Licensor"), and PAO TMK, a corporation organized and existing under the laws of the Russian Federation, having its principal place of business at 40/2a, Pokrovka Street, Moscow, 105062, Russian Federation ("Licensee" and together with Licensor, the "Parties" and each individually and indistinctly, a "Party").

**WHEREAS**, Licensor is the owner of that certain technology relating to the manufacturing of premium and semi-premium connections for steel tubular products, as further described herein;

**WHEREAS**, Licensee, for itself and for the other entities of the Licensee Group (as such term is defined in Schedule "A" hereto), desires to obtain, and Licensor is willing to grant, (x) a license under such technology to the Licensee Group and (y) technical assistance in connection with such technology, in each case, on the terms and subject to the conditions set forth herein;

**NOW THEREFORE**, in consideration of the premises, and of the representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

## ARTICLE 1.    DEFINITIONS

**Section 1.1**            **Definitions; Interpretation**

(a)        Unless otherwise defined herein or unless the context otherwise requires, the terms listed in in Schedule "A" hereto are used in this Agreement with the meanings specified for such terms in Schedule "A" hereto.

(b)        The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms. If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).

(c)        The words "hereof", "herein", and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement. Where a reference in this Agreement is made to an Annex, Exhibit, Section or Schedule, such reference shall be to an Annex, Exhibit, Section or Schedule to this Agreement unless otherwise indicated.

(d)        The word "or" is inclusive and not exclusive.

(e)        The terms "day" and "days", "month" and "months", "quarter" and "quarters" and "year" and "years" mean and refer to calendar day(s), month(s), quarter(s) and year(s), respectively.

(f)        Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation" (and the fact that the words "include", "includes" or "including" may actually be followed by the express words "without limitation" in some Sections or clauses of this Agreement and not in others shall not be given any special meaning or relevance whatsoever).

(g)     The headings used in this Agreement are inserted for convenience and identification only, and are not intended to describe, interpret, define, or limit the scope, extent or intention of this Agreement or any provision hereof.

## ARTICLE 2.    LICENSE GRANT

### Section 2.1        License Grant

On the terms and subject to the conditions of this Agreement (including, without limitation, the restrictions set forth in <u>Subsection 2.1.5</u> below), Licensor hereby grants the Licensee Group the licenses described in <u>Subsection 2.1.1</u> through (and including) <u>Subsection 2.1.4</u> below:

*Subsection 2.1.1*          <u>Threading, Repair and Conversion of Products</u>

A non-exclusive license (without the right to sub-license) under the Technology to thread, repair and convert Premium Connections on Products of all grades at Authorized Facilities in the Territory.

*Subsection 2.1.2*          <u>Threading, Repair and Conversion of Accessory Equipment</u>

A non-exclusive license (without the right to sub-license) under the Technology to thread, repair and convert Premium Connections on Accessory Equipment of all grades at Authorized Facilities in the Territory**.**

*Subsection 2.1.3*          <u>Sale of Threaded, Repaired or Converted Products</u>

A non-exclusive license (without the right to sub-license) under the Technology to sell, in the Territory, Products threaded, repaired, or converted with Premium Connections in accordance with this Agreement.

*Subsection 2.1.4*          <u>Sale of Threaded, Repaired or Converted Accessory Equipment</u>

A non-exclusive license (without the right to sub-license) under the Technology to sell, in the Territory, Accessory Equipment threaded, repaired or converted with Premium Connections in accordance with this Agreement.

*Subsection 2.1.5*          <u>Restrictions</u>

(a)     The Licensee Group shall have no right or license to use the Technology for any purpose other than the threading, repair, conversion, use and sale of Products and Accessory Equipment within the Territory, strictly in accordance with the terms and subject to the conditions of this Agreement.  Licensee covenants and agrees that Licensee (x) shall not sell, and shall cause the other entities of the Licensee Group not to sell, and (y) shall not permit its or other Licensee Group entity's distributors, agents or customers to sell, in each case, outside the Territory or for use outside the Territory, any Products or Accessory Equipment threaded, repaired or converted by the Licensee Group under this Agreement.

(b)     Unless with the prior written authorization of Licensor, Licensee may not and shall not and shall cause the other entities of the Licensee Group not to, thread, repair, convert or sell Premium Connections on full length products not manufactured by the Licensee Group.

### Section 2.2        Infringements

(a)     In the event that Licensee or any other entity of the Licensee Group becomes aware of any actual or threatened infringement, misappropriation, other violation, or challenge to the validity, scope or enforceability of the Technology in the Territory by a third party (a "<u>Third-Party Infringement</u>"), Licensee shall give prompt notice thereof to Licensor.  Licensor shall have the sole and exclusive power (as between Licensee or any other entity of the Licensee Group and

Licensor) to direct and control any prosecution, enforcement or other Action against or in respect of any Third-Party Infringement.

(b)    Licensee shall fully cooperate, and shall cause other entities of the Licensee Group to fully cooperate, with Licensor and its counsel, at Licensor's cost and expense, in prosecuting or taking any enforcement or other Action against or in respect of any Third-Party Infringement. Without limitation to the foregoing, Licensee shall, and shall cause other entities of the Licensee Group to, execute any and all documents as may be necessary or advisable for or in connection with any such enforcement or other Action against or in respect of any Third-Party Infringement, including, without limitation, any instruments as may be required to file, renew, protect, perfect or maintain the Technology or any Licensor or other applicable owner's rights thereto, and Licensee shall provide (or cause to be provided) any testimony or other evidence relating to any such Third-Party Infringement as required by any applicable law, rule or regulation or as Licensor may reasonably request.

(c)    Except with the prior written consent of Licensor, neither Licensee nor any other entity of the Licensee Group may prosecute or bring any enforcement or other Action against or in respect of any Third-Party Infringement.

(d)    In the event that any claim or demand is asserted or threatened against Licensee or any other entity of the Licensee Group by a third party alleging that any intellectual property right owned by such third-party is infringed, misappropriated, or otherwise violated by the use of Technology by the Licensee Group under this Agreement (a "Third-Party Claim"), Licensee shall give prompt notice thereof to Licensor. Licensor shall have the right, but not the obligation, to assume the sole control and conduct of the defense against any Third-Party Claim, and to settle or compromise any such Third-Party Claim, in each case, in Licensor's sole and absolute discretion and at its sole cost and expense. In the event that Licensor elects not to defend against or settle a Third-Party Claim, Licensee shall have the right to do so, at its sole cost and expense; provided that, notwithstanding such election, Licensor shall continue to be entitled to at any time, upon written notice to Licensee, takeover and assume the sole control and conduct of the defense against such Third-Party Claim, and to settle or compromise any such Third-Party Claim, in each case, in Licensor's sole and absolute discretion and at its sole cost and expense. Notwithstanding anything to the contrary herein, Licensor shall in no event be required to indemnify Licensee, any other entity of the Licensee Group or any of their respective directors, officers, employees, agents or other representatives, for or in respect of any liabilities, losses, damages, demands, assessments, claims, costs and expenses (including, without limitation, any interest, awards, judgments, penalties, settlements, fines, diminution in value, cost and expenses incurred in connection with the Third-Party Claim (including, without limitation, attorneys' fees and expenses, and all fees and expenses of consultants and other professionals) imposed on, sustained or incurred by or asserted against any such entity or person in connection with or arising out of arising out of or relating to any Third-Party Claim.

(e)    Licensee or Licensor, whoever is not conducting and controlling the defense of a Third Party Claim (the "Non-Defending Party"), shall fully cooperate with the other Party (the "Defending Party") and its counsel with respect to the defense and/or other resolution of the Third-Party Claim and the Defending Party shall keep the Non-Defending Party fully apprised of all aspects of the defense of and efforts to settle any Third-Party Claim while it is pending. Without limitation to the foregoing, the Non-Defending Party shall execute any and all documents as may be necessary or advisable for or in connection with the defense and resolution of the Third-Party Claim, and shall provide (or cause to be provided) any testimony or other evidence relating to any such Third-Party Claim as required by any applicable law, rule or regulation or as the Defending Party may from time to time reasonably request.

### Section 2.3      Authorized Facilities

(a)    The Licensee Group shall be entitled to thread, repair and convert Products and Accessory Equipment pursuant to this Agreement only at such Licensee Group's facilities as are specifically authorized for such purposes by Licensor (each, an "Authorized Facility"). Set forth as Schedule "B" hereto is a list of Authorized Facilities as of the Effective Date.

(b)    Licensee may request Licensor to authorize additional or new Licensee Group's facilities, which authorization shall not be unreasonably withheld. Any additional or new Licensee Group's facilities so authorized by Licensor shall be added to the list in Schedule "B" hereto, which shall be amended accordingly.

(c)    Notwithstanding anything to the contrary in the foregoing provisions in this Section 2.3 or in any other Section of this Agreement, if at any time following the Effective Date or the Licensee's grant of an authorization under Section 2.3(b), Licensor shall determine, in its reasonable discretion, that any one or more Authorized Facilities does not meet (or does no longer meet) the Licensor's technical, operational, finishing, quality or performance standards, Licensor shall have the right to revoke its authorization with respect to such Authorized Facility(ies) by giving written notice of such revocation to Licensee (each, a "Revocation Notice" and any Licensee Group's facility for which Licensor's authorization is revoked pursuant to this Section 2.3(c), a "Revoked Facility"), whereupon the list in Schedule "B" hereto (as then in effect) shall be amended to remove such Revoked Facility(ies). Upon receipt of any such Revocation Notice, Licensee shall immediately cease, and shall cause other entities of the Licensee Group to immediately cease, threading, repairing or converting Premium Connections in the relevant Revoked Facility(ies). In the event of Licensee or any other entities of the Licensee Group's failure to so cease threading, repairing or converting Premium Connections in the relevant Revoked Facility(ies), Licensor shall be entitled to terminate this Agreement pursuant to Section 10.5(b).

## ARTICLE 3.    ROYALTY PAYMENTS

### Section 3.1      Royalties

In consideration of the licenses and rights granted to the Licensee Group hereunder, Licensee shall pay to Licensor the royalties ("Royalties") set forth in Schedule "C".

### Section 3.2      Payments

(a)    Royalties and other payments due to Licensor under this Agreement shall be paid in U.S. Dollars, in immediately available funds, to the account specified in Section 3.2(b) below, or to such other account as Licensor may from time to time designate by written notice to Licensee. Licensor shall invoice Licensee for any Royalties or other amounts payable to Licensee hereunder, and Licensee shall pay all invoiced amounts within forty-five (45) days after receipt of such invoices; provided, that in the event of a *bona fide* disagreement or dispute concerning any invoiced amount in any Licensor invoices, Licensee shall pay the amount not disputed by the applicable due date and the Parties shall engage in good faith discussions to promptly resolve the disagreement or dispute on the remainder amount; and provided, further, that Licensee shall have no right of offset and may not withhold any Royalty or other payments for any reason other than a *bona fide* disagreement or dispute concerning any invoiced amount in any Licensor invoices. If Licensee fails to pay any invoiced amounts (other than any amount that is the subject of a *bona fide* disagreement or dispute) when and as due in accordance with this Section 3.2(a), and shall not cure such failure to pay within thirty (30) days after receiving written notice of such failure to pay from Licensor, Licensor shall be entitled to terminate this Agreement pursuant to Section 10.5(b).

(b)     Except as may otherwise be directed in writing by Licensor, all Royalty or other payments required to be made to Licensor hereunder should be made to the following account:

>   Bank Routing: 021000021
>   Swift Code: CHASUS33
>   General Bank Reference: JPMorgan Chase New York, NY 10004
>   Acct#: 226966767
>   Account Name: Ultra Premium Services, LLC.

(c)     Each reference in this Agreement to U.S. Dollars is of the essence, and the Licensee hereby irrevocably and unconditionally waives the right to invoke any defense of impossibility, impracticability, frustration of purpose or similar theory in relation to its payment obligations under this Agreement in U.S. dollars. The obligation of Licensee in respect of any amount due under this Agreement shall, notwithstanding any payment in any other currency (whether pursuant to a judgment or otherwise), be discharged only to the extent of the amount in U.S. Dollars that Licensor may, in accordance with normal banking procedures, purchase with the sum paid in such other currency (after any premium and costs of exchange) on the Business Day immediately following the day on which Licensor receives such payment.  If the amount in U.S. Dollars that may be so purchased for any reason falls short of the amount originally due, Licensee shall pay such additional amounts, in U.S. Dollars, as may be necessary to compensate for such shortfall. Any obligation of Licensee not discharged by such payment shall be due as a separate and independent obligation and, until discharged as provided herein, shall continue in full force and effect.  In the event of any restriction or prohibition on the convertibility or transferability of foreign currencies in the foreign exchange markets of the Russian Federation, Licensee shall, at its own expense, obtain Dollars through any legal mechanism for the acquisition of Dollars in any exchange market.  Notwithstanding the foregoing, nothing in this Section 3.2(c) shall impair any of the rights of Licensor under this Agreement or justify Licensee in refusing to make payments hereunder in Dollars as and when due for any reason whatsoever, and any failure to make payment hereunder shall, even in the event of a complete and absolute prohibition on the convertibility or transferability of foreign currencies in the foreign exchange markets of the Russian Federation, constitute a breach of the Licensee's payment obligations under this Agreement and shall entitle Licensor to terminate this Agreement pursuant to Section 10.5(b) in the events or in the circumstances described in the last sentence of Section 3.2(a) above.

**Section 3.3     Taxes**

Any and all taxes, levies, imposts, deductions or withholdings (collectively, "Taxes") to which any Royalty or other amounts payable to Licensor under this Agreement, or its execution may be subject to, shall be for the account of Licensee. If Licensee shall be required by law to deduct any Taxes from or in respect of any sum payable to Licensor hereunder (i) the sum payable shall be increased as may be necessary so that, after making all required deductions, Licensor receives an amount equal to the sum it would have received had no such deductions been made, (ii) Licensee shall make such deductions, and (iii) Licensee shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law and shall deliver to the Licensor copies of evidence of any such Tax payments made pursuant to this Section 3.3.

**Section 3.4     Records**

Licensee shall keep and shall cause the other entities of the Licensee Group to keep accounting documents and records reflecting all the threading, repair, conversion and sales of Products and Accessory Equipment with Premium Connections, which documents and records shall include, among other things, all information necessary or required to calculate all Royalty amounts payable by Licensee hereunder for or in connection with such threading, repair,

conversion and sales. All such accounting documents and records (collectively, the "Relevant Records") shall be kept at the Authorized Facilities, available for Licensor's audit or review, for the longer of (i) the period of time required by applicable law, and (ii) five (5) years following the threading, repair, conversion and sale of any Product or Accessory Equipment with Premium Connections.

**Section 3.5          Reports**

(a)          By not later than ten (10) calendar days following the last day of each calendar month, Licensee shall prepare and deliver to Licensor a monthly Activity Report relating to the Premium Connections threaded, repaired or converted under this Agreement and a monthly Gauge Rental Report relating to the movement of the gauges supplied by Licensor under this Agreement, in each case, in the calendar month to which such Activity Report and such Gauge Rental Report relate; provided that in the event that no Premium Connections shall have been threaded, repaired or converted under this Agreement in any given calendar month or there shall have been no movement of Gauges supplied by Licensor under this Agreement in any given calendar month, Licensee shall prepare and deliver to Licensor the relevant Activity Report or Gauge Rental Report for such calendar month stating so.

(b)          Activity Reports and Gauge Rental Reports shall be prepared and delivered in such form as Licensor shall from time to time determine.

(c)          Licensor will use commercially reasonable efforts to (A) by the later of (x) ten (10) days following Licensor's receipt of an Activity Report and (y) twenty (20) days following the end of the month covered by such Activity Report, sign, date and return a copy of such Activity Report to Licensee, and (B) within ten (10) days following the return of such copy, issue and deliver its invoice to Licensee in respect of the period covered by such Activity Report; provided that neither the signing, dating and returning of a copy of any Activity Report by Licensor nor Licensor's issuance and delivery of an invoice based upon any such Activity Report pursuant to this Section 3.5(c) shall be construed or interpreted as an acceptance by Licensor of any figures or other information contained in any such Activity Report nor shall it limit or preclude any Licensor audit or other rights or any causes of action or claims of Licensor under this Agreement relating to such Activity Report or the matters or transactions covered thereby.

**Section 3.6          Right to Audit**

(a)          Licensor shall have the right during the term of this Agreement and for five (5) years thereafter to examine (or, at Licensor's sole option, engage an independent auditor to examine) the Relevant Records in Licensee's or any Licensee Group entity's possession at any time and from time to time, at least twice every twelve (12) months, to verify compliance with the terms of this Agreement. Such audit shall be requested in writing at least ten (10) Business Days in advance and shall be conducted during Licensee's (or the relevant Licensee Group entity's, as applicable) normal business hours. Subject to Section 3.6(b) below, Licensor shall bear any and all fees and expenses it may incur in connection with any such audit of the Relevant Records.

(b)          If any audit establishes that (x) Licensee or any other Licensee Group entity failed to keep Relevant Records in accordance with Section 3.4 hereof or (y) Licensee underpaid any Royalty or other amounts due to Licensor under this Agreement, then, without prejudice to any other rights or remedies available to Licensor under this Agreement (including, without limitation, the right to terminate the Agreement pursuant to Section 10.5(a) below) or under applicable law:

(i) Licensee shall reimburse Licensor for the costs and expenses of such audit within five (5) Business Days after receiving invoices thereof;

(ii) Licensee shall bear, and promptly advance or (at Licensor's sole option, reimburse) any and all reasonable fees and expenses to be incurred (or incurred) in connection with any subsequent audits for the remainder of the term of this Agreement; and

(iii) if the relevant audit has established that Licensee underpaid any Royalty or other amounts due to Licensor under this Agreement, Licensee shall pay Licensor any such deficiency within five (5) Business Days after receipt of written notice thereof.

(c)     Licensor hereby agrees with Licensee that Licensor will not, and will cause its directors, officers, employees, agents and representatives not to, disclose or use any non-public, confidential information of Licensee or other Licensee Group entity to which Licensor may have access in connection with any audit conducted under this Agreement; provided, however, that the information subject to the foregoing provision of this sentence will not include any information generally available to, or known by, the public other than as a result of disclosure in violation hereof; and provided, further, that the provisions of this Section 3.6 will not prohibit any retention of copies of records or disclosure made in connection with the enforcement of any right or remedy relating to this Agreement.

## ARTICLE 4.   CONFIDENTIAL INFORMATION

**Section 4.1        Delivery and Handling of Proprietary Documentation**

(a)     In connection with this Agreement, Licensor may have provided or may provide the Licensee Group with access to Proprietary Documentation relating to Premium Connections and Technology, which shall be treated by the Licensee Group as Confidential Information under Section 4.2 below.

(b)     Without prejudice to the provisions in Section 4.2 below, Licensee agrees to refrain, and to cause the other entities of the Licensee Group to refrain, from (i) making copies (whether hard or electronic copies) or abridgements of such Proprietary Documentation, except as may be reasonably necessary or required for purposes of this Agreement, (ii) providing to any person other than an employee of Licensee or other Licensee Group entity (x) who has a need to know the Proprietary Documentation in connection with the transactions contemplated in this Agreement and (y) who has signed and delivered a confidentiality undertaking in the form of Schedule "D" hereto (an "Authorized Licensee Employee"), access to or any hard or electronic copies of, or otherwise allowing or permitting any such third party to access or obtain or review copies (whether hard or electronic copies) of, such Proprietary Documentation, or (iii) using such Proprietary Documentation for any purpose other than the purposes contemplated in this Agreement.  Licensee shall cause every other Licensee Group entity that is provided any hard or electronic copies of, or is otherwise allowed or permitted to access or obtain or review any hard or electronic copies of any Proprietary Documentation to execute and deliver to Licensor a written joinder whereby such Licensee Group entity shall agree to be fully bound by, and subject to, Licensee's obligations under this Section 4.1 and under Section 4.2 below as though an original party hereto.  In any event, Licensee shall be liable for any breach of this provision by any of Licensee's or other Licensee Group entity's directors, officers, employees or other representatives (including any directors, officers, employees or other representatives who subsequently leave the employ of Licensee or such other Licensee Group entity).

(c)     Promptly upon Licensor's written request, and in any event by not later than ten (10) Business Days after such request, Licensee shall promptly return or destroy (as directed by Licensor), and shall cause the other entities of the Licensee Group to (i) promptly return, delete or destroy (as directed by Licensor), all Proprietary Documentation, including any and all copies (including hard and electronic copies) and abridgements thereof and (ii) certify in writing to

Licensor that all Proprietary Documentation and any and all copies (including hard and electronic copies) and abridgements thereof have been so returned, deleted or destroyed.

**Section 4.2      Use and Non-disclosure of Confidential Information**

(a)      In connection with this Agreement, each Party may have received and may receive, directly or indirectly, non-public and confidential documents or information confidential (collectively, "Confidential Information"), including, but not limited to, in the case of Licensee as the receiving Party, any Proprietary Documentation and, in the case of Licensor as the receiving Party, any documents or information provided pursuant to Section 3.4 and Section 3.5 above and Section 6.1 below as well as information obtained through any inspections or evaluations under Section 6.3 and Section 7.3. Confidential Information may be provided or made available in tangible form, or may be received visually, electronically or orally. Each Party receiving any Confidential Information (a "Receiving Party") agrees to, and, in the case of Licensee as the Receiving Party, Licensee shall cause the other entities of the Licensee Group to (i) hold in strict confidence, and not disclose to any person other than, in the case of Licensee as the Receiving Party, an Authorized Licensee Employee or, in the case of Licensor as the Receiving Party, any director, officer, employee, agent or other representative of Licensor or its Affiliates who has a need to know in connection with the performance of its work, function or duties for Licensor or its Affiliates, any Confidential Information provided or made available by or on behalf of the other Party (the "Disclosing Party") including, in the case of Licensee as the Disclosing Party, any Confidential Information provided or made available by any other entity of the Licensee Group, (ii) use any such Confidential Information exclusively for the purposes contemplated in this Agreement and for no other purposes, and (iii) protect all such Confidential Information against unauthorized disclosure. Without limitation to (and in furtherance of) the foregoing, Licensee agrees to maintain, and Licensee agrees to cause the other entities of the Licensee Group to maintain, within the Authorized Facilities, a Security File for the purposes of containing and confining all Contents when such Contents are not in use. Licensee shall cause every other Licensee Group entity that is provided any Confidential Information, or is otherwise allowed or permitted to access or obtain or review any hard or electronic copies of any Confidential Information, to execute and deliver to Licensor a written joinder whereby such Licensee Group entity shall agree to be fully bound by, and subject to, Licensee's obligations under this Section 4.2 below as though an original party hereto. In any event, each Receiving Party shall be liable for any breach of this provision by any of such Party's or its Affiliates' directors, officers, employees or other representatives who are provided or otherwise permitted or allowed access to any Confidential Information (including any directors, officers, employees or other representatives who subsequently leave the employ of such Party or such Affiliate).

(b)      The obligations under Section 4.2(a) shall not apply with respect to any information that can be demonstrated by competent evidence that such information:

(i)      is (at the time of disclosure) or becomes (after the time of disclosure) known to the public or part of the public domain through no breach of this Agreement by the Receiving Party or its directors, officers, employees or representatives;

(ii)      is disclosed to the Receiving Party on a non-confidential basis by a third party (other than, in the case of Licensee as the Receiving Party, any of the other Licensee Group entities, any Affiliates of Licensee or such other Licensee Group entities, and any Licensee's or other Licensee Group entity's directors, officers, employees, consultants, contractors, advisors or other representatives) who is entitled to disclose it without breaching any confidentiality obligation to the Disclosing Party or its Affiliates; or

(iii)     is independently developed by or on behalf of the Receiving Party (or, in the case of Licensee as the Receiving Party, any other Licensee Group entity), as evidenced by its written records, without use or access to the Confidential Information;

provided, however, that, notwithstanding anything to the contrary in this Section 4.2(b) or in any other Section of this Agreement, the Parties (x) acknowledge that, up to the Effective Date, Licensor was owned and controlled, indirectly, by Licensee, and that Licensee and one or more entities of the Licensee Group already know and are already in possession of, Proprietary Documentation and other non-public, confidential information of Licensor or its Affiliates and (y) agree that the fact that Licensee or any one or more entities of the Licensee Group already know or are already in possession of, any Proprietary Documentation or other non-public, confidential information of Licensor or its Affiliates shall not exclude or in any way limit the application of any obligation of Licensee under Section 4.2(a) with respect to such Proprietary Documentation or information.

(c)     The restrictions set forth in Section 4.2(a) shall not prohibit a Receiving Party from disclosing or using (as specified below) any Confidential Information that is required to be disclosed by it under any applicable law, or an order, subpoena or other mandatory request of a court or other governmental entity of competent jurisdiction; provided that the Receiving Party provides the Disclosing Party at least ten (10) Business Days prior written notice of such required disclosure and affords the Disclosing Party an opportunity to oppose or limit, or secure confidential treatment for such required disclosure, and if disclosure is nonetheless compelled, the Receiving Party discloses only that portion of the Confidential Information that is legally required to be disclosed as advised by legal counsel.

(d)     The Parties acknowledge and agree that breaches of any provisions of this ARTICLE 4 by a Receiving Party may cause irreparable harm to the Disclosing Party, and the Disclosing Party shall be entitled to, in addition to any other remedies available to it (subject to the terms of this Agreement), injunctive relief enjoining the Receiving Party's action in breach of any such provision, and each Party agrees that it will not, and that Licensee will cause the other entities of the Licensee Group not to, seek (and each Party agrees to waive and Licensee agrees to cause the other entities of the Licensee Group to waive) any requirement for the securing or posting of a bond in connection with seeking or obtaining such relief.

(e)     Upon expiration or termination of this Agreement, each Party shall, and Licensee shall cause the other entities of the Licensee Group to (i) promptly destroy, delete, or return (in the case of Licensor, at its option, and in the case of Licensee, as directed by Licensor) any and all Confidential Information in either Party's or such other Licensee Group entities' possession, including any and all copies (including hard and electronic copies) and abridgements thereof, and (ii) certify in writing to the other Party that all Confidential Information and any and all copies (including hard and electronic copies) and abridgements thereof have been so returned, deleted or destroyed.

(f)     A complete and accurate list of all Authorized Licensee Employee as of the Effective Date is attached as Schedule "E" hereto.  Licensee shall maintain at all times a complete and accurate list all Authorized Licensee Employee in the form of Schedule "E" hereto, and shall promptly notify Licensor in writing upon the occurrence of any of the following events: (i) any Authorized Licensee Employee is terminated or otherwise leaves the employ of Licensee or the relevant Licensee Group entity for any reason; (ii) any Authorized Licensee Employee no longer has a need to know the Confidential Information, or (iii) any person not included in Schedule "E" (as then effective needs) to know the Confidential Information and is to be added to the list as an Authorized Licensee Employee.  In each case, Licensee's notice shall set forth a description of the relevant occurrence, including the name(s) and title(s) of the relevant Authorized Licensee

Employee(s) or employee(s), as applicable, and shall be accompanied by an updated version of Schedule "E".

**Section 4.3        Designation of Technical Representatives**

(a)        Promptly following the Effective Date, Licensee, shall appoint and shall cause the other members of the Licensee Group to each appoint, a technical representative for each of the Authorized Facilities, who shall be primarily responsible for the reception of Confidential Information and Proprietary Documentation on behalf of the Licensee Group, and who shall ensure the proper handling of such Confidential Information and Proprietary Documentation as per the terms of Section 4.1 and Section 4.2 above.  Upon such appointment, Licensee shall provide, by written notice to Licensor, complete and accurate contact information of the technical representatives so appointed.

(b)        If any technical representative appointed pursuant to Section 4.3 (i) is terminated or otherwise leaves the employ of Licensee or the relevant Licensee Group entity for any reason and/or (ii) is replaced by Licensee or the relevant Licensee Group entity for any reason, Licensee shall inform Licensor of such change by written notice by not later than five (5) Business Days after the occurrence of such event, including, where applicable, complete and accurate contact information of the technical representative appointed as replacement.

## ARTICLE 5.    PRODUCTS MARKING

**Section 5.1        Obligation to Mark**

Licensee shall mark, and shall cause the other entities of the Licensee Group to mark, each Product and Accessory Equipment on which a Premium Connection is threaded, repaired or converted or any other material or document related therewith as per the procedures prescribed by Licensor.

**Section 5.2        Use of Trademarks**

Licensee shall use, and shall cause the other entities of the Licensee Group to use, the Trademarks only in literature and advertising approved in advance by Licensor in writing. All goodwill relating to the Trademarks shall belong exclusively to Licensor and its Affiliates. Neither Licensee nor any other Licensee Group entity is being given a license or any other rights, either by grant or inference, to use any Trademarks. Use of any Trademarks by the Licensee Group shall inure solely to the benefit of Licensor and its Affiliates. Licensee agrees to refrain from using or seeking, and to cause the other entities of the Licensee Group not to use or seek, any registration of any trademark, trade name, corporate name, domain name, that is identical or confusingly similar to any Trademarks or to any of Licensor or any of its Affiliates' corporate names and trademarks, both during the term of this Agreement and thereafter.

## ARTICLE 6.    BUSINESS AND TECHNICAL INFORMATION; TOOLING AND GAUGES; TRAINING OF PERSONNEL; IMPROVEMENTS

**Section 6.1        Obligation to Provide Business and Technical Information**

Licensor agrees to make available to Licensee, for use by the Licensee Group, promptly following the execution of this Agreement, business and technical information in Licensor's possession which, in Licensor's opinion, is reasonably required to thread, repair and convert Premium Connections on Products and Accessory Equipment as contemplated under this Agreement. Technical information may include drawings, inspection manuals, gauging manuals, standards and specifications of quality and performance of Premium Connections on Products and Accessory Equipment, and manufacturing processes and procedures. Technical information shall be provided in the English language.  Licensor shall make available to Licensee, for use by

the Licensee Group, all changes or supplements to the technical information as may be incorporated from time to time. Any and all Taxes and other costs or expenses associated with the delivery or return of any business or technical information under this Agreement shall be borne by Licensee, and Licensee agrees to, promptly upon Licensor's request, reimburse Licensor for any such Taxes or other reasonable and documented out-of-pocket costs and expenses as Licensor may have incurred in connection with any such delivery or return.

### Section 6.2    Tooling and Gauges

(a)    Licensor and Licensee acknowledge and agree that the proper and effective use of the Technology requires the use of specialized tooling and gauges fabricated using or incorporating certain proprietary technology of Licensor, which are not commodity goods freely available in the open market.  Licensee agrees to purchase and acquire, and to cause the other entities of the Licensee Group to purchase and acquire, solely from Licensor or its Affiliates, or a third-party vendor designated and approved by Licensor, all Tooling and Gauges required for threading, repairing and converting Premium Connections on Products and Accessory Equipment.

(b)    Tooling and Gauges supply shall be subject to the general terms and conditions attached hereto as Schedule "F".  Gauges (but not Tooling) shall be made available to Licensee at no extra cost; provided that, upon Licensor's request, Licensee shall return, and shall cause the other entities of the Licensee Group to return, to Licensor any Gauges made available by Licensor pursuant to this Agreement in their entirety and in good functioning condition, and Licensee shall be liable for any Gauges damaged beyond normal wear and tear as per the terms of Section 6.7(a).

(c)    License shall abide by, and shall cause the other entities of the Licensee Group to abide by, the rules and policies issued by Licensor from time to time relating to the calibration, service or verification of Gauges against master Gauges held by Licensor.

(d)    Any and all Taxes and other costs or expenses associated with the delivery or return of any Tooling or Gauges under this Agreement shall be borne by Licensee, and Licensee agrees to, promptly upon Licensor's request, reimburse Licensor for any such Taxes or other reasonable and documented out-of-pocket costs and expenses as Licensor may have incurred in connection with any such delivery or return.

### Section 6.3    Right to Inspect Gauges and Gauges Recalibration

(a)    At Licensor's request, Licensee agrees to promptly return, and to cause the other entities of the Licensee Group to promptly return, any or all of Licensor's Gauges for purposes of checking, recalibration or for Licensor's use at another facility.  Licensee agrees to provide, and to cause the other entities of the Licensee Group to provide, Licensor access at all times to Gauges in the Licensee Group's possession for periodical control. Licensor agrees to make available to the Licensee Group a calibrated Gauge to replace each Gauge taken by Licensor for inspection. Any and all costs associated with the shipping of Gauges from and to the calibration site designated by Licensor, including customs fees, duties and other Taxes, and storage costs and expenses, shall be borne by Licensee, and Licensee agrees to, promptly upon Licensor's request, reimburse Licensor for any such customs fees, duties, other Taxes, and/or storage costs and expenses, or other reasonable and documented out-of-pocket costs and expenses, as Licensor may have incurred in connection therewith.

(a)    Notwithstanding the provisions in Section 6.3(a) above, in case any Gauges maintained in an Authorized Facility are out of calibration and until such time as such out-of-calibration Gauges are returned to Licensor, Licensor shall charge Licensee, and Licensee shall pay Licensor, a fee of $150.00 (one hundred and fifty Dollars) per day.

**Section 6.4        Training of Personnel**

(a)        The Licensee Group may, from time to time, and at its own expense, send a reasonable number of Authorized Licensee Employees for a reasonable period of time to a manufacturing facility of Licensor or, at Licensor's election, a manufacturing facility of an Affiliate of Licensor, for the purpose of receiving technical training from, and studying methods employed, by Licensor in the threading, repair and conversion of Premium Connections on products and accessory equipment, subject to the payment to Licensor (or an Affiliate of Licensor) of a training fee per Authorized Licensee Employee attending such technical training visit, the amount of which shall be determined by Licensor and informed to Licensee reasonably in advance of such technical training visit.  Licensee shall request such technical training visits by written notice to Licensor at least thirty (30) days in advance of the proposed date therefor, indicating the proposed duration and topics to be covered thereat, and identifying the Authorized Licensee Employees that would be attending such training visit; provided that the proposed date, duration and topics to be covered in any such training visit shall be mutually agreed between the Parties.

(b)        For the avoidance of doubt, Licensee shall be solely responsible for the payment of any and all salaries or wages, and all expenses of any Authorized Licensee Employees attending any technical training visit.  Licensee shall indemnify, defend, hold harmless and reimburse Licensor and its Affiliates, for, from and against any and all damages, losses, charges, liabilities, claims, demands, actions, suits, proceedings, payments, assessments, costs and expenses (including, without limitation, any interest, awards, judgments, penalties, settlements or fines, as well as attorneys' fees and expenses) (collectively, "Losses") imposed on, sustained or incurred by or asserted against Licensor or any of its Affiliates in connection with or arising out of (x) any injury, sickness or death of any Authorized Licensee Employees attending any technical training visit, including any injury, sickness or death resulting from the sole or contributory negligence of Licensor or its Affiliates, or any of Licensor or its Affiliate's directors, officers, employees, agents or other representatives and (y) any claim for the payment of salary, wages, expenses or any other amounts (whether of a like nature or not) by any such Authorized Licensee Employees.

**Section 6.5        Availability of Specialists**

(a)        Upon Licensee's written request delivered reasonably in advance, Licensor agrees to provide, for a maximum term of seven (7) continuous days, a technical specialist to assist the Licensee Group at any Authorized Facility for any new quality standard certification for the threading, repair or conversion of any Premium Connection.  Licensee agrees to pay any reasonable travel, transportation (to and from any Authorized Facility) and living expenses (including room and board) incurred by Licensor's technical specialist while traveling for the Licensee Group, plus a daily fee of $700 (seven hundred Dollars) (the "Technical Specialist Fee"). Licensor may from time to time increase the applicable Technical Specialist Fee as Licensor may see fit, provided that the new Technical Specialist Fee shall become effective only after thirty (30) from delivery of Licensor's notice thereof to Licensee.

(b)        In the event any entity of the Licensee Group shall be required to (i) requalify for the threading, repair or conversion of a Premium Connection due to Licensor's revocation of the Licensee Group's quality standard certification therefor, or (ii) have a Licensor representative provide monitoring or inspection to or for any Licensee Group customer, Licensor shall provide, and Licensee shall receive and pay for, a technical specialist to assist the Licensee Group in obtaining such requalification or providing such monitoring or inspection, and Licensee shall pay all reasonable travel, transportation (to and from any Authorized Facility) and living expenses (including room and board) incurred by Licensor's technical specialist while providing such assistance plus the then-applicable Technical Specialist Fee.

(c) Upon Licensee's written request delivered reasonably in advance, and subject to availability of technical specialists, Licensor shall made available one or more technical specialists to give advice at a manufacturing facility of Licensor, or a facility of an Affiliate of Licensor designated by Licensor, in relation to threading, repair and conversion of Premium Connections on Products and Accessory Equipment and assist the Licensee Group with any problems that may arise in relation thereto. Should the Licensee Group require the services of technical specialists at any place other than at a manufacturing facility of Licensor (or such other facilities of any Affiliates of Licensor as Licensor may designate), Licensee shall pay to Licensor an amount equal to the reasonable travel, transportation and living expenses (including room and board) incurred by Licensor's technical specialists _plus_ the then-applicable Technical Specialist Fee per technical specialist providing such services.

**Section 6.6        Field Service**

Unless otherwise agreed upon by the Parties in writing, Licensor shall not be required to provide any technical assistance for field service for Products or Accessory Equipment threaded, repaired or converted by the Licensee Group under this Agreement.

**Section 6.7        Maintenance of Confidential Information, Gauges and Tooling**

(a) Licensee shall be responsible for the maintenance of all Proprietary Documentation and other Confidential Information and any Tooling and Gauges made available to Licensee or any other entities of the Licensee Group pursuant to or in connection with this Agreement. Licensee shall provide for and ensure that all such Proprietary Documentation and other Confidential Information, Tooling and Gauges are properly stored, inventoried, and protected with such degree of care as Licensor may from time to time reasonably indicate and under no circumstances less than reasonable care. Licensee agrees to abide by, and to cause the other members of the Licensee Group to abide by, all procedures established by Licensor concerning the maintenance and inventory of Gauges and manuals, drawings and other Proprietary Documentation. In the event any Gauges, manuals or drawings are damaged beyond normal wear and tear, Licensee shall be pay to Licensor the repair or replacement cost for such damaged Gauges, manuals or drawings.

(b) Licensee shall not (and shall cause the other members of the Licensee Group not to, disassemble, dimensional measure, or copy, or allow others to disassemble, dimensional measure, or copy, any Gauges supplied by Licensor except as may be required in the course of the ordinary prescribed use of such Gauges.

**Section 6.8        Material Breach of Maintenance and Non-Disclosure Obligation**

Without prejudice to any other rights or remedies available to Licensor under this Agreement (including, without limitation, the rights and remedies contemplated in Section 4.2(d)) or applicable law, in the event that any Proprietary Documentation or other Confidential Information, or any Tooling or Gauges, or any reproduction of same, is found to be (in whole or in part) in the possession of any person other than an entity of the Licensee Group or an Authorized Licensee Employee in circumstances that lead Licensor to reasonably conclude that Licensee has been grossly negligent in complying with its obligations under Section 4.1, Section 4.2 or Section 6.7 or has willfully failed to observe or breached any such obligations, then Licensor shall be entitled to forthwith terminate this Agreement pursuant to Section 10.5(b).

**Section 6.9        Sales Literature**

Subject to Licensor's written approval, the Licensee Group shall be entitled to distribute Licensor's sales literature for Premium Connections to its customers.

**Section 6.10          Licensee Group Improvements**

(a)      The Licensee Group shall not be entitled to use the Technology for any purpose other than those specifically permitted by this Agreement. If Licensee foresees any possibility of Licensee or any other member of the Licensee Group developing modifications or improvements in the design or manufacture of the Premium Connections ("Improvements"), Licensee shall give prior written notice only to Licensor about such possibility. In any event, Licensor shall be the sole and exclusive owner of any such Improvements and shall be entitled to decide, in its sole discretion, whether or not any such Improvements are to be implemented and, where applicable, when and how such implementation will occur and any protection strategy related to securing and/or preserving any intellectual property rights with respect to any such Improvements or any portion thereof.

(b)      Licensee hereby irrevocably and unconditionally agrees to (i) assign, and cause the other entities of the Licensee Group and any Licensee or such other entities' directors, officers, employees, consultants, contractors, advisors or other representatives to assign, to Licensor or such other entity as Licensor may designated, any and all rights in and to the Improvements, at no cost to Licensor; and (ii) provide, and cause the other members of the Licensee Group and any Licensee or such other entities' directors, officers, employees, consultants, contractors, advisors or other representatives to provide, at Licensor's expenses, such assistance as Licensor or such other entity designated by Licensor may request in respect of such Improvements, at any time and from time to time (including after termination or expiration of the term of this Agreement), in any and all countries and parts of the world, including the making of any Filings and execution of any other documents as may be necessary or advisable for Licensor or such other entity to secure and/or preserve any intellectual property rights with respect to any such Improvements or any portion thereof (including for purposes of any reissues, renewals, extensions, continuations, divisions or continuations in part); provided that, in the event Licensee shall fail to make any such Filings or execute any such documents within ten (10) Business Days from Licensor's written request, Licensor shall be authorized to, and Licensee hereby irrevocably authorizes and appoints Licensor as its true and lawful attorney-in-fact with full power and authority to, make any such Filings or execute any such documents on behalf and in the name of Licensee and to do all other lawful acts as may be necessary or conducive for the purposes of this Section 6.10.

(c)      If the foregoing provisions in clauses (a) and (b) of this Section 6.10 are finally determined to be void, illegal or unenforceable by a court or competent jurisdiction, then clauses (a) and (b) of this Section 6.10 shall be deemed to have been modified to read in their entirety as follows: "*Should the Licensee Group develops any modifications or improvements in the design or manufacture of Premium Connections using Technology, Licensee shall communicate such modifications or improvements to Licensor and hereby grants an irrevocable, perpetual royalty-free non-exclusive license to Licensor to make, use, sub-license and sell Premium Connections on Products and Accessory Equipment incorporating such modifications or improvements anywhere in the world and otherwise on terms and conditions similar to those set forth in this Agreement*."

**ARTICLE 7.    PRODUCT QUALITY AND PERFORMANCE**

**Section 7.1          Compliance Obligations**

Licensee acknowledges that the safety of Premium Connections and protection of Trademarks are primary reasons for maintaining the quality and performance of the licenses granted by this Agreement.  Licensee shall at all times have, and shall cause the other entities of the Licensee Group to have, properly trained personnel and operate the Authorized Facilities in such manner as is necessary or advisable to thread, repair and convert Premium Connections under the licenses granted by this Agreement in strict compliance with the quality, finishing and

performance standards and specifications from time to time established by Licensor and made available to Licensee. Licensee shall comply, and shall cause the other entities of the Licensee Group to comply, with all manufacturing procedures, finishing and gauging practices set forth in the Technology. Any changes in manufacturing procedures, including in threading, repair, finishing and gauging procedures, shall be made only with and subject to the terms of Licensor's prior written consent therefor. Without prejudice to any other rights or remedies available to Licensor under this Agreement or applicable law, in the event any Premium Connections that are threaded, repaired or converted by the Licensee Group shall fail to comply with the then-effective quality, finishing and performance standards and specifications established by Licensor, Licensee shall forthwith refrain from and cease, and shall cause the other members of the Licensee Group to forthwith refrain from and cease, using or applying any Trademarks on or with respect to any such non-compliant Premium Connections.

**Section 7.2      Certification to Thread and Repair**

(a)      Before starting to use the Technology, Licensee shall obtain, and shall cause the other entities of the Licensee Group to obtain, from Licensor the requisite quality standard certification. In order to obtain such certification, the Licensee shall provide and shall cause the other entities of the Licensee Group to provide Licensor with samples of Premium Connections threaded, repaired or converted in an Authorized Facility that meet Licensor's quality, finishing and performance standards and specification. Licensor shall test such samples and shall determine whether a quality standard certification shall be granted to Licensee or any other Licensee Group entity; provided that Licensor shall not unreasonably deny granting such quality standard certification to Licensee or any other Licensee Group entity.

(b)      Following the granting of any quality standard certification under Section 7.2(a) above, Licensor may at any time and from time to time require License to provide, or to cause other Licensee Group entities to provide, new samples for Licensor to test. In the event that such new samples shall fail to meet Licensor's quality, finishing and performance standards and specification, Licensor may revoke Licensee or any other Licensee Group entity's quality standard certification; provided, however, that if Licensor determines such failure to be material, Licensor shall be entitled to forthwith terminate this Agreement pursuant to Section 10.5(b).

**Section 7.3      Licensee Group Evaluation**

The Licensee Group shall be required to answer evaluation questionnaires in order to allow Licensor to review technical and quality performance by the Licensee Group. Without prejudice to the foregoing, Licensor shall be entitled to make, or cause to be made, on-site evaluations on the Licensee Group's Authorized Facilities. Such evaluations shall be performed during normal business hours and upon at least ten (10) Business Days prior notice to Licensee. Licensee acknowledges that failure to meet Licensor's technical or quality performance standards may result in termination of this Agreement, without prejudice to any other rights or remedies available to Licensor under this Agreement or applicable law.

**Section 7.4      Obligation to Provide Access to the Licensee Group's Facilities**

Licensee shall provide and shall cause the other entities of the Licensee Group to provide free access to its Authorized Facilities to Licensor's or its Affiliates' technical specialists to perform inspections or evaluations under Section 6.3 and Section 7.3.

**Section 7.5      Quality Problems**

(a)      Licensor shall cooperate to resolve problems the Licensee Group may have in complying with applicable Premium Connection quality, finishing and performance standards and specification. In the event Premium Connections that are threaded, repaired or converted by the

Licensee Group fail to conform to then-applicable quality, finishing and performance standards and specification established by Licensor, Licensee shall forthwith refrain from and cease, and shall cause the other members of the Licensee Group to forthwith refrain from and cease, marketing or selling any non-conforming Premium Connections until the problems causing such non-conformance are solved.

(b)     Licensor will grant the Licensee Group a ninety (90) day cure period to solve any problems the Licensee Group may have in complying with applicable Premium Connection quality, finishing and performance standards and specification; provided during such cure period and pending a full resolution of all such problems, License shall not and may not, and shall cause the other members of the Licensee Group not to, market or sell non-conforming Premium Connections; and provided, further, that in the event that Licensee shall fail to resolve such problems within such time-frame, Licensor shall be entitled to forthwith terminate this Agreement pursuant to Section 10.5(b).

## ARTICLE 8.   WARRANTY

### Section 8.1          Warranty

Licensor warrants that the Technology supplied to the Licensee Group pursuant to this Agreement shall, if properly applied under circumstances equivalent to those existing at the manufacturing facilities of Licensor, permit the Licensee Group to thread, repair and convert Premium Connections of the same kind and nature threaded, repaired and converted by Licensor; provided, however, that no representation or warranty is made or given as to the suitability of the Technology if used in any manner different than that in which Licensor uses it. Except as expressly provided herein, the Technology licensed under this Agreement is being licensed without representation or warranty of any kind or nature, including title, design, performance, fitness for a particular purpose, absence of defects (latent or otherwise), non-infringement of patents or other intellectual or industrial property rights or merchantability; it being understood, for the avoidance of doubt, that the licenses granted and the Technology supplied hereunder are being granted or supplied, as applicable, strictly on an "as is" and "where is" basis. Licensor's sole obligation to the Licensee Group under this warranty is limited exclusively to the replacement of non-conforming Technology.

### Section 8.2          Exclusion of Tooling

(a)     Licensee (x) acknowledges and agrees that Tooling, including thread form inserts, groove tools, Teflon seal rings, and thread protectors supplied or sold by Licensor or its Affiliates for each Premium Connection may not be manufactured by Licensor or its Affiliates and (y) further agrees that Licensor and its Affiliates shall not be warrantors with respect to any thread form inserts, groove tools, Teflon seal rings, thread protectors or other Tooling manufactured by third parties.

(a)     Any and all Tooling manufactured by third parties shall be guaranteed in the manner and to the extent guaranteed by the actual manufacturer thereof, and then only to the extent that Licensor is able reasonably to enforce it, as provided in the general terms and conditions attached hereto as Schedule "F".

### Section 8.3          Warranty to Customers

Whenever market practice allows, Licensee agrees to use and to cause the other members of the Licensee Group to use reasonable efforts to limit its warranty to customers for all Premium Connections on Products and Accessory Equipment threaded, repaired or converted by it, to the terms stated in Schedule "G".

## ARTICLE 9.   INDEMNIFICATION

(a)      Licensee and Licensor shall indemnify and hold harmless the respective other Party, its Affiliates, directors, officers and employees from any loss, damage or destruction of the property and equipment of the other, its directors, officers, employees and invitees (whether owned by such one Party or by a third party); and from all liability and expense (including attorney's fees), arising from all claims, demands and causes of action for the injury or death of any director, officer, employee or invitee of such one Party; arising from an incident or performance under this Agreement without regard to the cause or causes thereof or the negligence or fault (active or passive) of any Party or parties or whether based upon any theory of strict liability. In the event this indemnity is limited by any law, then the indemnity herein shall apply to the maximum extent allowed in the jurisdiction where the loss, damage, destruction, injury or death occurs.

(b)      Licensee hereby agrees to indemnify, defend and hold Licensor and Licensor's Affiliates and their respective officers, directors, employees, agent, stockholders and controlling persons and their respective successors and assigns harmless from and against any and all liabilities, losses, damages, demands, assessments, claims, costs and expenses (including interest, awards, judgments, penalties, settlements, fines, diminution in value, cost and expenses incurred in connection with investigating and defending any claims or causes of action (including, without limitation, attorneys' fees and expenses, and all fees and expenses of consultants and other professionals)) actually suffered, incurred or realized by such party arising out of, resulting from or relating to the use of the Technology by the Licensee Group, the threading, repair, conversion, sale or use of any Premium Connections on Products and Accessory Equipment by the Licensee Group, or for any breach of any covenant or agreement by Licensee hereunder except:

(i)      for the portion of any claim, demand, cause of action, loss or cost directly attributable to the willful misconduct of Licensor; and

(ii)     for the conditions of mutual indemnity of paragraph (a) above in this ARTICLE 9.

(c)      Licensee shall, and shall cause the other members of the Licensee Group to, obtain, maintain and provide Licensor with a copy of its certificates of insurance coverage for contractual and comprehensive general liability (including but not limited to product liability in connection with Premium Connections threaded or repaired by the Licensee Group, in an amount in no event less than U.S.$ 1,000,000.00 (one million Dollars). Such insurance shall be placed with reputable insurers, satisfactory to Licensor, and shall include Licensor as additional assured. The insurance policy must include a thirty (30) days cancellation clause in Licensor's favour, by means of which the insurer will give Licensor thirty (30) days prior written notice of any cancellation of the policy. All insurance coverage pertaining to the threading and repair of any Premium Connections by the Licensee Group shall fully extend to and protect Licensor and its Affiliates with respect to any Premium Connections threaded or repaired by the Licensee Group under this Agreement.  All deductibles included in the policy shall be assumed by Licensee.

(d)      Except to the extent (x) awarded by a court or arbitrator to a third party pursuant to a third-party claim relating to the use of the Technology by the Licensee Group, the threading, repair, conversion, sale or use of any Premium Connections on Products and Accessory Equipment by the Licensee Group or (y) reasonably foreseeable, neither Party shall be liable to the other Party for any special, consequential, incidental, exemplary or punitive damages, including, without limitation, loss of profits, revenue or business, whether such damages arises under contract, tort or otherwise.

## ARTICLE 10.   TERM AND TERMINATION

**Section 10.1      Term**

(a)      The term of this Agreement shall commence on and as of the Execution Date and, unless earlier terminated as expressly provided herein, shall expire upon the six (6)-year anniversary of the Effective Date; provided that such term may be extended by mutual written agreement of the Parties at any time on or prior to such six (6)-year anniversary date.

(b)      Notwithstanding anything herein to the contrary, the term of the licenses granted hereunder shall in no event extend beyond the expiration date of Patents or other intellectual property rights related to the Technology.

**Section 10.2      Lack of use of the Technology**

Beginning on the second Contract Year, Licensor shall be entitled to unilaterally terminate this Agreement if, in any given Contract Year, the Licensee Group shall fail to sell at least ten thousand (10,000) metric tons of Products on which Premium Connections have been threaded, repaired or converted.  In such case, Section 10.3 shall apply and Licensor shall not be required to pay any compensation or other amount to Licensee or to any other entity of the Licensee Group as a result of any losses suffered by Licensee or any other entity of the Licensee Group or otherwise in connection with Licensor's unilateral termination.

**Section 10.3      Completion of Pending Works by the Licensee Group**

In case of termination of this Agreement other than pursuant to Section 10.5, the Licensee Group shall be entitled to continue using the Technology following such termination, for a maximum additional term not to exceed six (6) months from delivery of the relevant Licensor termination notice, exclusively to complete any pending orders from its respective customers to the extent placed and accepted prior to receipt of the relevant termination notice; provided that, to benefit from the extension contemplated in this Section 10.3, Licensee must submit to Licensor, by not later than three (3) Business Days following delivery of the relevant Licensor termination notice, true and complete copies of such pending orders; it being understood, for the avoidance of doubt, that failure to submit such copies within such three (3)-Business Day period shall result in the immediate termination of any and all rights of the Licensee Group to continue using the Technology.

**Section 10.4      Insolvency**

Licensor shall be entitled to terminate this Agreement in the event any of Licensee or any other member of the Licensee Group controlling Licensee becomes bankrupt or insolvent, or enters into a composition with creditors, or if a receiver is appointed for all or majority of its assets, or if any petition or application for reorganization is filed by or against it; provided that Licensee shall not be discharged from any liability to Licensor for any amounts due at the time of termination or from antecedent liability and the licenses to Licensor shall continue in effect without impairment.

**Section 10.5      Termination for Default**

(a)      Except for a breach or failure to observe or perform Section 7.5 (which breach or failure shall be governed by Section 10.5(b) below), if either Party shall breach or fail to observe or perform any covenants, agreements, or undertakings under this Agreement in any material respect, and such breach or failure is incapable of being cured or, if capable of being cured, shall have not been cured by the failing or breaching Party within thirty (30) days after written notice thereof is given by the other (non-breaching) Party, then such other (non-breaching) Party may, upon expiration of such thirty (30)-day notice period, give the failing or breaching Party written

notice of termination of this Agreement either with immediate effect or with effect on and as of such future date as such other (non-breaching) Party may, in its discretion, designate in such termination notice.

(b)    Notwithstanding anything in this Agreement to the contrary, Licensor shall be entitled to terminate this Agreement with immediate effect (i) if Licensee or any other Licensee Group entity shall breach or fail to observe or perform any covenants, agreements, or undertakings under any of Subsection 2.1.5 (Restrictions), Section 4.1 (Delivery and Handling of Proprietary Documentation), Section 5.1 (Obligation to Mark), Section 12.1 (Economic Sanctions and Export Controls Compliance) or ARTICLE 16 (Business Integrity and Transparency – Conflict of Interests); and/or (ii) in the events or in the circumstances described in any of (v) the last sentence of Section 3.2(a) (Payments), (w) Section 6.8 (Material Breach of Maintenance and Non-Disclosure Obligation), (x) the proviso to Section 7.2(b) (Certification to Thread and Repair), or (y) the proviso to Section 7.5(b) (Quality Problems).

(c)    The Parties agree that, without prejudice to any indemnification rights they may be entitled to under this Agreement or applicable law, a non-breaching Party shall be entitled to injunctive relief enjoining a breaching Party's action in breach of this Agreement, and each Party agrees that it will not seek (and agrees to waive) any requirement for a non-breaching Party to secure or post a bond in connection with its seeking or obtaining such relief.

**Section 10.6    Change of Control**

This Agreement may be terminated by Licensor with immediate effect in the event that Licensee undergoes a Change in Control. For purposes of this Section 10.6, a "Change in Control" shall mean (i) any occurrence, event, transaction or series of transactions (including, without limitation, a merger, spin-off, scheme of arrangement or other corporate reorganization transactions) as a result of which Mr. Dmitry Aleksandrovich Pumpyanskiy ceases to own (directly, or indirectly through TMK Steel Holding Limited or one or more subsidiaries of Licensee) more than fifty percent (50%) of the voting shares or other equity interests in Licensee or otherwise ceases to hold (directly, or indirectly through TMK Steel Holding Limited or one or more subsidiaries of Licensee) the power to elect a majority of the members of the board of directors or equivalent body governing the affairs of Licensee.

**Section 10.7    Effect of Termination**

(a)    In the event of termination of this Agreement pursuant to any of Section 10.4, Section 10.5 or Section 10.6 or pursuant to ARTICLE 13, this Agreement shall become void and of no effect with no liability to any person on the part of any Party (or of any of its representatives or Affiliates); provided, however, that (a) no such termination shall relieve any Party of any liability for Losses of the other Party resulting from any breach of this Agreement prior to such termination and (b) the provisions set forth in this Section 10.7, and in each of Section 4.1, Section 4.2, ARTICLE 8, ARTICLE 11, ARTICLE 14 and ARTICLE 17 shall survive the termination of this Agreement.

(b)    Upon termination of this Agreement pursuant to any of Section 10.1, Section 10.4, Section 10.5, Section 10.6, ARTICLE 13 or otherwise, and except as permitted by Section 10.3 (if and to the extent applicable), (i) Licensee shall not, and shall cause the other entities of the Licensee Group not to, engage in the threading, repairing, conversion or sale of any Premium Connection, and Licensee shall not, and shall cause the other entities of the Licensee Group not to, use the Technology for any purposes whatsoever; and (ii) Licensee shall, and shall cause the other entities of the Licensee Group to, promptly return to Licensor all Gauges, Tooling and Technology, and to return to Licensor or destroy or delete (as directed by Licensor), all Proprietary Documentation and Confidential Information, including any and all hard or electronic

copies or abridgements thereof, in each case, which are in the possession or under the control of the Licensee Group.

### Section 10.8        Damages and Injunctions

The Parties acknowledge and agree that any unauthorized use (including use following expiration or termination of this Agreement) by the Licensee Group of the Technology shall result in immediate or irreparable damage to Licensor, which damage is not adequately compensable in money damages. For these reasons, the Parties expressly agree that an injunction may and should be issued to prevent and restrain such unauthorized use, and Licensee hereby waives and shall cause the other entities of the Licensee Group to waive, any defense it may have against the issuance of such injunction.

## ARTICLE 11.  NOTICES

All notices, consents, waivers, and other communications under this Agreement must be in writing and in the English language and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), provided that a copy is mailed by certified mail, return receipt requested, (c) sent by electronic mail or otherwise sent through the Tenaris Licensee Network, or (d) when received by the addressee, if sent by a recognized courier service (receipt requested), in each case to the appropriate addresses and facsimile numbers set forth below (or to such other addresses and facsimile numbers as a Party may designate by notice to the other Party):

If to **ULTRA PREMIUM SERVICES LLC.**

10120 Houston Oaks Drive,
Houston, Texas 77064,
USA.
**Attention:** VP for Research, Engineering and Product Development

**Telephone No.:** +1 (630) 8740078

**Facsimile No.:** +1 (630) 8746431

**E- mail:** Ddiederich@tmk-ipsco.com and
Denderle@tenaris.com

If to **PAO TMK**

40/2a, Pokrovka Street,
Moscow, 105062, Russian Federation.

**Attention:** S.A. Rekin

**Telephone No.:** +7 (495) 4115353

**Facsimile No.:** +7 (495) 7757601

**E-mail:** RekinSA@tmk-group.com

## ARTICLE 12.  APPROVALS

### Section 12.1        Economic Sanctions and Export Controls Compliance

(a)      Any and all activity directly or indirectly related to this Agreement, including, without limitation, any (i) license of technology, patent, trademark, trade name, know-how or any other intellectual property granted hereunder ("Licensed Items"), (ii) sale, lease or other disposition of Tooling and/or Gauges (or other item), or (iii) sale of goods incorporating any of such Licensed Items to any person; shall at all times be in strict conformity with all economic sanctions and export control laws and regulations applicable to any Party to this Agreement, including, without limitation, the U.S. Countering America's Adversaries Through Sanctions Act, or any executive order, directive or regulation pursuant to the authority thereof, including the regulations of the United States Department of the Treasury set forth under 31 CFR, Subtitle B, Chapter V, or any orders or licenses issued thereunder.

(b)      All Parties shall at all times be in compliance with all economic sanctions and export control regimes applicable to any party to a transaction related to this Agreement, including but not limited to the United Nations, United States, and European Union regimes. Licensee shall not make, and shall cause the other entities of the Licensee Group not to make, any disposition by way of sublicensing, transfer, trans-shipment, re-export, diversion or otherwise, of any (i) Licensed Items, Tooling, Gauges and/or other item licensed or otherwise provided hereunder, or (ii) Products, Accessory Equipment or other goods or technology incorporating any of the foregoing, except as said laws and regulations may expressly permit to Licensor, and no such disposition or transfer will be made other than to or within the Territory, as defined and specified in this Agreement.

(c)      Without limiting the generality of the foregoing, Licensee shall not, and shall cause the other entities of the Licensee Group not to, directly or indirectly, include or involve, or sell, provide, export, re-export, transfer, divert, loan, lease, consign, sublicense or otherwise release or dispose of any (i) Licensed Items, Tooling, Gauges and/or other item provided hereunder to, or (ii) Products, Accessory Equipment or other goods or technology incorporating any of the foregoing to, or (iii) otherwise involve in any capacity or for any purpose (including, for example, for payment or logistic purposes); any prohibited, sanctioned, or designated person or country with whom or which Licensor or any other Licensee Group entity is, or may at any time during the term of this Agreement be, prohibited to engage in business under the United Nations, United States, or European Union sanctions regimes (including, but not limited to, any person from time to time included on the list of *Specially Designated Nationals and Blocked Persons* administered by the U.S. Treasury Office of Foreign Assets Control or the European Union Assets Freeze List), or any entity owned or controlled directly or indirectly by any such prohibited, sanctioned, or designated person or country, as applicable, except as said laws and regulations may expressly permit to Licensor.

(d)      For the avoidance of doubt, Licensee represents and warrants that no Licensed Items, Tooling, Gauges or any Products or Accessory Equipment incorporating any of the foregoing will be used, whether directly or indirectly, in (i) the development, manufacture, use or storage of nuclear, biological or chemical weapons, or ballistic missiles systems, or by any military end-user, and/or (ii) any other prohibited activity, including, but not limited to, the support of terrorism and human rights abuses or violations.

(e)      Notwithstanding anything in this Agreement to the contrary, no provision in this Agreement shall be interpreted or applied so as to require any of Licensor or Licensee to do, or refrain from doing, anything which would constitute a violation of any economic sanctions and export control regimes applicable to such Party or to any of its Affiliates (including, in the case of Licensor, its parent entity Tenaris S.A. and any direct or indirect subsidiaries of Tenaris S.A.)

(f)      Upon Licensor's request, Licensee shall make available and shall cause the other entities of the Licensee Group to make available any and all documentation and information associated with this Agreement or any transaction relating to this Agreement (including, by way of example but not of restriction, any documents or information relating to the identities of all parties involved in the transaction, documents or information relating to any product, and any banking and payment information) to any bank, financial institutions or any other party that may be involved in some aspect of any transaction relating to this Agreement and that requires such information to satisfy itself of its compliance with legal and regulatory requirements, including economic sanctions and export control laws and regulations.

(g)      Upon Licensor's request, Licensee shall provide and shall cause the other entities of the Licensee Group to provide Licensor with an annual certification in the form of Schedule "K" hereto, stating the Licensee Group's compliance with the provisions of this Section

12.1; provided that Licensor may from time to modify such certification form to reflect any modifications in the economic sanctions and export control regimes mentioned therein.

(h)     Licensee shall reimburse and shall cause the other entities of the Licensee Group to reimburse each of Licensor, its Affiliates, any directors, officers or employees of any of Licensor or any of its Affiliates, and any bank, financial institutions or any other party that may be involved in some aspect of any transaction relating to this Agreement (collectively, the "Indemnified Parties") for, and release, defend, indemnify and hold harmless the Indemnified Parties against, any claim, demand, liability, investigation, fine or penalty, or any Loss or damage (including, without limitation, reasonable fees and expenses of counsel), imposed on, sustained or incurred by or asserted against any Indemnified Person in connection with or arising out of any failure of Licensee to comply with the provisions of this Section 12.1. Neither Licensor nor any of the Indemnified Parties shall have any liability to the Licensee Group or to any other person for, in connection with or arising out of any failure of Licensee to comply or cause the other entities of the Licensee Group to comply with the provisions of this Section 12.1.

### Section 12.2     Registration of the Agreement

Promptly upon execution and delivery of this Agreement, Licensee shall, if required by any applicable law, rule or regulation in the Territory, register this Agreement with the appropriate governmental departments, agencies, or offices within the Territory, and shall obtain all requisite approvals from governmental entities in the Territory. All rights granted by Licensor to Licensee and the other Licensee Group entities under this Agreement are granted in the understanding and on the condition that Licensee shall comply and shall cause the other entities of the Licensee Group to comply with all requirements and obligations under this Section 12.2.

### Section 12.3     Cooperation to Obtain Approvals and Licenses

Licensor and Licensee shall cooperate in obtaining any approvals or licenses which may be required in connection with the implementation of this Agreement or any portion thereof.

### Section 12.4     Third Party Beneficiary

Other than with respect to the payment of Royalties, Licensor's Affiliates shall be deemed to be a third-party beneficiary of this Agreement and shall be entitled to enforce their own rights and the rights of Licensor hereunder.

### ARTICLE 13.  FORCE MAJEURE

If the performance of this Agreement or any obligation under this Agreement, except payment of moneys due and maintenance of information and documents in confidence, is prevented, restricted or interfered with by acts of government, war, rebellion, riot, labor unrest, unavailability of materials, acts of God, or any other force, act or condition beyond the reasonable control of the Parties ("Force Majeure"), the Party affected by Force Majeure shall be excused from such performance to the extent of such prevention, restriction or interference, provided that the Party so affected promptly notifies the other Party of the Force Majeure condition, uses its reasonable commercial efforts to avoid or remove the Force Majeure condition, and continues performance under this Agreement with utmost dispatch when such Force Majeure condition is removed. In the event a Force Majeure condition results in suspension of performance under this Agreement for a continuous period of ninety (90) days or more, the Party not affected by the Force Majeure condition may terminate this Agreement by giving the affected Party written notice of termination.

## ARTICLE 14. GOVERNING LAW; DISPUTE RESOLUTION

**Section 14.1**      **Governing Law**

This Agreement, and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by, and enforced in accordance with, the laws of the State of New York, including its statutes of limitations, without giving effect to applicable principles of conflicts of law (whether of the State of New York or any other jurisdiction) to the extent that the application of the laws of another jurisdiction would be required thereby.

**Section 14.2**      **Dispute Resolution**

(a)      Any dispute, controversy, or claim between the Parties (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, the negotiation, execution, performance or breach of this Agreement, or its validity or termination, that may not be resolved through good faith negotiations between the Parties for a period not exceeding three (3) months following notice by one Party to the other that such a dispute, controversy or claim exists, shall be finally resolved by arbitration administered by the ICC. The arbitration shall be conducted in accordance with the General Rules, except as they may be modified herein or by written agreement of the Parties. The I.B.A. Rules of Evidence shall apply together with the General Rules governing any submission to arbitration under this Agreement. Where they are inconsistent with the General Rules, the I.B.A. Rules of Evidence shall control but solely as regards the presentation and reception of evidence. The arbitration tribunal shall consist of three (3) arbitrators. The place of arbitration shall be Paris, France. The arbitration proceedings shall be conducted in the English language. The arbitrators shall not be authorized to decide any dispute, controversy or claim *ex aequo et bono* or as *amiable compositeurs* but shall strictly apply the law governing this Agreement. The award rendered in any arbitration commenced hereunder shall be final, conclusive and binding upon the Parties, their successors and assigns, and judgment thereon may be entered in any court having jurisdiction for its enforcement. To the maximum extent that such right may be waived under applicable law, the Parties hereby irrevocably waive any right to seek an appeal or to otherwise prevent, hinder or delay enforcement of any arbitration award rendered pursuant to the above provisions. The Parties agree to maintain confidentiality as to all aspects of the arbitration, including its existence and results.

(b)      Each Party reserves the right to seek relief from any courts in any country or jurisdiction to (i) ensure the setting in motion of any arbitration proceedings pursuant to Section 14.2(a); (ii) obtain preliminary injunctive orders to protect rights before the constitution of the arbitration tribunal in any such arbitration proceeding, provided that no such act may be interpreted as a waiver by the Parties to the arbitration proceeding; (iii) seek any and all specific performance reliefs before the constitution of the arbitration tribunal or to file any necessary enforcement lawsuit; and (iv) enforce any arbitration award anywhere in the world.

## ARTICLE 15. ASSIGNMENT, SUBLICENSING AND SUB-CONTRACTING.

**Section 15.1**      **Assignment. No Sub-Licensing or sub-contracting by Licensee**

(a)      The licenses granted by this Agreement are personal to the Licensee and the other entities of the Licensee Group, and none of the Licensee or the other entities of the Licensee Group may assign such licenses or grant any sub-license thereunder or otherwise assign any right or delegate any obligation under or relating to this Agreement without the prior written consent

of Licensor (which may be withheld in Licensor's sole discretion). Licensor shall be entitled to assign this Agreement to any of its Affiliates at any time during the term of this Agreement.

(b)  With the prior written consent of Licensor (which may be withheld in Licensor's sole discretion), the Licensee Group may subcontract any of the works that the Licensee Group is entitled to perform under the licenses granted by this Agreement to a third party that is properly authorized and qualified by Licensor to perform the subcontracted work.

### ARTICLE 16.  BUSINESS INTEGRITY AND TRANSPARENCY – CONFLICT OF INTERESTS

(a)  Licensee will ensure and shall cause the other entities of the Licensee Group to ensure compliance with the general standards and principles of Tenaris's Code of Conduct for Suppliers (available at http://www.tenaris.com/en/AboutUs.aspx/CodeOfConduct) by each of the Licensee Group's agents, employees and subcontractors.

(b)  Licensee will comply, and cause the other entities of the Licensee Group and Licensee and such other entities' agents, employees and subcontractors to comply, with all anti-corruption laws applicable in the countries where the Agreement is entered into or performed, including the U.S. Foreign Corrupt Practices Act, the UK Bribery Act and the OECD Convention for Combating Bribery of Foreign Public Officials in International Business Transactions, as well as the laws, rules and regulations applicable in the Territory.

(c)  Licensee shall not, and shall cause the other entities of the Licensee Group not to, in connection with the performance, obligations or commitments contemplated in this Agreement, or in connection with any other business transactions involving Licensor, transfer, provide, pay or grant anything of value, directly or indirectly, to any Public Official, employee of a government-controlled company, or political party, or any Private Person in order to obtain any improper benefit or advantage. Licensee further warrants that no money paid to the Licensee Group as compensation or otherwise has been or will be used to pay any bribe or kickback in violation of applicable law. Licensee warrants that no payments will be made by the Licensee Group, its agents, employees, or subcontractors on behalf of Licensor without obtaining prior written approval from Licensor.

(d)  Licensee shall maintain, and promptly upon Licensor's request, give Licensor access to, complete and accurate records identifying the amount and the recipient(s) of any payments made by the Licensee Group on Licensor's behalf, and provide to Licensor true and complete copies of such records. At no time shall any such payment be made by Licensee or any other entity of the Licensee Group, or by any of their respective agents, employees or subcontractors, to any undisclosed third party.

(e)  Licensee warrants that its and each of the other Licensee Group entities' owners, employees, agents and subcontractors are not agents, employees or otherwise affiliated with any government or instrumentality of any government, and that Licensee will inform Licensor of any change in such status.  Licensee agrees to answer promptly, fully, and truthfully any questions from Licensor related to the Licensee Group's anti-corruption program and other controls related to corruption, and to cooperate fully in any Licensor's or its Affiliate's investigation of a breach of this anti-corruption provision.

(f)  Licensor reserves the right to audit the Licensee Group's compliance with the terms of this anti-corruption provision at any time and from time to time.

(g)  Licensee shall allow and shall cause the other entities of the Licensee Group to allow Licensor to carry out background checks or due diligence investigations on Licensee or any other entity of the Licensee Group or their respective agents, employees or subcontractors

performing any services or activities in connection with the Agreement, whenever Licensor deems it appropriate or necessary. In addition, Licensee shall update the information provided to Licensor whenever any changes may cause such information to be false, inaccurate or incomplete.

(h)　　Licensee will monitor compliance by it, by the other entities of the Licensee Group, and by its and their respective agents, employees or subcontractors with the anti-corruption obligations assumed under this Agreement and will disclose in writing to Licensor details of any breach or suspected breach of the anti-corruption obligations assumed under this Agreement promptly after learning of such breach. Licensee further agrees that if subsequent developments cause any of the representations herein to become inaccurate or untrue, Licensee will immediately so advise Licensor.

(i)　　Whenever Licensee fails to comply or to cause the other Licensee Group entities to comply with this ARTICLE 16, Licensor shall be entitled to terminate the Agreement pursuant to Section 10.5(b).

## ARTICLE 17.  MISCELLANEOUS

### Section 17.1　　Severability

The Parties expressly agree that it is not their intention to violate any public policy, statute or common law rule; and if any provision(s) of this Agreement shall be held to be invalid, illegal or unenforceable, in whole or in part, in any jurisdiction within which the Agreement is to be performed, or if any appropriate government agency or authority shall require the Parties to delete any provision of this Agreement, such invalidity, illegality, enforceability or deletion shall not impair or affect the remaining provisions of this Agreement. The Parties shall endeavor in good faith negotiations to replace the invalid, illegal, unenforceable or deleted provisions by valid provisions, the effect of which comes as close as legally possible to the intention of the Parties on the date of execution of this Agreement, provided, however, that the Parties shall be entitled to terminate the Agreement pursuant to Section 10.5(b) should any material provision of the Agreement be held to be invalid, illegal or unenforceable in whole or in part.

### Section 17.2　　Non Waiver

The failure of any Party hereto to enforce at any time any of the provisions of this Agreement, or exercise any rights or any elections herein provided, shall in no way be considered to be a waiver of such provisions, rights or elections or in any way to affect the validity of this Agreement.  The exercise by such Party of any rights or any elections under this Agreement shall not preclude or prejudice such Party from exercising the same or any other rights or elections it may have under this Agreement.

### Section 17.3　　Entire Agreement

This Agreement contains the entire Agreement between the Parties relating to the matters contemplated herein and has been entered into relying only upon the provisions contained herein and not upon any other representation by either of the Parties. This Agreement supersedes all representations, agreement, statements and understandings, whether written or oral, relating to such matters made prior to execution of this Agreement.  This Agreement may not be amended, modified or supplemented except as agreed in a writing executed by both Parties.

### Section 17.4　　Choice of Language

This Agreement has been prepared in the English language and, notwithstanding any translation of this Agreement into any other language, the English version of this Agreement shall control in all respects.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, each Party has caused this Agreement in multiple originals to be subscribed by duly authorized representative on the Effective Date.

ULTRA PREMIUM SERVICES L.L.C.

By: _____

Name: P. D. GAZITZINE

Title: CHAIRMAN & CEO

Date: JAN 2, 2020

PAO TMK

By: _____

Name: Vadim Shmatovich

Title: VP, TMK

Date:

**LIST OF SCHEDULES**

| SCHEDULE | A | DEFINITIONS |
|---|---|---|
| SCHEDULE | B | FACILITIES |
| SCHEDULE | C | ROYALTIES |
| SCHEDULE | D | CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT |
| SCHEDULE | E | EMPLOYEE |
| SCHEDULE | F | SUPPLY OF TOOLING AND GAUGES - GENERAL TERMS AND CONDITIONS |
| SCHEDULE | G | WARRANTY TO CUSTOMERS |
| SCHEDULE | H | PATENTS |
| SCHEDULE | I | LIST OF LICENSED CONNECTIONS |
| SCHEDULE | J | TRADEMARKS |
| SCHEDULE | K | COMPLIANCE CERTIFICATION |

Unofficial Copy Office of Marilyn Burgess District Clerk

**Schedule "A"**

## DEFINITIONS

"Accessory Equipment" shall mean the threaded items necessary to complete a well to produce oil and gas, such as crossovers, connectors, pup joints, liner hangers, landing nipples, packers, packer stringers, end line pressure control equipment, safety valves, gas lift valve mandrels, lift plugs, lift caps, hydrostatic test plugs, hydrostatic test caps, handling plugs, handling caps, discharge head hangers, float shoes, float guides, float collars, collars, blast joints, tubing anchors, side pocket mandrels, flow couplings, threaded couplings and similar equipment as defined in API Standards series 5, latest edition, but excluding the items casing and tubing.

"Action" means any civil, criminal, administrative or regulatory action, suit, demand, claim, complaint, litigation, investigation, review, audit, formal proceeding, arbitration, hearing or other similar proceeding or dispute.

"Activity Report" means the report to be issued by Licensee informing the Premium Connections Threaded or Repaired by the Licensee Group in accordance with Section 3.5 of this Agreement.

"Affiliate" means and includes (i) when used with reference to PAO TMK, a company organized under the laws of the Russian Federation, and its direct and indirect subsidiaries (whether now existing or from time to time incorporated or organized) as well as any partnership, joint venture, limited liability company, corporation, trust, or other entity controlled by Dmitry Aleksandrovich Pumpyanskiy or his heirs or assigns; and (ii) when used with reference to Licensor, Tenaris S.A., a company organized under the laws of the Grand Duchy of Luxembourg, and its direct or indirect subsidiaries (whether now existing or from time to time incorporated or organized.) For purposes of this Agreement, the term "subsidiary" means, when used with reference to an specific person, any partnership, limited liability partnership, joint venture, corporation, limited liability company or other legal entity that is controlled by such person, and the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a partnership, limited liability partnership, joint venture, corporation, limited liability company or other legal entity, whether through the ownership of voting shares or other securities, by contract or otherwise.

"Agreement" means this Premium Connections Technology License Agreement.

"Authorized Facility" has the meaning set forth in Section 2.3(a), and includes the Licensee Group's facilities listed in Schedule "B" hereto, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the provisions of this Agreement.

"Authorized Licensee Employee" has the meaning set forth in Section 4.1(a).

"Business Day" means any day other than (a) a Saturday or a Sunday or (b) a day on which banking and savings and loan institutions are authorized or required by law to be closed in New York City, New York, United States of America or in the city of Moscow, Russian Federation.

"Change in Control" has the meaning set forth in Section 10.6.

"Confidential Information" has the meaning set forth in Section 4.2(a).

"Content" means all tangible representations of the Technology.

"Contract Year" means the period of (12) twelve calendar months beginning on January 1 and ending on December 31 of each calendar year for the entire duration of the term of this Agreement, except that (x) the first Contract Year shall commence on the Effective Date and end of December 31, 2020 and (y) the last Contract Year shall commence on January 1 of the calendar

year in which the term of this Agreement shall expire and end on the date of expiration of the term of this Agreement.

"convert" and "conversion" means removing an existing thread (API, Semi Premium, or Premium) on any Products or Accessory Equipment and replacing it with a different thread (no longer the same connection as the original) of a licensed Premium Connection.

"Defending Party" has the meaning set forth in Section 2.2(e).

"Disclosing Party" has the meaning set forth in Section 4.2(a).

"Dollars," "U.S. Dollars," "U.S.$," or "$" means lawful currency of the United States of America.

"Filings" means and includes any notices, notifications, reports, applications or other filings required to be or that can be made to or with any governmental entity, including any administrative or regulatory authority, agency, commission, body, court or other governmental or quasi-governmental entity and any supranational body.

"Force Majeure" has the meaning set forth in ARTICLE 13.

"Gauges" means Licensor's or its Affiliate's proprietary gauges and gauge tools necessary for the Licensee Group to thread, repair or convert Premium Connections on Products and Accessory Equipment pursuant to the licenses granted hereunder.

"Gauge Rental Report" means the report to be issued by Licensee informing the quantity of gauges delivered by Licensor to the Licensee Group and those returned by the Licensee Group in accordance with Section 3.5.

"General Rules" means ICC's Rules of Arbitration in effect at the time of an arbitration in accordance with Section 14.2.

"ICC" means the Court of Arbitration of the International Chamber of Commerce.

"Improvements" has the meaning set forth in Section 6.10(a).

"Indemnified Parties" has the meaning set forth in Section 12.1(h).

"Licensee" means PAO TMK.

"Licensee Group" means and includes each of PAO TMK and any direct and indirect subsidiaries of PAO TMK, whether now existing or from time to time incorporated or organized; and any reference to an "entity of the Licensee Group" or a "Licensee Group entity" shall be a reference to any of the foregoing (indistinctly) and any reference to the "entities of the Licensee Group" or the "Licensee Group entities" shall be a reference to all of the foregoing (indistinctly)

"Licensed Items" has the meaning set forth in Section 12.1(a).

"Licensor" means ULTRA Premium Services L.L.C.

"Losses" has the meaning set forth in Section 6.4(b).

"Non-Defending Party" has the meaning set forth in Section 2.2(e).

"Parties" means Licensee and Licensor.

"Party" means either Licensee or Licensor.

"Patents" means those patents and patent applications described in Schedule "H" which protect one or more technical features of Premium Connections, and their equivalents and extensions in other countries, and future patents and patent applications to the extent added as provided in this Agreement.

"<u>Pipe Joint</u>" means full length pipe meeting the length requirements of Range 2 or Range 3 as defined in API 5CT.

"<u>Premium Connections</u>" means the current line of Premium and Semi-Premium Connections described in <u>Schedule "I"</u> hereto and any improvements thereto as may be added in the future.

"<u>Products</u>" means full length tubular products manufactured by the Licensee Group.

"<u>Proprietary Documentation</u>" means any drawing or document, in either man-readable or machine-readable form, or any tangible thing which is the property of Licensor, including without limitation, all price lists, discount sheets, customer lists, supplier lists, quotations, analytical data, market data, engineering data, drawings, computer software, manuals, specifications, standards, designs, plans, methods, procedures, samples, materials, techniques, formulations, instruments, overlays for insert and product inspection, CNC programmes and other business and technical information in tangible form which are the property of Licensor.

"<u>Receiving Party</u>" has the meaning set forth in <u>Section 4.2(a)</u>.

"<u>repair</u>" means re-cutting a worn or damaged thread for Premium Connections on Products and Accessory Equipment and replacing it with a new thread of the identical thread previously removed.

"<u>Revocation Notice</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Revoked Facility</u>" has the meaning set forth in <u>Section 2.3(c)</u>.

"<u>Security File</u>" means a file which can be securely locked by the Licensee Group.

"<u>Taxes</u>" has the meaning set forth in <u>Section 3.3</u>.

"<u>Technical Specialist Fee</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Technology</u>" means all current (and future to the extent provided in this Agreement) systematic techniques, methods or approaches to solve problems, which Licensor has the right to license in the Territory and which is reasonably necessary for the Licensee Group to thread, repair or convert Premium Connections on Products and on Accessory Equipment, including Licensor's technical information, industrial processes, Patents, procedures, specifications, standards, drawings, trade secrets, know-how, manuals, Proprietary Documentation and other Confidential Information relating to any of the foregoing.

"<u>Territory</u>" means the territory of the Russian Federation and the Republic of Kazakhstan.

"<u>Third-Party Claim</u>" has the meaning set forth in <u>Section 2.2(d)</u>.

"<u>Third-Party Infringement</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

"<u>thread</u>" and "<u>threading</u>" means the processes of cutting threads embodying the Technology and Patents licensed hereunder on a plain-end pipe.

"<u>Tooling</u>" means tooling and accessories made to a Party's specification (either by a Party hereto or any other person) for use in the threading, repair or conversion of Premium Connections on Products and Accessory Equipment in accordance with a Party's Technology or Patents, including, without limitation, thread form inserts, groove tools, Teflon seal rings, thread protectors and roller markers.

"<u>Trademarks</u>" means those current trademarks and trade names listed in <u>Schedule "J"</u> hereto and any future trademarks and trade names that may identify Premium Connections, both registered and unregistered.

## SCHEDULE "B"

### AUTHORIZED FACILITIES

1. "Volzhsky Pipe Plant", Joint stock company, address: Russian Federation, 404119, Volzhsky, Volgograd Region, 7th Autoroad, 6.

2. "Taganrog Metallurgical Plant", Public Joint stock company, address: Russian Federation, Taganrog, ul. Zavodskya, 1

3. TMK NGS-Nizhnevartovsk Joint stock company, address: Building 1, Nizhnevartovsk pipe maintenance facility, Samotlorsk oil-field, Khanty-Mansi Autonomous Okrug - Yugra, Russian Federation, 628637

4. "Sinarsky Pipe Plant", Public Joint stock company, address: Russian Federation, 623401, Sverdlovsk region, Kamensk-Uralsky, Zavodskoy proezd, 1

5. "Orsky Machine Building Plant", Joint stock company, address: Russian Federation 462431, Russian Federation, Orenburg Region, Orsk, Krupskaya street, 1

6. "TMK-Kaztrubprom" LLC, address: The Republic of Kazakhstan, Uralsk, st. Ruzheinikova, 11

**Schedule "C"**

**ROYALTIES**

In consideration of the licenses granted hereby by Licensor to the Licensee Group, Licensee shall pay Licensor:

a)  <u>Products</u>: a royalty fee equal to two percent (2%) of the sales price to customers (net of value added or similar Taxes but without deduction for any discounts for volume or otherwise) of the Products on which Premium Connections have been threaded, repaired or converted and sold by Licensee or any other entity of the Licensee Group, and

b)  <u>Accessory Equipment</u>: a royalty fee equal to the higher of (i) two percent (2%) of the sales price to customers (net of value added or similar Taxes but without deduction for any discounts for volume or otherwise) of the Accessory Equipment on which Premium Connections have been threaded, repaired or converted and sold by Licensee or any other entity of the Licensee Group, and (y) U.S.$ 75.00 (seventy-five Dollars) per Accessory Equipment end threaded, repaired or converted with Premium Connections.

**Schedule "D"**

## CONFIDENTIALITY AND INVENTION ASSIGNMENT AGREEMENT

This AGREEMENT is by and between_____ ("EMPLOYER") and each employee of EMPLOYER designated on the attached Schedule E ("EMPLOYEE") who has signed Schedule E.

To enable EMPLOYEE to perform certain work connected with his/her employment with EMPLOYER, it shall be necessary to disclose to EMPLOYEE valuable confidential information which belongs to ULTRA Premium Services L.L.C. or its Affiliates, a licensor or supplier of EMPLOYER and a third-party beneficiary of this AGREEMENT. EMPLOYEE hereby acknowledges that he/she has been informed of the valuable and confidential nature of this information. In consideration of EMPLOYEE's continued employment by EMPLOYER and the disclosure to EMPLOYEE of such valuable confidential information, and other good and valuable consideration, EMPLOYEE hereby agrees not to disclose any of this information to any third party or to any other employee of EMPLOYER unless that employee has proper need-to-know the same and has executed a similar written Confidentiality Agreement obligating that employee not to make any unauthorized use or disclosure of the information. EMPLOYEE also agrees not to use any of this information except in connection with the threading and repair of Premium Connections, pursuant to that certain Premium Connections Technology License Agreement between EMPLOYER and ULTRA Premium Services L.L.C dated _.

EMPLOYEE agrees to promptly disclose and assign to EMPLOYER or its nominee any and all inventions whether or not patentable made or conceived by him/her either solely or jointly with others which result from or relate to the work done by EMPLOYER pursuant to the aforementioned Premium Connections Technology License Agreement, and which arise from the disclosure to EMPLOYEE of the information belonging to ULTRA Premium Services L.L.C or its Affiliates. EMPLOYEE further agrees to do all lawful acts reasonably necessary to enable EMPLOYER or said nominee to obtain, maintain and enforce patents for such inventions in the United States or other countries.

EMPLOYEE shall be liable and responsible for any loss or damage to any confidential information while such is in the possession of EMPLOYEE.

Date: _____

UNDERSTOOD AND AGREED TO:   EMPLOYER

_____

Employer's Name

By: _____

Title: _____

Unofficial Copy Official Purchased Document

**Schedule "E"**

**EMPLOYEE**

Signature _____     Signature _____

Print Name _____     Print Name _____

Signature _____     Signature _____

Print Name _____     Print Name _____

Signature _____     Signature _____

Print Name _____     Print Name _____

Signature _____     Signature _____

Print Name _____     Print Name _____

Signature _____     Signature _____

Print Name _____     Print Name _____

Signature _____     Signature _____

Print Name _____     Print Name _____

Signature _____     Signature _____

Print Name _____     Print Name _____

Unofficial Copy Office of Marilyn Burgess District Clerk

**Schedule "F"**

## SUPPLY OF TOOLING AND GAUGES - GENERAL TERMS AND CONDITIONS

### 1.DEFINITIONS

"Affiliate", of any specified person, any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct the management and policies of such person directly or indirectly, through the ownership of voting securities or the right to elect the majority of the members of the board of directors of such person; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement", the contract or arrangement relating to a single sale and/or supply transaction, and/or service agreement binding the Parties upon Client's acceptance of Supplier's offer or quotation, or express or implied acceptance (as provided herein) of the Order Acknowledgement.

"Client", the person to whom the Tooling and/or Gauges are provided under the Agreement, including its successors and assigns.

"Gauges", the gauges and gauge tools necessary to thread and repair connections on full length products and accessory equipment.

"ICC", the International Chamber of Commerce.

"Order", the document issued by Client requesting the supply of Tooling and/or Gauges for Client.

"Order Acknowledgment", the acknowledgment form containing these Terms delivered by Supplier to Client in response to an Order, which, if not rejected by Client within five (5) business days from receipt by Client, shall render the Agreement binding on the Parties and subject to these Terms.

"Parties", collectively, Client and Supplier.

"Supplier", the person identified in the offer or quotation, or named in the Order Acknowledgement or an Affiliate that will supply the Tooling and/or Gauges under the Agreement, including its successors and assigns.

"Terms", these general terms and conditions for the supply of Tooling and/or Gauges.

"Tooling", means tooling and accessories made to the Client's specification for use in threading or repair connections on full length products or accessory equipment including without limitation thread form inserts, groove tools, Teflon seal rings, thread protectors and roller markers.

### 2.ENTIRE AGREEMENT

The Agreement (together with the Premium Connections Technology License Agreement to which a form of this Agreement is attached) represents the entire agreement of the Parties in relation to the sale of Tooling and/or Gauges, and supersedes any and all prior agreements with respect to the subject matter thereof. Client's acceptance of Supplier's offer or quotation containing these Terms, or receipt of an Order Acknowledgement without giving written objection thereto within five (5) business days from receipt of the same shall constitute acceptance by Client of the Terms. No representations other than those set forth in the Terms shall be deemed made.

Any conflicting terms contained in any written document (including any correspondence), unless incorporated herein by a written addition hereto expressly accepted by Supplier or a document signed by Supplier making reference to this clause, shall be of no force or effect and these Terms shall apply.

### 3.APPLICABILITY

These Terms shall apply to all sales of Tooling and/or Gauges agreed with Client, unless expressly provided otherwise in writing.

4. DELIVERY

Supplier will deliver the Tooling and/or Gauges in accordance with the Incoterm 2010 mutually agreed by the Parties. Supplier will comply with the delivery terms agreed in the Agreement. In the event that it becomes impossible to deliver the Tooling and/or Gauges within the agreed terms due to material problems affecting production, the Parties shall make their best efforts to agree on new delivery terms taking into consideration the abovementioned problems.

5. RISK AND TITLE TO THE TOOLING AND/OR GAUGES

Client will become responsible for the risk of loss or damage to the Tooling and/or Gauges upon delivery of the Tooling and/or Gauges in accordance with Article 4 of these Terms.

6. TRANSFER AND RETENTION OF TITLE

Title to the Tooling and/or Gauges will pass from Supplier to Client upon full payment of the Tooling and/or Gauges by Client in accordance with Article 7 of these Terms. Supplier shall retain title to the Tooling and/or Gauges sold or delivered until they have been paid in full by Client. Accordingly, all Supplier's sales are always made subject to the condition precedent of payment of the price in full and coupled with retention of title, Client nonetheless bearing the risk of loss, liability or other risks of the Tooling and/or Gauges as provided in the Agreement and in Incoterms 2010 and consequently having to insure those risks.

The remittance of a letter of credit or other commercial paper does not constitute payment in full.

Until such time as the property in the Tooling and/or Gauges passes to Client,

Client shall hold the Tooling and/or Gauges as Supplier's fiduciary agent and bailee.

In the event of non-payment, and without prejudice to late charges as provided for herein, Supplier may demand, by registered letter, return receipt requested, the restitution of the delivered Tooling and/or Gauges at the cost and risk of Client.

In default of immediate discharge by Client of its obligation to return the Tooling and/or Gauges, Client may be compelled to do so by summary order authorizing Supplier to repossess the Tooling and/or Gauges to which Supplier retains title at Client's premises or elsewhere at Client's sole expense. Should this retention of title provision be invalid under the law of the country in which the Tooling and/or Gauges are situated, such protection for Supplier as in that country corresponds to the above retention of title provision shall be deemed to have been agreed upon. Client shall take all measures necessary for such protection for Supplier to come into effect and/or be maintained.

7. PAYMENT

Except as otherwise provided in the Agreement, Supplier shall invoice Client upon delivery of the Tooling and/or Gauges, and Client will pay the invoice within thirty (30) days of receipt of Supplier's invoice. Any amounts owed hereunder by Client shall be paid by wire transfer, in immediately available funds, to the bank account designated by Supplier in the invoice.

Supplier shall at all times be entitled to require from Client all the payment guarantees it may deem necessary.

Supplier shall be entitled to (i) terminate totally or partially its obligation under the Agreement and any other agreements with Client and/or (ii) suspend totally or partially deliveries of Tooling and/or Gauges under the Agreement and any other agreements with Client. For such purposes, Supplier will give Client written notice of termination and/or suspension, which shall become

effective if Client does not remedy its default within five (5) working days from receipt of Supplier's notice.

In the event of any claim or legal action brought by Client for any cause whatsoever, Client shall have no rights of retention of set-off.

## 8. TAXES

All payments by Client to Supplier under the Agreement shall be made free of any and all taxes (including VAT), which shall be borne by Client. In the event that any withholding or deduction from any payment to be made by Client is required in respect of any taxes, then Client shall:

(a)     pay to the relevant authority the full amount required to be so withheld or deducted and;

(b)     pay to Supplier such additional amounts necessary to ensure that the net amount actually received by Supplier shall be equal to the full amount Supplier would have received had no such withholding or deduction been required.

## 9. WARRANTY

Supplier warrants that the Tooling and/or Gauges manufactured by Supplier or its Affiliates will be free from defects in materials and workmanship for a period of twelve (12) months from delivery. Supplier ensures that the Tooling and/or Gauges will meet the requirements of specifications set forth in the Agreement.

EXCEPT FOR THE WARRANTIES CONTAINED HEREIN, NEITHER SUPPLIER NOR ITS AFFILIATES MAKE ANY OTHER WARRANTIES, INCLUDING THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY OR, RESULT. THE WARRANTIES CONTAINED IN THIS ARTICLE ARE IN LIEU OF ALL OTHER WARRANTIES, TERMS, REPRESENTATIONS, GUARANTEES OR LIABILITIES, WHETHER ORAL, WRITTEN, EXPRESS, IMPLIED OR STATUTORY, AND SUCH OTHER WARRANTIES, TERMS, REPRESENTATIONS, GUARANTEES OR LIABILITIES, AT COMMON LAW, IN CONTRACT, IN TORT, OR OTHERWISE (INCLUDING, WITHOUT LIMITATION, STRICT PRODUCT LIABILITY AND NEGLIGENCE) ARE DISCLAIMED. SUPPLIER AND ITS AFFILIATES' WARRANTY OBLIGATIONS HEREUNDER, AND CLIENT'S REMEDIES (EXCEPT AS TO TITLE) ARE SOLELY AND EXCLUSIVELY AS STATED IN THIS ARTICLE.

Client shall give notice to Supplier within five (5) days from the date of discovery of a hidden defect or from the date on which a diligent purchaser should have discovered the hidden defect; and within fifteen (15) days from the date of delivery of the Tooling and/or Gauges in case of patent defects. Failure by the Client to give written notice within the aforesaid period shall release Supplier from any liability thereof.

Liability of Supplier under this warranty shall be limited to repair, replacement or refund of the purchase price of the defective Tooling and/or Gauges.

Supplier further warrants all corrective actions it performs against defects in material or workmanship for a period of twelve (12) months from the date of the applicable repair or replacement.

Tooling and/or Gauges not manufactured by Supplier is guaranteed in the manner and to the extent guaranteed by the actual manufacturer, and then only to the extent that Supplier is able, reasonably, to enforce it.

Neither Supplier nor its Affiliates shall have any warranty obligations with respect to any Tooling and/or Gauges, or part thereof, which: (i) is normally consumed in operation, (ii) has a normal life inherently shorter than the warranty period specified herein, (iii) is not properly stored, installed, maintained or repaired, or is modified other than pursuant to Supplier's instructions or

approval, or (iv) has been subjected to any other kind of detrimental exposure, or has been involved in an accident for which Supplier could not be responsible.

## 10. TERMINATION FOR DEFAULT

If Supplier fails to commence actions to remedy any default of its material obligations under the Agreement within thirty (30) days from written notice given by Client, then Client may terminate the Agreement without penalty and/or liability except for amounts payable in respect of Tooling and/or Gauges previously supplied to Client.

In the event that Client experiences financial difficulties, becomes insolvent or is put into liquidation, Supplier will be entitled to immediately terminate all Agreements with Client by giving it written notice of termination.

Any legal action arising from the Agreement, based on any grounds whatsoever, must be brought by Client within twelve (12) months from the date of delivery of the respective Tooling and/or Gauges.

## 11. LIABILITIES AND INDEMNITIES

Supplier's liability for damages, costs, and expenses and losses however arising from or related to the fulfillment or the non-fulfillment of the Agreement, whether in contract, law or tort, shall be limited to the compensation of direct damages, costs, expenses and losses and such compensation shall be limited to one hundred percent (100 %) of the value of the Agreement.

Neither Party shall be liable for damages for loss of profits, income, revenue or production, nor any indirect, special, punitive, exemplary or consequential damages (including, but not limited to, loss of goods, cost of capital, cost incurred in connection with labor, overhead, general administration, transportation, substitute facilities, supply sources) or other similar damages, whether any such liability would be based on contract, tort, equity or otherwise.

The Parties´ liability and their remedy and relief for all matters arising by virtue of their performance or non-performance of the Agreement (including the failure to supply conforming Tooling and/or Gauges) shall be limited exclusively to the express conditions contained in these Terms. Any other rights not expressly provided herein, such as, but not limited to, rights of cancellation, termination, restitution or price reduction and any claims for damages irrespective of their grounds (including, but not limited to, tort, breach of contract, and negligence) or nature, shall be deemed excluded.

Should the Tooling and/or Gauges be subjected to transformation including mechanical and technical procedures other than by Supplier or any of its Affiliates, Client shall defend and hold harmless Supplier and its Affiliates form, against, for and in respect of (i) any loss, liability, claim, damage (including consequential or incidental) asserted or incurred by, Client or a third party by reason of any defects in the Tooling and/or Gauges attributable to any act or omission of Client and (ii) any claim, loss, liability, damage (including consequential or incidental) asserted against Supplier (including any of its Affiliates) by any third party in excess of the limitations of liability set forth under these Terms. If Supplier (including its Affiliates) receives a claim which Client is obligated to provide indemnification under this Article, Supplier shall notify Client of such claim and Client shall provide Supplier or the relevant Affiliate with the sums necessary to discharge the amounts payable by Supplier or its relevant Affiliate (including legal fees and all expenses and costs related thereto).

The limitations and exclusions of liability hereunder shall extend to Supplier's Affiliates (including their subcontractors).

## 12. ASSIGNMENT AND SUBCONTRACTING

Supplier may assign, license or subcontract to any of its Affiliates all or any part of the Agreement without Client's consent, provided Supplier remains liable as primary obligor under the Agreement. Client may not assign or in any way dispose of the Agreement without the prior written consent of Supplier.

## 13. ECONOMIC SANCTIONS AND EXPORT CONTROL COMPLIANCE

All activity including any sale hereunder shall at all times be in strict conformity with all applicable economic sanctions and export control laws and regulations.

All parties shall at all times be in compliance with all economic sanctions and export control regimes applicable to any party to a transaction hereunder, including but not limited to the United Nations, United States, and European Union regimes. Client shall not make any disposition by way of trans-shipment, re-export, diversion or otherwise, of products, technology or any other item to be supplied hereunder except as said laws and regulations may expressly permit to Supplier, and no such disposition or transfer will be made other than to the ultimate country of destination specified in the Purchase Order and/or as declared as the country of ultimate destination on Supplier's invoice. Upon request Client shall provide Supplier with a Certification of End Use that specifies the precise location, project, and type of application of the items provided by Tenaris.

Without limitation of the foregoing, Client shall not, directly or indirectly, include or involve, or sell, provide, export, re-export, transfer, divert, loan, lease, consign, or otherwise release or dispose of any products, technology or any other item to be supplied hereunder to, or otherwise involve in any capacity, including but not limited to, the payment or logistics side of the transaction, including banks, shippers, forwarders, or intermediaries, any prohibited, sanctioned, or designated party and/or country under the United Nations, United States, or European Union sanctions regimes, including but not

limited to parties on the List of Specially Designated Nationals and Blocked Persons administered by the U.S. Treasury Office of Foreign Assets Control or the European Union Assets Freeze List, or any entity owned or controlled by such prohibited, sanctioned, or designated party and/or country, as applicable, except as said laws and regulations may expressly permit to Supplier.

In addition, Client confirms that the abovementioned products, technology and/or other items to be supplied hereunder will be used by end-users for operations in oil or gas fields. For the avoidance of doubt, Client represents and warrants that none of any such products, technology and/or items will be used whether directly or indirectly, in (i) the development, manufacture, use, storage, of nuclear, biological or chemical weapons, or of ballistic missiles systems, or by any military end user, and/or (ii) any other prohibited activity, including, but not limited to, the support of terrorism and human rights abuses.

Notwithstanding anything to the contrary in any offer, Agreement or any Purchase Order, no provision shall be interpreted or applied so as to require Supplier or Client to do, or refrain from doing, anything which would constitute a violation of any economic sanctions and export control regimes applicable to any party to the transaction.

Client hereby agrees that any and all documentation associated with this Tender or any resulting Contract, Purchase Order, the identities of all parties involved, Product information, and banking and payment information shall be made available upon request to financial institutions or any other party that may be involved in some aspect of transactions hereunder and that requires such information to satisfy itself of its compliance with legal and regulatory requirements, including economic sanctions and export control laws and regulations.

Any act or omission or failure of Client to act in compliance with the foregoing that results in Supplier, including its Affiliates,

or any of the parties involved in the transaction ("<u>Indemnified Parties</u>") being subject to any investigation by any governmental or other authority or finding of violation of applicable laws, including, without limitation, the imposition of fines and penalties, Client shall reimburse all Indemnified Parties for and release, defend, indemnify and hold harmless the Indemnified Parties (including banks involved) against any claim, demand, liability, loss or damage imposed by the applicable governmental or other authority arising out of such an action, omission or failure to act or as a result of Client's breach of its obligations under this article. Neither Supplier nor any of the Indemnified Parties assume any liability to Client or to any other person for Client's acts of non-compliance with export control laws, sanctions, restrictive measures and embargoes.

## 14. SEVERABILITY

If any term or provision of the Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of the Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated thereby is not affected in any adverse manner to either Party hereto. Upon determination that any term or provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify the Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner, to the end that the transactions contemplated in the Agreement may be fulfilled to the extent possible.

## 15. DISPUTE RESOLUTION / GOVERNING LAW

ARTICLE 14 of the Premium Connections Technology License Agreement is incorporated by reference herein, *mutatis mutandis*.

**Schedule "G"**

**Warranty to Customers**

Licensee warrants that all Materials delivered under this Order shall conform to the specifications and descriptions listed on the face side hereof or if none are listed, then to Licensee standard specifications for such Materials. The foregoing warranty shall continue in effect until such Materials are accepted or the time period to inspect the same expires, whichever shall first occur. Except for the warranty just given, Licensee HEREBY DISCLAIMS ALL OTHER WARRANTIES OF EVERY KIND AND CHARACTER WHETHER EXPRESS OR IMPLIED, INCLUDING THOSE RELATING TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR INTENDED USE. Any misuse of Materials or the improper application or alteration thereof after delivery by Licensee shall be at the Buyer's risk and expense. Provided, however, in the event the Buyer timely rejects any Materials which fail to conform to the specifications and descriptions of this Order, then Licensee shall have the option either to replace such Materials at its sole cost and expense or to give the Buyer credit as to the price therefor. Unless specifically stated in this Order to the contrary, Licensee shall not be liable for any transportation, installation, fabrication, inspection, testing or other expenses incurred by the Buyer or its customers as a result of any breach of warranty herein. In addition, any claim made by the Buyer against Licensee and/or Licensor shall in no event exceed the invoice price for the specific Materials in question, nor shall Licensee and/or Licensor be liable for any consequential or incidental damages which may be suffered or incurred on account of any nonconforming Materials shipped to the Buyer or its customer, it being agreed that in all cases. Licensee shall have the opportunity to remedy and correct any breach of warranty in the manner provided above and that the existence of any nonconforming shipment shall not constitute a default unless the same reoccurs in more than one instance, and provided Licensee fails to give adequate written assurances to the Buyer after a demand is made therefor.

**Schedule "H"**

## PATENTS

US Patent 9,869,414

US Patent 9388925

US Patent 10053924

Patent Application 16/227,467 (Patent Pending)

Patent Application- 15/962,043 (Patent Pending)

**Schedule "I"**

**LIST OF LICENSED CONNECTIONS**

<u>Premium Connections:</u>

ULTRA™ FJ

ULTRA™ SF

ULTRA™ FX

ULTRA™ QX

ULTRA™ CX

ULTRA ™ GX

SF TORQ® (also known as TORQ® SFW™)

QX TORQ® (also known as TORQ® QXW™)


<u>Semi-Premium Connections:</u>

ULTRA™ DQX

DQX TORQ®( also known as TORQ® DQW™)

**Schedule "J"**

## TRADEMARKS

ULTRA™ Premium Connections

ULTRA™ FJ

ULTRA™ SF

ULTRA™ FX

ULTRA™ QX

ULTRA™ DQX

ULTRA™ CX

ULTRA ™ GX

SF TORQ™

TORQ® SFW™

QX TORQ®

TORQ® QXW™

DQX TORQ®

TORQ® DQW™

**SCHEDULE "K"**

**COMPLIANCE CERTIFICATION**

[Original Letterhead of *PAO TMK*]

**ANNUAL EXPORT CONTROL AND ECONOMIC SANCTIONS
COMPLIANCE CERTIFICATION**

*PAO TMK* (the "Licensee") declares and warrants that any and all activity directly or indirectly related to the license agreement between Licensee and *ULTRA Premium Services L.L.C.* ("Ultra Premium Services") dated January 2, 2020 (the "License Agreement"), including without limitation, any (i) license of technology, patent, trademark, trade name, know-how or any other intellectual property granted thereunder ("Licensed Items"), (ii) sub-licensing of any such Licensed Items by the Licensee Group (as expressly permitted in the License Agreement), (iii) sale, lease or other disposition of Tooling, Gauges (as defined in the License Agreement) and/or other item, or (iv) sale of goods incorporating any of such Licensed Items to any third party (collectively with the Licensed Items, the "Authorized Activity"), shall at all times be in strict conformity with all economic sanctions and export control laws and regulations applicable to any Party to the License Agreement, including the United Nations, United States and European Union regimes.

In particular, the Licensee further declares and warrants that:

1. none of the Authorized Activity will be intended for or otherwise used in (A) (i) deepwater (i.e., waters deeper than 500 feet), (ii) Arctic offshore or (iii) shale projects (i.e., involving resources located in shale formations) that have the potential to produce oil or gas, (B) the construction, maintenance, expansion, or repair of pipelines for exportation of energy from the Russian Federation, (C) in the Crimea region (including Sevastopol), nor (D) in the *Yuzhno-Kirinskoye* Field, located in the Sea of Okhotsk.

2. the Authorized Activity will not be used or otherwise intended for any military purpose or end use (including the development, manufacture, use, storage, of nuclear, biological or chemical weapons, or of ballistic missiles systems) or by any military end user, nor for the support of terrorism or human rights abuses.

3. none of the Licensee, the other members of the Licensee Group (as such term is defined in the License Agreement), their respective shareholders, directors and officers is listed, or owned or controlled by or acting on behalf of, a person or entity listed, as a prohibited party under U.S. Executive Orders Nos. 13660 and 13661, as amended, or otherwise listed on the list of *Specially Designated Nationals and Blocked Persons* administered by the U.S. Department of the Treasury's *Office of Foreign Assets Control* (OFAC) or other comparable lists of parties or countries with whom or which Licensor is prohibited to engage in any business, administered by the United States, the United Nations, the European Union or the United Kingdom (hereinafter "Sanctioned Persons").

4. neither the Licensee nor any of the other members of the Licensee Group shall make any disposition of Authorized Activity by way of licensing, sublicensing, transfer, re-transfer, transshipment, sale, resale, export, re-export, diversion or otherwise, to Sanctioned Persons.

The inaccuracy or falsehood of the above information or the breach of the aforementioned declarations and commitments by Licensee, will entitle *ULTRA Premium Services* to terminate the License Agreement without any liability to *ULTRA Premium Services*.

Neither *ULTRA Premium Services* nor its Affiliates assume any liability to Licensee or to any other person for Licensee's (or any other member of the Licensee Group's) acts of non-compliance with the above certifications, declarations and warranties (including, but not limited to, non-compliance with export control laws, sanctions, restrictive measures and embargoes).

The Licensee's Legal Representative

Signature: …………………………………….

Name: ……………………………………

Surname: …………………………………….

Title: …………………………………….

Date: …………………………………….

Stamp:

## LICENSE AGREEMENT - MANUFACTURING

THIS LICENSE AGREEMENT - MANUFACTURING (this "Agreement") is entered into this 1st day of October, 2018 (the "Effective Date") by and between ULTRA Premium Services, L.L.C., a Delaware L.L.C. ("ULTRA" or "Licensor"), and TMK Premium Services ("Licensee").

WHEREAS, ULTRA is the owner of certain patents or pending patent applications, know-how, confidential design information, trademarks and other intellectual property related to the manufacturing and threading of premium connections for oil country tubular goods, as further described herein; and

WHEREAS, Licensee desires a license to use said patents, patent applications, know-how, confidential design information, trademarks and other intellectual property and ULTRA is willing to grant a license to use said patents, patent applications, know-how, confidential design information, trademarks and other intellectual property to Licensee, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the terms, conditions and provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensee and ULTRA hereby agree as follows:

1.    DEFINITIONS.

     1.1    "Accessory" means a down hole product, tool or assembly including but not

## ЛИЦЕНЗИОННЫЙ ДОГОВОР НА ИЗГОТОВЛЕНИЕ ПРОДУКЦИИ

НАСТОЯЩИЙ ЛИЦЕНЗИОННЫЙ ДОГОВОР НА ИЗГОТОВЛЕНИЕ ПРОДУКЦИИ (в дальнейшем «Договор») заключается сегодня, «01» октября 2018 г. («Дата вступления в силу») между компанией ULTRA Premium Services, L.L.C., компанией с ограниченной ответственностью, зарегистрированной в штате Делавер («Компания ULTRA» , далее так же «Лицензиар»), и ООО «ТМК-Премиум Сервис» («Лицензиат»).

ПРИНИМАЯ ВО ВНИМАНИЕ, ЧТО компания ULTRA является владельцем определенных патентов или заявок на патент, находящихся на рассмотрении, ноу-хау, конфиденциальной проектной информации, торговых марок и прочей интеллектуальной собственности, относящейся к производству и нарезке резьб для соединений класса Премиум на трубах нефтепромыслового сортамента, как описано в дальнейшем; а также

ПРИНИМАЯ ВО ВНИМАНИЕ, ЧТО Лицензиат желает получить лицензию на использование упомянутых патентов, заявок на патенты, ноу-хау, конфиденциальной проектной информации, торговых марок и прочей интеллектуальной собственности, а компания ULTRA желает предоставить лицензию на использование упомянутых патентов, заявок на патент, ноу-хау, конфиденциальной проектной информации, торговых марок и прочей интеллектуальной собственности Лицензиату на условиях, указанных в настоящем Договоре,

ТАКИМ ОБРАЗОМ, с учетом вышеизложенного, принимая во внимание условия и положения, предусмотренные в настоящем договоре, а также иное юридически действительное встречное удовлетворение, получение и достаточность которого настоящим подтверждается, Лицензиат и компания ULTRA договорились о нижеследующем:

1.    ОПРЕДЕЛЕНИЯ

     1.1    «Приспособления» - продукция, инструменты или узлы, спускаемые в

limited to crossover subs, float equipment and pup joints.

1.2 "Confidential Information" means all such information, whether written or oral, which is designated by ULTRA as "Confidential" or which is proprietary or confidential in nature including, without limitation, the Licensed Technology. Confidential Information expressly includes, but is not limited to, all materials in print or electronic media embodying any facets of the Licensed Technology.

1.3 "Improvements" means any and all modifications, changes, amendments, additions or revisions to any of the Licensed Technology including, but not limited to, any and all patents, copyrights, trade secrets, know-how, and any other intellectual property rights therein, which are developed, conceived, discovered, learned, produced, or otherwise created by Licensee (including any of its officers, directors, employees, subsidiaries, or related companies), whether individually or jointly with ULTRA or others, arising out of or in connection with any rights granted hereunder.

1.4 "Licensed Field" means the use of the Licensed Technology and Licensed Trademark only on and in conjunction with the manufacture, threading or repair of a Licensed Product for ULTRA or a Licensed Seller. Any other use of the Licensed Technology or Licensed Trademark shall be subject to the discretion and the express prior written approval by ULTRA.

1.5 "Licensed Manufacturing Facility" means those facilities licensed to manufacture, thread or repair Licensed Product and identified on EXHIBIT C.

1.6 "Licensed Product" means any

скважину, в том числе, переводники, башмаки с обратным клапаном и укороченные трубы.

1.2 «Конфиденциальная информация» - информация, изложенная в письменной или устной форме, определенная компанией ULTRA как «конфиденциальная» или являющаяся служебной или конфиденциальной по своему характеру, включая, в числе прочего, Лицензионную технологию. Конфиденциальная информация включает в себя, помимо прочего, все материалы на печатных и электронных носителях, в которых изложены какие-либо аспекты Лицензионной технологии.

1.3 «Улучшения» - изменения, дополнения или пересмотренные версии Лицензионной технологии, включая, в числе прочего, все патенты, авторские права, коммерческую тайну, ноу-хау и права на любую другую интеллектуальную собственность в рамках настоящего Договора, разработанные, сформулированные, установленные, полученные или каким-либо иным образом созданные Лицензиатом (включая его должностных лиц, директоров, работников, филиалы и связанные с ним компании) в индивидуальном порядке либо совместно с компанией ULTRA или другими компаниями вследствие или в связи с получением прав по настоящему Договору.

1.4 «Лицензированная сфера деятельности» - использование Лицензионной технологии и Лицензионной торговой марки исключительно в целях изготовления, нарезки резьбы и ремонта Лицензионной продукции для компании ULTRA или Лицензированного продавца. Любое другое использование Лицензионной технологии или Лицензионной торговой марки осуществляется по усмотрению компании ULTRA при условии получения от нее предварительного письменного согласия.

1.5 «Лицензированный производственный объект» - предприятие, получившее лицензию на изготовление, нарезку резьбы и ремонт Лицензионной продукции, указанное в ПРИЛОЖЕНИИ С.

1.6 «Лицензионная продукция»

Unofficial Translation - Office of Halliburton Process Document System

connection on oilfield casing, tubing, or Accessory listed on EXHIBIT A, provided that connection is manufactured by a Licensed Manufacturing Facility that has been issued a certificate of qualification by ULTRA for that connection.

1.7 "Licensed Seller" means those entities licensed to sell Licensed Product and identified on EXHIBIT D.

1.8 "Licensed Technology" means: **(i)** the issued patents and pending patent applications listed on EXHIBIT B attached hereto, including all re-examinations claiming priority therefrom; and (ii) trade secrets and other information (including discoveries, concepts, ideas, formulas and compositions, whether patentable or unpatentable and whether or not reduced to practice), works of authorship, knowhow, manufacturing and production procedures, processes and techniques (including, without limitation, thread profiles), methods of use, research and development information, drawings, manufacturing specifications, overlays, plans and technical data (whether or not a trade secret) that is deemed relevant to the Licensed Field by ULTRA, and disclosed to Licensee by ULTRA; and (iii) any and all Improvements to items (i) and (ii) of this subsection as deemed relevant by ULTRA and disclosed to Licensee by ULTRA.

1.9 "Licensed Trademark" means only the trademark(s) listed on EXHIBIT B attached hereto, and only in the form shown therein.

1.10 "Required Components" means carbide inserts (including thread and special seal tools/inserts), product overlays, special gauge standards, and any other gauges unique to the manufacturing, threading and repair of the Licensed Product.

любое соединение на обсадных трубах, насосно-компрессорных трубах и приспособлениях, указанных в ПРИЛОЖЕНИИ A, изготовленное на Лицензированном производственном объекте, получившем аттестационное свидетельство на это соединение от компании ULTRA.

1.7 «Лицензированный продавец» - предприятия, получившие лицензию на реализацию Лицензионной продукции, указанные в ПРИЛОЖЕНИИ D.

1.8 «Лицензионная технология» -- (i) выпущенные патенты и заявки на патенты, находящиеся на рассмотрении, указанные в ПРИЛОЖЕНИИ B, включая все повторные рассмотрения с заявляемым приоритетом на основе таких патентов и заявок; а также (ii) коммерческая тайна и прочая информация (включая открытия, концепции, идеи, формулы и составы, независимо от их патентоспособности и возможности практического применения), авторские работы, ноу-хау, регламенты, процессы и методы изготовления и производства (в том числе профили резьбы), способы использования, научно-исследовательская информация, чертежи, технологические инструкции, кальки-шаблоны, планы и технические данные (независимо от того, являются они коммерческой тайной или нет), которые относятся, по мнению компании ULTRA, к Лицензированной сфере деятельности и раскрываются Лицензиату компанией ULTRA; а также (iii) все улучшения по частям (i) и (ii) данного подпункта, которые относятся, по мнению компании ULTRA, к Лицензированной сфере деятельности и раскрываются Лицензиату компанией ULTRA.

1.9 «Лицензионная торговая марка» - торговые марки, которые указаны в ПРИЛОЖЕНИИ B, и только в той форме, в которой они представлены.

1.10 «Необходимые компоненты» - твердосплавные режущие пластины (включая специальные режущие пластины и инструменты для уплотнения), кальки-шаблоны, специальные шаблоны и калибры, а также прочие мерительные инструменты, специально разработанные для производства, нарезки резьбы и ремонта

Unofficial Copy Official Documents Network

UNOFFICIAL Copy Officially certified by Olympic Scientific Clerk

1.11 "Services" means technical support, design support, the training of personnel, and other support services normally provided by ULTRA to its customers or licensees relative to the use and operation of the Licensed Technology.

## 2. GRANT.

2.1 Subject to the terms and conditions herein, ULTRA hereby grants Licensee, and Licensee accepts, a non-exclusive, non-transferable, terminable, revocable, license (without the right to sublicense) in and to the Licensed Technology and for use only in the Licensed Field and solely at a Licensed Manufacturing Facility.

2.2 Subject to the terms and conditions herein, ULTRA hereby grants to Licensee, and Licensee accepts, a non-exclusive, non-transferable, terminable, revocable, license (without the right to sublicense) to use the Licensed Trademark and the goodwill associated therewith only on and in connection with the manufacture, threading and repair of Licensed Product for ULTRA or a Licensed Seller.

2.3 Licensee shall not offer for sale, promote, market, advertise or otherwise provide Licensed Product to third parties except (a) pursuant to a separate LICENSE AGREEMENT - SALES AND MARKETING between Licensee and ULTRA or (b) to a Licensed Seller, it being understood and agreed that the license granted herein is solely a license to manufacture, thread and repair the Licensed Product. The licenses granted to Licensee herein shall not be construed to confer any right upon Licensee by implication, estoppel or otherwise as to any technology or trademarks, or other intellectual property of ULTRA, not specifically identified in Sections 2.1 or 2.2 herein. Licensee further acknowledges that, beyond the grant of Sections 2.1

Лицензионной продукции.

1.11 «Услуги» - техническая поддержка, авторская поддержка, обучение персонала и прочие услуги поддержки, которые компания ULTRA обычно предоставляет своим заказчикам или лицензиатам в отношении использования и работы с Лицензионной технологией.

## 2. ПРЕДОСТАВЛЕНИЕ ЛИЦЕНЗИИ

2.1 При условии соблюдения условий настоящего Договора компания ULTRA настоящим предоставляет, а Лицензиат принимает неисключительную, не подлежащую передаче, ограниченную по времени, отзывную лицензию (без права сублицензирования) на Лицензионную технологию для применения исключительно в Лицензированной сфере деятельности и исключительно на Лицензированном производственном объекте.

2.2 При условии соблюдения условий настоящего Договора компания ULTRA настоящим предоставляет Лицензиату, а Лицензиат принимает неисключительную, не подлежащую передаче, ограниченную по времени, отзывную лицензию (без права сублицензирования) для использования Лицензионной торговой марки и связанной с ней деловой репутации исключительно в целях изготовления, нарезки резьбы и ремонта Лицензионной продукции для компании ULTRA или Лицензированного продавца.

2.3 Лицензиат не может предлагать для продажи, продвигать на рынке, рекламировать и иным образом предоставлять лицензионную продукцию третьим лицам, кроме как (а) на основании отдельного ЛИЦЕНЗИОННОГО ДОГОВОРА О ПРОДАЖЕ И ПРОДВИЖЕНИИ НА РЫНКЕ, заключенного между Лицензиатом и компанией ULTRA, или (b) Лицензированному продавцу, при этом понимается, что настоящим договором предоставляется лицензия исключительно на изготовление, нарезку резьбы и ремонт Лицензионной продукции. Лицензии, предоставляемые Лицензиату по настоящему Договору, не наделяют его какими бы то ни было правами (подразумеваемым образом, в силу

and 2.2 above, it acquires no right, title or interest in and to either the Licensed Technology or the Licensed Trademark.

2.4     Licensee acknowledges and agrees that it does not have, and this Agreement shall not be construed to grant, any right to sublicense any rights granted or acquired hereunder, without the prior written consent of an authorized officer of ULTRA, which consent may be withheld or denied at the sole discretion of ULTRA.

## 3.     REPORTS AND RECORDS.

3.1     Licensee shall deliver to ULTRA, within ten (10) days after each calendar month during the term of this Agreement, an activity report for the preceding (1) month period: (i) an itemized accounting of each Licensed Product manufactured, including the identity of each customer, product description and quantity; and (ii) a certification by Licensee's senior officer, or their delegate, as to the completeness and accuracy of the activity report.

3.2     Licensee shall, at its own cost and expense, maintain complete and accurate books and records covering all manufacturing completed pursuant to this Agreement. Upon reasonable notice, ULTRA and its duly authorized representatives shall have the right, during normal business hours, during the term of this Agreement and for five (5) years thereafter, to examine and copy said books and records and all other documents and materials in the possession of and under the control of Licensee with respect to all manufacturing arising out of or relating to this Agreement. The exercise by ULTRA of any right to audit at any time or times or the acceptance by ULTRA of any statement or payment shall be without

правовой презумпции или иным образом) на технологии, торговые марки и прочую интеллектуальную собственность компании ULTRA, особо не оговоренную в п.п. 2.1 и 2.2 настоящего Договора. Лицензиат дополнительно признает, что помимо прав, указанных в п.п. 2.1 и 2.2 выше, он не получает каких бы то ни было иных прав ни на Лицензионную технологию, ни на Лицензионную торговую марку.

2.4     Лицензиат признает и подтверждает, что у него нет и в рамках настоящего Договора не предусматривается каких бы то ни было прав на сублицензирование каких бы то ни было прав, приобретенных в рамках настоящего Договора, без предварительного письменного согласия уполномоченного должностного лица компании ULTRA, в котором может быть отказано исключительно по усмотрению компании ULTRA.

## 3.     ОТЧЕТЫ И ДОКУМЕНТЫ

3.1     Лицензиат доставляет компании ULTRA в течение 10 (десяти) дней после завершения каждого календарного месяца в течение срока действия настоящего Договора отчет о результатах деятельности за предыдущий период продолжительностью 1 (один) месяц: (а) детализированный отчет о каждой изготовленной единице лицензионной продукции, включая наименование каждого заказчика, наименование и количество продукции; а также (b) заявление руководящего должностного лица Лицензиата или его заместителя о полноте и точности отчета о результатах деятельности.

3.2     Лицензиат за свой счет ведет точные и полные журналы и учетные документы по всему производству, выполненному в соответствии с настоящим Договором. При предварительном уведомлении компания ULTRA и ее должным образом уполномоченные представители имеют право в рабочее время, в течение срока действия настоящего Договора и 5 (пяти) лет после окончания срока его действия изучить копии указанных журналов и учетных документов, а также прочей документации и материалов, находящихся во владении и под контролем Лицензиата, относящихся к производству в рамках настоящего Договора и в

Official Copy Original Marilyn Barsegian Notary Seal

prejudice to any rights or remedies and shall not bar ULTRA from thereafter disputing the accuracy of any statement or payment, and Licensee shall remain fully liable for any balance due under this Agreement. Such records shall be retained for at least five (5) years following the termination of this Agreement.

связи с ним. Осуществление компанией ULTRA права на проведение периодических проверок, а также принятие компанией ULTRA каких бы то ни было заявлений и платежей не приводит к ограничению ее прав и средств защиты, а также не лишает компанию ULTRA возможности оспорить точность какого-либо заявления или платежа, при этом Лицензиат несет полную ответственность за любые суммы задолженности в рамках настоящего Договора. Такие учетные документы должны храниться в течение не менее 5 (пяти) лет после прекращения действия настоящего Договора.

## 4. QUALITY CONTROL.

4.1    Licensee shall apply the Licensed Trademark to the Licensed Product, and shall apply no other mark or name. Licensee shall not manufacture, thread or repair any Licensed Product under any other mark or name.

4.2    Licensee shall maintain the distinctiveness of the Licensed Trademark and the image and high quality of Licensed Product offered under any Licensed Trademark. Licensee agrees that before it can commence manufacturing of Licensed Product, it must first submit samples of Licensed Product manufactured by Licensee to ULTRA for written approval, which may be denied at the reasonable discretion of ULTRA. Licensee agrees that all Licensed Product manufactured by it will be of high quality as to workmanship, design and materials and shall be at least equal in quality, workmanship, design and material to the samples of Licensed Product approved by ULTRA under this Agreement. All manufacturing, threading and repair of Licensed Product shall be of a quality in keeping with the quality and prestige of the Licensed Trademark.

4.3    Licensee shall use and employ the Licensed Trademark for and in connection with the Licensed Product in strict accordance with all

## 4. КОНТРОЛЬ КАЧЕСТВА

4.1    Лицензиат наносит на Лицензионную продукцию только Лицензионную торговую марку и не наносит на нее каких бы то ни было иных марок и наименований. Лицензиат не может изготавливать, нарезать резьбу и ремонтировать Лицензионную продукцию под какими бы то ни было иными марками и наименованиями.

4.2    Лицензиат должен обеспечивать отчетливость торговой марки и ее изображения, а также высокое качество Лицензионной продукции, производимой под Лицензионной торговой маркой. Лицензиат обязуется, прежде чем начать изготовление Лицензионной продукции, предварительно представить образцы лицензионной продукции, изготовленные Лицензиатом, компании ULTRA для письменного утверждения, в котором может быть обоснованно отказано по усмотрению компании ULTRA. Лицензиат обязуется обеспечить высокое качество изготавливаемой им Лицензионной продукции в части исполнения, конструкции и материалов, которое должно быть как минимум не ниже качества (в части исполнения, конструкции и материалов) образцов Лицензионной продукции, утвержденных компанией ULTRA в соответствии с настоящим Договором. Качество изготовления, нарезки резьбы и ремонта всей Лицензированной продукции должно соответствовать качеству и престижу Лицензионной торговой марки.

4.3    Лицензиат должен использовать Лицензионную торговую марку для Лицензионной продукции и в связи с ней в

standards, rules and procedures provided by ULTRA from time to time, including, without limitation, the Trademark Guide attached hereto as EXHIBIT E.

строгом соответствии со всеми стандартами, правилами и регламентами, периодически предоставляемыми компанией ULTRA, в том числе в соответствии с Руководством по использованию торговых марок в ПРИЛОЖЕНИИ Е.

4.4     Licensee shall manufacture Licensed Product in strict adherence to and in accordance with good quality system practices and in accordance with any written standards, rules and procedures provided by ULTRA regarding the manufacture, threading and repair of Licensed Product, including, without limitation, the manufacturing procedures. Licensee shall maintain its gauges, instruments and standards used to manufacture, thread and repair the Licensed Product in a proper state of calibration and shall inspect, evaluate, measure and maintain such gauges, instruments and standards in accordance with the manufacturing procedures. Records of instrument calibration and product quality and inspection shall be kept by Licensee, which records shall comply with the manufacturing procedures and any other requirements as to form, content or otherwise as specified by ULTRA, for at least five (5) years and shall be made available during normal business hours for inspection by ULTRA or its designee upon reasonable notice.

4.4     Лицензиат должен изготавливать Лицензионную продукцию в строгом соответствии с принятыми нормами системы качества, а также в соответствии с письменными стандартами, правилами и процедурами, предоставляемыми компанией ULTRA в отношении изготовления, нарезки резьбы и ремонта Лицензионной продукции, в том числе производственными регламентами. Лицензиат должен поддерживать мерительные инструменты, измерительные приборы, шаблоны и эталоны, используемые для изготовления, нарезки резьбы и ремонта Лицензионной продукции, в откалиброванном состоянии и должен проводить технический осмотр, оценку, измерение и обслуживание таких мерительных инструментов, приборов, инструментов, шаблонов и эталонов в соответствии с производственными регламентами. Лицензиат должен хранить записи о калибровке измерительных приборов, а также о качестве продукции и техническом контроле, отвечающие требованиям производственных регламентов и прочим требованиям к форме и содержанию записей, сформулированным компанией ULTRA, в течение не менее 5 (пяти) лет и должен обеспечить доступ к ним в течение нормального рабочего времени для ознакомления компанией ULTRA или ее уполномоченным представителем при получении заблаговременного уведомления.

4.5     Licensee shall submit to ULTRA for prior review and written approval any new materials using a Licensed Trademark on or in connection with the Licensed Product in a manner other than that which has previously been approved under this Section 4.5, which approval may be granted or denied at the sole and absolute discretion of ULTRA. Licensee may not use any materials using a Licensed Trademark unless such materials are in substantial conformity with, and at least equal in quality to, materials previously approved by ULTRA in accordance with this Section.

4.5     Лицензиат должен подавать компании ULTRA на предварительное рассмотрение и письменное утверждение любые новые материалы, относящиеся к использованию Лицензионной торговой марки на Лицензионной продукции или в связи с ней каким бы то ни было способом, отличным от того, что был ранее утвержден согласно п. 4.5, при этом такое утверждение может быть предоставлено или в нем может быть отказано исключительно по усмотрению компании ULTRA. Лицензиат не может использовать материалы, содержащие Лицензионную торговую марку, если такие материалы не соответствуют материалам, ранее

Unofficial Translation — marina.golosova@gmail.com

4.6 To ensure that Licensee complies with the quality standards set forth in this Section 4, ULTRA may request, upon reasonable notice to Licensee, and Licensee shall provide, full and open access at reasonable times to any location operated by or under the control of Licensee in order to verify Licensee's proper use of any Licensed Trademark on and in connection with the Licensed Product, and to verify Licensee's manufacture, threading and repair of Licensed Product in accordance with this Agreement, so that ULTRA shall have sufficient opportunity to make whatever investigation it shall deem necessary or reasonably desirable in connection with its exercise of quality control under this Agreement.

4.7 In the event any Licensed Product is not being manufactured in conformance with the quality required under this Agreement, in the reasonable and good faith judgment of ULTRA, ULTRA shall notify Licensee thereof in writing, providing Licensee with an explanation as to how such goods fail to conform to such standards and Licensee shall promptly change its operations to conform thereto. In the event Licensee's use of any Licensed Trademark on or in connection with the Licensed Product is not in accordance with the quality required under this Agreement, in the reasonable and good faith judgment of ULTRA, ULTRA shall notify Licensee thereof in writing and Licensee shall promptly change such use or employment to conform thereto.

4.8 Licensee acknowledges and agrees that the proper and effective use of the Licensed Technology requires the use of specialized gauges, overlays, and thread and seal inserts fabricated using or incorporating certain highly proprietary technology



утвержденным компанией ULTRA согласно этому разделу или если их качество ниже качества таких ранее утвержденных материалов.

4.6 Чтобы убедиться, что Лицензиат соблюдает стандарты качества, изложенные в разделе 4, компания ULTRA может запросить, путем предварительного уведомления Лицензиата, а Лицензиат должен предоставить полный и открытый доступ в разумный срок к любой производственной площадке, осуществляющей работу под контролем Лицензиата, с целью проверки надлежащего использования Лицензиатом любой Лицензионной торговой марки на Лицензионной продукции или в связи с ней, а также проверить, как Лицензиат выполняет изготовление, нарезку резьбы и ремонт Лицензионной продукции согласно настоящему Договору, с тем чтобы у компании ULTRA имелась достаточная возможность выполнить любые проверки, которые она посчитает необходимыми и целесообразными для контроля качества в рамках настоящего Договора.

4.7 В случае если по обоснованному и добросовестному мнению компании ULTRA при производстве Лицензионной продукции не соблюдаются требования к качеству в рамках настоящего Договора, компания ULTRA должна известить об этом Лицензиата в письменной форме с пояснениями в отношении несоответствия продукции стандартам, а Лицензиат должен оперативно изменить процесс работы, чтобы обеспечить соответствие этим требованиям. В случае если по обоснованному и добросовестному мнению компании ULTRA при использовании Лицензионной торговой марки на Лицензионной продукции или в связи с ней не соблюдаются требования к качеству, предусмотренные настоящим Договором, компания ULTRA должна известить об этом Лицензиата в письменной форме, а Лицензиат должен оперативно изменить такое использование, чтобы обеспечить соответствие этим требованиям.

4.8 Лицензиат признает и подтверждает, что для соответствующего и эффективного использования Лицензионной технологии требуется использование специальных мерительных инструментов, калек-шаблонов и

of ULTRA, which are not commodity goods freely available on the open market. Accordingly, in order to assure the quality of the Licensed Product produced by Licensee under this Agreement, Licensee shall purchase all Required Components from ULTRA. ULTRA shall sell such Required Components to Licensee at fair, non-discriminatory price pursuant to standard terms and conditions of ULTRA in effect at the time of each such purchase by Licensee from ULTRA. Moreover, in recognition of the confidential and proprietary status of the Required Components, Licensee shall not resell, distribute or otherwise disseminate any Required Components acquired from ULTRA to any third party without prior written consent from ULTRA.

пластин для резьбы и уплотнения, изготовленных с использованием запатентованной технологии компании ULTRA, и эти изделия не являются промышленными товарами, находящимися в свободной продаже. Соответственно, чтобы обеспечить качество Лицензионной продукции, произведенной Лицензиатом в рамках настоящего Договора, Лицензиат должен приобрести все Требуемые компоненты у компании ULTRA. Компания ULTRA продает такие Требуемые компоненты Лицензиату по умеренной, недискриминационной цене в соответствии со стандартными условиями компании ULTRA, действующими на момент каждой такой покупки Лицензиатом у компании ULTRA. Более того, учитывая конфиденциальность таких Требуемых компонентов и их защищенность правом собственности компании ULTRA, Лицензиат не может перепродавать или каким бы то ни было иным образом распространять Требуемые компоненты, приобретенные у компании ULTRA, третьим сторонам без предварительного письменного согласия компании ULTRA.

4.9     Licensee shall, during the term of this Agreement: (a) comply with all laws and regulations applicable to its manufacture of the Licensed Product and shall not at any time take any action that would cause ULTRA or Licensee to be in violation of any of such applicable laws or regulations; and (b) obtain all applicable licenses, permits, approvals or authorizations required by any governmental entity or agency having jurisdiction over the manufacture of the Licensed Product.

4.9     Лицензиат должен в течение срока действия настоящего Договора: (а) соблюдать все законы и правила, применяемые к изготовлению им Лицензионной продукции и ни в коем случае не может предпринимать каких-либо действий, в результате которых компания ULTRA или Лицензиат нарушат какие-либо из этих законов и правил; а также (b) получать все необходимые лицензии, разрешения, согласования и одобрения, требуемые каким бы то ни было органом государственной власти или учреждением, которому подведомственно производство Лицензионной продукции.

4.10     During the term of this Agreement, in all public uses of any Licensed Trademark on and in connection with the Licensed Product, where commercially practicable and possible, Licensee shall use its best efforts to indicate that any Licensed Trademark is owned by ULTRA and shall use the appropriate notice symbol ® if the Licensed Trademark is registered with the U.S. Patent and Trademark Office, or ™ directly adjacent to every use of the Licensed Trademark if not federally registered.

4.10     В течение срока действия настоящего Договора во всех ситуациях публичного использования любой Лицензионной торговой марки, в коммерчески целесообразных и возможных случаях, Лицензиат должен предпринимать все возможное для указания принадлежности любой Лицензионной торговой марки компании ULTRA, а также должен в установленном порядке применять символ ®, если Лицензионная торговая марка зарегистрирована в Бюро США по патентам и товарным знакам, или символ ™ при каждом использовании Лицензионной торговой марки, не прошедшей

4.11    In addition to the terms, conditions, and marking requirements set forth above, Licensee shall comply with all written instructions provided by ULTRA with respect to marking Licensed Product, packaging, or materials containing or discussing Licensed Product, including, but not limited to, any instructions ULTRA may provide with respect to designation of connection name, OD, wall or weight of Licensed Product.

4.12    Licensee acknowledges, understands and agrees that it shall not perform, do, or cause any act to be done, or fail to take any action, during or after the term of this Agreement, or assist any third party in performing, doing or causing any act to be done, which would be detrimental to, injure or impair: (a) any Licensed Trademark; (b) any applications for registration or registrations thereof; (c) the respective goodwill related to any Licensed Trademark; (d) the federal, state or common law rights of ULTRA in or to any Licensed Trademark; (e) the right, title, interest, and ownership by ULTRA in and to any Licensed Trademark; and (f) the validity and enforceability of any of the foregoing.

4.13    Any use of a Licensed Trademark by Licensee shall inure solely to the benefit of ULTRA. All goodwill accrued by, and due to, the use of any Licensed Trademark anywhere shall be the sole and exclusive property of ULTRA.

4.14    From time to time, Licensee may request that ULTRA provide Services to Licensee. Any such request must be made in writing to ULTRA based on an additional Agreement and mutually accepted by both parties before any on-site Services will be provided. If ULTRA agrees to such request,

федеральную регистрацию.

4.11    Помимо соблюдения условий и требований к маркировке, изложенных выше, Лицензиат должен соблюдать все инструкции, предоставленные компанией ULTRA в письменной форме, в отношении маркировки Лицензионной продукции, ее упаковки, а также материалов, в которых содержится или рассматривается Лицензионная продукция, включая, в числе прочего, инструкции, предоставленные компанией ULTRA в отношении обозначения наименования соединения, наружного диаметра, толщины стенки или погонного веса Лицензионной продукции.

4.12    Лицензиат обязуется в течение срока действия настоящего Договора и после его истечения не предпринимать каких-либо действий, не способствовать таким действиям, не проявлять бездействия, а также не помогать какой-либо третьей стороне в осуществлении или способствовании осуществлению таких действий, в результате которых будет причинен вред или нанесен ущерб: (a) какой-либо Лицензионной торговой марке; (b) ее регистрации или заявкам о ее регистрации; (c) деловой репутации в отношении какой-либо Лицензионной торговой марки; (d) правам компании ULTRA на основании федерального закона или общего права в отношении какой-либо Лицензионной торговой марки; (e) праву собственности компании ULTRA в отношении какой-либо Лицензионной торговой марки; а также (f) действительности и юридической силе всего вышеизложенного.

4.13    Любое использование Лицензиатом Лицензионной торговой марки должно идти исключительно на пользу компании ULTRA. Деловая репутация, созданная где бы то ни было благодаря использованию какой-либо Лицензионной торговой марки, является исключительной собственностью компании ULTRA.

4.14    Время от времени Лицензиат может запрашивать предоставление Услуг со стороны компании ULTRA. Каждый такой запрос должен оформляться в письменном виде и должен обоюдно приниматься обеими сторонами до оказания каких-либо Услуг на месте. Если

Uncontrolled Copy Office of International Standards

ULTRA, on its own or through a third party, will provide Services to Licensee relating to the use and application of the Licensed Technology, including manufacturing specifications for manufacturing, threading and repairing Licensed Product, with Licensee being responsible for payment of all actual travel-related expenses incurred by ULTRA. ULTRA shall have no obligation to customize or modify any portion of the Licensed Technology as may be requested by Licensee.

**5.     RIGHTS IN INTELLECTUAL PROPERTY.**

5.1     Licensee acknowledges and agrees that ULTRA owns all right, title and interest in, to, and under the Licensed Technology, any Licensed Trademark, and Improvements thereto. ULTRA shall have the sole and exclusive right to file any additional patent applications on any Licensed Technology, Licensed Trademark, and Improvement thereto.

5.2     Any Improvement in or to any of the Licensed Technology shall be the sole and exclusive property of ULTRA, and ULTRA shall own any and all right, title and interest in, to, and under such Improvements. Licensee agrees to assign and hereby does assign to ULTRA any and all right, title and interest in, to, and under any such Improvement to any of the Licensed Technology subject to Licensee's licensed right to use same on the terms and conditions herein. During the term of this Agreement, Licensee shall, on a quarterly basis, make a complete written disclosure to ULTRA of any such Improvement arising during such quarter, specifically pointing out the features or concepts that Licensee believes to be new or different. At its sole discretion and expense, ULTRA shall have the right to prepare, file, prosecute and maintain any patent or copyright application(s), or seek any other form of intellectual property protection, claiming, seeking to register, or otherwise related to any and all Improvements.

5.3     Licensee shall give ULTRA and its

компания ULTRA дает согласие на выполнение такого запроса, она сама или через третью сторону предоставляет Услуги Лицензиату в отношении использования и применения Лицензионной технологии, включая технические данные для изготовления, нарезки резьбы и ремонта Лицензионной продукции, при этом Лицензиат отвечает за оплату всех фактических расходов на поездки, понесенных компанией ULTRA. Компания ULTRA не обязана изменять или дорабатывать какую-либо часть Лицензионной технологии по запросу Лицензиата.

**5.     ПРАВА НА ИНТЕЛЛЕКТУАЛЬНУЮ СОБСТВЕННОСТЬ**

5.1     Лицензиат признает и подтверждает, что компании ULTRA принадлежат все права на Лицензионную технологию, Лицензионную торговую марку и их улучшения. Компания ULTRA имеет исключительное право на подачу дополнительной патентной заявки в отношении любой Лицензионной технологии, Лицензионной торговой марки и их улучшений.

5.2     Любые улучшения Лицензионной технологии являются исключительной собственностью компании ULTRA, и ей принадлежат все права на такие улучшения. Лицензиат обязуется передать и настоящим передает компании ULTRA все права на такие улучшения Лицензионной технологии, при этом Лицензиат имеет право их пользования в соответствии с условиями настоящего Договора. В течение срока действия настоящего Договора Лицензиат на ежеквартальной основе предоставляет компании ULTRA подробный письменный отчет обо всех таких улучшениях, возникших в течение соответствующего квартала, особенно подчеркивая те характеристики и концепции, которые Лицензиат считает новыми или отличными от существовавших ранее. По своему собственному усмотрению и за свой счет компания ULTRA имеет право готовить и подавать заявки на регистрацию патентов и авторских прав, поддерживать их в силе, а также прибегать к другим способам защиты интеллектуальной собственности в отношении любых улучшений.

5.3     Лицензиат должен оказывать

attorneys all reasonable assistance (but at no cost to Licensee) in connection with the preparation and prosecution of any patent or patent application within the Licensed Technology and any patent or copyright applications prepared or filed in connection with any Improvement. Whenever requested to do so by ULTRA, Licensee agrees to execute (provided that Licensee exercises due care in determining that any statement it makes is complete and accurate in all material respects) any and all applications, assignments or other instruments that ULTRA deems reasonably necessary or desirable to protect its interests in the Licensed Technology.

5.4    Licensee has and shall maintain written agreements with its officers, directors, employees, agents, contractors, members, and anyone else involved in the use or exploitation of the Licensed Technology, such agreements containing provisions substantially similar to those in EXHIBIT F, prohibiting the disclosure or use of Confidential Information and sufficient to provide and assign the rights contemplated by this Section 5 to ULTRA. Licensee shall provide copies of such agreements to ULTRA at any time upon request.

5.5    Licensee shall not, directly or indirectly, patent, register, apply for patent or registration, or otherwise attempt to acquire any legal protection in or for any Licensed Technology, Licensed Trademark, or any other proprietary rights related to any Licensed Technology, Licensed Trademark, or other proprietary rights related thereto, without the prior written consent of ULTRA.

6.    CONFIDENTIALITY AND NON-USE.

6.1    Licensee recognizes that, in connection with this Agreement, it will receive access to business, technical, or financial information of, from or for ULTRA, which is confidential, proprietary, or a trade secret of ULTRA.

компании ULTRA и ее юристам разумное содействие (но не за счет Лицензиата) в связи с подготовкой и регистрацией любых патентов и патентных заявок, относящихся к Лицензионной технологии, а также патентных заявок и заявок на регистрацию авторских прав в связи с любыми улучшениями. По требованию компании ULTRA Лицензиат обязуется оформлять (при условии, что Лицензиат добросовестно определяет, что его заявления являются полными и точными по существу) все заявки, документы о передаче прав и прочие документы, которые компания ULTRA обоснованно считает необходимыми или желательными для защиты своих интересов по Лицензионной технологии.

5.4    Лицензиат оформляет и поддерживает в силе письменные договора со своими должностными лицами, директорами, участниками, подрядчиками, партнерами и всеми прочими лицами, участвующими в использовании или эксплуатации Лицензионной технологии, в которых содержатся положения, аналогичные по существу положениям, изложенным в ПРИЛОЖЕНИИ F, защищающим раскрытие и использование Конфиденциальной информации, и достаточные для обеспечения прав компании ULTRA, предусмотренных данным разделом 5. Лицензиат предоставляет копии таких договоров компании ULTRA по ее запросу в любое время.

5.5    Лицензиат не должен, прямо или косвенно, патентовать, регистрировать, подавать заявку на патент или регистрацию или пытаться каким бы то ни было иным способом приобрести юридическую защиту в отношении Лицензионной технологии и Лицензионной торговой марки, а также права собственности на Лицензионную технологию и Лицензионную торговую марку без предварительного письменного согласия компании ULTRA.

6.    КОНФИДЕНЦИАЛЬНОСТЬ И НЕИСПОЛЬЗОВАНИЕ

6.1    Лицензиат признает, что в рамках настоящего Договора он получит доступ к деловой, технической или финансовой информации компании ULTRA, являющейся конфиденциальной, служебной информацией или

Unofficial Copy (Confidential) see details at www.ultra.com

коммерческой тайной компании ULTRA.

6.2    Licensee acknowledges that all Confidential Information is proprietary and valuable to ULTRA, and that any disclosure or unauthorized use of Confidential Information will cause ULTRA irreparable harm and loss. Licensee warrants and agrees that neither it, nor any others used in the performance of this Agreement, shall use the Confidential Information for itself or others or disclose any Confidential Information to others, without first obtaining the prior written consent of ULTRA.

6.2    Лицензиат признает, что вся Конфиденциальная информация является собственностью компании ULTRA и имеет ценность для нее, и что любое раскрытие или неправомерное использование Конфиденциальной информации нанесет непоправимый вред компании ULTRA. Лицензиат заявляет и подтверждает, что ни он, ни какие бы то ни было иные лица, задействованные в выполнении настоящего Договора, не будут использовать Конфиденциальную информацию в своих или чужих целях, а также раскрывать Конфиденциальную информацию третьим лицам без предварительного письменного согласия компании ULTRA.

6.3    Licensee shall: (a) use such Confidential Information for the sole and limited purpose of exercising its rights and performing its obligations hereunder; and (b) return all Confidential Information (other than any Required Components purchased or received from ULTRA, the handling of which shall be subject to the terms of Section 11.6), including copies or other written, physical, or electronic embodiments of, or containing, such Confidential Information (including any studies, analyses, compilations or other materials prepared in whole or in part based on such Confidential Information) to ULTRA immediately upon the termination of the licenses granted to Licensee under this Agreement.

6.3    Лицензиат обязуется: (a) использовать такую Конфиденциальную информацию исключительно в целях осуществления своих прав и исполнения обязательств в рамках настоящего Договора; а также (b) вернуть компании ULTRA всю Конфиденциальную информацию (за исключением каких-либо Требуемых компонентов, приобретенных или полученных от компании ULTRA, передача которых должна быть осуществлена согласно условиям п. 11.6), в т.ч. ее копии и иные воплощения в письменной, физической и электронной форме (включая исследования, анализ, подборки и прочие материалы, подготовленные полностью или частично на основе такой Конфиденциальной информации), сразу по завершении действия лицензий, предоставленных Лицензиату в соответствии с настоящим Договором.

6.4    This Agreement shall not affect Licensee's rights to use or disclose information which it first proves, to the reasonable satisfaction of ULTRA:

6.4    Настоящий Договор не влияет на права Лицензиата на использование и раскрытие информации, которая, как он изначально заявляет, к обоснованному удовлетворению компании ULTRA:

(a)    Is in the public domain through no wrongful act of itself prior to the date of its disclosure to Licensee by ULTRA;

(a)    находилась в свободном доступе не в результате какого-либо противоправного действия до ее раскрытия Лицензиату компанией ULTRA;

(b)    Was in Licensee's possession, on a

(b)    была в собственности Лицензиата

non-confidential basis, prior to ULTRA's disclosure to Licensee (such proof must be evidenced by written records);

**(c)** Has become part of the public domain by publication or otherwise not due to any unauthorized act or omission on the part of Licensee;

**(d)** Was independently developed by Licensee without reference to or reliance upon the Confidential Information of ULTRA (such proof must be evidenced by written records); or

**(e)** Was disclosed to Licensee on a non-confidential basis by a third party having a lawful right to do so, prior to disclosure by ULTRA of such information to Licensee (such proof must be evidenced by written records).

6.5 If Licensee, or its representatives, is compelled to disclose Confidential Information by governmental or judicial process, Licensee agrees to promptly provide ULTRA with written notice of such requirement to allow sufficient time for ULTRA to apply for judicial review of such compelled disclosure, or an appropriate protective order to retain the confidentiality of such information.

## 7. INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS.

7.1 Licensee shall promptly notify ULTRA of any unauthorized use, suspected

---

на неконфиденциальной основе до ее раскрытия Лицензиату компанией ULTRA (доказательствами должны служить письменные свидетельства);

**(c)** стала частью информации, находящейся в свободном доступе, путем публикации или иным образом, не в результате неправомерного действия или бездействия со стороны Лицензиата;

**(d)** была независимо разработана Лицензиатом без ссылки на Конфиденциальную информацию компании ULTRA и без ее использования (доказательствами должны служить письменные свидетельства); либо

**(e)** была раскрыта Лицензиату на неконфиденциальной основе третьей стороной, имеющей на это право, до того как она была раскрыта Лицензиату компанией ULTRA (доказательствами должны служить письменные свидетельства).

6.5 Если Лицензиат или его представители принуждаются к раскрытию Конфиденциальной информации государством или судебным процессом, Лицензиат обязуется немедленно известить компанию ULTRA о таком требовании путем письменного уведомления, чтобы у компании ULTRA было достаточно времени подать заявление на юридическое рассмотрение правомерности такого принудительного раскрытия или получить защитное предписание суда, позволяющее сохранить конфиденциальность такой информации.

## 7. НАРУШЕНИЕ ПРАВ ИНТЕЛЛЕК-ТУАЛЬНОЙ СОБСТВЕННОСТИ

7.1 Лицензиат должен немедленно уведомить компанию ULTRA о любом

Unofficial Copy Office of Marilyn Burgess District Clerk

infringement or misappropriation of any of the Licensed Technology or Licensed Trademark of which it becomes aware and provide ULTRA with any evidence of such suspected or actual infringement or misappropriation. ULTRA shall have sole discretion to determine how to respond to any such unauthorized use or suspected infringement or misappropriation, and in defending against any action alleging invalidity, unenforceability or non-infringement of any Licensed Technology or Licensed Trademark, including the right to settle or otherwise compromise any dispute. Licensee, at no out-of-pocket cost to Licensee, shall provide reasonable assistance and cooperation in any legal action ULTRA may initiate or defend, including allowing ULTRA to join Licensee as a party to any such suit, having its employees testify when requested, and making relevant records, information, samples or specimens reasonably available to ULTRA, subject to reasonable safeguards for confidentiality.

7.2    Licensee shall not threaten, warn, or attempt to assert any intellectual property right against any third party relating to infringement of any of the Licensed Technology or Licensed Trademark or otherwise take any action that may support challenges to any rights or potentially asserted rights in or to any of the Licensed Technology or Licensed Trademark, without the prior written consent of ULTRA, which may be withheld at the sole discretion of ULTRA.

несанкционированном использовании, предполагаемом нарушении или незаконном присвоении какой-либо Лицензионной технологии или Лицензионной торговой марки, о котором ему стало известно, и предоставить компании ULTRA доказательства такого предполагаемого или фактического нарушения или незаконного присвоения. Компания ULTRA имеет право по своему собственному усмотрению определять, как реагировать на такое несанкционированное использование, предполагаемое нарушение или незаконное присвоение, и принимать меры для защиты от любых заявлений о недействительности прав на Лицензионную технологию или Лицензионную торговую марку, об отсутствии их правовой защиты и отсутствии их нарушения, включая право на урегулирование или иное разрешение каких бы то ни было споров. Лицензиат оказывает, не неся денежных затрат, разумную помощь и содействие в любом судебном процессе, который может инициировать компания ULTRA или в котором она может выступать в роли ответчика, включая предоставление компании ULTRA возможности присоединиться к Лицензиату в качестве стороны любого такого судебного процесса, обеспечение, по требованию, дачи показаний сотрудниками Лицензиата, а также предоставление компании ULTRA соответствующих документов, информации, проб и образцов с сохранением обоснованного уровня конфиденциальности.

7.2    Лицензиат не должен угрожать третьей стороне, предупреждать ее и пытаться заявить ей свои права на интеллектуальную собственность в связи с нарушением прав на Лицензионную технологию или Лицензионную торговую марку, а также предпринимать какие-либо действия в поддержку оспаривания каких бы то ни было прав или потенциально заявляемых прав на любую Лицензионную технологию или Лицензионную торговую марку без предварительного письменного согласия компании ULTRA, в котором может быть отказано по исключительному усмотрению компании ULTRA.

## 8. REPRESENTATIONS AND WARRANTIES OF ULTRA.

8.1 ULTRA represents and warrants that it has the authority to grant the rights set forth in Sections 2.1 and 2.2 above.

8.2 ULTRA does not warrant the patentability or validity of the Licensed Technology or Licensed Trademark and makes no representations with regard to the scope of the Licensed Technology or Licensed Trademark or that such Licensed Technology or Licensed Trademark may be exploited without infringing other patents, trademarks, or any other rights, as the case may be.

8.3 EXCEPT AS PROVIDED IN SECTION 8.1, ULTRA MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO THE LICENSED TECHNOLOGY OR LICENSED TRADEMARK, AND EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER IMPLIED WARRANTY WITH RESPECT TO THE CAPABILITIES, SAFETY, UTILITY OR COMMERCIAL APPLICATION OF THE LICENSED TECHNOLOGY. ULTRA SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES SUFFERED BY LICENSEE, ITS OFFICERS, DIRECTORS, MEMBERS, MANAGERS, TRUSTEES, EMPLOYEES OR CUSTOMERS OR ANY OTHER DAMAGES RESULTING FROM THE USE OF THE LICENSED TECHNOLOGY, THE LICENSED TRADEMARK OR THE MANUFACTURING, THREADING, REPAIR AND USE OF THE LICENSED PRODUCT.

## 8. ЗАВЕРЕНИЯ И ГАРАНТИИ КОМПАНИИ ULTRA

8.1 Компания ULTRA заверяет и гарантирует, что она уполномочена предоставлять права, указанные в п.п. 2.1 и 2.2 выше.

8.2 Компания ULTRA не гарантирует патентоспособность и применимость Лицензионной технологии и Лицензионной торговой марки и не делает заявлений в отношении области применения Лицензионной технологии и Лицензионной торговой марки, а также возможность использования Лицензионной технологии и Лицензионной торговой марки без нарушения других патентов, торговых марок и любых других прав, в зависимости от обстоятельств.

8.3 ЗА ИСКЛЮЧЕНИЕМ ПОЛОЖЕНИЯ п. 8.1 КОМПАНИЯ ULTRA НЕ ДЕЛАЕТ ЗАВЕРЕНИЙ И НЕ ДАЕТ ГАРАНТИЙ ЛЮБОГО РОДА В ОТНОШЕНИИ ЛИЦЕНЗИОННОЙ ТЕХНОЛОГИИ И ЛИЦЕНЗИОННОЙ ТОРГОВОЙ МАРКИ И ОДНОЗНАЧНО ОТКАЗЫВАЕТСЯ ОТ КАКИХ БЫ ТО НИ БЫЛО ГАРАНТИЙ КОММЕРЧЕСКОГО КАЧЕСТВА И ПРИГОДНОСТИ ДЛЯ КОНКРЕТНОГО ПРИМЕНЕНИЯ, А ТАКЖЕ ИНЫХ ПОДРАЗУМЕВАЕМЫХ ГАРАНТИЙ В ОТНОШЕНИИ ВОЗМОЖНОСТЕЙ, БЕЗОПАСНОСТИ, ПОЛЕЗНОСТИ И КОММЕРЧЕСКОГО ПРИМЕНЕНИЯ ЛИЦЕНЗИРУЕМОЙ ТЕХНОЛОГИИ. КОМПАНИЯ ULTRA НЕ НЕСЕТ ОТВЕТСТВЕННОСТИ ЗА КАКИЕ БЫ ТО НИ БЫЛО ПРЯМЫЕ, НЕПРЯМЫЕ, ОСОБЫЕ, КОСВЕННЫЕ УБЫТКИ, ПОНЕСЕННЫЕ ЛИЦЕНЗИАТОМ, ЕГО ДОЛЖНОСТНЫМИ ЛИЦАМИ, ДИРЕКТОРАМИ, УЧАСТНИКАМИ, РУКОВОДИТЕЛЯМИ, ПОПЕЧИТЕЛЯМИ, РАБОТНИКАМИ И ЗАКАЗЧИКАМИ, А ТАКЖЕ ЛЮБЫЕ ПРОЧИЕ УБЫТКИ, ВОЗНИКАЮЩИЕ В РЕЗУЛЬТАТЕ ИСПОЛЬЗОВАНИЯ ЛИЦЕНЗИОННОЙ ТЕХНОЛОГИИ, ЛИЦЕНЗИОННОЙ ТОРГОВОЙ МАРКИ ИЛИ В РЕЗУЛЬТАТЕ ИЗГОТОВЛЕНИЯ, НАРЕЗКИ РЕЗЬБЫ, РЕМОНТА И ИСПОЛЬЗОВАНИЯ ЛИЦЕНЗИРОВАННОЙ ПРОДУКЦИИ.

9. **REPRESENTATIONS AND WARRANTIES OF LICENSEE.**

9.1 Licensee represents and warrants that it has all necessary authority and power to enter into this Agreement.

9.2 Without in any way limiting Licensee's liability pursuant to the indemnity provisions of this Agreement, Licensee represents and warrants that it will maintain comprehensive general liability insurance in the amount of at least $1,000,000 (combined single limit per occurrence) with a broad form property damage liability endorsement, covering each Licensed Manufacturing Facility. This insurance shall include broad form blanket contractual liability, personal injury liability, products and completed operations liability.

9.3 The insurance described in Section 9.2 shall include: (a) a cross-liability endorsement; (b) an endorsement stating that ULTRA shall receive at least thirty (30) days written notice prior to cancellation or non-renewal of coverage; (c) an endorsement naming ULTRA as an additional insured; (d) an endorsement stating that the insurance required by this Agreement is primary and that any insurance purchased by ULTRA shall only apply in excess of the insurance purchased by Licensee; and (e) a waiver of subrogation in favor of ULTRA.

9.4 All insurance shall be obtained from an insurance company reasonably satisfactory to ULTRA. Licensee shall give at least thirty (30) days prior written notice to ULTRA of the cancellation or any modification of such insurance policy that would adversely affect the status or benefits of ULTRA there

9. **ЗАЯВЛЕНИЯ И ГАРАНТИИ КОМПАНИИ ULTRA**

9.1 Лицензиат заявляет и гарантирует, что он имеет все необходимые полномочия и возможности для заключения настоящего Договора.

9.2 Ни в коем случае не ограничивая обязанностей Лицензиата по положениям настоящего Договора об ограждении от ответственности, Лицензиат обязуется обеспечить в отношении каждого Лицензированного производственного объекта комплексное страхование общей ответственности на сумму не менее $1 000 000 (единый комбинированный лимит на один страховой случай) с индоссаментом, обеспечивающим расширение страховой защиты в случае ответственности за материальный ущерб. Такое страхование должно обеспечивать общую ответственность сторон по договору расширенной формы, ответственность за причинение вреда личности, ответственность за продукцию и ответственность за выполненные операции.

9.3 Договор страхования, предусмотренный в п. 9.2, должен включать в себя: (а) индоссамент о взаимной ответственности; (b) индоссамент, в соответствии с которым компания ULTRA должна получить письменное уведомление как минимум за 30 (тридцать) дней до отмены или невозобновления страхового обеспечения; (c) индоссамент, в соответствии с которым компания ULTRA является дополнительным страхователем; (d) индоссамент, в соответствии с которым страхование, обязательное в рамках настоящего Договора, является основным, и что любое другое страхование, оплаченное компанией ULTRA, должно применяться исключительно в дополнение к основному страхованию, приобретенному Лицензиатом; (е) отказ от суброгационных прав в пользу компании ULTRA.

9.4 Все страховые полисы должны быть получены у страховой компании, которая удовлетворяет требованиям компании ULTRA. В случае отмены такого страхового полиса или внесения в него изменений, в результате которых ухудшается страховая защита или обеспечение


Unofficial Office of the Maritime Commissioner's work

under. This insurance may be obtained for ULTRA by Licensee in conjunction with a policy which covers products other than the Licensed Product.

9.5 No later than one hundred twenty (120) days from the date hereof, Licensee shall furnish to ULTRA a certificate, in form and substance reasonably satisfactory to ULTRA, evidencing the insurance required herein.

## 10. INDEMNIFICATION OF ULTRA.

10.1 Licensee agrees to indemnify, defend and hold harmless ULTRA and its partners, officers, employees and agents, and the partners, members, directors, officers, employees and agents of parent companies and affiliates of ULTRA (each an "ULTRA Indemnitee") from and against any and all claims, demands, losses, damages, penalties, costs or expenses (including reasonable attorneys' and expert witness' fees and costs) of any kind or nature (each, a "Liability"), arising from or relating to: (a) the manufacture, threading or repair of any Licensed Product by Licensee; (b) any unauthorized use of information provided by ULTRA to Licensee; (c) any violation or breach by Licensee of any representation, warranty, covenant or agreement made by Licensee pursuant to this Agreement, except to the extent that such Liability is (i) caused by the negligence or willful misconduct of ULTRA, or (ii) results from a breach of a representation or warranty of ULTRA set forth in Section 8 above; and (d) actions for product liability, negligence, intentional torts, or the like, arising out of or relating to Licensee's manufacture, threading or repair of Licensed Product. The ULTRA Indemnitees shall be entitled to participate at their option and expense, through counsel of their own selection, in any indemnified action, and may join in any legal actions related to any such Liability. Licensee shall not enter into any settlement or compromise affecting any rights or obligations of any ULTRA Indemnitee or which includes an express or implied admission of liability, negligence or wrongdoing by any ULTRA Indemnitee, without the prior written consent of such

компании ULTRA, Лицензиат предоставляет компании ULTRA письменное уведомление как минимум за 30 (тридцать) дней. Такое страхование может быть приобретено для компании ULTRA Лицензиатом совместно с полисом, распространяющимся на продукцию, не являющуюся Лицензионной.

9.5 Не позднее 120 (сто двадцати) дней после даты настоящего Договора Лицензиат должен предоставить компании ULTRA свидетельство, по форме и содержанию удовлетворяющее компанию ULTRA, подтверждающее наличие страхования, требуемого настоящим Договором.

## 10. ВОЗМЕЩЕНИЕ УЩЕРБА КОМПАНИИ ULTRA

10.1 Лицензиат обязуется освобождать, ограждать и защищать компанию ULTRA, ее партнеров, должностных лиц, работников и агентов, а также партнеров, участников, директоров, должностных лиц, работников и агентов материнских компаний и филиалов компании ULTRA (каждый из которых является «освобождаемым от ответственности лицом со стороны компании ULTRA») от любых и всяческих рекламаций, требований, убытков, ущерба, штрафов, затрат и расходов (включая обоснованные юридические издержки и расходы на привлечение экспертов в качестве свидетелей) любого рода и любой природы (именуемых в каждом отдельном случае «Ответственностью»), в связи с: (a) изготовлением, нарезкой резьбы или ремонтом какой-либо Лицензионной продукции Лицензиатом; (b) несанкционированным использованием информации, предоставленной компанией ULTRA Лицензиату; (c) нарушением Лицензиатом какого-либо заявления, гарантии или обязательства, принятого Лицензиатом в соответствии с настоящим Договором, кроме случаев, когда такая Ответственность (i) вызвана неосторожностью или злонамеренными действиями компании ULTRA или (ii) является результатом нарушения заявления или гарантии компании ULTRA, изложенных в разделе 8 выше; а также (d) исками об ответственности за продукцию, неосторожность, умышленное правонарушение и т.п., предъявляемыми по причине или в связи с изготовлением, нарезкой

ULTRA Indemnitee.

резьбы или ремонтом Лицензионной продукции Лицензиатом. Освобождаемые от ответственности лица со стороны компании ULTRA имеют право принимать участие по своему желанию и за свой счет, через выбранного ими адвоката в любом судебном процессе по освобождению от ответственности, а также могут присоединиться к любому судебному процессу в отношении такой Ответственности. Лицензиат не должен заключить договоров об урегулировании спора и компромиссе, которые влияют на права или обязательства какого-либо Освобождаемого от ответственности лица со стороны компании ULTRA, или предусматривают явно выраженное или подразумеваемое признание ответственности, неосторожности или правонарушения какого бы то ни было Освобождаемого от ответственности лица со стороны компании ULTRA, без предварительного письменного согласия на это Освобождаемого от ответственности лица со стороны компании ULTRA.

## 11.  DURATION, MODIFICATION, AND TERMINATION.

## 11.  СРОК ДЕЙСТВИЯ, ИЗМЕНЕНИЕ И РАСТОРЖЕНИЕ ДОГОВОРА

11.1  This Agreement shall commence on the Effective Date and remain effective through October 1, 2019, automatically renewing thereafter for additional one year terms, except if terminated as provided in this Section 11.

11.1  Настоящий Договор вступает в силу в дату вступления в силу и действует в течение 1 (одного) года с последующим автоматическим продлением, за исключением случая расторжения, предусмотренного в настоящем разделе (11).

11.2  This Agreement may be terminated by ULTRA immediately, upon written notice to Licensee, upon any of the following:

11.2  Настоящий Договор может быть расторгнут компанией ULTRA немедленно путем уведомления Лицензиата в письменной форме в одном из следующих случаев:

(a) Licensee breaches a covenant, representation or warranty in this Agreement and such breach is not cured within fifteen (15) days from receipt of written notice from ULTRA; or

(a) Лицензиат нарушает обязательство, заявление или гарантию, предусмотренную настоящим Договором, и не исправляет такое нарушение в течение 15 (пятнадцати) дней с момента получения письменного уведомления от компании ULTRA; или

(b) Licensee is adjudged bankrupt or has its assets placed in the hands of a receiver or makes any assignment or other accommodation for the benefit of creditors.

(b) Лицензиат объявляется банкротом или его активы размещаются у получателя, или он передает какие-либо права или заключает иную сделку в интересах кредиторов.

11.3  Either party may terminate this Agreement at any time upon thirty (30) days written

11.3  Любая из сторон может расторгнуть настоящий Договор в любое время

notice to the other party.

11.4    In the event the Agreement is terminated for any reason, Licensee shall return, or at the discretion and direction of ULTRA, destroy all documents and materials pertaining to or embodying any Confidential Information (other than any Required Components purchased or received from ULTRA, the handling of which shall be subject to the terms of Section 11.6), retaining no copies (except as may be required under applicable law). Upon termination of this Agreement and the license granted herein, Licensee shall cease any and all manufacturing, threading and repair of Licensed Product. The provisions of Sections 1, 3, 4, 5, 6, 10, 11, 12 and 13 of this Agreement shall remain in full force and effect notwithstanding the termination of this Agreement.

11.5    After termination, unless the Agreement has been terminated by ULTRA for cause as provided in Section 11.2, Licensee shall have one (1) month to complete previously commenced manufacturing, threading or repair of Licensed Product.

11.6    After termination of this Agreement, Licensee shall return to ULTRA all Required Components in its possession which were originally purchased from ULTRA. Such return of Required Components shall take place (a) within fifteen (15) days after termination of this Agreement by ULTRA as provided in Section 11.2 or (b) within fifteen (15) days after completion of previously commenced production of Licensed Product if this Agreement is terminated for any other reason.

## 12.    NOTICES    AND    BANKING INFORMATION.

All notices, requests, and other communications hereunder shall be in writing and

путем уведомления другой стороны в письменном виде за 30 (тридцать) дней.

11.4    В случае расторжения настоящего Договора по какой бы то ни было причине Лицензиат возвращает или, по усмотрению или указанию компании ULTRA, уничтожает все документы и материалы, относящиеся к Конфиденциальной информации или воплощающие ее (за исключением Требуемых компонентов, приобретенных или полученных от компании ULTRA, обращение с которыми осуществляется в соответствии с условиями п. 11.6) без сохранения копий (за исключением случаев, предусмотренных действующим законодательством). По расторжении настоящего Договора и прекращении действия лицензии, предоставленной в соответствии с ним, Лицензиат прекращает изготовление, нарезку резьбы и ремонт Лицензионной продукции. Положения разд. 1, 3, 4, 5, 6, 10, 11, 12 и 13 настоящего Договора остаются в полной силе и продолжают действовать, несмотря на расторжение настоящего Договора.

11.5    После расторжения Договора, если он не был расторгнут компанией ULTRA по причинам, указанным в п. 11.2, Лицензиату дается 1 (один) месяц для завершения ранее начатых изготовления, нарезки резьбы и ремонта Лицензионной продукции.

11.6    После расторжения настоящего Договора Лицензиат возвращает компании ULTRA все Требуемые компоненты, находящиеся у него, которые были приобретены у компании ULTRA. Такой возврат Требуемых компонентов должен быть осуществлен: (a) в течение 15 (пятнадцати) дней после расторжения настоящего Договора компанией ULTRA в соответствии с положениями п. 11.2 или (b) в течение 15 (пятнадцати) дней после завершения ранее начатого производства Лицензионной продукции, если настоящий Договор не был расторгнут по какой-либо другой причине.

## 12.    УВЕДОМЛЕНИЯ

Все уведомления, запросы и прочие сообщения в рамках настоящего Договора

shall be (a) personally delivered, (b) sent by recognized overnight courier service, or (c) sent by e-mail, in each case to the respective address specified below, or such other address as may be specified in writing to the other party hereto, and shall be deemed to have been delivered upon receipt:

направляются в письменном виде и должны быть (a) доставлены лично, (b) отправлены авторитетной курьерской службой доставки на следующий день или (c) отправлены по электронной почте, в каждом из случаев по соответствующему адресу, указанному ниже, или другому адресу, указанному в письменном виде, другой стороне, и считаются доставленными по получении:

to ULTRA:

ULTRA Premium Services, L.L.C.
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Attn: VP for Research, Engineering and Product Development
email: Ddiederich@tmk-ipsco.com

Компании ULTRA:

ULTRA Premium Services, L.L.C.
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Вниманию: Вице-президент по НИОКР
эл. почта: Ddiederich@tmk-ipsco.com

to Licensee:

TMK Premium Services, LLC
20 Podsosensky Side Street, Building 1,
Moscow, 105062, Russian Federation
and Attn: S.A. Rekin
email: RekinSA@tmk-group.com

with a copy to:

TMK IPSCO
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Attn: General Counsel
email: GC@tmk-ipsco.com
with a copy to:

Лицензиату:

ООО «ТМК-Премиум Сервис»
105062, Российская федерация, Москва,
Подсосенский переулок, 20, стр.1
Москва, 105062
Вниманию: С.А. Рекин
эл. почта: RekinSA@tmk-group.com
Копия:

TMK IPSCO
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Вниманию: Главный юрисконсульт
эл. почта: GC@tmk-ipsco.com
Копия:

_____
_____
_____
_____
Attn:
email:

_____
_____
_____
_____
Вниманию:
эл. почта:

Banking information for ULTRA and Licensee is below:

LICENSOR:

ЛИЦЕНЗИАР:
ULTRA Premium Services, L.L.C. (U.S.A.)

Unofficial Copy Office of Martin Burgess District Clerk

ULTRA Premium Services, L.L.C. (U.S.A.)
Address: 10120 Houston Oaks Drive, Houston, Texas 77064, USA.
Address for postal correspondence: 10120 Houston Oaks Drive, Houston, Texas 77064, USA.

Bank details:
JPMorgan Chase
New York, NY 10004
Ipsco Tubulars Inc. dba TMK Ipsco
Account #226965181
SWIFT CODE: CHASUS33
ABA# 021000021

LICENSEE:

Address: 51 Rosa Luxemburg street, Yekaterinburg, 620026, Russian Federation

Address for postal correspondence: 20 Podsosensky Side Street, Building 1, Moscow, 105062, Russian Federation

INN/KPP 6672244954/668501001
Tel.: +7(495) 411 53 53

Bank Detail:
TMK Premium Services, (Ekaterinburg, Russia)
Account No.40702840804400800031
SKB-BANK (Ekaterinburg, Russia) in favour of Moscow branch
SWIFT: SKBERU4E
Account: № 0104195417
VTB Bank (Europe) SE, Frankfurt am Main, Germany
SWIFT: OWHBDEFF

### 13. MISCELLANEOUS PROVISIONS.

13.1   The licenses and all rights granted to Licensee hereunder are personal in nature, and Licensee shall not have the right to transfer or assign the license, this Agreement, or any of its rights, interests, or obligations hereunder, or any part hereof, without the prior written consent of ULTRA, and any attempt by Licensee to make an assignment without such consent shall be void *ab initio*.

---

Адрес место нахождения:   10120 Houston Oaks Drive, Houston, Texas 77064, USA.
Адрес для почтовой корреспонденции: 10120 Houston Oaks Drive, Houston, Texas 77064, USA.
Тел: +1 (630) 874-0078, Fax: +1 (630) 874-6431
Банковские реквизиты:
Bank Routing: 021000021
Swift Code: CHASUS33
General Bank Reference: JPMorgan Chase New York, NY 10004
Acct#: 226966767
Account Name: Ultra Premium Services, LLC.

ЛИЦЕНЗИАТ

ООО «ТМК-Премиум Сервис»
Адрес место нахождения: 620026, Свердловская обл., г. Екатеринбург, ул. Розы Люксембург, д.51
Адрес для почтовой корреспонденции: 105062, Российская Федерация, Москва, Подсосенский переулок, 20, стр.1
ИНН: 6672244954 / КПП: 668501001
Тел.: +7(495) 411 53 53

Банковские реквизиты:
TMK Premium Services, (Ekaterinburg, Russia)
Account No.40702840804400800031
SKB-BANK (Ekaterinburg, Russia) in favour of Moscow branch
SWIFT: SKBERU4E
Account: № 0104195417
VTB Bank (Europe) SE, Frankfurt am Main, Germany
SWIFT: OWHBDEFF

### 13. ПРОЧИЕ ПОЛОЖЕНИЯ

13.1   Лицензии и все права, полученные Лицензиатом по настоящему Договору, являются личными по своей сути, и Лицензиат не имеет права передавать лицензию, настоящий Договор, а также какие-либо из своих прав и обязанностей по нему без предварительного письменного согласия компании ULTRA, при этом любая попытка такой передачи, предпринимаемая Лицензиатом без такого согласия, изначально не имеет юридической силы.

Unofficial Copy Office of Marilyn Burgess District Clerk

13.2    ULTRA shall have the right to transfer or assign its rights and interests in this Agreement to any domestic or foreign corporation or other business entity, provided, that such transferee agrees to be bound by all of the terms hereof and is the holder of all relevant Licensed Technology and Licensed Trademark applicable to the Licensed Manufacturing Facility. ULTRA shall give written notice to Licensee within thirty (30) days of any such transfer or assignment.

13.3    In the event Licensee breaches any material term of this Agreement, ULTRA shall be entitled to equitable relief by way of temporary and permanent injunction and such other and further relief as any court with jurisdiction may deem just and proper.

13.4    The interpretation and application of the provisions of this Agreement shall be governed by the laws of the State of Texas, without giving effect to any principals of conflicts of law. This Agreement is not governed by the United Nations Convention of Contracts for the International Sale of Goods, the application of which is hereby expressly excluded.

13.5    Neither party may waive or release any of its rights or interest in this Agreement except in writing. The failure of a party to assert a right hereunder or to insist on compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the other party.

13.6    In case any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provisions shall not be affected or impaired in any other jurisdiction, nor shall the remaining provi-

13.2    Компания ULTRA имеет право передавать свои права по настоящему Договору любой отечественной или иностранной корпорации или предприятию при условии, что такой правопреемник обязуется соблюдать все условия настоящего Договора и является владельцем соответствующей Лицензионной технологии и Лицензионной торговой марки, применимым к Лицензированному производственному объекту. Компания ULTRA уведомляет Лицензиата о такой передаче в письменном виде в течение 30 (тридцати) дней.

13.3    Если Лицензиат нарушает какое-либо существенное условие настоящего Договора, компания ULTRA имеет право на средство судебной защиты по праву справедливости путем временного и бессрочного судебного запрета и иного средства защиты, которое суд с соответствующей юрисдикцией может посчитать целесообразным.

13.4    Интерпретация и применение положений настоящего Договора регламентируется законами штата Техас без учета каких бы то ни было принципов правовых коллизий. Настоящий Договор не регламентируется Конвенцией Организации Объединенных Наций о договорах международной купли-продажи товаров, применение которой настоящим однозначно исключается.

13.5    Отказ любой из сторон от своих прав по настоящему Договору возможен только в письменной форме. Неспособность одной из сторон утвердить свое право по настоящему Договору или настоять на соблюдении какого-либо условия настоящего Договора не означает отказа от такого права и не оправдывает в дальнейшем неисполнения такого условия другой стороной.

13.6    Если одно или несколько положений настоящего Договора должны считаться недействительными, незаконными или невыполнимыми в каком-либо отношении на территории какой-либо юрисдикции, это не влияет на действительность, законность и выполнимость таких положений на территории другой юрисдикции, и это также не влияет на остальные

sions contained herein in any way be affected or impaired thereby.

13.7  Neither party shall represent itself as the agent or legal representative of the other party hereto for any purpose whatsoever and shall have no right to create or assume any obligation of any kind, express or implied, for or on behalf of the other party hereto. The relationship of Licensee and ULTRA under this Agreement shall be solely that of independent contractors and nothing herein shall be construed to create or imply any relationship of employment, agency, joint venture, partnership, franchise or any relationship other than that of arm's length independent contractors.

13.8  Any legal action or proceeding with respect to this Agreement shall be brought only in the courts of the State of Texas or of the United States of America located in the State of Texas and, by execution and delivery of this Agreement, each party hereby accepts for itself and in respect to its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Licensee hereby irrevocably and unconditionally waives any claim for special, consequential or punitive damages and any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing or maintaining of any such action or proceeding in such respective jurisdictions.

13.9  This Agreement constitutes the entire agreement and understanding between the parties relating to the subject matter hereof, and neither party shall be obligated by any condition, promise or representation other than those expressly stated herein or as may be subsequently agreed to by the parties hereto in writing.

положения настоящего Договора.

13.7  Ни одна из сторон не должна представлять себя в роли агента или законного представителя другой стороны настоящего Договора в каких бы то ни было целях, а также не имеет права создавать или принимать на себя какие бы то ни было обязательства, явно выраженные или подразумеваемые, от имени другой стороны. Взаимоотношения Лицензиата и компании ULTRA по настоящему Договору исключительно соответствуют взаимоотношениям независимых договаривающихся сторон, при этом ни одно из положений настоящего Договора не должно интерпретироваться как создающее трудовые, агентские отношения, отношения участников совместного предприятия, партнерства, франшизы и прочие взаимоотношения, помимо взаимоотношений абсолютно независимых договаривающихся сторон.

13.8  Любое юридическое или процессуальное действие в отношении настоящего Договора должно осуществляться только в судах штата Техас или судах США, находящихся на территории штата Техас, при этом подписывая настоящий Договор и передавая его другой стороне, каждая из сторон безоговорочно принимает в отношении себя и своего имущества исключительную компетенцию вышеуказанных судов. Лицензиат настоящим окончательно и безоговорочно отказывается от каких-либо исков об особых, косвенных или штрафных убытках, а также от возражений, в том числе против места проведения возможного юридического или процессуального действия на территории соответствующей юрисдикции на основании отсутствия тесной связи спора и места его рассмотрения.

13.9  Настоящий Договор представляет собой полную договоренность сторон в отношении предмета настоящего Договора, и ни одна из сторон не связана какими бы то ни было иными условиями, обещаниями и заявлениями, помимо того, что явно выражено в настоящем Договоре, или может быть впоследствии согласовано сторонами в письменной форме.

13.10 This Agreement supersedes all representations, agreements, statements and understandings whether written or oral, relating to such matters made prior to execution of this Agreement. This Agreement may not be modified or supplemented except as agreed in writing and executed by both parties.

13.11 ULTRA and Licensee acknowledge that they have cooperated in the drafting and preparation of this Agreement. In any construction or interpretation of the terms of this Agreement, the terms shall not be construed against any party. Each of the parties hereto further acknowledges that its respective entry into this Agreement has been based upon the advice of its own respective counsel or its own respective knowledge, information, belief, experience and choosing, with no party relying upon the estimates, expectations or projections of the other party, beyond those set forth in this Agreement, if any.

13.12 The headings herein are included for purposes of convenience only and shall not affect the construction or interpretation of the provisions of this Agreement.

13.13 The undersigned parties represent and warrant that each has full authority to execute this Agreement on behalf of themselves, their predecessors and all other persons or entities named herein.

13.14 This Agreement has been prepared in English and notwithstanding any translation of this Agreement into any other language, the English version of this Agreement shall control in all aspects.

13.15 This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

13.10 Настоящий Договор аннулирует все заявления, договоренности и соглашения, устные или письменные, в отношении предмета Договора, которые были сделаны до подписания настоящего Договора. Настоящий Договор не может быть изменен или дополнен, если это не согласовано обеими сторонами в письменной форме.

13.11 Компания ULTRA и Лицензиат признают, что они совместно работали над составлением и подготовкой настоящего Договора. При истолковании условий настоящего Договора условия не должны истолковываться против какой-либо из сторон. Каждая из сторон настоящего Договора признает, что заключение ею настоящего Договора основывалось на рекомендациях ее собственного юрисконсульта, а также на ее знаниях, информации, убеждениях, опыте и выборе, при этом ни одна из сторон не полагалась на оценки, ожидания и прогнозы другой стороны, кроме тех, которые изложены в настоящем Договоре, если таковые имеются.

13.12 Заголовки в настоящем Договоре даны исключительно в целях удобства и не должны влиять на толкование положений настоящего Договора.

13.13 Стороны, подписавшие настоящий Договор, заявляют и гарантируют, что каждая из сторон полностью уполномочена выполнять настоящий Договор от своего имени, от имени своих предшественников и прочих лиц и организаций, указанных в настоящем Договоре.

13.14 Настоящий Договор составлен на английском языке, и независимо от того, на какой язык осуществляется перевод Договора, английская версия Договора имеет преимущественную силу во всех отношениях.

13.15 Настоящий Договор может быть составлен в нескольких экземплярах, каждый из которых считается оригиналом, и все они составляют один и тот же документ и вступают в силу после их подписания каждой из сторон и передачи другой стороне, при этом Стороны не обязаны подписывать один и тот же экземпляр.

13.16    The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

13.16    Обмен экземплярами настоящего Договора и страницами с подписями с помощью факсимильной передачи (будь то прямая передача с одного факсимильного устройства на другое путем автоматического соединения или с помощью всемирной сети), по электронной почте в формате pdf или с помощью других электронных средств, позволяющих сохранить первоначальные графику и внешний вид документа, или с помощью сочетания таких средств составляет подписание настоящего договора Сторонами и его должную передачу друг другу, при этом такие копии могут использоваться вместо оригинального Договора в любых целях. Подписи Сторон, переданные факсимильными устройствами, считаются оригинальными подписями Сторон в любых целях.

Unofficial Copy Office of Marilyn Burgess District Clerk

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

В ПОДТВЕРЖДЕНИЕ ВЫШЕИЗЛОЖЕННОГО стороны заключили настоящий Договор посредством подписания своими представителями, уполномоченными в установленном порядке на Дату вступления Договора в силу.


**ULTRA PREMIUM SERVICES, L.L.C.**

By: _____

*Name/ФИО*: David Diederich/Дэвид Дитрих

*Title/должность*: Vice President, Research and Product Development / Вице-президент по НИОКР

*Date/дата*:


**TMK Premium Services /**
**ООО «ТМК-Премиум Сервис»**

By: _____

*Name/ФИО*: S.A. Rekin/Рекин С.А.

*Title/должность*: General Director/ Генеральный директор

*Date/дата*:

Unofficial Copy Office of Marilyn Burgess District Clerk

## Exhibit A / Приложение А

## Licensed Product / Лицензионная продукция

### Connections / Соединения

TMK UP ULTRA™ FJ

TMK UP ULTRA™ SF

TMK UP ULTRA™ FX

TMK UP ULTRA™ QX

TMK UP ULTRA™ DQX

TMK UP ULTRA™ CX

TMK UP ULTRA™ GX

TMK UP™ SF TORQ™

TMK UP™ QX TORQ™

### Accessory / Приспособления

Any Accessory utilizing the thread forms of the connections listed above. This Agreement **PERMITS** the manufacturing of Accessories. / Приспособления с формами резьб, соответствующими указанным выше соединениям. Настоящий Договор **ДОПУСКАЕТ** изготовление приспособлений.

### Couplings / Муфты

This Agreement **PERMITS** the manufacturing of coupling products without prior written authorization from ULTRA. / Настоящий Договор **ДОПУСКАЕТ** изготовление муфтовой продукции без получения предварительного письменного разрешения от компании ULTRA.

### Full Length (Repair) / Полноразмерная продукция (ремонт)

Full length products are those defined as API range 1, 2 and 3 This Agreement **PERMITS** the manufacturing of full length repairs without prior written authorization from ULTRA. / К полноразмерной продукции относятся изделия классов длины 1, 2 и 3 по стандарту API. Настоящий Договор **ДОПУСКАЕТ** производство ремонта полноразмерной продукции без получения предварительного письменного разрешения от компании ULTRA.

A repair of a full length product shall mean replacing, or reworking an existing TMK UP ULTRA™ Connection or TMK BPN with the same type of connection. A new full length product shall include replacing an existing TMK UP ULTRA™ Connection or TMK UP™ BPN with another type of TMK UP ULTRA™ Connection or

Unofficial copy of Office of Marilyn Burgess District Clerk

TMK UP™ BPN and shall be governed according to the terms for Full Length (New). / Ремонт полноразмерной продукции означает замену или переделку существующего соединения TMK UP UL-TRA™ или TMK BPN с получением соединения того же типа. Замена существующего соединения TMK UP ULTRA™ на соединение TMK UP™ BPN или существующего соединения TMK UP™ BPN на соединение TMK UP ULTRA™ считается получением новой продукции и регламентируется в соответствии с условиями, действующими в отношении полноразмерной продукции (новой).

**Full Length (New) / Полноразмерная продукция (новая)**

Full Length products are those defined as API range 1, 2 and 3. Any Full Length (New) utilizing the thread forms of the connections listed above with a purchase order from TMK IPSCO. This Agreement **PERMITS** the manufacturing of new full length products without prior written authorization from ULTRA. / К полноразмерной продукции относятся изделия классов длины 1, 2 и 3 по стандарту API. Любая полноразмерная продукция (новая) с формами резьб, соответствующими указанным выше соединениям, при наличии заказа на поставку от TMK IPSCO. Настоящий Договор **ДОПУСКАЕТ** изготовление новой полноразмерной продукции без получения предварительного письменного разрешения от компании UL-TRA.
/
**Handling Plugs / Подъемные заглушки**

This Agreement **PROHIBITS** the manufacture of ULTRA Handling Plugs. / Настоящий Договор **ЗАПРЕЩАЕТ** изготовление подъемных заглушек с соединением ULTRA.

When requesting prior written authorization from ULTRA under this Agreement, please include the following information: / При запросе предварительного письменного разрешения от компании ULTRA в рамках настоящего Договора указать следующую информацию:

* name of distributor / наименование дистрибьютора
* end use of customer / конечное использование заказчиком
* manufacturer of pipe / изготовитель трубы
* pipe size, pipe grade and wall thickness / диаметр, группа прочности и толщина стенки трубы
* type of connection / тип соединения
* number of pieces / количество штук
* required / desired or planned ship date / требуемая или запланированная дата отгрузки
* ship to location / пункт назначения при отгрузки

All written requests shall be sent to: / Все письменные запросы направлять:
Attn: VP for Research, Engineering and Product Development, David Diederich Email: ddiederich@tmk-ipsco.com / Вниманию: Вице-президент по НИОКР David Diederich
Эл. почта: ddiederich@tmk-ipsco.com

With a copy to: / Копия:
Attn: General Counsel / Вниманию: Главный юрисконсульт
Email: gc@tmk-ipsco.com / Эл. почта: gc@tmk-ipsco.com

Attn: Licensing / Вниманию: Лицензионный отдел
Email: ultralicensee@tmk-ipsco.com / эл. почта: ultralicensee@tmk-ipsco.com

## Exhibit B / Приложение B

### Licensed Patents / Патенты, составляющие предмет лицензии

US Patent 9,869,414 / Патент США 9,869,414
Patent Application 62 / 505,262 (Patent Pending)
/ Патентная заявка 62 / 505,262 (ожидается
получение патента)
Patent Application 13 / 798330 (Patent Pending) /
Патентная заявка 13 / 798330 (ожидается
получение патента)

### Licensed Trademark / Лицензионная торговая марка

ULTRA™ Premium Connections / Премиальные соединения ULTRA™

TMK UP ULTRA™ FJ

TMK UP ULTRA™ SF

TMK UP ULTRA™ FX

TMK UP ULTRA™ QX

TMK UP ULTRA™ DQX

TMK UP ULTRA™ CX

TMK UP ULTRA ™ GX

TMK UP™ SF TORQ™

TMK UP™ QX TORQ™

Unofficial Copy Office of Marilyn Burgess District Clerk

<u>Exhibit C / Приложение C</u>

**Licensed Manufacturing Facility / Лицензированный производственный объект**

Joint stock company "Orskiy Machine Building Plant"/ АО "Орский машиностроительный завод" Krupskaya Street 1 Orsk, Orenburg Region/ ул.Крупской д.1, г.Орск, Оренбургская область , 462431, Russian Federation Russia / Россия


**Facilities to be sub licensed by TMK Premium Services, LLC / Объекты, подлежащие сублицензированию обществом с ограниченной ответственностью «ТМК-Премиум Сервис»**

Unofficial Copy Office of Marilyn Burgess District Clerk

**Exhibit D / Приложение D**

**Licensed Sellers / Лицензированные продавцы**

TMK IPSCO
10120 Houston Oaks Drive
Houston, Texas 77064
USA

Unofficial Copy Office of Marilyn Burgess District Clerk

Unofficial Copy of Materials in Wills District Clerks

<u>Exhibit E / Приложение Е</u>

**Trademark Guide / Руководство по использованию торговых марок**

1. **Proper Use of the Trademarks of ULTRA™ Premium Oilfield Services ("ULTRA™") / Надлежащее использование Торговой марки ULTRA™ Premium Oilfield Services ("ULTRA™")**

Proper use of the trademarks of ULTRA™ is vital for their continued protection. / Надлежащее использование торговых марок ULTRA™ крайне важно для их постоянной защиты.

Improper use can result in a mark becoming generic. / Ненадлежащее использование может привести к тому, что марка превратится в свободный товарный знак.

The following examples illustrate the proper way in which to use the trademarks of ULTRA: / Надлежащее использование торговых марок ULTRA показано на следующих примерах:

* Never use a trademark as a noun; always use a trademark as an adjective. / Не использовать торговую марку в функции независимого существительного, использовать только в функции дополнения.

    o Improper: "Use of the TMK UP ULTRA™ SF has increased in horizontal and directional drilling environments." / Неправильно: "Увеличилось использование TMK UP ULTRA™ GX в горизонтальном и наклонно-направленном бурении"

    o Proper: "Use of the TMK UP ULTRA™ SF Premium Connection has increased in horizontal and directional drilling environments." / Правильно: "Увеличилось использование труб с премиальными соединениями TMK UP ULTRA™ GX в горизонтальном и наклонно-направленном бурении."

* Always distinguish trademarks by using them in all upper-case letters (use of italics or bold text also distinguishes the trademark): / Торговые марки должны выделяться путем написания их заглавными буквами (использование курсива и жирного шрифта также допустимо).

    o Improper: Ultra™-SF / о Неправильно: Ultra™-SF

    o Proper: **TMK UP ULTRA™ SF** , TMK UP *ULTRA™ SF* / о Правильно: **TMK UP ULTRA™ SF** , TMK UP *ULTRA™ SF*

* Never use a trademark in the possessive form. / Не использовать наименование торговой марки в притяжательной форме.

    o Improper: "TMK UP ULTRA™ SF's performance in the shale plays . . ." / Неправильно: " Показатели применения TMK UP ULTRA™ SF на сланцевых объектах]. . ."

    o Proper: "The performance of the TMK UP ULTRA™ SF Premium Connection in the shale plays . . ." / Правильно: "Показатели применения премиального соединения TMK UP ULTRA™ SF на сланцевых объектах. . ."

* In advertising, press releases, articles, documents, and reports, the proper trademark acknowledgement (® or ™) need only appear in the first or most prominent mention of the mark. It does not need to be referenced thereafter. / В рекламных материалах, статьях, документах, отчетах подтверждение торговой марки (значком ® или ™) требуется только при первом, а также наиболее значимых упоминаниях. Нет необходимости делать такое подтверждение при каждом упоминании.

2. **Affixing the Trademark to Licensed Product / Присоединение Торговой марки к Лицензионной продукции**

The format of stenciling to be applied to oilfield casing, tubing and accessories featuring ULTRA™ Premium Connections is set forth in the Manufacturing Procedures. / Формат маркировки, наносимой на нефтепромысловые обсадные трубы, НКТ и приспособления с премиальными соединениями ULTRA™, приведен в Производственном регламенте.

Unofficial Copy Office of Marilyn Burgess District Clerk

## Employee Confidentiality and Non-Disclosure / Требования к работникам в отношении конфиденциальности и неразглашения

Licensee recognize that, in connection with this Agreement, it will receive access to business, technical, or financial information from or for ULTRA, which is deemed Confidential Information and as such is proprietary, or a trade secret of ULTRA. Confidential Information expressly includes, but is not limited to, all materials in print or electronic media embodying any facets of the Licensed Technology. / Лицензиат признает, что в рамках настоящего Договора он получит доступ к деловой, технической или финансовой информации компании ULTRA, считающейся конфиденциальной, и, как таковая, являющейся служебной информацией или коммерческой тайной компании ULTRA. Конфиденциальная информация включает в себя, помимо прочего, все материалы на печатных и электронных носителях, в которых изложены какие-либо аспекты Лицензионной технологии.

Employees of the Licensee, by signing below, acknowledge that all Confidential Information is proprietary and valuable to ULTRA, and that any disclosure or unauthorized use of Confidential Information will cause ULTRA irreparable harm and loss. Licensee and its employees warrant and agree that, during the term of this Agreement or thereafter, they shall not use for itself or others or disclose to any third party Confidential Information, without first obtaining the prior written consent of ULTRA. Licensee and its employees also agree not to use or share Confidential Information except with the machining, repair and gauging of ULTRA threaded connections pursuant to this Agreement. / Работники Лицензиата, поставившие свою подпись под документом, признают, что вся Конфиденциальная информация является собственностью компании ULTRA и имеет ценность для нее, и что любое раскрытие или неправомерное использование Конфиденциальной информации нанесет непоправимый вред компании ULTRA. Лицензиат и его работники гарантируют и обязуются в течение срока действия настоящего Договора, а также по его завершении не использовать в своих или чужих целях и не раскрывать третьим лицам Конфиденциальную информацию без предварительного получения письменного разрешения от компании ULTRA. Лицензиат и его работники также обязуются не использовать Конфиденциальную информацию и не делиться ею в каких бы то ни было целях, кроме изготовления, ремонта и измерения резьбовых соединений ULTRA в соответствии с настоящим Договором.

Licensee and its employees shall promptly notify ULTRA of any unauthorized use, suspected infringement or misappropriation of any of Confidential Information of which it becomes aware and provide ULTRA with any evidence of such suspected or actual infringement or misappropriation. / Лицензиат и его работники должны немедленно уведомить компанию ULTRA о любом несанкционированном использовании, предполагаемом нарушении или незаконном присвоении какой-либо Конфиденциальной информации, о котором им стало известно, и предоставить компании ULTRA доказательства такого предполагаемого или фактического нарушения или незаконного присвоения.

Licensee and its employees shall not threaten, warn, or attempt to assert any intellectual property right against any third party relating to infringement of any of the Licensed Technology or Licensed Trademark or otherwise take any action that may support challenges to any rights or potentially asserted rights in or to any of the Licensed Technology or Licensed Trademark, without the prior written consent of ULTRA, which may be withheld at the sole discretion of ULTRA. / Лицензиат и его работники не должны угрожать третьей стороне, предупреждать ее и пытаться заявить ей свои права на интеллектуальную собственность в связи с нарушением прав на Лицензионную технологию или Лицензионную торговую марку, а также предпринимать какие-либо действия в поддержку оспаривания каких бы то ни было прав или потенциально заявляемых прав на любую Лицензионную технологию или Лицензионную торговую марку без предварительного письменного согласия компании ULTRA, в котором может быть отказано по исключительному усмотрению компании ULTRA.

Licensee and its employees agree to assign and hereby do assign to ULTRA any and all right, title and interest in, to, and under any such Improvements to any of the Licensed Technology subject to Licensee's licensed right to use same on the terms and conditions herein. / Лицензиат и его работники обязуются передать и настоящим передают компании ULTRA все права на улучшения любой Лицензионной технологии с сохранением за Лицензиатом права на их использование на условиях настоящего Договора.

During the term of this Agreement, Licensee shall, on a quarterly basis, make a complete written disclosure to ULTRA of any such Improvement arising during such time period, specifically pointing out the features or concepts that the Licensee or employee believes to be new or different. / В течение срока действия настоящего Договора Лицензиат на ежеквартальной основе предоставляет компании ULTRA подробный письменный отчет обо всех таких улучшениях, возникших в течение такого периода времени, особенно подчеркивая те характеристики и концепции, которые Лицензиат или работник считает новыми или отличными от существовавших ранее.

If Licensee, or its employees, is compelled to disclose Confidential Information by governmental or judicial process, Licensee agrees to promptly provide ULTRA with written notice of such requirement to allow sufficient time for ULTRA to apply for judicial review of such compelled disclosure, or an appropriate protective order to retain the confidentiality of such information. / Если Лицензиат или его работники принуждаются к раскрытию Конфиденциальной информации государством или судебным процессом, Лицензиат обязуется немедленно известить компанию ULTRA о таком требовании путем письменного уведомления, чтобы у компании ULTRA было достаточно времени подать заявление на юридическое рассмотрение правомерности такого принудительного раскрытия или получить защитное предписание суда, позволяющее сохранить конфиденциальность такой информации.

The employee acknowledges that he has been informed of the proprietary and confidential nature of work activities relating to the manufacture, threading or repair of Licensed Product of ULTRA. / Работник подтверждает, что он проинформирован о конфиденциальном характере работ, относящихся к изготовлению, нарезке резьбы и ремонту Лицензионной продукции компании ULTRA.

### Exhibit F-1: Employee Confidentiality and Non-Disclosure Confirmation Page / Приложение F-1. Подтверждение ознакомления с требованиями к работникам в отношении конфиденциальности и неразглашения

By signing below, the identified employee of the Licensee acknowledges that Exhibit F "Employee Confidentiality and Non-Disclosure" has been read, understood and has had opportunity to ask questions. Thus, the identified employee has been informed of the proprietary and confidential nature of the Confidential Information of ULTRA and, as an individual and employee, agrees not to disclose or share such Confidential Information with any third party, except with the express written permission of ULTRA. It is the responsibility of the "Licensee" to keep this page updated. All updates shall be sent to ultralicensee@tmk-ipsco.com / Подписывая данный документ, работник подтверждает, что он ознакомился с Приложением F «Требования к работникам в отношении конфиденциальности и неразглашения», понял его содержание и имел возможность задать вопросы. Таким образом, работник проинформирован о служебном и конфиденциальном характере Конфиденциальной информации компании ULTRA и, как частное лицо и работник, обязуется не разглашать такую Конфиденциальную информацию третьей стороне, если на то не дано письменное согласие компании ULTRA. За актуализацию данной страницы ответственность несет «Лицензиат». Уточнения и изменения направлять по адресу ultralicensee@tmk-ipsco.com

| Employee Name / Имя и фамилия работника: | Title / Должность: | Email Address / Адрес электронной почты | Signature / Подпись: | Date / Дата: |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Unofficial Copy Office of Marilyn Burgess District Clerk

# LICENSE AGREEMENT – SALES AND MARKETING

# ЛИЦЕНЗИОННЫЙ ДОГОВОР О ПРОДАЖЕ И ПРОДВИЖЕНИИ НА РЫНКЕ

THIS LICENSE AGREEMENT – SALES AND MARKETING (this "Agreement") is entered into this 1st day of October, 2018 (the "Effective Date") by and between Ultra Premium Services, L.L.C., a Delaware L.L.C ("ULTRA" hereinafter also the "Licensor"), and TMK Premium Services ("Licensee").

НАСТОЯЩИЙ ЛИЦЕНЗИОННЫЙ ДОГОВОР О ПРОДАЖЕ И ПРОДВИЖЕНИИ НА РЫНКЕ (в дальнейшем «Договор») заключается сегодня, «01» октября 2018 г. («Дата вступления в силу») между компанией с ограниченной ответственностью ULTRA Premium Services L.L.C., зарегистрированной в штате Делавер («Компания ULTRA», далее так же «Лицензиар»), и ООО «ТМК-Премиум Сервис» («Лицензиат»).

WHEREAS, ULTRA is in the business of developing, designing, licensing, oil country tubular goods, including pipe and tubing connections;

ПРИНИМАЯ ВО ВНИМАНИЕ, что компания ULTRA занимается разработкой, проектированием, лицензированием труб нефтепромыслового сортамента, включая соединения труб;

WHEREAS, Licensee is in the business of providing manufacturers of OCTG and gas pipes with licensees and sublicensees based on both: own patents and Know-How related to threading of thread connections of OCTG and gas pipes, and patents and Know-How obtained due to contractual relations with third companies;

ПРИНИМАЯ ВО ВНИМАНИЕ, что Лицензиат занимается предоставлением, для производителей труб нефтепромыслового и газового сортамента, лицензий, сублицензий на основании как своих патентов и ноу хау относящихся к нарезке резьбовых соединений труб нефтепромыслового и газового сортамента, так и на основании патентов и ноу хау полученных на основании договорных отношений с третьими компаниями;

WHEREAS, ULTRA is the owner of certain patents or pending patent applications, know-how, confidential design information, trademarks and other intellectual property related to the threading and manufacturing of oil country tubular goods, as further described herein; and

ПРИНИМАЯ ВО ВНИМАНИЕ, ЧТО компания ULTRA является владельцем определенных патентов или заявок на патент, находящихся на рассмотрении, ноу-хау, конфиденциальной проектной информации, торговых марок и прочей интеллектуальной собственности, относящейся к нарезке резьб и изготовлению труб нефтепромыслового сортамента, как описано в дальнейшем; а также

WHEREAS, Licensee desires a license to use the said patents, patent applications, know-how, confidential design information, trademarks and other intellectual property and ULTRA is willing to

ПРИНИМАЯ ВО ВНИМАНИЕ, ЧТО Лицензиат желает получить лицензию на использование упомянутых патентов, заявок на патенты, ноу-хау, конфиденциальной

grant a license to use the said patents, patent applications, know-how, confidential design information, trademarks and other intellectual property to Licensee, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals, the terms, conditions, and provisions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Licensee and ULTRA hereby agree as follows:

проектной информации, торговых марок и прочей интеллектуальной собственности, а компания ULTRA желает предоставить лицензию на использование упомянутых патентов, заявок на патент, ноу-хау, конфиденциальной проектной информации, торговых марок и прочей интеллектуальной собственности Лицензиату на условиях, указанных в настоящем Договоре,

ТАКИМ ОБРАЗОМ, с учетом вышеизложенного, принимая во внимание условия и положения, предусмотренные в настоящем договоре, а также иное юридически действительное встречное удовлетворение, получение и достаточность которого настоящим подтверждается, Лицензиат и компания ULTRA договорились о нижеследующем:

## 1. DEFINITIONS.

1.1 "Accessory" means a down hole product, tool or assembly including, but not limited to, crossover subs, float equipment and pup joints.

1.2 "Confidential Information" means all information, whether written or oral, which is designated by ULTRA as "Confidential" or which is proprietary or confidential in nature including, without limitation, the Licensed Technology and all materials, printed, electronic or otherwise embodying any facets of the Licensed Technology.

1.3 "Field Services" means the inspection, servicing, running and retrieving of any Licensed Product, the inspection and installation of seal rings, and the performance of other related services on any Licensed Product.

## 1. ОПРЕДЕЛЕНИЯ

1.1 «Приспособления» - продукция, инструменты или узлы, спускаемые в скважину, в том числе, переводники, башмаки с обратным клапаном и укороченные трубы.

1.2 «Конфиденциальная информация» - информация, изложенная в письменной или устной форме, определенная компанией ULTRA как «конфиденциальная» или являющаяся служебной или конфиденциальной по своему характеру, включая, в числе прочего, Лицензионную технологию и все материалы на печатных, электронных и иных носителях, в которых изложены какие-либо аспекты Лицензионной технологии.

1.3 «Услуги на месте эксплуатации» - технический контроль, обслуживание, спуск и подъем лицензионной продукции, технический контроль и монтаж уплотнительных колец, а также выполнение других сопутствующих работ на любой единице лицензированной продукции.

Unofficial Copy of MV Business Russia — Clerk

1.4 "Improvements" means any and all modifications, changes, amendments, additions or revisions to any of the Licensed Technology including, but not limited to, any and all patents, copyrights, trade secrets, know-how, and any other intellectual property rights therein, which are developed, conceived, discovered, learned, produced, or otherwise created by Licensee (including any of its officers, directors, employees, subsidiaries, or related companies), whether individually or jointly with ULTRA or others, arising out of or in connection with any rights granted hereunder.

1.4 «Улучшения» - изменения, дополнения или пересмотренные версии Лицензионной технологии, включая, в числе прочего, все патенты, авторские права, коммерческую тайну, ноу-хау и права на любую другую интеллектуальную собственность в рамках настоящего Договора, разработанные, сформулированные, установленные, полученные или каким-либо иным образом созданные Лицензиатом (включая его должностных лиц, директоров, работников, филиалы и связанные с ним компании) в индивидуальном порядке либо совместно с компанией ULTRA или другими компаниями вследствие или в связи с получением прав по настоящему Договору.

1.5 "Licensed Distribution Territory" means the geographic areas described on EXHIBIT C as amended from time to time at the sole discretion of ULTRA.

1.5 «Территория лицензированного сбыта» - географические области, указанные в Приложении С, с учетом изменений, которые могут периодически вноситься исключительно по усмотрению компании ULTRA.

1.6 "Licensed Field" means the use of the Licensed Technology and Licensed Trademark only on and in conjunction with the marketing, distribution, offer for sale or sale of a Licensed Product or Field Services in the Licensed Distribution Territory. Any other use of the Licensed Technology or Licensed Trademark shall be subject to the discretion and the express prior written approval by ULTRA.

1.6 «Лицензированная сфера деятельности» - использование Лицензионной технологии и Лицензионной торговой марки исключительно в целях продвижения на рынке, сбыта, предложения к продаже и продажи Лицензионной продукции или услуг на месте эксплуатации на территории лицензированного сбыта. Любое другое использование Лицензионной технологии или Лицензионной торговой марки осуществляется по усмотрению компании ULTRA при условии получения от нее предварительного письменного согласия.

1.7 "Licensed Manufacturing Facility" means those facilities licensed to manufacture, thread or repair a Licensed Product pursuant to a separate LICENSE AGREEMENT-MANUFACTURING and identified on Exhibit D, as amended from time to time at the sole discretion of ULTRA.

1.7 «Лицензированный производственный объект» - предприятие, получившее лицензию на изготовление, нарезку резьбы и ремонт Лицензионной продукции в соответствии с отдельным ЛИЦЕНЗИОННЫМ ДОГОВОРОМ НА ИЗГОТОВЛЕНИЕ ПРОДУКЦИИ, указанное в ПРИЛОЖЕНИИ D, с учетом изменений, которые могут периодически вноситься

Partial Copy of an Unverified Business Document

1.8  "Licensed Product" means any connection on oilfield casing, tubing, or Accessory listed on EXHIBIT A, provided that connection is manufactured by a Licensed Manufacturing Facility that has been issued a certificate of qualification by ULTRA for that connection.

1.9  "Licensed Technology" means: **(a)** the issued patents and pending patent applications listed on EXHIBIT B attached hereto, including all re-examinations claiming priority therefrom; and (b) trade secrets and other information (including discoveries, concepts, ideas, formulas and compositions, whether patentable or unpatentable and whether or not reduced to practice), works of authorship, know-how, manufacturing and production procedures, processes and techniques (including, without limitation, thread profiles), methods of use, research and development information, drawings, manufacturing specifications, overlays, plans and technical data (whether or not a trade secret) that is deemed relevant to the marketing, distribution, sale or manufacture of any Licensed Product by ULTRA, and disclosed to Licensee by ULTRA; and (c) any and all Improvements to items (a) and (b) of this subsection as deemed relevant by ULTRA and disclosed to Licensee by ULTRA.

1.10  "Licensed Trademark" means only the trademark(s) listed on EXHIBIT B attached hereto, and only in the form shown therein.

исключительно по усмотрению компании ULTRA.

1.8  «Лицензионная продукция» - любое соединение на обсадных трубах, насосно-компрессорных трубах и приспособлениях, указанных в ПРИЛОЖЕНИИ А, изготовленное на Лицензированном производственном объекте, получившем аттестационное свидетельство на это соединение от компании ULTRA.

1.9  «Лицензионная технология» – (a) выпущенные патенты и заявки на патенты, находящиеся на рассмотрении, указанные в ПРИЛОЖЕНИИ В, включая все повторные рассмотрения с заявляемым приоритетом на основе таких патентов и заявок; а также (b) коммерческая тайна и прочая информация (включая открытия, концепции, идеи, формулы и составы, независимо от их патентоспособности и возможности практического применения), авторские работы, ноу-хау, регламенты, процессы и методы изготовления и производства (в том числе профили резьбы), способы использования, научно-исследовательская информация, чертежи, технологические инструкции, кальки-шаблоны, планы и технические данные (независимо от того, являются они коммерческой тайной или нет), которые относятся, по мнению компании ULTRA, к продвижению на рынке, сбыту, продаже или изготовлению Лицензионной продукции и раскрываются Лицензиату компанией ULTRA; а также (c) все улучшения по частям (a) и (b) данного подпункта, которые относятся, по мнению компании ULTRA, к Лицензированной сфере деятельности и раскрываются Лицензиату компанией ULTRA.

1.10  «Лицензионная торговая марка» - торговые марки, которые указаны в ПРИЛОЖЕНИИ В, и только в той форме, в

Unofficial Copy Of County Court District Clerk

1.11 "Service" means technical support, design support, sales and marketing literature, the training of personnel, and other support services normally provided by ULTRA to its customers or licensees relative to the use and operation of the Licensed Technology.

## 2. GRANT.

2.1 Subject to the terms and conditions herein, ULTRA hereby grants to Licensee, and Licensee accepts, a non-exclusive, non-transferable, terminable, revocable, license (a) to market, distribute, offer for sale and sell the Licensed Product in the Licensed Distribution Territory and (b) in and to the Licensed Technology for use only in connection with the marketing, distribution and sale of Licensed Product in the Licensed Distribution Territory. Licensee may grant a sublicense subject to written approval by ULTRA.

2.2 Subject to the terms and conditions herein, ULTRA hereby grants to Licensee, and Licensee accepts, a non-exclusive, non-transferable, terminable, revocable, license to use any Licensed Trademark and the goodwill associated therewith only on and in connection with the marketing, distribution, offer for sale and sale of Licensed Product in the Licensed Distribution Territory. Licensee may grant a sublicense subject to written approval by ULTRA.

---

которой они представлены.

1.11 «Услуги» – техническая поддержка, авторская поддержка, литература по продажам и маркетингу, обучение персонала и прочие услуги поддержки, которые компания ULTRA обычно предоставляет своим заказчикам или лицензиатам в отношении использования и работы с Лицензионной технологией.

## 2. ПРЕДОСТАВЛЕНИЕ ЛИЦЕНЗИИ

2.1 При условии соблюдения условий настоящего Договора компания ULTRA настоящим предоставляет Лицензиату, а Лицензиат принимает неисключительную, не подлежащую передаче, ограниченную по времени отзывную лицензию (a) для продвижения на рынке, сбыта, предложения к продаже и продажи Лицензионной продукции на Территории лицензированного сбыта, а также (b) на лицензионную технологию для использования исключительно в связи продвижением на рынке, сбытом, предложением к продаже и продажей Лицензионной продукции на Территории лицензированного сбыта. Лицензиат может выдавать сублицензию после письменного одобрения компании ULTRA.

2.2 При условии соблюдения условий настоящего Договора компания ULTRA настоящим предоставляет Лицензиату, а Лицензиат принимает неисключительную, не подлежащую передаче, ограниченную по времени, отзывную лицензию для использования любой Лицензионной торговой марки и связанной с ней деловой репутации исключительно в целях продвижения на рынке, сбыта, предложения к продаже и продажи Лицензионной продукции на территории лицензированного сбыта. Лицензиат может выдавать сублицензию после письменного одобрения компании

2.3 Licensee shall not manufacture, thread or repair Licensed Product except pursuant to a separate LICENSE AGREEMENT-MANUFACTURING between Licensee and ULTRA, it being understood and agreed that the license granted herein is solely a license to market, distribute, offer for sale and sell the Licensed Product in the Licensed Distribution Territory. The licenses granted to Licensee herein shall not be construed to confer any right upon Licensee by implication, estoppel or otherwise as to any technology or trademarks, or other intellectual property of ULTRA, not specifically identified in Sections 2.1 or 2.2 herein. Licensee further acknowledges that, beyond the grant of Sections 2.1 and 2.2 above, it acquires absolutely no right, title or interest in and to either the Licensed Technology or any Licensed Trademark.

2.4 Licensee acknowledges and agrees that it does not have, and this Agreement shall not be construed to grant, any right to sublicense any rights granted or acquired hereunder, without the prior written consent of an authorized officer of ULTRA, which consent may be withheld or denied at the sole discretion of ULTRA.

2.5 Licensee acknowledges and agrees that the license granted hereunder applies solely in the Licensed Distribution Territory and agrees that,

2.3 Лицензиат не может изготавливать, нарезать резьбу и ремонтировать лицензионную продукцию, кроме как на основании отдельного ЛИЦЕНЗИОННОГО ДОГОВОРА НА ИЗГОТОВЛЕНИЕ ПРОДУКЦИИ, заключенного между Лицензиатом и компанией ULTRA, при этом понимается, что настоящим договором представляется лицензия исключительно на продвижение на рынке, сбыт, предложение к продаже и продажу Лицензионной продукции на Территории лицензированного сбыта. Лицензии, предоставляемые Лицензиату по настоящему Договору, не наделяют его какими бы то ни было правами (подразумеваемым образом, в силу правовой презумпции или иным образом) на технологии, торговые марки и прочую интеллектуальную собственность компании ULTRA, особо не оговоренную в п.п. 2.1 и 2.2 настоящего Договора. Лицензиат дополнительно признает, что помимо прав, указанных в п.п. 2.1 и 2.2 выше, он не получает каких бы то ни было иных прав ни на Лицензионную технологию, ни на какую бы то ни было Лицензионную торговую марку.

2.4 Лицензиат признает и подтверждает, что у него нет и в рамках настоящего Договора не предусматривается каких бы то ни было прав на сублицензирование каких бы то ни было прав, приобретенных в рамках настоящего Договора, без предварительного письменного согласия уполномоченного должностного лица компании ULTRA, в котором может быть отказано исключительно по усмотрению компании ULTRA.

2.6 Лицензиат признает и подтверждает, что лицензия, выданная в рамках настоящего Договора, применяется

if it receives any inquiry or any order from a prospective purchaser whose place of business is located outside of the Licensed Distribution Territory, it will promptly refer any such inquiry or order to ULTRA.

исключительно на Территории лицензированного сбыта, и обязуется в случае получения запроса или какого-либо заказа от потенциального покупателя, место деятельности которого находится за пределами Территории лицензированного сбыта, немедленно направить такой запрос или заказ компании ULTRA.

# 3  REPORTS AND ROYALTIES.

3.1 Licensee shall send the reports provided under the license agreement for the manufacture of the products, and shall pay royalties to ULTRA in the amounts specified in the EXHIBIT G.

3.2 Not later than by the 7th day of the month after each calendar month during the term of this Agreement, Licensee shall deliver to ULTRA: (a) a completed royalty Report, in the format provided in EXHIBIT G1, and also a license use "Act," in the format provided in EXHIBIT H, for the preceding one (1) month period indicating all Licensed Products made in the preceding one (1) month period, including the identity of each customer and all royalty amounts accrued and due, signed by the Licensee's authorized officer, thus confirming the completeness and accuracy of the royalty report signed on the last day of the reporting month.

ULTRA shall sign the Act before 23rd day of month next to reporting month. ULTRA shall include the date of signing on the Act.

# 3.  ОТЧЕТЫ И ЛИЦЕНЗИОННЫЕ ОТЧИСЛЕНИЯ

3.1 Лицензиат направляет отчеты, предоставленные в рамках лицензионного договора на изготовление продукции, и выплачивает компании ULTRA лицензионные отчисления в суммах, указанных в ПРИЛОЖЕНИИ G.

3.2 Лицензиат сдает компании ULTRA не позднее 7- го (седьмого) числа месяца, следующего за каждым календарным месяцем в течение срока действия настоящего Договора, полный Отчет о лицензионных отчислениях по форме, представленной в ПРИЛОЖЕНИИ G1, а также Акт об использовании, за предшествующий период продолжительностью 1 (один) месяц, с указанием всей Лицензионной продукции, изготовленной за предыдущий период продолжительностью 1 (один) месяц, включая наименование каждого заказчика, все накопленные и подлежащие уплате суммы лицензионных отчислений, за подписью уполномоченного лицо Лицензиата, удостоверяющей полноту и точность отчета о лицензионных отчислениях, подписанные последним числом месяца, за который подается отчет.

Компания ULTRA обязуется подписать полученный Акт до 23-ого числа месяца, следующего за отчетным. Компания ULTRA обязуется проставить на Акте дату его

3.3 All amounts payable to ULTRA shall be paid in US Dollars to ULTRA. All checks and bank drafts must be drawn on U.S. banks.

Payment shall be made within 35 (thirty-five) calendar days from the end of the reporting month. The payment term shall be extended in case of ULTRA's delay in signing the Act specified in clause 3.2, for number of days of such delay.

For overdue payments on royalty, a penalty of one (1%) of the amount of license fees payable for each month after the expiration of the established payment term shall be charged.

3.4 Each payment to be made by Licensee to ULTRA under this Agreement shall be made free and clear, and without any deduction, withholding, or set-off whatsoever, including, but not limited to, for or on account of duties, taxes or other transactional costs, other than in respect of Section 3.8. of the Agreement.

3.5 Licensee shall bear all taxes, duties and other governmental charges in relation to or arising under this Agreement, including, without limitation, any state or federal income taxes, any stamp or documentary taxes or duties, turnover, sales or use taxes, value added taxes, excise taxes, customs or exchange control duties or any other charges relating to or on any Royalty payable by Licensee to ULTRA (other than taxes based upon income of ULTRA). Licensee shall obtain, at its own cost and expense, all licenses, Federal Reserve Bank, commercial bank or other bank approvals, and any other documentation necessary for the importation of materials and products and the transmission of royalties and all other payments relevant to Licensee's performance

3.3 Все суммы, подлежащие выплате компании ULTRA согласно настоящей статье 3, выплачиваются в долларах США на имя компании ULTRA. Все чеки и банковские тратты должны быть выписаны на банки США.
Оплата производится в течение 35 (тридцати пяти) календарных дней с даты окончания отчетного месяца. Срок оплаты продлевается в случае нарушения компанией ULTRA срока подписания Акта, указанного в п.3.2, на количество дней просрочки.
За просроченные платежи по лицензионным отчислениям начисляется пеня в размере одного (1%) от подлежащей оплате суммы лицензионных отчислений за каждый месяц после истечения установленного срока платежа.

3.4 Каждый платеж, осуществляемый Лицензиатом в счет компании ULTRA в соответствии с настоящим Договором, должен быть необремененным, без каких-либо вычетов и зачетов, в том числе в зачет уплаты каких-либо сборов, налогов и прочих операционных расходов, за исключением случая, указанного в п.3.8 настоящего Договора.

3.5 Лицензиат несет все расходы по оплате налогов, сборов и прочих государственных платежей в отношении настоящего Договора и в связи с ним, включая, в числе прочего, федеральный подоходный налог, гербовые сборы, сборы и пошлины за оформление документов, налоги с оборота, продаж или за использование, налоги на добавленную стоимость, акцизные сборы, таможенные пошлины, пошлины на валютные операции, а также любые иные платежи, относящиеся к лицензионным отчислениям, выплачиваемым Лицензиатом в счет компании ULTRA (кроме налогов, основанных на доходах компании ULTRA). Лицензиат получает за свой счет все

under this Agreement.

лицензии, одобрения от федерального резервного банка, коммерческого или какого-либо иного банка и все прочие документы, необходимые для ввоза материалов и продукции, перевода лицензионных отчислений и всех прочих платежей, относящихся к действиям Лицензиата в рамках настоящего Договора.

3.6 Licensee and ULTRA shall pay all the relevant taxes in their countries. Issues on Parties' tax liabilities may be governed, without limitation, by The Convention between the United States of America and the Russian Federation for the avoidance of double taxation and prevention of fiscal evasion with respect to taxes on income and capital (Washington, June 17, 1992). If during the period of this Agreement validity, a new Convention between the Government of the Russian Federation and the Government of the United States of America for the avoidance of double taxation and prevention of fiscal evasion with respect to taxes on income and capital comes into effect, this new Convention between the Russian Federation and the United States of America also covers the present Agreement signed by ULTRA and Licensee except as otherwise provided in Convention between the Russian Federation and the United States of America.

3.6 Лицензиат и компания ULTRA уплачивают все необходимые налоги в своих странах. Вопросы налогообложения сторон могут регулироваться, в том числе, Договором между Российской Федерацией и Соединенными Штатами Америки об избежании двойного налогообложения и предотвращении уклонения от налогообложения в отношении налогов на доходы и капитал (Вашингтон, 17 июня 1992 г.). Если в период действия настоящего Договора вступает в силу новый «Договор между Российской Федерацией и Соединенными Штатами Америки об избежании двойного налогообложения и предотвращении уклонения от налогообложения в отношении налогов на доходы и капитал» данный Договор между Российской Федерацией и Соединенными Штатами Америки также распространяет свое действие на настоящий Договор, подписанный компанией ULTRA и Лицензиатом, если иное не оговорено в Договоре между Российской Федерацией и Соединенными Штатами Америки .

3.7. Within the terms of the Convention for the avoidance of double taxation and prevention of fiscal evasion on income and capital (Washington, June 17, 1992) ULTRA shall provide Licensee with a Certification that ULTRA is a resident of the United States for federal tax purposes (United States residency certificate) annually before the first payment.

ULTRA shall bear all the expenses related to translation of documents, which ULTRA submits to Licensee.

3.7. В рамках Договора об избежании двойного налогообложения и предотвращении уклонения от налогообложения в отношении налогов на доходы и капитал (Вашингтон, 17 июня 1992 г.) компания ULTRA предоставляет Лицензиату справки/сертификат о подтверждение статуса налогового резидента США ежегодно до первой оплаты.

Расходы по переводу документов, которые компания ULTRA передает

3.8. If ULTRA doesn't provide Licensee with the United States residency certification, according to the Law of the Russian Federation (and/or taking into consideration the terms of bilateral international Convention for the avoidance of double taxation), Licensee shall pay the tax which will be calculated, withheld, and paid from the amount of license fee paid to ULTRA. In this case, Licensee will transfer to ULTRA the amount of license fee after deducting tax and submit to ULTRA the following documents:
- confirmation of the Russian Federation tax resident status;
- letter from Licensee signed by the head of the company of Licensee and certified by the seal of Licensee confirming that the tax was withheld and paid by Licensee;
- copy of the payment document confirming that the tax was withheld from the license fee of ULTRA and paid by Licensee.

## 4. RECORDS.

4.1. Licensee shall, at its own cost and expense, maintain complete and accurate books and records covering all transactions arising out of or relating to this Agreement including, but not limited to, as are required for the determination of royalties owed to ULTRA pursuant to this Agreement. Such books and records shall be maintained in accordance with generally accepted accounting principles in the jurisdiction in which Licensee conducts business. Upon reasonable notice, ULTRA or its duly authorized representative shall have the right, during normal business hours, during the term of this Agreement and for five (5) years thereafter, to examine and copy said books and records and all other documents and materials in the possession of or under the control of the Licensee with respect to all transactions arising out of or relating to this Agreement. The exercise by ULTRA of any right to

Лицензиату, несет компания ULTRA.

3.8. В случае, если компания ULTRA не предоставила Лицензиату справку/сертификат о своем статусе налогового резидента, в соответствии с законодательством Российской Федерации (и/или с учетом положений двустороннего международного договора об избежание двойного налогообложения) с суммы лицензионного отчисления, выплачиваемого в адрес компании ULTRA, должен быть исчислен, удержан и уплачен Лицензиатом налог, Лицензиат перечисляет компании ULTRA сумму лицензионного отчисления за вычетом суммы налога и предоставляет компании ULTRA следующие документы:
- подтверждение статуса налогового резидента Российской Федерации;
- письмо от Лицензиата, подписанное руководителем компании Лицензиата и заверенное печатью Лицензиата, в котором сообщается об удержании и уплате налога Лицензиатом;
- копию платежного документа, который подтверждает уплату Лицензиатом налога, удержанного из Лицензионного отчисления компании ULTRA.

## 4. УЧЕТНЫЕ ДОКУМЕНТЫ.

4.1 Лицензиат за свой счет ведет точные и полные журналы и учетные документы по всем сделкам, вытекающим из настоящего Договора или относящимся к нему, включая, в числе прочего, записи, необходимые для определения размера лицензионных отчислений, подлежащих уплате компании ULTRA в соответствии с настоящим Договором. Такие журналы и учетные документы должны храниться в соответствии с общепринятыми принципами бухгалтерского учета на той территории, в пределах которой Лицензиат ведет свою хозяйственную деятельность. При предварительном уведомлении компания ULTRA или ее должным образом уполномоченный представитель имеет право в рабочее время, в течение срока действия

audit at any time or times or the acceptance by ULTRA of any statement or payment shall be without prejudice to any rights or remedies and shall not bar ULTRA from thereafter disputing the accuracy of any statement or payment, and the Licensee shall remain fully liable for any balance due under this Agreement. Such records shall be retained for at least five (5) years following the termination of this Agreement.

4.2. In the event that an audit under Section 4.1 reveals an underpayment by Licensee, Licensee will promptly pay ULTRA all amounts underpaid, together with interest on such underpaid amounts at an interest rate equal to one percent (1%) per month from when such underpaid amounts should have been originally paid until the actual date of payment. In the event that an audit under Section 4.1 reveals an overpayment by Licensee, ULTRA will promptly pay Licensee all amounts overpaid. The cost of any audit conducted pursuant to Section 4.1 will be borne by ULTRA, unless such audit reveals a discrepancy of greater than 5% of the total amount determined to be actually due, in which case Licensee will bear such cost.

# 5   QUALITY CONTROL.

5.1     Licensee shall market, distribute, offer for sale and sell Licensed Product only under any Licensed Trademark, and shall not market,

настоящего Договора и 5 (пяти) лет после окончания срока его действия изучить копии указанных журналов и учетных документов, а также прочей документации и материалов, находящихся во владении и под контролем Лицензиата, относящихся ко всем сделкам в рамках настоящего Договора и в связи с ним. Осуществление компанией ULTRA права на проведение периодических проверок, а также принятие компанией ULTRA каких бы то ни было заявлений и платежей не приводит к ограничению ее прав и средств защиты, а также не лишает компанию ULTRA возможности оспорить точность какого-либо заявления или платежа, при этом Лицензиат несет полную ответственность за любые суммы задолженности в рамках настоящего Договора. Такие учетные документы должны храниться в течение не менее 5 (пяти) лет после прекращения действия настоящего Договора.

4.2     Если в ходе аудита, проводимого согласно п. 4.1, обнаружится, что Лицензиат недоплатил какую-либо сумму, Лицензиат должен немедленно выплатить компании ULTRA все недоплаченные суммы вместе с процентами в размере 1% (одного процента) за каждый месяц с момента, когда такая сумма изначально подлежала выплате, и до даты фактического платежа. Если в ходе аудита, проводимого согласно п. 4.1, обнаружится, что Лицензиат переплатил какую-либо сумму, компания ULTRA должна немедленно вернуть Лицензиату всю переплаченную сумму. Расходы на проведение аудита согласно п. 4.1 несет компания ULTRA; но если в ходе аудита обнаруживается расхождение, превышающее 5% от общей суммы к уплате, расходы на аудит несет Лицензиат.

# 5.   КОНТРОЛЬ КАЧЕСТВА

5.1     Лицензиат осуществляет продвижение Лицензионной продукции на рынке, ее сбыт, предложение к продаже и

Unofficial Copy / www.Burgess.com

distribute, offer for sale or sell Licensed Product under any other mark or name.

5.2     Licensee shall maintain the distinctiveness of any Licensed Trademark and the image and high quality of Licensed Product bearing or offered under any Licensed Trademark.

5.3     Licensee shall use and employ the Licensed Trademark for and in connection with the marketing, distribution, offer for sale and sale of Licensed Product in strict accordance with all standards, rules and procedures provided by ULTRA from time to time, including, without limitation, the Trademark Guide attached hereto as EXHIBIT E. Moreover, Licensee agrees that it will: (a) maintain, or cause to be maintained, the highest standard of required quality by ULTRA in the marketing, distribution, offer for sale and sale of any and all of the Licensed Product on which any Licensed Trademark is used; (b) comply with any and all local, state, and federal laws pertaining to the marketing, distribution, offer for sale and sale of the Licensed Product; and (c) provide efficient, courteous, high quality products or services to the public.

5.4     Licensee shall market, distribute, offer for sale and sell each Licensed Product in strict adherence and in accordance with the Marketing and Sale Procedures attached hereto as EXHIBIT F; provided, however, that in the event of any conflict between the Marketing and Sale Procedures and applicable law in the Licensed Distribution Territory,

продажу только под Лицензионной торговой маркой и не должен осуществлять продвижение Лицензионной продукции на рынке, ее сбыт, предложение к продаже и продажу под какой бы то ни было иной торговой маркой.

5.2     Лицензиат должен обеспечивать отчетливость любой торговой марки и ее изображения, а также высокое качество Лицензионной продукции, на которую наносится Лицензионная торговая марка или которая производится под Лицензионной торговой маркой.

5.3     Лицензиат использует Лицензионную торговую марку для продвижения на рынке, сбыта, предложения к продаже и продажи Лицензионной продукции в строгом соответствии со всеми стандартами, правилами и регламентами, периодически предоставляемыми компанией ULTRA, включая, в числе прочего, Руководство по использованию торговых марок, приведенное в Приложении Е к настоящему Договору. Более того, Лицензиат обязуется: (а) поддерживать или обеспечивать поддержание высочайших стандартов качества, требуемых компанией ULTRA при продвижении на рынке, сбыте, предложении к продаже и продаже Лицензионной продукции, на которой используется Лицензионная торговая марка; (b) соблюдать все местные, региональные и федеральные законы в отношении продвижения на рынке, сбыта, предложения к продаже и продажи Лицензионной продукции; и (с) предоставлять покупателям высококачественную продукцию при эффективном и вежливом обслуживании.

5.4     Лицензиат осуществляет продвижение на рынке, сбыт, предложение к продаже и продажу каждой единицы Лицензионной продукции в строгом соответствии с Регламентом продвижения на рынке и продаж, приведенным в ПРИЛОЖЕНИИ F к настоящему Договору;

applicable law in the Licensed Distribution Territory shall govern.

5.5    Licensee shall submit to ULTRA for prior review and written approval any new materials using a Licensed Trademark on or in connection with the Licensed Product in a manner other than as provided in the Marketing and Sale Procedures or that which has previously been approved under this Section 5.5, which approval may be granted or denied at the sole and absolute discretion of ULTRA. Licensee may not use any materials using a Licensed Trademark unless such materials are in substantial conformity with, and at least equal in quality to, materials previously approved by ULTRA in accordance with this Section.

5.6    To ensure that Licensee complies with the quality standards set forth in this Section 5, ULTRA may request, upon reasonable notice to Licensee, and Licensee shall provide, full and open access at reasonable times to any location operated by or under the control of Licensee in order to verify Licensee's proper use of any Licensed Trademark on and in connection with the Licensed Product, to verify Licensee's provision of Licensed Product in accordance with the terms and conditions of this Agreement, and to examine Licensee's use of any Licensed Trademark in connection with the Licensed Product, so that ULTRA shall have sufficient opportunity to make whatever investigation it shall deem necessary and reasonably desirable in connection with its exercise of quality control under this Agreement.

при этом в случае расхождений между Регламентом продвижения на рынке и продаж и действующим законодательством на Территории лицензированного сбыта применяется законодательство Территории лицензированного сбыта.

5.5    Лицензиат должен подавать компании ULTRA на предварительное рассмотрение и письменное утверждение любые новые материалы, относящиеся к использованию Лицензионной торговой марки на Лицензионной продукции или в связи с ней каким бы то ни было способом, отличным от предусмотренного в Регламенте продвижения на рынке и продаж или от ранее утвержденного согласно п. 5.5, при этом такое утверждение может быть предоставлено или в нем может быть отказано исключительно по усмотрению компании ULTRA. Лицензиат не может использовать материалы, содержащие Лицензионную торговую марку, если такие материалы не соответствуют материалам, ранее утвержденным компанией ULTRA согласно этому разделу или если их качество ниже качества таких ранее утвержденных материалов.

5.6    Чтобы убедиться, что Лицензиат соблюдает стандарты качества, изложенные в разделе 5, компания ULTRA может запросить, путем предварительного уведомления Лицензиата, а Лицензиат должен предоставить полный и открытый доступ в разумный срок к любой производственной площадке, осуществляющей работу под контролем Лицензиата, с целью проверки надлежащего использования Лицензиатом любой Лицензионной торговой марки на Лицензионной продукции или в связи с ней, а также проверить, как Лицензиат выполняет поставку Лицензионной продукции согласно условиям настоящего Договора, и изучить использование Лицензиатом Лицензионной торговой марки в связи Лицензионной продукцией, с тем чтобы у компании ULTRA

5.7 In the event Licensee's use of a Licensed Trademark in connection with the Licensed Product is not in accordance with the quality required under this Agreement, in the reasonable and good faith judgment of ULTRA, ULTRA shall notify Licensee thereof in writing and Licensee shall promptly change such use or employment to conform thereto.

5.8 Licensee shall, during the term of this Agreement: (a) comply with all applicable laws and regulations relating to its marketing, distribution, offer for sale and sale of the Licensed Product and shall not at any time take any action which would cause ULTRA or Licensee to be in violation of any of such applicable laws and regulations; and (b) obtain any and all licenses, permits, approvals or authorizations required by any governmental entity or agency having jurisdiction over the marketing, distribution, offer for sale and sale of the Licensed Product.

5.9 During the term of this Agreement, in all public uses of any Licensed Trademark on and in connection with the Licensed Product, where commercially practicable and possible, Licensee shall use its best efforts to indicate that any Licensed Trademark are owned by ULTRA and shall use the appropriate notice symbol ® if the Licensed Trademark is registered with the U.S. Patent and Trademark Office, or ™ directly adjacent to every use of the Licensed Trademark if not federally

имелась достаточная возможность выполнить любые проверки, которые она посчитает необходимыми и целесообразными для контроля качества в рамках настоящего Договора.

5.7 В случае если по обоснованному и добросовестному мнению компании ULTRA при использовании Лицензионной торговой марки на Лицензионной продукции или в связи с ней не соблюдаются требования к качеству, предусмотренные настоящим Договором, компания ULTRA должна известить об этом Лицензиата в письменной форме, а Лицензиат должен оперативно изменить такое использование, чтобы обеспечить соответствие этим требованиям.

5.8 Лицензиат должен в течение срока действия настоящего Договора: (a) соблюдать все законы и правила, применяемые к продвижению на рынке, сбыту, предложению к продаже и продаже Лицензионной продукции, и ни в коем случае не может предпринимать каких-либо действий, в результате которых компания ULTRA или Лицензиат нарушат какие-либо из этих законов и правил; а также (b) получать все необходимые лицензии, разрешения, согласования и одобрения, требуемые каким бы то ни было органом государственной власти или учреждением, которому подведомственны продвижение на рынке, сбыт, предложение к продаже и продажа Лицензионной продукции.

5.9 В течение срока действия настоящего Договора во всех ситуациях публичного использования любой Лицензионной торговой марки, в коммерчески целесообразных и возможных случаях, Лицензиат должен предпринимать все возможное для указания принадлежности любой Лицензионной торговой марки компании ULTRA, а также должен в установленном порядке применять символ ®, если Лицензионная торговая марка

registered.

зарегистрирована в Бюро США по патентам и товарным знакам, или символ ™ при каждом использовании Лицензионной торговой марки, не прошедшей федеральную регистрацию.

5.10    In addition to the terms, conditions, and marking requirements set forth above, Licensee shall comply with all written instructions provided by ULTRA with respect to marking Licensed Product, packaging, or materials containing or discussing Licensed Product.

5.10    Помимо соблюдения условий и требований к маркировке, изложенных выше, Лицензиат должен соблюдать все инструкции, предоставленные компанией ULTRA в письменной форме, в отношении маркировки Лицензионной продукции, ее упаковки, а также материалов, в которых содержится или рассматривается Лицензионная продукция

5.11    Licensee acknowledges, understands and agrees that it shall not perform, do, or cause any act to be done, or fail to take any action, during or after the term of this Agreement, or assist any third party in performing, doing or causing any act to be done, which would be detrimental to, injure or impair: (a) a Licensed Trademark; (b) any applications for registration or registrations therefor; (c) the respective goodwill related to a Licensed Trademark; (d) the federal, state or common law rights of ULTRA in or to a Licensed Trademark; (e) the right, title, interest, and ownership by ULTRA in and to the Licensed Trademark; and (f) the validity and enforceability of any of the foregoing.

5.11    Лицензиат обязуется в течение срока действия настоящего Договора и после его истечения не предпринимать каких-либо действий, не способствовать таким действиям, не проявлять бездействия, а также не помогать какой-либо третьей стороне в осуществлении или способствовании осуществлению таких действий, в результате которых будет причинен вред или нанесен ущерб: (a) Лицензионной торговой марке; (b) ее регистрации или заявкам о ее регистрации; (c) деловой репутации в отношении Лицензионной торговой марки; (d) правам компании ULTRA на основании федерального закона или общего права в отношении Лицензионной торговой марки; (e) праву собственности компании ULTRA в отношении Лицензионной торговой марки; а также (f) действительности и юридической силе всего вышеизложенного.

5.12    Any use of the Licensed Trademarks by Licensee shall inure solely to the benefit of ULTRA. All goodwill accrued by, and due to, the use of any Licensed Trademark anywhere shall be the sole and exclusive property of ULTRA.

5.12    Любое использование Лицензиатом Лицензионных торговых марок должно идти исключительно на пользу компании ULTRA. Деловая репутация, созданная где бы то ни было благодаря использованию какой-либо Лицензионной торговой марки, является исключительной собственностью компании ULTRA.

5.13    From time to time, Licensee may

5.13    Время от времени Лицензиат

request that ULTRA provide Services to Licensee. Any such request must be made in writing to ULTRA based on an additional Agreement mutually accepted in writing by both parties before any on-site Services will be provided. If ULTRA agrees to such request, ULTRA, on its own or through a third party, will provide Services to Licensee with Licensee being responsible for payment of all actual travel related expenses incurred by ULTRA, or as otherwise may be agreed to between the parties.

может запрашивать у ULTRA предоставление услуг Лицензиату. Любой такой запрос должен быть сделан в письменной форме в ULTRA на основе дополнительного соглашения, взаимно принятого в письменной форме обеими сторонами, прежде чем любые услуги на месте будут предоставлены. Если ULTRA согласится с таким запросом, ULTRA самостоятельно или через третью сторону будет предоставлять услуги лицензиату, при этом Лицензиат будет нести ответственность за оплату всех расходов, связанных с поездками, понесенных ULTRA, или в иных случаях, которые могут быть согласованы между сторонами.

## 6    RIGHTS IN INTELLECTUAL PROPERTY.

6.1 Licensee acknowledges and agrees that ULTRA owns all right, title and interest in, to, and under the Licensed Technology, Licensed Trademark, and Improvements thereto. ULTRA shall have the sole and exclusive right to file any additional patent applications on any of the Licensed Technology, Licensed Trademark, and Improvements thereto.

6.2 Any Improvements in or to any of the Licensed Technology shall be the sole and exclusive property of ULTRA, and ULTRA shall own any and all right, title and interest in, to, and under such Improvements. Licensee agrees to assign and hereby does assign to ULTRA any and all right, title and interest in, to, and under any such Improvements to any of the Licensed Technology subject to Licensee's licensed right to use same on the terms and conditions herein. At its sole discretion and expense, ULTRA shall have the right to prepare, file, prosecute and maintain any patent or copyright application(s), or seek any other form of intellectual property protection, claiming, seeking to register, or otherwise related to any and all Improvements.

## 6.    ПРАВА                      НА ИНТЕЛЛЕКТУАЛЬНУЮ СОБСТВЕННОСТЬ

6.1 Лицензиат признает и подтверждает, что компании ULTRA принадлежат все права на Лицензионную технологию, Лицензионную торговую марку и их улучшения. Компания ULTRA имеет исключительное право на подачу дополнительной патентной заявки в отношении любой Лицензионной технологии, Лицензионной торговой марки и их улучшений.

6.2 Любые улучшения Лицензионной технологии являются исключительной собственностью компании ULTRA, и ей принадлежат все права на такие улучшения. Лицензиат обязуется передать и настоящим передает компании ULTRA все права на такие улучшения Лицензионной технологии, при этом Лицензиат имеет право их пользования в соответствии с условиями настоящего Договора. По своему собственному усмотрению и за свой счет компания ULTRA имеет право готовить и подавать заявки на регистрацию патентов и авторских прав, поддерживать их в силе, а также прибегать к другим способам защиты интеллектуальной собственности в

6.3 Licensee shall give ULTRA and its attorneys all reasonable assistance (but at no cost to Licensee) in connection with the preparation and prosecution of any patent or patent application within the Licensed Technology and any patent or copyright applications prepared or filed in connection with any Improvement. Whenever requested to do so by ULTRA, Licensee agrees to execute (provided that Licensee exercises due care in determining that any statement it makes is complete and accurate in all material respects) any and all applications, assignments or other instruments that ULTRA deems reasonably necessary or desirable to protect its interests in the Licensed Technology.

6.4 Licensee shall not, directly or indirectly, patent, register, apply for patent or registration, or otherwise attempt to acquire any legal protection in or for the Licensed Technology, Licensed Trademark, or any other proprietary rights related to the Licensed Technology, Licensed Trademark, or other proprietary rights related thereto, without the prior written consent of ULTRA.

7    CONFIDENTIALITY AND NON-USE.

7.1 Licensee recognizes that, in connection with this Agreement, it will receive access to business, technical, or financial information of, from or for ULTRA, which is confidential, proprietary, or a trade secret of ULTRA.

7.2 Licensee acknowledges that all Confidential Information is proprietary and valuable to ULTRA, and that any disclosure or unauthorized use of Confidential Information will cause ULTRA

6.3    Лицензиат должен оказывать компании ULTRA и ее юристам разумное содействие (но не за счет Лицензиата) в связи с подготовкой и регистрацией любых патентов и патентных заявок, относящихся к Лицензионной технологии, а также патентных заявок и заявок на регистрацию авторских прав в связи с любыми улучшениями. По требованию компании ULTRA Лицензиат обязуется оформлять (при условии, что Лицензиат добросовестно определяет, что его заявления являются полными и точными по существу) все заявки, документы о передаче прав и прочие документы, которые компания ULTRA обоснованно считает необходимыми или желательными для защиты своих интересов по Лицензионной технологии.

6.4    Лицензиат не должен, прямо или косвенно, патентовать, регистрировать, подавать заявку на патент или регистрацию или пытаться каким бы то ни было иным способом приобрести юридическую защиту в отношении Лицензионной технологии и Лицензионной торговой марки, а также права собственности на Лицензионную технологию и Лицензионную торговую марку без предварительного письменного согласия компании ULTRA.

7.    КОНФИДЕНЦИАЛЬНОСТЬ И НЕ-ИСПОЛЬЗОВАНИЕ

7.1    Лицензиат признает, что в рамках настоящего Договора он получит доступ к деловой, технической или финансовой информации компании ULTRA, являющейся конфиденциальной, служебной информацией или коммерческой тайной компании ULTRA.

7.2    Лицензиат признает, что вся Конфиденциальная информация является собственностью компании ULTRA и имеет ценность для нее, и что любое раскрытие или

irreparable harm and loss. Licensee warrants and agrees that neither it, nor any others used in the performance of this Agreement, shall use the Confidential Information for itself or others or disclose any Confidential Information to others, without first obtaining the prior written consent of ULTRA.

неправомерное использование Конфиденциальной информации нанесет непоправимый вред компании ULTRA. Лицензиат заявляет и подтверждает, что ни он, ни какие бы то ни было иные лица, задействованные в выполнении настоящего Договора, не будут использовать Конфиденциальную информацию в своих или чужих целях, а также раскрывать Конфиденциальную информацию третьим лицам без предварительного письменного согласия компании ULTRA.

7.3 Licensee shall: (a) use such Confidential Information for the sole and limited purpose of exercising its rights and performing its obligations hereunder; and (b) return all Confidential Information, including copies or other written, physical, or electronic embodiments of, or containing, such Confidential Information (including any studies, analyses, compilations or other materials prepared in whole or in part based on such Confidential Information) to ULTRA immediately upon the termination of the licenses granted to Licensee under this Agreement.

7.3 Лицензиат обязуется: (a) использовать такую Конфиденциальную информацию исключительно в целях осуществления своих прав и выполнения обязательств в рамках настоящего Договора; а также (b) вернуть компании ULTRA всю Конфиденциальную информацию, в т.ч. ее копии и иные воплощения в письменной, физической и электронной форме (включая исследования, анализ, подборки и прочие материалы, подготовленные полностью или частично на основе такой Конфиденциальной информации), сразу по завершении действия лицензий, предоставленных Лицензиату в соответствии с настоящим Договором.

7.4 This Agreement shall not affect Licensee's rights to use or disclose information which it first proves, to the reasonable satisfaction of ULTRA:

7.4 Настоящий Договор не влияет на права Лицензиата на использование и раскрытие информации, которая, как он изначально заявляет, к обоснованному удовлетворению компании ULTRA:

(a) Is in the public domain through no wrongful act of itself prior to the date of its disclosure to Licensee by ULTRA;

(a) находилась в свободном доступе не в результате какого-либо противоправного действия до ее раскрытия Лицензиату компанией ULTRA;

(b) Was in Licensee's possession, on a non-confidential basis, prior to disclosure by ULTRA to Licensee (such proof must be evidenced by written records);

(b) была в собственности Лицензиата на неконфиденциальной основе до ее раскрытия Лицензиату компанией ULTRA (доказательствами должны

(c) Has become part of the public domain by publication or otherwise not due to any unauthorized act or omission on the part of Licensee;

(d) Was independently developed by Licensee without reference to or reliance upon the Confidential Information of ULTRA (such proof must be evidenced by written records); or

(e) Was disclosed to Licensee on a non-confidential basis by a third party having a lawful right to do so, prior to disclosure by ULTRA of such information to Licensee (such proof must be evidenced by written records).

7.5 If Licensee, or its representatives, is compelled to disclose Confidential Information by governmental or judicial process, Licensee agrees to promptly provide ULTRA with written notice of such requirement to allow sufficient time for ULTRA to apply for judicial review of such compelled disclosure, or an appropriate protective order to retain the confidentiality of such information.

(c) стала частью информации, находящейся в свободном доступе, путем публикации или иным образом, не в результате неправомерного действия или бездействия со стороны Лицензиата;

(d) была независимо разработана Лицензиатом без ссылки на Конфиденциальную информацию компании ULTRA и без ее использования (доказательствами должны служить письменные свидетельства); либо

(e) была раскрыта Лицензиату на неконфиденциальной основе третьей стороной, имеющей на это право, до того как она была раскрыта Лицензиату компанией ULTRA (доказательствами должны служить письменные свидетельства).

7.5 Если Лицензиат или его представители принуждаются к раскрытию Конфиденциальной информации государством или судебным процессом, Лицензиат обязуется немедленно известить компанию ULTRA о таком требовании путем письменного уведомления, чтобы у компании ULTRA было достаточно времени подать заявление на юридическое рассмотрение правомерности такого принудительного раскрытия или получить защитное предписание суда, позволяющее сохранить конфиденциальность такой информации.

Unofficial sample of Marilyn Burgess this is a disclaimer

## 8 INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS.

8.1 Licensee shall promptly notify ULTRA of any unauthorized use, suspected infringement or misappropriation of any of the Licensed Technology or Licensed Trademark of which it becomes aware and provide ULTRA with any evidence of such suspected or actual infringement or misappropriation. ULTRA shall have sole discretion to determine how to respond to any such unauthorized use or suspected infringement or misappropriation, and in defending against any action alleging invalidity, unenforceability or non-infringement of any Licensed Technology or Licensed Trademark, including the right to settle or otherwise compromise any dispute. Licensee, at no out-of-pocket cost to Licensee, shall provide all reasonable assistance and cooperation in any legal action ULTRA may initiate or defend, including allowing ULTRA to join Licensee as a party to any such suit, having its employees testify when requested, and making relevant records, information, samples or specimens reasonably available to ULTRA, subject to reasonable safeguards for confidentiality.

8.2 Licensee shall not threaten, warn, or attempt to assert any intellectual property right against any third party relating to infringement of any of the Licensed Technology or Licensed Trademark or otherwise take any action that may

## 8. НАРУШЕНИЕ ПРАВ ИНТЕЛЛЕКТУАЛЬНОЙ СОБСТВЕННОСТИ

8.1 Лицензиат должен немедленно уведомить компанию ULTRA о любом несанкционированном использовании, предполагаемом нарушении или незаконном присвоении какой-либо Лицензионной технологии или Лицензионной торговой марки, о котором ему стало известно, и предоставить компании ULTRA доказательства такого предполагаемого или фактического нарушения или незаконного присвоения. Компания ULTRA имеет право по своему собственному усмотрению определять, как реагировать на такое несанкционированное использование, предполагаемое нарушение или незаконное присвоение, и принимать меры для защиты от любых заявлений о недействительности прав на Лицензионную технологию или Лицензионную торговую марку, об отсутствии их правовой защиты и отсутствии их нарушения, включая право на урегулирование или иное разрешение каких бы то ни было споров. Лицензиат оказывает в полном объёме, не неся денежных затрат, разумную помощь и содействие в любом судебном процессе, который может инициировать компания ULTRA или в котором она может выступать в роли ответчика, включая предоставление компании ULTRA возможности присоединиться к Лицензиату в качестве стороны любого такого судебного процесса, обеспечение, по требованию, дачи показаний сотрудниками Лицензиата, а также предоставление компании ULTRA соответствующих документов, информации, проб и образцов с сохранением обоснованного уровня конфиденциальности.

8.2 Лицензиат не должен угрожать третьей стороне, предупреждать её и пытаться заявить ей свои права на интеллектуальную собственность в связи с нарушением прав на Лицензионную

Unofficial Copy Office of Minnesota Secretary of State

support challenges to any rights or potentially asserted rights in or to any of the Licensed Technology or Licensed Trademark, without the prior written consent of ULTRA, which may be withheld at the sole discretion of ULTRA.

# 9 REPRESENTATIONS AND WARRANTIES OF ULTRA.

9.1 ULTRA represents and warrants that it has the authority to grant the rights set forth in Sections 2.1 and 2.2 above.

9.2 ULTRA does not warrant the patentability or validity of the Licensed Technology or Licensed Trademark and makes no representations with regard to the scope of the Licensed Technology or Licensed Trademark or that such Licensed Technology or Licensed Trademark may be exploited without infringing other patents, trademarks, or any other rights, as the case may be.

9.3 EXCEPT AS PROVIDED IN SECTION 9.1, ULTRA MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO THE LICENSED TECHNOLOGY OR LICENSED TRADEMARK, AND EXPRESSLY DISCLAIMS ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY OTHER IMPLIED WARRANTY WITH RESPECT TO THE CAPABILITIES, SAFETY, UTILITY OR COMMERCIAL APPLICATION OF THE LICENSED TECHNOLOGY. ULTRA SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, CONSEQUENTIAL OR OTHER DAMAGES SUFFERED BY LICENSEE, ITS OFFICERS, DIRECTORS, MEMBERS,

технологию или Лицензионную торговую марку, а также предпринимать какие-либо действия в поддержку оспаривания каких бы то ни было прав или потенциально заявляемых прав на любую Лицензионную технологию или Лицензионную торговую марку без предварительного письменного согласия компании ULTRA, в котором может быть отказано по исключительному усмотрению компании ULTRA.

# 9. ЗАВЕРЕНИЯ И ГАРАНТИИ КОМПАНИИ ULTRA

9.1 Компания ULTRA заверяет и гарантирует, что она уполномочена предоставлять права, указанные в п.п. 2.1 и 2.2 выше.

9.2 Компания ULTRA не гарантирует патентоспособность и применимость Лицензионной технологии и Лицензионной торговой марки и не делает заявлений в отношении области применения Лицензионной технологии и Лицензионной торговой марки, а также возможности использования Лицензионной технологии и Лицензионной торговой марки без нарушения других патентов, торговых марок и любых других прав, в зависимости от обстоятельств.

9.3 ЗА ИСКЛЮЧЕНИЕМ ПОЛОЖЕНИЯ п. 9.1 КОМПАНИЯ ULTRA НЕ ДЕЛАЕТ ЗАВЕРЕНИЙ И НЕ ДАЕТ ГАРАНТИЙ ЛЮБОГО РОДА В ОТНОШЕНИИ ЛИЦЕНЗИОННОЙ ТЕХНОЛОГИИ И ЛИЦЕНЗИОННОЙ ТОРГОВОЙ МАРКИ И ОДНОЗНАЧНО ОТКАЗЫВАЕТСЯ ОТ КАКИХ БЫ ТО НИ БЫЛО ГАРАНТИЙ КОММЕРЧЕСКОГО КАЧЕСТВА И ПРИГОДНОСТИ ДЛЯ КОНКРЕТНОГО ПРИМЕНЕНИЯ, А ТАКЖЕ ИНЫХ ПОДРАЗУМЕВАЕМЫХ ГАРАНТИЙ В ОТНОШЕНИИ ВОЗМОЖНОСТЕЙ, БЕЗОПАСНОСТИ, ПОЛЕЗНОСТИ И КОММЕРЧЕСКОГО ПРИМЕНЕНИЯ ЛИЦЕНЗИРУЕМОЙ ТЕХНОЛОГИИ.

MANAGERS, TRUSTEES, EMPLOYEES OR CUSTOMERS OR ANY OTHER DAMAGES RESULTING FROM THE USE OF THE LICENSED TECHNOLOGY, THE LICENSED TRADEMARK OR THE MARKETING, DISTRIBUTION, OFFER FOR SALE OR SALE OF THE LICENSED PRODUCT.

КОМПАНИЯ ULTRA НЕ НЕСЕТ ОТВЕТСТВЕННОСТИ ЗА КАКИЕ БЫ ТО НИ БЫЛО ПРЯМЫЕ, НЕПРЯМЫЕ, ОСОБЫЕ, КОСВЕННЫЕ УБЫТКИ, ПОНЕСЕННЫЕ ЛИЦЕНЗИАТОМ, ЕГО ДОЛЖНОСТНЫМИ ЛИЦАМИ, ДИРЕКТОРАМИ, УЧАСТНИКАМИ, РУКОВОДИТЕЛЯМИ, ПОПЕЧИТЕЛЯМИ, РАБОТНИКАМИ И ЗАКАЗЧИКАМИ, А ТАКЖЕ ЛЮБЫЕ ПРОЧИЕ УБЫТКИ, ВОЗНИКАЮЩИЕ В РЕЗУЛЬТАТЕ ИСПОЛЬЗОВАНИЯ ЛИЦЕНЗИОННОЙ ТЕХНОЛОГИИ, ЛИЦЕНЗИОННОЙ ТОРГОВОЙ МАРКИ ИЛИ В РЕЗУЛЬТАТЕ ПРОДВИЖЕНИЯ НА РЫНКЕ, СБЫТА, ПРЕДЛОЖЕНИЯ К ПРОДАЖЕ И ПРОДАЖИ ЛИЦЕНЗИОННОЙ ПРОДУКЦИИ.

## 10 REPRESENTATIONS AND WARRANTIES OF LICENSEE.

10.1 Licensee represents and warrants that it has all necessary authority and power to enter into this Agreement.

10.2 Without in any way limiting the Licensee's liability pursuant to the indemnity provisions of this Agreement, the Licensee represents and warrants that it will maintain comprehensive general liability insurance in the amount of at least $1,000,000 (combined single limit per occurrence). This insurance shall include broad form blanket contractual liability, personal injury liability, advertising liability, products and completed operations liability.

10.3 The insurance described in Section 10.2 shall include: (a) a cross-liability endorsement; (b) an endorsement stating that ULTRA shall receive at least thirty (30) days written notice prior to cancellation or non-renewal of coverage; (c) an

## 10. ЗАЯВЛЕНИЯ И ГАРАНТИИ КОМПАНИИ ULTRA

10.1 Лицензиат заявляет и гарантирует, что он имеет все необходимые полномочия и возможности для заключения настоящего Договора.

10.2 Ни в коем случае не ограничивая обязанностей Лицензиата по положениям настоящего Договора об ограждении от ответственности, Лицензиат обязуется обеспечить комплексное страхование общей ответственности на сумму не менее $1 000 000 (единый комбинированный лимит на один страховой случай). Такое страхование должно обеспечивать общую ответственность сторон по договору расширенной формы, ответственность за причинение вреда личности, ответственность за рекламу, а также ответственность за продукцию и выполненные операции.

10.3 Договор страхования, предусмотренный в п. 10.2, должен включать в себя: (а) индоссамент о взаимной ответственности; (b) индоссамент, в соответствии с которым компания ULTRA

endorsement naming ULTRA as an additional insured; (d) an endorsement stating that the insurance required by this Agreement is primary and that any insurance purchased by ULTRA shall only apply in excess of the insurance purchased by the Licensee; and (e) a waiver of subrogation in favor of ULTRA.

10.4 All insurance shall be obtained from an insurance company reasonably satisfactory to ULTRA. Licensee shall give at least thirty (30) days prior written notice to ULTRA of the cancellation or any modification of such insurance policy that would adversely affect the status or benefits of ULTRA there under. This insurance may be obtained for ULTRA by Licensee in conjunction with a policy which covers products other than the Licensed Product.

10.5 No later than one hundred twenty (120) days from the date hereof, Licensee shall furnish to ULTRA a certificate, in form and substance reasonably satisfactory to ULTRA, evidencing the insurance required herein.

# 11 INDEMNIFICATION OF ULTRA.

11.1 Licensee agrees to indemnify, defend and hold harmless ULTRA and its partners,

должна получить письменное уведомление как минимум за 30 (тридцать) дней до отмены или невозобновления страхового обеспечения; (c) индоссамент, в соответствии с которым компания ULTRA является дополнительным страхователем; (d) индоссамент, в соответствии с которым страхование, обязательное в рамках настоящего Договора, является основным, и что любое другое страхование, оплаченное компанией ULTRA, должно применяться исключительно в дополнение к основному страхованию, приобретенному Лицензиатом; (e) отказ от суброгационных прав в пользу компании ULTRA.

10.4 Все страховые полисы должны быть получены у страховой компании, которая удовлетворяет требованиям компании ULTRA. В случае отмене такого страхового полиса или внесения в него изменений, в результате которых ухудшается страховая защита или обеспечение компании ULTRA, Лицензиат предоставляет компании ULTRA письменное уведомление как минимум за 30 (тридцать) дней. Такое страхование может быть приобретено для компании ULTRA Лицензиатом совместно с полисом, распространяющимся на продукцию, не являющуюся Лицензионной.

10.5 Не позднее 120 (сто двадцати) дней после даты настоящего Договора Лицензиат должен предоставить компании ULTRA свидетельство, по форме и содержанию удовлетворяющее компанию ULTRA, подтверждающее наличие страхования, требуемого настоящим Договором.

# 11. ВОЗМЕЩЕНИЕ УЩЕРБА КОМПАНИИ ULTRA

11.1 Лицензиат обязуется освобождать, ограждать и защищать

Unofficial Copy of Non-Business Distribution Copy

officers, employees, and agents, and the partners, members, directors, officers, employees and agents of parent companies and affiliates of ULTRA (each an "ULTRA Indemnitee") from and against any and all claims, demands, losses, damages, penalties, costs or expenses (including reasonable attorneys' and expert witness' fees and costs) of any kind or nature (each, a "Liability"), arising from or relating to: (a) any unauthorized use of information provided by ULTRA to Licensee; (b) any violation or breach by Licensee of any representation, warranty, covenant or agreement made by Licensee pursuant to this Agreement, except to the extent that such Liability is (i) caused by the negligence or willful misconduct of ULTRA, or (ii) results from a breach of a representation or warranty of ULTRA set forth in Section 9 above; and (c) actions for negligence, intentional tort, or the like, relating to Licensee's marketing, distribution, offer for sale or sale of any Licensed Product. Licensee agrees not to file any lawsuits against any ULTRA Indemnitee (other than ULTRA for any alleged breach of this Agreement) in connection with the design, development, advertisement, marketing, manufacture, use, offer for sale, or sale of Licensed Product and all activities associated therewith. The ULTRA Indemnitees shall be entitled to participate at their option and expense, through counsel of their own selection, in any indemnified action, and may join in any legal actions related to any such Liability. Licensee shall not enter into any settlement or compromise affecting any rights or obligations of any ULTRA Indemnitee or which includes an express or implied admission of liability, negligence or wrongdoing by any ULTRA Indemnitee, without the prior written consent of such ULTRA Indemnitee.

компанию ULTRA, ее партнеров, должностных лиц, работников и агентов, а также партнеров, участников, директоров, должностных лиц, работников и агентов материнских компаний и филиалов компании ULTRA (каждый из которых является «освобождаемым от ответственности лицом со стороны компании ULTRA») от любых и всяческих рекламаций, требований, убытков, ущерба, штрафов, затрат и расходов (включая обоснованные юридические издержки и расходы на привлечение экспертов в качестве свидетелей) любого рода и любой природы (именуемых в каждом отдельном случае «Ответственностью»), в связи с: (а) несанкционированным использованием информации, предоставленной компанией ULTRA Лицензиату; (b) нарушением Лицензиатом какого-либо заявления, гарантии или обязательства, принятого Лицензиатом в соответствии с настоящим Договором, кроме случаев, когда такая Ответственность (i) вызвана неосторожностью или злонамеренными действиями компании ULTRA или (ii) является результатом нарушения заявления или гарантии компании ULTRA, изложенных в разделе 9 выше; а также (с) исками об ответственности за неосторожность, умышленное правонарушение и т.п., предъявляемыми в связи с продвижением на рынке, сбытом, предложением к продаже и продажей Лицензионной продукции Лицензиатом. Лицензиат обязуется не подавать каких бы то ни было судебных исков против освобождаемых от ответственности лиц со стороны компании ULTRA (кроме исков против компании ULTRA в случае предполагаемых нарушений настоящего Договора) в связи с проектированием, разработкой, рекламированием, продвижением на рынке, изготовлением, использованием, предложением к продаже или продажей Лицензионной продукции, а также любыми сопутствующими этому действиями. Освобождаемые от ответственности лица со стороны компании ULTRA имеют право

Unofficial Copy obtained from www.illusorypromise.com

принимать участие по своему желанию и за свой счет, через выбранного ими адвоката в любом судебном процессе по освобождению от ответственности, а также могут присоединиться к любому судебному процессу в отношении такой Ответственности. Лицензиат не должен заключить договоров об урегулировании спора и компромиссе, которые влияют на права или обязательства какого-либо Освобождаемого от ответственности лица со стороны компании ULTRA, или предусматривают явно выраженное или подразумеваемое признание ответственности, неосторожности или правонарушения какого бы то ни было Освобождаемого от ответственности лица со стороны компании ULTRA, без предварительного письменного согласия на это Освобождаемого от ответственности лица со стороны компании ULTRA.

## 12 DURATION, MODIFICATION, AND TERMINATION.

12.1 This Agreement shall commence on the date of its signing and shall be valid until October 01, 2019 inclusively, automatically renewing thereafter for the next year, if no Party announces in writing its intention to terminate this Agreement not later than thirty (30) calendar days prior to expiration of the Agreement validity.

12.2 This Agreement may be terminated by ULTRA immediately, upon written notice to Licensee, upon any of the following:

(a) Licensee breaches a covenant, representation or warranty in this Agreement and such breach is not cured within fifteen (15) days from receipt of written notice from

## 12. СРОК ДЕЙСТВИЯ, ИЗМЕНЕНИЕ И РАСТОРЖЕНИЕ ДОГОВОРА

12.1 Настоящий Договор вступает в силу с момента его подписания и действует по «01» октября 2019 года включительно и автоматически продлевается на следующий последующий год и так до момента, когда одна из Сторон не заявит в письменной форме о своём намерении прекратить действие Договора не позднее, чем за 30 (тридцать) календарных дней до истечения срока действия Договора.

12.2 Настоящий Договор может быть расторгнут компанией ULTRA немедленно путем уведомления Лицензиата в письменной форме в одном из следующих случаях:

(a) Лицензиат нарушает обязательство, заявление или гарантию, предусмотренную настоящим Договором, и не исправляет такое нарушение в течение 15 (пятнадцати) дней

ULTRA; or

(b)  Licensee is adjudged bankrupt or has its assets placed in the hands of a receiver or makes any assignment or other accommodation for the benefit of creditors.

12.3 Either party may terminate this Agreement at any time upon thirty (30) days written notice to the other party.

12.4 Upon termination of this Agreement, all sums that have accrued and are due to ULTRA pursuant to Section 3 shall become immediately due.

12.5 In the event the Agreement is terminated for any reason, Licensee shall return, or at the discretion and direction of ULTRA, destroy (a) all advertising and marketing materials furnished by ULTRA and relating to any Licensed Product and (b) all documents and materials pertaining to or embodying any Confidential Information, retaining no copies (except as may be required under applicable law) Upon termination of this Agreement and any license granted herein, Licensee shall cease any and all marketing, distribution, offering for sale and selling of any Licensed Product. The provisions of Sections 1, 3, 4, 6, 7, 11, 12, 13 and 14 of this Agreement shall remain in full force and effect notwithstanding the termination of this Agreement.

с момента получения письменного уведомления от компании ULTRA; или

(b)  Лицензиат объявляется банкротом или его активы размещаются у получателя, или он передает какие-либо права или заключает иную сделку в интересах кредиторов.

12.3  Любая из сторон может расторгнуть настоящий Договор в любое время путем уведомления другой стороны в письменном виде за 30 (тридцать) дней.

12.4  Сразу после расторжения настоящего Договора наступает срок уплаты всех сумм, подлежащих уплате компании ULTRA согласно разд. 3.

12.5  В случае расторжения настоящего Договора по какой бы то ни было причине Лицензиат возвращает или, по усмотрению и указанию компании ULTRA, уничтожает (a) все рекламные и маркетинговые материалы, предоставленные компанией ULTRA, относящиеся к любой лицензионной продукции, а также (b) все документы и материалы, относящиеся к Конфиденциальной информации или воплощающие ее, без сохранения копий (за исключением случаев, предусмотренных действующим законодательством). После расторжения настоящего Договора и прекращения действия лицензии, выданной в соответствии с ним, Лицензиат должен прекратить продвижение на рынке, сбыт, предложение к продаже и продажу Лицензионной продукции. Положения разд. 1, 3, 4, 6, 7, 11, 12, 13 и 14 настоящего Договора остаются в полной силе и продолжают действовать, несмотря на расторжение настоящего Договора.

## 13 NOTICES.

All notices, requests, and other communications hereunder shall be in writing and shall be (a) personally delivered, (b) sent by recognized overnight courier service, or (c) sent by e-mail, in each case to the respective address specified below, or such other address as may be specified in writing to the other party hereto, and shall be deemed to have been delivered upon receipt:

to ULTRA:
ULTRA Premium Services, L.L.C.
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Attn: VP for Research, Engineering and Product Development
email: Ddiederich@tmk-ipsco.com

to Licensee:
TMK Premium Services
20 Podsosensky Side Street, Building 1, Moscow, 105062, Russian Federation
and Attn: S.A. Rekin
email: RekinSA@tmk-group.com

with a copy to:
TMK IPSCO
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Attn: General Counsel
email: GC@tmk-ipsco.com

with a copy to:
Attn:
email:
ULTRA Premium Services, L.L.C. (U.S.A.)
Address location: 10120 Houston Oaks Drive, Houston, Texas 77064, USA.

## 13. УВЕДОМЛЕНИЯ

Все уведомления, запросы и прочие сообщения в рамках настоящего Договора направляются в письменном виде и должны быть (a) доставлены лично, (b) отправлены авторитетной курьерской службой доставки на следующий день или (c) отправлены по электронной почте, в каждом из случаев по соответствующему адресу, указанному ниже, или другому адресу, указанному в письменном виде, другой стороне, и считаются доставленными по получении:

Компании ULTRA:
ULTRA Premium Services, L.L.C.
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Вниманию: Вице-президент по НИОКР
эл. почта: Ddiederich@tmk-ipsco.com

Лицензиату:
ООО «ТМК-Премиум Сервис»
105062, Москва, Подсосенский переулок, 20, стр.1
Вниманию: С.А. Рекин
эл. почта: RekinSA@tmk-group.com

Копия:
TMK IPSCO
10120 Houston Oaks Drive
Houston, Texas 77064
USA
Вниманию: Главный юрисконсульт
эл. почта: GC@tmk-ipsco.com
Копия:
Вниманию:
эл. почта:

ULTRA Premium Services, L.L.C. (U.S.A.)
Адрес место нахождения: 10120 Houston

Unofficial Copy Office of Main Bates registration

Address for postal correspondence: 10120 Houston Oaks Drive, Houston, Texas 77064, USA.
Тел: +1 (630) 874-0078, Fax: +1 (630) 874-6431
Bank Detail:
Bank Routing: 021000021
Swift Code: CHASUS33
General Bank Reference: JPMorgan Chase New York, NY 10004
Acct#: 226966767
Account Name: Ultra Premium Services, LLC.

**LICENSEE**
TMK Premium Services
Address location: 51 Rosa Luxemburg street, Yekaterinburg,
620026, Russian Federation
Address for postal correspondence: 20 Podsosensky Side Street, Building 1, Moscow, 105062, Russian Federation
INN/KPP 6672244954/668501001
Tel.: +7(495) 411 53 53
Bank Detail:
TMK Premium Services, (Ekaterinburg, Russia)
Account No.40702840804400800031
SKB-BANK (Ekaterinburg, Russia) in favour of Moscow branch
SWIFT: SKBERU4E
Account: № 0104195417
VTB Bank (Europe) SE, Frankfurt am Main, Germany
SWIFT: OWHBDEFF

## 14 MISCELLANEOUS PROVISIONS.

14.1 The licenses and all rights granted to Licensee hereunder are personal in nature, and Licensee shall not have the right to transfer or assign the license, this Agreement, or any of its rights, interests, or obligations hereunder, or any part hereof, without the prior written consent of ULTRA, and any

Oaks Drive, Houston, Texas 77064, USA.
Адрес для почтовой корреспонденции: 10120 Houston Oaks Drive, Houston, Texas 77064, USA.
Тел: +1 (630) 874-0078, Fax: +1 **(630) 874-6431**
Банковские реквизиты:
Bank Routing: 021000021
Swift Code: CHASUS33
General Bank Reference: JPMorgan Chase New York, NY 10004
Acct#: 226966767
Account Name: Ultra Premium Services, LLC.

**ЛИЦЕНЗИАТ**
ООО «ТМК-Премиум Сервис»
Адрес место нахождения: 620026, Свердловская обл., г. Екатеринбург, ул. Розы Люксембург, д.51
Адрес для почтовой корреспонденции: 105062, Москва, Подсосенский переулок, 20, стр.1
ИНН: 6672244954 / КПП: 668501001
Тел.: +7(495) 411 53 53
Банковские реквизиты:
TMK Premium Services, (Ekaterinburg, Russia)
Account No.40702840804400800031
SKB-BANK (Ekaterinburg, Russia) in favour of Moscow branch
SWIFT: SKBERU4E
Account: № 0104195417
VTB Bank (Europe) SE, Frankfurt am Main, Germany
SWIFT: OWHBDEFF

## 14. ПРОЧИЕ ПОЛОЖЕНИЯ

14.1 Лицензии и все права, полученные Лицензиатом по настоящему Договору, являются личными по своей сути, и Лицензиат не имеет права передавать лицензию, настоящий Договор, а также какие-либо из своих прав и обязанностей по

Unofficial Copy Office of Nancy Rister District Clerk

attempt by Licensee to make an assignment without such consent shall be void *ab initio.*

14.2 ULTRA shall have the right to transfer or assign its rights and interests in this Agreement to any domestic or foreign corporation or other business entity, provided, that such transferee agrees to be bound by all of the terms hereof and is the holder of all relevant Licensed Technology and Licensed Trademark in the Licensed Distribution Territory. ULTRA shall give written notice to Licensee within thirty (30) days of any such transfer or assignment.

14.3 In the event Licensee breaches any material term of this Agreement, ULTRA shall be entitled to equitable relief by way of temporary and permanent injunction and such other and further relief as any court with jurisdiction may deem just and proper.

14.4 The interpretation and application of the provisions of this Agreement shall be governed by the laws of the State of Texas, without giving effect to any principals of conflicts of law. This Agreement is not governed by the United Nations Convention of Contracts for the International Sale of Goods, the application of which is hereby expressly excluded.

14.5 Neither party may waive or release any of its rights or interest in this Agreement except in writing. The failure of a party to assert a right hereunder or to insist on compliance with any term or condition of this Agreement shall not constitute a waiver of that right or excuse a similar subsequent failure to perform any such term or condition by the

нему без предварительного письменного согласия компании ULTRA, при этом любая попытка такой передачи, предпринимаемая Лицензиатом без такого согласия, изначально не имеет юридической силы.

14.2 Компания ULTRA имеет право передавать свои права по настоящему Договору любой отечественной или иностранной корпорации или предприятию при условии, что такой правопреемник обязуется соблюдать все условия настоящего Договора и является владельцем соответствующей Лицензионной технологии и Лицензионной торговой марки на Территории лицензированного сбыта. Компания ULTRA уведомляет Лицензиата о такой передаче в письменном виде в течение 30 (тридцати) дней.

14.3 Если Лицензиат нарушает какое-либо существенное условие настоящего Договора, компания ULTRA имеет право на средство судебной защиты по праву справедливости путем временного и бессрочного судебного запрета и иного средства защиты, которое суд с соответствующей юрисдикцией может посчитать целесообразным.

14.4 Интерпретация и применение положений настоящего Договора регламентируется законами штата Техас без учета каких бы то ни было принципов правовых коллизий. Настоящий Договор не регламентируется Конвенцией Организации Объединенных Наций о договорах международной купли-продажи товаров, применение которой настоящим однозначно исключается.

14.5 Отказ любой из сторон от своих прав по настоящему Договору возможен только в письменной форме. Неспособность одной из сторон утвердить свое право по настоящему Договору или настоять на соблюдении какого-либо условия настоящего Договора не означает отказа от

other party.

14.6 In case any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provisions shall not be affected or impaired in any other jurisdiction, nor shall the remaining provisions contained herein in any way be affected or impaired thereby.

14.7 Neither party shall represent itself as the agent or legal representative of the other party hereto for any purpose whatsoever and shall have no right to create or assume any obligation of any kind, express or implied, for or on behalf of the other party hereto. The relationship of Licensee and ULTRA under this Agreement shall be solely that of independent contractors and nothing herein shall be construed to create or imply any relationship of employment, agency, joint venture, partnership, franchise or any relationship other than that of arm's length independent contractors.

14.8 Any legal action or proceeding with respect to this Agreement shall be brought only in the courts of the State of Texas or of the United States of America located in the State of Texas and, by execution and delivery of this Agreement, each party hereby accepts for itself and in respect to its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. The Licensee hereby irrevocably and unconditionally waives any claim for special, consequential or punitive dam-

такого права и не оправдывает в дальнейшем неисполнения такого условия другой стороной.

14.6 Если одно или несколько положений настоящего Договора должны считаться недействительными, незаконными или невыполнимыми в каком-либо отношении на территории какой-либо юрисдикции, это не влияет на действительность, законность и выполнимость таких положений на территории другой юрисдикции, и это также не влияет на остальные положения настоящего Договора.

14.7 Ни одна из сторон не должна представлять себя в роли агента или законного представителя другой стороны настоящего Договора в каких бы то ни было целях, а также не имеет права создавать или принимать на себя какие бы то ни было обязательства, явно выраженные или подразумеваемые, от имени другой стороны. Взаимоотношения Лицензиата и компании ULTRA по настоящему Договору исключительно соответствуют взаимоотношениям независимых договаривающихся сторон, при этом ни одно из положений настоящего Договора не должно интерпретироваться как создающее трудовые, агентские отношения, отношения участников совместного предприятия, партнерства, франшизы и прочие взаимоотношения, помимо взаимоотношений абсолютно независимых договаривающихся сторон.

14.8 Любое юридическое или процессуальное действие в отношении настоящего Договора должно осуществляться только в судах штата Техас или судах США, находящихся на территории штата Техас, при этом подписывая настоящий Договор и передавая его другой стороне, каждая из сторон безоговорочно принимает в отношении себя и своего имущества исключительную компетенцию

Certified Copy Office of Mgmt & Distribution

ages and any objection, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing or maintaining of any such action or proceeding in such respective jurisdictions.

14.9    This Agreement constitutes the entire agreement and understanding between the parties relating to the subject matter hereof, and neither party shall be obligated by any condition, promise or representation other than those expressly stated herein or as may be subsequently agreed to by the parties hereto in writing.

14.10   This Agreement supersedes all representations, agreements, statements and understandings whether written or oral, relating to such matters made prior to execution of this Agreement. This Agreement may not be modified or supplemented except as agreed in writing and executed by both parties.

14.11   ULTRA and Licensee acknowledge that they have cooperated in the drafting and preparation of this Agreement. In any construction or interpretation of the terms of this Agreement, the terms shall not be construed against any party. Each of the parties hereto further acknowledges that its respective entry into this Agreement has been based upon the advice of its own respective counsel or its own respective knowledge, information, belief, experience and choosing, with no party relying upon the estimates, expectations or projections of the other party, beyond those set forth in this Agreement, if any.

вышеуказанных судов. Лицензиат настоящим окончательно и безоговорочно отказывается от каких-либо исков об особых, косвенных или штрафных убытках, а также от возражений, в том числе против места проведения возможного юридического или процессуального действия на территории соответствующей юрисдикции на основании отсутствия тесной связи спора и места его рассмотрения.

14.9    Настоящий    Договор представляет собой полную договоренность сторон в отношении предмета настоящего Договора, и ни одна из сторон не связана какими бы то ни было иными условиями, обещаниями и заявлениями, помимо того, что явно выражено в настоящем Договоре, или может быть впоследствии согласовано сторонами в письменной форме.

14.10   Настоящий    Договор аннулирует все заявления, договоренности и соглашения, устные или письменные, в отношении предмета Договора, которые были сделаны до подписания настоящего Договора. Настоящий Договор не может быть изменен или дополнен, если это не согласовано обеими сторонами в письменной форме.

14.11   Компания    ULTRA    и Лицензиат признают, что они совместно работали над составлением и подготовкой настоящего Договора. При истолковании условий настоящего Договора условия не должны истолковываться против какой-либо из сторон. Каждая из сторон настоящего Договора признает, что заключение ею настоящего Договора основывалось на рекомендациях    ее    собственного юрисконсульта, а также на ее знаниях, информации, убеждениях, опыте и выборе, при этом ни одна из сторон не полагалась на оценки, ожидания и прогнозы другой стороны, кроме тех, которые изложены в настоящем Договоре, если таковые имеются.

14.12   The headings herein are included for purposes of convenience only and shall not affect the construction or interpretation of the provisions of this Agreement.

14.13   The undersigned parties represent and warrant that each has full authority to execute this Agreement on behalf of themselves, their predecessors and all other persons or entities named herein.

14.14   This Agreement has been prepared in English and notwithstanding any translation of this Agreement into any other language, the English version of this Agreement shall control in all aspects.

14.15   This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

14.16   The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

14.12   Заголовки в настоящем Договоре даны исключительно в целях удобства и не должны влиять на толкование положений настоящего Договора.

14.13   Стороны, подписавшие настоящий Договор, заявляют и гарантируют, что каждая из сторон полностью уполномочена выполнять настоящий Договор от своего имени, от имени своих предшественников и прочих лиц и организаций, указанных в настоящем Договоре.

14.14   Настоящий Договор составлен на английском языке, и независимо от того, на какой язык осуществляется перевод Договора, английская версия Договора имеет преимущественную силу во всех отношениях.

14.15   Настоящий Договор может быть составлен в нескольких экземплярах, каждый из которых считается оригиналом, и все они составляют один и тот же документ и вступают в силу после их подписания каждой из сторон и передачи другой стороне, при этом Стороны не обязаны подписывать один и тот же экземпляр.

14.6   Обмен экземплярами настоящего Договора и страницами с подписями с помощью факсимильной передачи (будь то прямая передача с одного факсимильного устройства на другое путем автоматического соединения или с помощью всемирной сети), по электронной почте в формате pdf или с помощью других электронных средств, позволяющих сохранить первоначальные графику и внешний вид документа, или с помощью сочетания таких средств составляет подписание настоящего договора Сторонами и его должную передачу друг другу, при этом такие копии могут использоваться вместо оригинального Договора в любых целях. Подписи Сторон, переданные факсимильными устройствами, считаются

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

В ПОДТВЕРЖДЕНИЕ ВЫШЕИЗЛОЖЕННОГО стороны заключили настоящий Договор посредством подписания своими представителями, уполномоченными в установленном порядке на Дату вступления Договора в силу.

**ULTRA PREMIUM SERVICES, L.L.C.**
By: TMK NSG, L.L.C., its sole member /
Подпись: TMK NSG, L.L.C., ее единственный
участник

By: _____
*Name/ФИО:* David Diederich/Дэвид Дитрих
*Title/должность:* Vice-President, Research and Product Development / Вице-президент по НИОКР

*Date/дата:*

**TMK Premium Services /
ООО «ТМК-Премиум Сервис»**

By: _____
*Name/ФИО:* S.A. Rekin/Рекин С.А.
*Title/должность:* General Director/ Генеральный директор

*Date/дата:*

Unofficial Copy Office of Marilyn Burgess - District Clerk

Uncertified Copy of a document in Burgess District Clerk

## Exhibit A / Приложение A

### Licensed Product / Лицензионная продукция

#### Connection / Соединение

TMK UP ULTRA™ FJ

TMK UP ULTRA™ SF

TMK UP ULTRA™ FX

TMK UP ULTRA™ QX

TMK UP ULTRA™ DQX

TMK UP ULTRA™ CX

TMK UP ULTRA™ GX

TMK UP™ SF TORQ™

TMK UP™ QX TORQ™

#### Accessory / Приспособления

Any Accessory utilizing the thread forms of the connections listed above. This Agreement **PERMITS** the sale of Accessories / Приспособления с формами резьб, соответствующими указанным выше соединениям. Настоящий Договор **ДОПУСКАЕТ** продажу приспособлений.

#### Couplings / Муфты

This Agreement **PERMITS** the sale of coupling products without prior written authorization from ULTRA / Настоящий Договор **ДОПУСКАЕТ** продажу муфтовой продукции без получения предварительного письменного разрешения от компании ULTRA.

#### Full Length (Repair) / Полноразмерная продукция (ремонт)

Full length products are those defined as API range 1, 2 and 3. This Agreement **PERMITS** the sale of full length repairs without prior written authorization from ULTRA. / К полноразмерной продукции относятся изделия классов длины 1, 2 и 3 по стандарту API. Настоящий Договор **ДОПУСКАЕТ** продажу отремонтированной полноразмерной продукции без предварительного письменного разрешения со стороны компании ULTRA.

A repair of a full length product shall mean replacing, or reworking an existing TMK UP ULTRA™ Connection or TMK UP™ BPN with the same type of connection. A new full length product shall include replacing an existing TMK UP ULTRA™ Connection or TMK BPN with another type of TMK UP ULTRA™ Connection or TMK UP™ BPN and shall be governed according to the terms for Full Length (New). / Ремонт полноразмерной продукции означает замену или переделку существующего соединения TMK UP UL-

TRA™ или TMK UP™ BPN с получением соединения того же типа. Замена существующего соединения TMK UP ULTRA™ на соединение TMK UP™ BPN или существующего соединения TMK UP™ BPN на соединение TMK UP ULTRA™ считается получением новой продукции и регламентируется в соответствии с условиями, действующими в отношении полноразмерной продукции (новой).

### Full Length (New) / Полноразмерная продукция (новая)

Full length products are those defined as API range 1, 2 and 3. This Agreement **PERMITS** the sale of new full length products without prior written authorization from ULTRA. / К полноразмерной продукции относятся изделия классов длины 1, 2 и 3 по стандарту API. Настоящий Договор **ДОПУСКАЕТ** продажу новой полноразмерной продукции без получения предварительного письменного разрешения от компании ULTRA.

### Handling Plugs / Подъемные заглушки

This Agreement **PROHIBITS** the sale of ULTRA Handling Plugs. / Настоящий Договор **ЗАПРЕЩАЕТ** продажу подъемных заглушек с соединением ULTRA.

When requesting prior written authorization from ULTRA under this Agreement, please include the following information: / При запросе предварительного письменного разрешения от компании ULTRA в рамках настоящего Договора указать следующую информацию:

* name of distributor / наименование дистрибьютора
* end use of customer / конечное использование заказчиком
* manufacturer of pipe / изготовитель трубы
* pipe size, pipe grade and wall thickness / диаметр, группа прочности и толщина стенки трубы
* type of connection / тип соединения
* number of pieces / количество штук
* required / desired or planned ship date / требуемая или запланированная дата отгрузки
* ship to location / пункт назначения при отгрузки

All written requests shall be sent to: / Все письменные запросы направлять:
Attn: VP for Research, Engineering and Product Development, David Diederich / Вниманию: Вице-президент по НИОКР David Diederich
Email: ddiederich@tmk-ipsco.com / Эл. почта: ddiederich@tmk-ipsco.com
/
With a copy to: / Копия:
Attn: General Counsel / Вниманию: Главный юрисконсульт
Email: gc@tmk-ipsco.com / Эл. почта: gc@tmk-ipsco.com

Attn: Licensing / Вниманию: Лицензионный отдел
Email: ultralicensee@tmk-ipsco.com / эл. почта: ultralicensee@tmk-ipsco.com

Unofficial Copy / Office of Marilyn Burgess District Clerk

**Licensed Patent / Патент, составляющий предмет лицензии**

US Patent 9,869,414 / Патент США 9,836,414
Patent Application 15/962,043 (Patent Pending) / Патентная заявка 15/962,043 (ожидается получение патента)
Patent Application- 62/608,945 (Patent Pending) / Патентная заявка 62/608,945 (ожидается получение патента)

**Licensed Trademark / Лицензионная торговая марка**

ULTRA™ Premium Connections / Премиальные соединения ULTRA™

TMK UP ULTRA™ FJ

TMK UP ULTRA™ SF

TMK UP ULTRA™ FX

TMK UP ULTRA™ QX

TMK UP ULTRA™DQX

TMK UP ULTRA™ CX

TMK UP ULTRA™ GX

TMK UP™ SF TORQ

TMK UP™ QX TORQ

Unofficial Copy Office of Marilyn Burgess District Clerk

Exhibit C / Приложение С

**Licensed Distribution Territory / Территория лицензированного сбыта**


**The Russian Federation Territory / Территория Российской Федерации**


This Sales and Marketing Agreement **PROHIBITS** the sale of ULTRA products by the license outside the specified territory without prior written permission from TMK IPSCO / Настоящий Договор о продаже и продвижении на рынке **ЗАПРЕЩАЕТ** продажу продукции компании ULTRA по лицензии за пределами оговоренной территории без предварительного письменного разрешения TMK IPSCO.

**Licensed Manufacturing Facility / Лицензированный производственный объект**

Joint stock company "Orskiy Machine Building Plant"/ АО "Орский машиностроительный завод" Krupskaya Street 1 Orsk, Orenburg Region/ ул.Крупской д.1, г.Орск, Оренбургская область , 462431, Russian Federation Russia / Россия

**Licensees sublicensed by TMK Premium Services, / Лицензиаты, получившие сублицензию от ООО «ТМК-Премиум Сервис»**

Exhibit E / Приложение E

**Trademark Guide / Руководство по использованию торговых марок**

**Proper Use of the Trademarks of ULTRA™ Premium Oilfield Services ("ULTRA") / Надлежащее использование Торговой марки ULTRA™ Premium Oilfield Services («ULTRA»)**

Proper use of the trademarks of ULTRA™ is vital for their continued protection. Improper use can result in a mark becoming generic. / Надлежащее использование торговых марок ULTRA™ крайне важно для их постоянной защиты. Ненадлежащее использование может привести к тому, что марка превратится в свободный товарный знак.

The following examples illustrate the proper way in which to use the trademarks of ULTRA. / Надлежащее использование торговых марок компании ULTRA показано на следующих примерах:

* Never use a trademark as a noun; always use a trademark as an adjective. / Не использовать торговую марку в функции независимого существительного, использовать только в функции дополнения.
    o Improper: "Use of the TMK UP ULTRA™ SF has increased in horizontal and directional drilling environments." / Неправильно: "Увеличилось использование TMK UP ULTRA™ GX в горизонтальном и наклонно-направленном бурении."

o Proper: "Use of the TMK UP ULTRA™ SF Premium Connection has increased in horizontal and directional drilling environments." / Правильно: "Увеличилось использование труб с премиальными соединениями TMK UP ULTRA™ GX в горизонтальном и наклонно-направленном бурении."

* Always distinguish trademarks by using them in all upper-case letters (use of italics or bold text also distinguishes the trademark) / Торговые марки должны выделяться путем написания их заглавными буквами (использование курсива и жирного шрифта также допустимо).:

   o Improper / Неправильно: Ultra™SF /

   o Proper / Правильно: **TMK UP ULTRA™ SF**, TMK UP *ULTRA™ SF*

* Never use a trademark in the possessive form. / Не использовать наименование торговой марки в притяжательной форме.

   o Improper: "TMK UP ULTRA SF's performance in the shale plays . . ." / Неправильно: Показатели применения TMK UP ULTRA SF на сланцевых объектах

   o Proper: "The performance of the TMK UP ULTRA™ SF Premium Connection in the shale plays . . ." / Правильно: Показатели применения труб с премиальными соединениями TMK UP ULTRA SF на сланцевых объектах

* In advertising, press releases, articles, documents, and reports, the proper trademark acknowledgement (® or ™) need only appear in the first or most prominent mention of the mark. It does not need to be referenced thereafter. / В рекламных материалах, статьях, документах, отчетах подтверждение торговой марки (значком ® или ™) требуется только при первом, а также при наиболее значимых упоминаниях. Нет необходимости делать такое подтверждение при каждом упоминании.


## 2. Affixing the Trademark to Licensed Product / Присоединение Торговой марки к Лицензионной продукции

The format of stenciling to be applied to oilfield casing, tubing and accessories featuring ULTRA™ Premium Connections is set forth in the Manufacturing Procedures. / Формат маркировки, наносимой на нефтепромысловые обсадные трубы, НКТ и приспособления с премиальными соединениями ULTRA™, приведен в Производственном регламенте.

Unofficial Copy Office of Marilyn Burgess District Clerk

Office of Manufacturer... (watermark)

## Exhibit F / Приложение F

## Marketing and Sale Procedures / Регламент продвижения на рынке и продаж

**How to contact the marketing department / Как связаться с отделом маркетинга**

Licensee may submit requests regarding linking to tmk-ipsco.com and other questions concerning this Marketing and Sale Procedures by mail, fax, or e-mail to the following contact: / Лицензиат может подать заявку на связь ссылками с веб-сайтом tmk-ipsco.com, а также задать вопросы в отношении настоящего Регламента продвижения на рынке и продаж по почте, факсу или электронной почте по следующим адресам:

TMK IPSCO
10120 Houston Oaks Drive
Houston, Texas 77064 USA
Attn. Scott Barnes / Вниманию Scott Barnes
e-mail: sbarnes@tmk-ipsco.com / Эл. почта: sbarnes@tmk-ipsco.com

1.  General Restrictions / Общие ограничения

(a)   Licensee shall not produce or use advertising or marketing materials relating to the Licensed Product. All such advertising or marketing materials will be furnished by ULTRA™ at their cost and sole discretion. / Лицензиат не должен создавать рекламные или маркетинговые материалы, относящиеся к Лицензионному продукту, и использовать такие материалы. Все рекламные и маркетинговые материалы предоставляются компанией ULTRA™ по ее усмотрению и за ее счет.

(b)   Licensee may not represent itself as an employee, agent or office of ULTRA™. All materials produced by Licensee must be worded and designed so that the reader understands that the material is coming from Licensee, and not ULTRA™. / Лицензиат не может представлять себя в качестве работника, агента или представительства компании ULTRA™. Все материалы, создаваемые Лицензиатом, должны быть сформулированы и оформлены таким образом, чтобы у читателя было четкое понимание, что данные материалы исходят от Лицензиата, а не от компании ULTRA™.

(c)   Licensee may utilize the logo of TMK IPSCO, the parent company of ULTRA™, in sales presentations to individual customers. Any such use of the TMK IPSCO logo shall be in accordance with identity guidelines of TMK IPSCO. / Лицензиат может использовать логотип ТМК IPSCO (материнской компании ULTRA™) в презентациях отдельным потенциальным заказчикам. Любое такое использование логотипа ТМК IPSCO должно соответствовать правилам идентификации компании ТМК IPSCO.

(d)   The ULTRA™ name and the TMK IPSCO logo may not be used on Licensee's business cards. / Лицензиат не может использовать логотип ТМК IPSCO и наименование ULTRA™ на своих визитных карточках.

(e)   Approval to use the ULTRA™ name and / or the TMK IPSCO logo on one particular type of material does not imply approval for any other use. Any uses of the name or logo not explicitly authorized by the Agreement and this Exhibit F must be submitted to ULTRA™ for approval, which may be withheld at sole discretion of ULTRA™. / Разрешение на использование наименования ULTRA™ и (или) логотипа ТМК IPSCO на материалах определенного типа не подразумевает разрешения на какое бы то ни было иное их использование. Любое использование наименования или логотипа, разрешение на которое не выражено явным образом в настоящем

Договоре и настоящем Приложении F, должно быть представлено на утверждение компании ULTRA™, в котором может быть отказано исключительно по усмотрению компании ULTRA™.

(f)   ULTRA™ and TMK IPSCO will not allow its name or logo to be used on endorsements of any kind. / Компании ULTRA™ и ТМК IPSCO не разрешают использовать свои наименования и логотипы на заявлениях любого рода в поддержку кого бы и чего бы то ни было.

(g)   Licensee should use caution in sales presentations that list or refer to products not offered by ULTRA or TMK IPSCO. / Лицензиат должен соблюдать осторожность при проведении презентаций для потенциальных покупателей, в которых может упоминаться продукция, не предлагаемая компаниями ULTRA и ТМК IPSCO.

Licensee must not give the appearance that such products are also offered by ULTRA™ or TMK IPSCO. / Лицензиат не должен создавать впечатление, что такая продукция также предлагается компаниями ULTRA™ и ТМК IPSCO.

2.  Website Linking / Ссылки на веб-сайт

Licensee may request that it use the TMK IPSCO logo and / or a link to tmk-ipsco.com site. Prior approval is needed from the marketing department for any such use or link, and approval will be subject to the following requirements: / Лицензиат может выразить желание использовать логотип ТМК IPSCO и (или) ссылку на сайт tmk-ipsco.com на своем веб-сайте. В таком случае необходимо получить разрешение от отдела маркетинга. Для получения разрешения должны быть соблюдены следующие требования:

(a)   If Licensee's web site includes the names and / or logos of competitors of ULTRA™ and / or TMK IPSCO, the names and / or logos of such competitors cannot be materially larger or smaller than the TMK IPSCO logo. / Если на сайте Лицензиата указаны наименования и (или) логотипы конкурентов компании ULTRA™ и (или) ТМК IPSCO, такие наименования и (или) логотипы не должны отличаться по размеру от логотипа ТМК IPSCO.

(b)   Any approval to Licensee to link to the tmk-ipsco.com site will be subject to the parties entering into a website linking agreement, a copy of which will be provided by the marketing department. / Разрешение на создание ссылки на веб-сайт tmk-ipsco.com дается Лицензиату при условии заключения сторонами Договора о создании ссылок на веб-сайт, копии которого предоставляется отделом маркетинга.

(c)   Licensee's web site will be monitored by ULTRA™ to ensure compliance with the website linking agreement and the applicable provisions of these Marketing and Sale Procedures. If Licensee's site is not in compliance, the linking relationship will be terminated. / Веб-сайт Лицензиата будет контролироваться компанией ULTRA™ для обеспечения соблюдения условий Договора о создании ссылок на веб-сайт, а также соответствующих положений настоящего Регламента продвижения на рынке и продаж. Если сайт Лицензиата не соответствует указанным требованиям, договор о ссылках на веб-сайт расторгается.

(d)   Licensee's web site must have a posted privacy policy that is reasonably acceptable to ULTRA™. / На веб-сайте Лицензиата должна быть размещена политика соблюдения конфиденциальности, приемлемая для компании ULTRA™.

3. Business Practices / Деловая практика

In the performance of its marketing, distribution, offer for sale and sale of any Licensed Product hereunder, Licensee shall conduct its business activities in full compliance with all applicable laws and regulations. Without limiting the foregoing, Licensee shall, in its marketing, distribution, offer for sale, and sale of the Licensed Product: / При продвижении на рынке, сбыте, предложении к продаже и продаже какой-либо Лицензионной продукции в соответствии с настоящим Договором Лицензиат должен вести хозяйственную деятельность с соблюдением всех применимых законов и норм. Наряду с вышесказанным при продвижении на рынке, сбыте, предложении продажи и продаже Лицензионной продукции Лицензиат должен:

(a)  Comply with all applicable trade controls, as well as all applicable export, re-export and import laws and regulations; / Соблюдать все применимые требования торгового контроля, а также все применимые законы и нормы в отношении экспорта, реэкспорта и импорта;

(b)  Conduct business in compliance with antitrust and fair competition laws that govern in the jurisdictions in which Licensee conduct business; / Соблюдать антимонопольные законы и законы о добросовестной конкуренции, действующие на территории осуществления хозяйственной деятельности Лицензиата;

(c)  Comply with all applicable environmental laws and regulations regarding hazardous materials, air emissions, waste and wastewater discharge; / Соблюдать все применимые экологические законы и нормы в отношении опасных материалов, выбросов загрязняющих веществ в атмосферу, образования отходов и отвода сточных вод;

(d)  Not participate in international boycotts that are not sanctioned by the United States government or applicable laws; / Не принимать участия в международных бойкотах, не санкционированных правительством США и соответствующими законами;

(e)  Not violate the United States Foreign Corrupt Practices Act (FCPA) or any applicable anti-corruption and anti-bribery laws that govern the jurisdictions in which Licensee conducts business (a layperson's guide to the FCPA statute can be found at the following link: http: / / www.justice.gov / criminal / fraud / fcpa / docs / lay-persons-guide.pdf); / Не нарушать закон США о борьбе с коррупцией во внешнеэкономической деятельности (FCPA), а также иные применимые законы в области борьбы с коррупцией и подкупом, действующие на территории осуществления хозяйственной деятельности Лицензиата (со справочником для неспециалистов по применению закона FCPA можно ознакомиться по следующей ссылке: http: / www.ustice.ov / criminal / fraud / fcpa / docs / lay-persons-http://www.justice.gov/criminal/fraud/fcpa/docs/lay-persons-guide.pdf );

(f)  Not engage in corruption, extortion or embezzlement in any form and not offer or accept bribes or other means to obtain an undue or improper business advantage; / Не принимать участие в актах коррупции, вымогательства, растраты в какой бы то ни было форме, не предлагать и не принимать взяток, а также не прибегать к другим средствам достижения неправомерной коммерческой выгоды;

(g)  Avoid insider trading by buying or selling the stock of OAO TMK (TMK IPSCO's parent company) or another company when in possession of material, non-public information about OAO TMK or

another company; / Избегать инсайдерских сделок, заключающихся в приобретении или продаже акций ОАО ТМК (материнская компания компании ТМК IPSCO) или другой компании в случае обладания существенной информацией, не являющейся достоянием общественности, об ОАО ТМК или другой компании;

(h)  Have and maintain processes to identify, monitor and understand applicable laws and regulations; and / Иметь и поддерживать регламенты по отслеживанию и ознакомлению с применимыми законами и нормами; а также

(i)  Maintain and keep current a valid business license as required by applicable laws and regulations. /Поддерживать действие лицензии на ведение хозяйственной деятельности согласно применимым законам и нормам.

If Licensee or any of its employees have concerns regarding the conduct of ULTRA™ or TMK IPSCO in the performance of this Agreement, they may report, anonymously if they wish, such conduct to the TMK IPSCO Ethics Phone Hotline, at 1-877-556-5339./Если у Лицензиата или кого-либо из его работников возникнут сомнения относительно этичности поведения компаний ULTRA™ или ТМК IPSCO при исполнении настоящего Договора, они могут обратиться (при желании, анонимно) по телефону горячей линии ТМК IPSCO по вопросам деловой этики 1-877-556-5339.

Royalty / Лицензионные отчисления

| OD (inches) / Д_нар (дюйм) | TMK UP ULTRA™ FX | TMK UP ULTRA™ FJ | TMK UP ULTRA™ SF | TMK UP ULTRA™ CX | TMK UP ULTRA™ DQX | TMK UP ULTRA™ QX/ GX | TMK UP™ SF TORQ | TMK UP™ QX TORQ |
|---|---|---|---|---|---|---|---|---|
| 2.375 | $ 28.00 | $ 29.00 | $ 38.00 | | | | $ 45.00 | |
| 2.875 | $ 28.00 | $ 32.00 | $ 42.00 | | | | $ 50.00 | |
| 3.500 | $ 28.00 | $ 32.00 | $ 42.00 | | | | $ 51.00 | |
| 4.000 | $ 28.00 | $ 33.00 | $ 43.00 | | | | $ 52.00 | |
| 4.500 | $ 28.00 | $ 33.00 | $ 43.00 | $ 33.00 | $ 18.00 | $ 37.00 | $ 54.00 | $ 39.00 |
| 5.000 | | $ 38.00 | $ 49.00 | $ 34.00 | $ 21.00 | $ 38.00 | $ 58.00 | $ 44.00 |
| 5.500 | | $ 38.00 | $ 54.00 | $ 34.00 | $ 23.00 | $ 38.00 | $ 64.00 | $ 49.00 |
| 6.625 | | $ 38.00 | $ 55.00 | $ 34.00 | $ 23.00 | $ 38.00 | $ 66.00 | $ 52.00 |
| 7.000 | | $ 41.00 | $ 56.00 | $ 34.00 | $ 25.00 | $ 41.00 | $ 70.00 | $ 53.00 |
| 7.625 | | $ 43.00 | $ 59.00 | $ 36.00 | $ 26.00 | $ 43.00 | $ 73.00 | $ 55.00 |
| 7.750 | | $ 46.00 | $ 59.00 | $ 51.00 | $ 28.00 | $ 44.00 | $ 75.00 | $ 57.00 |
| 8.625 | | $ 46.00 | $ 60.00 | $ 51.00 | $ 28.00 | $ 46.00 | $ 78.00 | $ 59.00 |
| 9.625 | | $ 51.00 | $ 67.00 | $ 51.00 | $ 31.00 | $ 51.00 | $ 80.00 | $ 60.00 |
| 9.875 | | $ 51.00 | $ 67.00 | $ 51.00 | $ 31.00 | $ 60.00 | $ 80.00 | $ 68.00 |
| 10.750 | | $ 64.00 | $ 85.00 | $ 64.00 | $ 39.00 | $ 64.00 | $ 100.00 | $ 76.00 |
| 11.750 | | $ 77.00 | $ 101.00 | $ 79.00 | $ 46.00 | $ 77.00 | $ 119.00 | $ 90.00 |
| 11.875 | | $ 87.00 | $ 121.00 | $ 79.00 | $ 56.00 | $ 88.00 | $ 142.00 | $ 108.00 |
| 13.375 | | $ 88.00 | $ 126.00 | $ 86.00 | $ 58.00 | $ 92.00 | $ 148.00 | $ 112.00 |
| 13.625 | | $ 99.00 | $ 129.00 | $ 86.00 | $ 61.00 | $ 99.00 | $ 152.00 | $ 115.00 |
| 16.000 | | $ 103.00 | $ 134.00 | $ 87.00 | $ 63.00 | $ 103.00 | $ 157.00 | $ 119.00 |

Full Length – Royalty paid per joint (a pipe contains two threads)/ Полноразмерная продукция – лицензионные отчисления за одну трубу (труба содержит две резьбы)
Accessory – Royalty paid per connection/end / Приспособления– лицензионные отчисления за одно соединение/конец
Coupling – Royalty paid per coupling (a coupling contains two threads)/ Муфты – лицензионные отчисления за одну муфту (муфта содержит две резьбы)
Prices may change with 30 days written notice by ULTRA™ / Цены могут быть изменены компанией ULTRA™ с направлением уведомления за 30 дней.

Unofficial Copy Official Marilyn Burgess District Clerk

Exhibit G-1 / Приложение G-1

Royalty Report Form / Форма отчета о лицензионных отчислениях



# MONTHLY REPORT / ОТЧЕТ ЗА МЕСЯЦ

### for ULTRA™ Premium Connections / по премиальным соединен

LICENSEE Name/Location / Наименование и адрес        Report Month / Отчетный месяц:
ЛИЦЕНЗИАТА:

| Customer / Заказчик | Order Date / Дата заказа | Order No. / № заказа | Product-Tubing, Sub, Casing, hanger Etc. / Продукция: НКТ, переводники, обсадные трубы, подвески и т.д. | Size / Диаметр | Weight / Вес | Connection / Соединение | Quantity / Количество | | Gag иа Испол н мери инст |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Pin /Joint Ниппель | Box / Coupling Муфта | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Prepared by:_____    Date:_____              TOTAL:
Page          of_____
Подготовил:_____     Дата:_____              ВСЕГО:
стр. _____ из_____

Email completed report to ultralicensee@tmk-ipsco.com / Заполненный отчет отправить по электронной п

**TMK Premium Services/ ООО «ТМК-Премиум**
**Сервис»**

_Unofficial Copy Office of Harris County District Clerk_

**Exhibit H / Приложение H**

Act of using the non-exclusive license Form / Форма Акта об использовании лицензии

ACT № __ от _____ 201_ г.
об использовании лицензии
по Лицензионному договору о продаже и продвижении на рынке от «01» октября 2018

ACT № __ dated _____, 201_
of using the non-exclusive license
in accordance with the LICENSE AGREEMENT - SALES AND MARKETING dated October 01,

| | |
|---|---|
| ULTRA Premium Services L.L.C., represented by _____, hereinafter referred to as the "UL-TRA" from one side, and TMK Premium Services, represented by S.A. Rekin, General Director, acting on the basis of Charter, hereinafter referred to as the "Licensee", from the other side, have agreed upon the followings: | Компания ULTRA Premium Servic____, действу____ полномочий, именуемая в дальнейшем «К____ стороны, и ООО «ТМК-Премиум Сервис», в ____ С. А. Рекина, действующего на основа____ дальнейшем «Лицензиат», с другой стороны, нижеследующем: |
| According to Licensee's report № __ dated _____, 201_ for the _____ 201_ to the License agreement – sales and marketing dated October 01, 2018 the amount of royalty is made up of _____ (_____) US dollars. | Согласно Отчету Лицензиата № __ от _____ Лицензионному договору о продаже и ____ «01» октября 2018 сумма лицензионного ____ (_____) долларов США. |
| This ACT is made into 2 (two) copies of equal legal validity to be inseparable part of the License agreement – sales and marketing dated October 01, 2018 | Настоящий Акт составлен в двух экземпл____ юридическую силу, по одному для каж____ неотъемлемой частью Лицензионного догово____ на рынке от «01» октября 2018 |
| **From ULTRA:**<br>**ULTRA Premium Services L.L.C.** | **From Licensee:**<br>**General Director**<br>**TMK-Premium Services** |
| **От Компании ULTRA:**<br>**Компания ULTRA Premium Services L.L.C.**<br><br>_____ / _____ / | **От Лицензиата:**<br>**Генеральный директор**<br>**ООО «ТМК-Премиум Сервис»**<br>/Rekin S. A.<br>/Рекин С. А. |



технический справочник

# Резьбовые соединения «Премиум»
## Семейство TMK UP

GREENWELL®

Unofficial Copy Office of Marilyn Burgess District Clerk

ВИДЫ ПРОДУКЦИИ

РЕКОМЕНДАЦИИ ПО ОБСЛУЖИВАНИЮ И ЭКСПЛУАТАЦИИ

GREEN WELL

MOMENT SERIES

TMK UP MOMENT

PRO SERIES

TMK UP CENTUM

TMK UP PF

TMK UP PF ET

CLASSIC SERIES

TMK UP FMC

LITE SERIES

TMK UP CWB

TMK UP MAGNA

СПРАВОЧНЫЕ ДАННЫЕ



# MOMENT SERIES

Премиальные соединения Moment Series обладают исключительной устойчивостью к растягивающим, сжимающим и изгибающим нагрузкам при избыточном внутреннем и наружном давлениях, а также способны выдерживать экстремальные моменты кручения, связанные с вращением колонны труб во время спуска и цементирования ультраглубоких наклонно-направленных скважин с большими отходами от вертикали и протяженными горизонтальными участками.

*TMK UP MOMENT*



©2020 TMK

Ex. D-1, Page 2 of 12

Unofficial Copy Office of Marilyn Burgess District Clerk



*Moment Series*

# Резьбовое соединение
# TMK UP MOMENT

TMK UP MOMENT

©2020 ТМК

44



**Диаграмма прочностных характеристик обсадных труб
с резьбовым соединением TMK UP MOMENT**

Unofficial Copy Office of Marilyn Burgess District Clerk

# Резьбовое соединение TMK UP MOMENT

Муфтовое резьбовое соединение с клиновидным профилем резьбы, позволяющее вращать обсадную колонну под действием крутящих нагрузок, значительно превышающих возможности упорных соединений. Разработано для строительства ERD-скважин, в т.ч. с применением технологий вращения и бурения на обсадной колонне.

**Сортамент:** 114,3 – 244,48 мм / 4 1/2" – 9 5/8"

**Применение:**
- Избыточный крутящий момент
- Эксплуатационная обсадная колонна
- Эксплуатационная насосно-компрессорная колонна
- Промежуточная колонна
- Хвостовики и оттяжки
- Вращение при установке
- Вращение при цементировании
- Высокое давление/температура

**Клиновидный профиль резьбы:**
- Сопротивляемость избыточному крутящему моменту
- 100% эффективность на растяжение/сжатие
- Высокая устойчивость к изгибающим нагрузкам
- Радиальный замок обеспечивает высокие эксплуатационные характеристики соединения
- Легкая посадка
- Быстрое свинчивание

**Выходные витки:**
- Максимальная площадь опасного сечения
- Повышенная усталостная прочность

Unofficial Copy Office of Marilyn Burgess District Clerk



ENGINEERING MANUAL

# Threaded connections Premium

## TMK UP family

GREENWELL®

PRODUCT LINE

OPERATIONS AND MAINTENANCE RECOMMENDATIONS

GREEN WELL

MOMENT SERIES

TMK UP MOMENT

PRO SERIES

TMK UP CENTUM

TMK UP PF

TMK UP PF ET

CLASSIC SERIES

TMK UP FMC

LITE SERIES

TMK UP CWB

TMK UP MAGNA

REFERENCE DATA

Unofficial Copy Office of Marilyn Burgess District Clerk



# MOMENT SERIES

Moment Series premium connections exhibit exceptional resistance to tensile, compressive and bending loads under excessive internal and external pressures, and are capable of withstanding the extreme torques associated with pipe string rotation during the running and cementing of ultradeep directional highly deviated ERD wells with extended horizontal sections.

*TMK UP MOMENT*



©2020 TMK

Ex. D-1, Page 8 of 12

Unofficial Copy Office of Marilyn Burgess District Clerk



TMK UP
MOMENT

©2020 TMK



**Strength characteristics diagram of casing with TMK UP MOMENT threaded connection**

Coupling

Pipe

Coupling

Pipe

internal pressure

compression

tension

external pressure

connection
pipe body

THREADED CONNECTIONS "PREMIUM" OF TMK UP SERIES

# Threaded connection TMK UP MOMENT

Threaded coupling connection with wedge thread profile allows rotation of the casing string under the impact of torsional loads that significantly exceed the ratings of shoulder connections. It was designed for building of the ERD-wells, including the implementation of casing rotation and drilling technologies

**Dimensions:** 114.3 - 244.48 mm / 4 1/2" - 9 5/8"

**Applications:**
- Excessive torque
- Production casing
- Production tubing
- Intermediate string
- Liners and guylines
- Rotation while landing
- Rotation while cementing
- High pressure/temperature

**Wedge thread profile:**
- Resistance to excessive torque
- 100% of tensile/compressive efficiency
- High resistance to bending loads
- Radial tool joint assures high performance of the connection
- Easy-running fit
- Fast makeup

**Thread tips:**
- Maximum weak section area
- Elevated fatigue endurance

©2020 TMK



# ТРУБНАЯ МЕТАЛЛУРГИЧЕСКАЯ КОМПАНИЯ





## 2019

Unofficial Copy Office of Marilyn Burgess District Clerk



# Конструкция резьбовых соединений обсадных колонн для строительства ERD скважин (скважин с большим отходом от вертикали)

OCTG

Ex. D-2, Page 2 of 13

1

# ТМК-глобальный поставщик трубной продукции



**№1** В МИРЕ ПО ОБЪЕМУ ПРОИЗВОДСТВА ТРУБ

**13%** ДОЛЯ НА МИРОВОМ РЫНКЕ OCTG

**24%** ДОЛЯ НА РОССИЙСКОМ ТРУБНОМ РЫНКЕ

**4** МЛН. Т ТРУБ РЕАЛИЗОВАНО В 2018 ГОДУ **+6% г/г**

**20+** ПРОИЗВОДСТВЕННЫХ АКТИВОВ ПО ВСЕМУ МИРУ

**80+** СТРАН ГЕОГРАФИЯ ПОСТАВОК

Unofficial Copy Office of Marilyn Burgess District Clerk

Ex. D-2, Page 3 of 13

2



# Анализ горизонтального бурения в РФ

Согласно данным RPI[1], доля горизонтального бурения в эксплуатационном фонде продолжит увеличиваться: с 11% в 2010 году она выросла до 43% в 2018 году, а к **2030 году** будет составлять **около 50%.**



## Доля горизонтального бурения в России[2]

Увеличение **в 4 раза** количества горизонтальных скважин

43%

37%

33,5%

32,8%

29,3%

20,6%

14,2%

12,2%

**11%**

2010 2011 2012 2013 2014 2015 2016 2017 2018



## Средние длины горизонтальных участков[3]

400-700 м

700-1500 м

1500-4000 м

4000 м и более

1%

9%

20%

70%

Источники:
[1] - Отчет RPI: «Российский рынок бурения нефтяных скважин: текущее состояние и прогноз до 2030 года»
[2] - ЦДУ ТЭК, аналитический отчет «Российский рынок бурения: текущее состояние и прогноз до 2027 года, RPI, 2017
[3] - Российский нефтесервис, 01.02.2017

3



## Условие спуска обсадной колонны

**Отход от вертикали, м**





Условие спуска колонны до проектной глубины

**W1>W2**

Ex. D-2, Page 5 of 13

Unofficial Copy Official of Marilyn Burgess District Clerk



# Технические особенности соединений при горизонте до 700 м



**W1>>W2**

J-траектория

500 – 700 м

**Технология заканчивания:**
- Спуск без вращения.
- Цементирование без вращения

**Рекомендации к соединению:**
- Упорное соединение
- Эффективность соединения на сжатие 60% по телу трубы.

**TMK UP Simplex (100/60)**

Совместим с Баттрессом

Упорный уступ торец ниппеля-торец ниппеля

Герметичность на жидкость за счет использования резьбоуплотнительной смазки

**При превышении момента свинчивания может произойти проворот заводского конца**

**TMK UP PF (100/60)**

Газогерметичное уплотнение конус-конус

Отрицательный угол к опорной грани обеспечивает высокую стойкость к изгибающим нагрузкам

**Испытано по ISO 13679 CAL IV**

5

Ex. D-2, Page 6 of 13



# Риски при вращении соединения TMK UP PF

1. При превышении операционного крутящего момента уступ муфты начинает вздуваться и уменьшать внутренний проходной диаметр трубы.

2. Нагружение соединения сжатием и крутящим моментом не допускается, так как это приведет к гарантированному вздутию уступа муфты с последующим его смятием.

3. Вздутие упорного торца – результат пластической деформации, приводящий к потере газогерметичности



**Вздутие упорного торца**

Уменьшение внутреннего диаметра

Внутренний диаметр трубы

6



## Технические особенности соединений при горизонте до 2000 м



J-траектория

**W1>W2**

**Технология заканчивания:**
- Спуск с проворотом колонны.
- Цементирование с вращением

**Рекомендации к соединению:**
- Упорное соединение
- Эффективность соединения на сжатие 100% по телу трубы.

**TMK UP CWB (100/100)**

Совместим с Баттрессом

Упорный уступ обеспечивает:
- защиту от избыточного момента
- Эффективность на сжатие 100%

Герметичность на жидкость за счет использования резьбоуплотнительной смазки

**TMK UP Centum (100/100)**



Радиальное уплотнение сфера-конус

Радиальный ограничитель

- Удаление зоны контакта уплотнения от торца для газогерметичности при любых сочетаниях нагрузок.

- «Радиальный ограничитель» исключает смещение торца ниппеля в радиальном направлении.

**Испытано по ISO 13679 CAL IV**

7

Unofficial Copy Office of Mary W Briggs District Clerk



# Технические особенности соединений для ERD скважин



**J-траектория**

**более 2000 м**

**W1<W2**

**Технология заканчивания:**
- Спуск с вращением; Спуск «Плавающего хвостовика»
- Цементирование с вращением

**Рекомендации к соединению:**
- Упорное соединение
- Эффективность соединения на сжатие 100% по телу трубы.
- Высокий операционный момент

**TMK UP Момент (100/100)**



- Геометрия витков (ширина) изменяется по всей длине соединения, что резко увеличивает способность к высоким операционным крутящим моментам

- Профиль соединения «Ласточкин хвост» добавляет радиальное смыкание, что улучшает:
  – Герметичность
  – Механическую прочность

| **Операционный момент:** |
| **+30% от Премиум соединений** |

8

Ex. D-2, Page 9 of 13

Unofficial Copy of Maritime Bureau's District Clerk



# Влияние длины горизонтального участка на выбор соединения



Ex. D-2, Page 10 of 13

Unofficial Copy Office of Marilyn Burgess District Clerk

# Бурение на обсадной колонне/хвостовике

**Силы, действующие на обсадную колонну при бурении**



Внутреннее давление

Внешнее давление

Силы растяжения

Нейтральная точка

**Знакопеременные нагрузки**

Силы сжатия

Крутящий момент

Зона усталостного разрушения соединений обсадных труб

Дополнительное требование к соединениям:
Испытание на усталостную прочность

Unofficial Copy Office of Marilyn Burgess District Clerk

10

Ex. D-2, Page 11 of 13



# Результаты испытаний соединений на усталостную прочность

| № образца | Изгиб соединения | Кол-во циклов до разрушения |
|-----------|------------------|------------------------------|
| 1 | 8.82 | $3.8 \times 10^5$ |
| 2 | 8.96 | $3.8 \times 10^5$ |
| 3 | 4.2 | $6.58 \times 10^6$ |
| 4 | 4.19 | $5.47 \times 10^6$ |
| 5 | 3.48 | $22.1 \times 10^6$ |
| 6 | 3.47 | $24.6 \times 10^6$ |

- Точки **1,2,3,4** находятся ниже теоретической кривой

- Точки **5,6** выше теоретической кривой; при изгибе соединения 3,48/30 м



- Теоретически величину усталостной прочности при изгибе определить нельзя.

- Как показали исследования, с увеличением угла изгиба величина усталостной прочности снижается в 10-100 раз.

- Для наклонно-направленного бурения на колонне требуется получение фактических данных по усталостной прочности соединения.

Ex. D-2, Page 12 of 13



**Вопросы**



Unofficial Copy Office of Marilyn Burgess District Clerk

12




для подписчиков журнала в 2021 году

В 2021 году редакция журнала «Бурение и нефть» предлагает своим подписчикам специальные условия: при оформлении годовой подписки на печатную версию Вам бесплатно предоставляется 3 полосы для размещения научной статьи

Журнал входит в перечень ВАК

+7(901) 519-13-33, +7(925) 384-93-11, тел./факс: +7(499) 613-93-17

# Конструкция резьбовых соединений для заканчивания горизонтальных скважин

THREAD CONNECTION DESIGN FOR COMPLETION IN HORIZONTAL WELL

REKIN S.A.1,
NURGALEEV A.R.1,
AGISHEV A.R.1,
YAKUNIN S.A.1,
SLOBODIN V.V.2

1 «ТМК-Premium Service», LLC
Moscow, 105062,
Russian Federation

2 «ТМК» PJSC
Moscow, 105062,
Russian Federation

Авторизация

имя пользователя

пароль

Войти на сайт
регистрация

Продуктивные пласты современных разрабатываемых месторождений располагаются все глубже и во все более сложных геологических условиях. Для повышения нефтеотдачи пласта и сокращения общего количества скважин на проекте строятся горизонтальные скважины.

Развитие технологии наклонно-направленного и горизонтального бурения привело не только к появлению нового бурового оборудования (роторно-управляемые системы, телеметрия и т.д.), но и к разработке новых резьбовых соединений и подходов их расчета для выбора к проекту с учетом жесткости колонны на изгиб и контактных сил взаимодействия колонны со стенкой скважины.

The productive formation of modern developed fields are located deeper and in increasingly complex geological conditions.
To enhance oil recovery and reduce the total number of wells, horizontal wells are being built on the project.
The development of directional and horizontal drilling technology has led not only to the emergence of new drilling equipment (rotary steerable systems, measurement while drilling, etc.), but also to the development of new threaded connections and approaches to calculation for selection to the project, taking into account the rigidity of the string in bending and contact forces
of interaction of the string with the borehole wall.

Ввиду того, что запасы «легкой» нефти и газа сокращаются, нефтегазовые компании все чаще ведут освоение сложных месторождений. Это приводит к увеличению глубин бурения, бурению горизонтальных скважин и скважин с большим отходом от вертикали, разработке месторождений с аномально высокими пластовыми давлениями.
В 2013–2018 гг. доля горизонтального бурения выросла с 21 до 48 %, а объемы вертикального бурения снизились на 13 %. И, согласно данным отчета Delloite, такая тенденция сохранится в ближайшем будущем. Все это приводит к повышению требований к внутрискважинному оборудованию.
При бурении и заканчивании горизонтальных скважин оборудование при спуске и эксплуатации воспринимает комбинированное нагружение. В связи с одновременным воздействием сжимающей нагрузки, нагрузки от изгиба, внутреннего и внешнего давления наиболее опасные сечения находятся в наклонно-направленном интервале (рис. 1). Выделим критерии, которые влияют на величину эквивалентного напряжения:
• геометрические параметры скважины (внутренний диаметр обсаженного ствола, эффективный диаметр открытого ствола, радиальный зазор между колонной и стенкой скважины, коэффициент трения колонны о породу);
• осевые силы сопротивления перемещению колонны и вращению колонны;
• интенсивность искривления ствола скважины и изгибающий момент;
• вес колонны и влияние контактных сил.
Осевые силы сопротивления перемещению колонны возникают из-за осевого перемещения колонны вверх/вниз как результат трения о стенку скважины. Преодоление этих сил вызывает в колонне:
• повышенные сжимающие усилия в процессе передачи осевой нагрузки нижней части колонны;
• изгибающие нагрузки при прохождении наклонно-направленных участков с большой интенсивностью искривления;
• высокий крутящий момент вращения колонны при спуске с вращением колонны.
Сопротивление движению колонны определяется значением коэффициента трения на данном участке скважины и контактными силами, возникающими между колонной и стенкой скважины (рис. 1) [1].
Наиболее опасным следствием действия сжимающих нагрузок является локальная потеря продольной устойчивости сначала в форме плоской синусоиды (синусоидальному баклингу), переходящей по мере увеличения сжимающей нагрузки к виду пространственной спирали (спиральному баклингу) (рис. 2). Превышение сжимающих усилий сверх критических нагрузок – баклинга сопровождается прогрессирующим ростом прижимающих усилий в контакте «колонна – стенки скважины», что приводит к заклинке (прихвату) колонны и инструмента в скважине. Наиболее часто баклинг наблюдается при бурении и спуске колонны без вращения. При операциях с колонной коэффициенты трения скольжения изменяются на



**РЕКИН С.А.**

д.т.н., генеральный директор

ООО «ТМК-Премиум Сервис»



**НУРГАЛЕЕВ А.Р.**

начальник отдела по проектированию скважин

ООО «ТМК- Премиум Сервис»



**АГИШЕВ А.Р.**

Главная   Свежий номер   О журнале   Архив журнала   Пользователю   Наши партнеры   [поиск по са]

которая ... к ... снизить силы сопротивления перемещению колонны вдоль оси скважины, тем самым обеспечивая достижение проектной глубины спуска.

Установлено, что значение критической нагрузки, приводящей к баклингу в горизонтальном стволе, прямо зависит от распределенного веса труб в буровом растворе и изгибной жесткости сечения тела трубы [2].

В сжатом состоянии колонна испытывает как сжимающие, так и изгибающие нагрузки, а в случае ее освобождения путем расхаживания с вращением при прихвате испытывает дополнительно высокие нагрузки при кручении. Действие комбинированных нагрузок «сжатие – изгиб» приводит к локальным изгибающим напряжениям в колонне, которые могут стать критическими для выбранного типоразмера трубы по слабому сечению [3, 4].

Расчет изгибающих нагрузок требует определения локальных значений кривизны по телу трубы (BSM). Коэффициент BSM (Bending Stress Magnification – усиление напряжения изгиба) является отношением максимального абсолютного значения кривизны тела трубы к кривизне ствола скважины на заданном участке. Произведение расчетного значения BSM на напряжение изгиба определяет напряжения изгиба тела трубы, которые концентрируются ближе к муфтовым соединениям при растяжении (рис. 3).

Полученные значения изгибающих напряжений используют в расчете эквивалентных напряжений по фон-Мизесу [2]. Условие прочности по соответствующей теории критерия прочности от напряженных состояний имеет следующий вид:

(1)

где: σэкв – эквивалентные напряжения по фон Мизесу, МПа;

; σb pipe – изгибающие напряжения, возникающие за счет кривизны скважины и учета жесткости тела трубы; σθ – напряжения, действующие в тангенсальном (круговом) направлении; σr – напряжения, действующие в радиальном направлении;





Рис. 1. Нагрузки, действующие на колонну в процессе спуска в наклонно-направленном интервале

Рис. 2. Моделирование потери устойчивости колонны в Well Plan



Рис. 3. Нагрузки, действующие на колонну в процессе ее эксплуатации

ООО «ТМК-Премиум Сервис»



**ЯКУНИН С.А.**

Ведущий инженер отдела по проектированию скважин

ООО «ТМК-Премиум Сервис»



**СЛОБОДИН В.В.**

руководитель обособленного подразделения в г. Южно-Сахалинск

ПАО «ТМК»

**Ключевые слова:** ООО «ТМК-Премиум Сервис», резьбовое соединение, TMK UP Moment, TMK UP Centum, эффективность на сжатие, потеря продольной устойчивости, горизонтальные скважины, локальное усиление напряжения изгиба, муфты, бурение

**Keywords:** TMK-Premium Service LLC, thread connection, TMK UP Moment, TMK UP Centum, compression efficiency, buckling, horizontal wells, local bending stress enhancement, couplings, drilling

Просмотров статьи: 1245



177 reader s

admin@burneft.ru

изгибающих напряжений (рис. 4).

Одним из самых уязвимых элементов в обсадной колонне является резьбовое соединение, которое ограничено следующими техническими параметрами:
• эффективность на сжатие в сравнении с телом трубы;
• допустимый изгиб соединения;
• операционный момент.

Поэтому выбор соединения является важным критерием для сохранения целостности колонны и ее работоспособности под действием комбинированных нагрузок (рис. 4, 5).

На рис. 4 показаны области допустимых нагрузок «осевая нагрузка – давление» для вертикального участка (случай отсутствия изгиба – выделено красной областью) и наклонно-направленного участка (случай с изгибом колонны – выделено зеленой областью) для типоразмера колонны 177,8 х 9,19 мм, группы прочности N 80. Согласно результатам расчета, соединения с эффективностью на сжатие 60 % и менее не способны обеспечить сохранение работоспособности соединения. Для рассмотренного случая требуется применение соединения с эффективностью на сжатие 100 %, например, ТМК UP Centum или ТМК UP Moment.

На рис. 5 показаны области допустимых нагрузок «осевая нагрузка – крутящий момент» для вертикального и наклонно-направленного участков. В качестве сравнения выбраны два соединения: соединение № 1 имеет 60 % сжатия до предела текучести и операционный крутящий момент 10 кН·м; соединение № 2 имеет 100 % сжатия до предела текучести и операционный крутящий момент 16 кН·м. Расчет комбинированной нагрузки (рис. 4) для вертикального участка показал, что колонна сохраняет свою целостность и не превышает допустимые нагрузки для обоих соединений. Что касается наклонно-направленного участка с интенсивностью искривления 1,5/10,0 м, то расчетная комбинированная нагрузка является критичной для соединения № 1, т.к. превышает предельное значение сжимающей нагрузки. В случае освобождения колонны при заклинке с приложенным операционным моментом 12 кН·м соединение № 1 не способно сохранить целостность ввиду превышения предельного операционного крутящего момента (рис. 5).



Рис. 4. Пример. Область допустимых комбинированных нагрузок «осевая нагрузка – давление» для типоразмера 177,8 х 9,19 мм N 80 ТМК UP Centum



Рис. 5. Область допустимых комбинированных нагрузок «осевая нагрузка – крутящий момент» для типоразмера 177,8 х 9,19 мм N 80

Таким образом, одним из эффективных методов, который позволяет решить проблемы с потерей устойчивости при спуске в горизонтальные интервалы, является спуск с вращением, при котором трение скольжения переходит в трение качения. И для инженера важно правильно определить критерии выбора резьбового соединения.

Выделим основные конструктивные особенности резьбового соединения для спуска в наклонно-направленную и горизонтальную скважину (рис. 6):
1. Торцевой упор. Торцевые упоры кроме уплотняющей функции служат ограничением осевого перемещения и воспринимают крутящий момент при вращении обсадной колонны.
2. Форма профиля резьбы. Для обеспечения высокой прочности соединения при действии осевой и изгибающей нагрузок применяется крюкообразная или клиновидная резьба (рис. 7).

Unofficial Copy Office of Marilyn Burgess LD Clerk

 

«металл – металл» имеют одно или несколько уплотнений и отличаются высокой герметичностью при давлении как жидкостью, так и газом. Для надежной герметизации применяются уплотнительные поверхности конической, сферической или цилиндрической форм, обеспечивающие после свинчивания соединения плотную посадку с заданным диаметральным натягом.

В зависимости от конструктивных особенностей соединения максимальный операционный момент будет отличаться для соединений. Например, на рис. 8 представлено сравнение соединения поколений Pro (TMK UP Centum и TMK UP PF ET) с соединением поколения Moment (TMK UP Moment).

Клиновидный профиль резьбы TMK UP Moment с прогрессирующим шагом по всей длине соединения (рис.9) резко увеличивает способность обеспечить высокий операционный момент в отличие от классических премиальных соединений с трапецеидальным профилем. Обладает 100 % эффективностью на растяжение и сжатие.

PRO серия. Линейка премиальных соединений, обладающих исключительной устойчивостью к растягивающим, сжимающим и изгибающим нагрузкам при избыточном внутреннем и наружном давлении: TMK UP™ CENTUM (рис. 10) – быстросборное упорное газогерметичное премиальное. Испытано по стандарту API 5C5 CAL IV. Прочность соединения равна прочности тела трубы и обеспечивает 100 % эффективность на растяжение и сжатие. Уплотнение «металл – металл» и профиль резьбы обеспечивают высокую газогерметичность при особо сложных условиях эксплуатации (предельных комбинированных изгибающих, сжимающих, растягивающих нагрузках, крутящем моменте, агрессивных средах). Может применяться на SAGD проектах и для циклического стимулирования водяным паром CSS.

## ВЫВОДЫ

По результатам рассмотрения явления продольной устойчивости в горизонтальных скважинах и расчета локальных изгибающих напряжений можно заключить следующее:

1. При выборе соединений необходимо учитывать изгибающие напряжения, возникающие за счет кривизны скважины и учета жесткости тела трубы.



Рис. 6. Ключевые элементы резьбового соединения



Рис. 7. Формы профиля премиальных резьбовых соединений



Рис. 8. Сравнение операционных моментов



Рис. 9. Профиль соединения TMK UP Moment



Рис. 10. TMK UP CENTUM

2. Наиболее эффективным способом снизить риски разрушения при расхаживании и вращении колонны, не доводя колонну до проектной глубины, является применение упорных резьбовых соединений с эффективностью на сжатие 100 %. Премиальные упорные резьбовые соединения ТМК отличаются от соединений ГОСТ и API подтвержденными стендовыми испытаниями при комбинированном нагружении и моментным нагрузкам.

3. Для обеспечения высокого операционного момента во время спуска с вращением необходимо применение специальных конструкций соединений с клиновидным типом профиля резьбы.

## Литература

1. Агишев А.Р., Рекин С.А., Павлов А.М., Федосеев Д.А. Применение упорного резьбового соединения для эффективного заканчивания горизонтальных скважин // Бурение и нефть. 2018. № 10. С. 24–28.

2. Kuru E., Martinez A., Miska S., 1999. «The Buckling Behavior of Pipes and Its Influence on the Axial Force Transfer in Directional Wells», Proceedings, SPE/IADC Drilling Conference, Paper No. SPE/IADC 52840, Amsterdam, Holland.

3. Bending Stress Magnification in Constant Curvature Doglegs With Impact on Drillstring and Casing. Paslay P.R., Techaid Corp., and Cernocky E.P. Shell Development Co. SPE 22547.

4. Рекин С.А., Янтурин А.Ш.; под ред. А.Ш. Янтурина. Устойчивость, упругая деформация, износ и эксплуатация бурильных и обсадных колонн (механика системы «колонна – скважина – пласт») . СПб.: Недра, 2005 (Уфа: Уфимский полиграфический комбинат). 460 с.

## References

Ex. D-3, Page 4 of 10

Unofficial Copy Obtained from the Bureau of Land Management Records Clerk

for Efficient Completion of Horizontal Wells]. Bureniye i neft' [Drilling and oil], 2018, no. 10. pp. 24–28. (In Russian).

2. Kuru E., Martinez A., Miska S. «The Buckling Behavior of Pipes and Its Influence on the Axial Force Transfer in Directional Wells», Proceedings, SPE/IADC Drilling Conference, Paper No. SPE/IADC 52840, 1999 Amsterdam, Holland. (In English).

3. Bending Stress Magnification in Constant Curvature Doglegs With Impact on Drillstring and Casing. Paslay P.R., Techaid Corp., and Cernocky E.P. Shell Development Co. SPE 22547. (In English).

4. Rekin S.A., Yanturin A.S. Stability, elastic deformation, wear-out and operation of drilling and casing strings (mechanics of a «string-wellbore-reservoir» system). SPb.: NEDRA, 2005 (UFA: Printing and Publishing Integrated Work.

**Комментарии посетителей сайта**

Комментировать этот материал »

 

home   Fresh issue   About the magazine   Journal archive   User   Our partners   Contacts   | site search burneft



The journal is included in the list
of VAK

+7 (901) 519-13-33, +7 (925) 384-93-11, tel./fax: +7 (499) 613-93-17

Drilling and oil › Archive of the magazine › Archive of issues › September 2020 › Tools and equipment

## Design of threaded connections for horizontal well completion
### THREAD CONNECTION DESIGN FOR COMPLETION IN HORIZONTAL WELL

REKIN SA1,
NURGALEEV AR1,
AGISHEV AR1,
YAKUNIN SA1,
SLOBODIN VV2
1 "TMK-Premium Service", LLC
Moscow, 105062,
Russian Federation
2 "TMK" PJSC
Moscow, 105062,
Russian Federation

The productive strata of modern developed fields are located deeper and in increasingly complex
geological conditions. To enhance oil recovery and reduce the total number of wells, horizontal wells
are being built on the project.

The development of technology for directional and horizontal drilling has led not only to the
emergence of new drilling equipment (rotary steerable systems, telemetry, etc.), but also to the
development of new threaded connections and approaches to their calculation for selection to the
project, taking into account the rigidity of the string on bending and contact forces of interaction of
the string with the borehole wall.

The productive strata of modern developed fields are located deeper and in increasingly complex geological conditions.
To enhance oil recovery and reduce the total number of wells, horizontal wells are being built on the project.
The development of directional and horizontal drilling technology has led not only to the emergence of new drilling equipment
(rotary steerable systems, measurement while drilling, etc.), but also to the development of new threaded connections and
approaches to their calculation for selection to the project, taking into account the rigidity of the string in bending and contact
forces
of interaction of the string with the borehole wall.

In view of the fact that reserves of "light" oil and gas are decreasing, oil and gas companies are increasingly
developing complex fields. This leads to an increase in drilling depths, drilling of horizontal wells and wells with
extended reach, development of fields with abnormally high reservoir pressures.
In 2013–2018 the share of horizontal drilling increased from 21% to 48%, while vertical drilling volumes
decreased by 13%. And, according to the Delloite report, this trend will continue in the near future. All this leads
to increased requirements for downhole equipment.
When drilling and completing horizontal wells, the equipment perceives a combined load during running and
operation. Due to the simultaneous effect of compressive load, bending load, internal and external pressure, the
most dangerous sections are in the obliquely directed interval (Fig. 1). Let us single out the criteria that affect
the value of the equivalent stress:
• geometrical parameters of the well (inner diameter of the cased hole, effective diameter of the open hole, radial
clearance between the string and the borehole wall, coefficient of friction of the string against the rock);
• axial forces of resistance to column displacement and column rotation;
• intensity of wellbore deviation and bending moment;
• column weight and influence of contact forces.
Axial string drag forces arise from the up / down axial movement of the string as a result of friction against the
borehole wall. Overcoming these forces causes in the column:
• increased compressive forces in the process of transferring the axial load of the lower part of the column;
• bending loads when passing obliquely directed sections with high curvature intensity;
• high torque of the string rotation during running with string rotation.
The resistance to the column movement is determined by the value of the friction coefficient in a given section of
the well and by the contact forces arising between the column and the wall of the well (Fig. 1) [1].
The most dangerous consequence of the action of compressive loads is a local loss of longitudinal stability, first in
the form of a flat sinusoid (sinusoidal buckling), which, as the compressive load increases, turns into a spatial
spiral (spiral buckling) (Fig. 2). The excess of the compressive forces in excess of the critical loads - buckling is
accompanied by a progressive increase in the pressing forces in the "column - wellbore wall" contact, which leads
to jamming (sticking) of the string and tool in the well. Buckling is most commonly observed when drilling and
running a string without rotation. During operations with rotation, the sliding friction coefficients of the string are
converted into rolling friction coefficients, which makes it possible to reduce the forces of resistance to the string
displacement along the well axis, thereby ensuring the achievement of the design running depth.
It has been established that the value of the critical load leading to buckling in a horizontal wellbore directly
depends on the distributed weight of pipes in the drilling fluid and the bending stiffness of the pipe body section
[2].

## Authorization

Username

password

Login to
register



**REKIN S.A.**

Doctor of Technical Sciences,
General Director

LLC "TMK-Premium Service"



**NURGALEEV A.R.**

Head of Well Design
Department

OOO "TMK-Premium Service"



**AGISHEV A.R.**

compressive and bending loads, and in the case of its release by reciprocating with rotation during sticking, it experiences additional high torsional loads. The action of the combined "compression - bending" loads leads to local bending stresses in the column, which can become critical for the selected standard size of the pipe along the weak section [3, 4].

Calculation of bending loads requires the determination of local values of curvature along the pipe body (BSM). BSM (Bending Stress Magnification) is the ratio of the maximum absolute curvature of the pipe body to the curvature of the wellbore in a given area. The product of the calculated BSM value by the bending stress determines the bending stresses of the pipe body, which are concentrated closer to the coupling joints in tension (Fig. 3).

The obtained values of bending stresses are used in the calculation of von Mises equivalent stresses [2]. The strength condition according to the corresponding theory of strength criterion for stressed states has the following form:

(1)

where: σeq - equivalent stresses according to von Mises, MPa;

; σb pipe - bending stresses arising from the curvature of the well and taking into account the rigidity of the pipe body; σθ - stresses acting in the tangential (circular) direction; σr - stresses acting in the radial direction; σтек is the yield stress of the given material; n is the applied safety factor.

The permissible values of the combined loads are described by the elasticity ellipse, taking into account local bending stresses (Fig. 4).

One of the most vulnerable elements in the casing is the threaded connection, which is limited by the following technical parameters:
• Compression efficiency compared to the pipe body;
• admissible bending of the connection;
• operational moment.

Therefore, the choice of the connection is an important criterion for maintaining the integrity of the string and its operability under the action of combined loads (Fig. 4, 5).

In fig. 4 shows the areas of permissible loads "axial load - pressure" for the vertical section (the case of no



Рис. 1. Нагрузки, действующие на колонну в процессе спуска в наклонно-направленном интервале



Рис. 2. Моделирование потери устойчивости колонны в Well Plan



Рис. 3. Нагрузки, действующие на колонну в процессе ее эксплуатации

LLC "TMK-Premium Service"



YAKUNIN S.A.

Lead Engineer, Well Design Department

LLC "TMK-Premium Service"



V.V. SLOBODIN

head of a separate subdivision in Yuzhno-Sakhalinsk

PJSC "TMK"

Key words: TMK-Premium Service LLC, threaded connection, TMK UP Moment, TMK UP Centum, compression efficiency, buckling, horizontal wells, local bending stress, couplings, drilling

Keywords: TMK-Premium Service LLC, threaded connection, TMK UP Moment, TMK UP Centum, compression efficiency, buckling, horizontal wells, local bending stress enhancement, couplings, drilling

Article views: 1272

АКРОС

with a compression efficiency of 60% or less are not capable of maintaining the joint performance. For the case considered, a connection with a compression efficiency of 100% is required, for example, TMK UP Centum or TMK UP Moment.

In fig. 5 shows the areas of permissible loads "axial load - torque" for the vertical and oblique sections. Two connections were selected as a comparison: connection no. 1 has 60% compression to yield point and an operating torque of 10 kN · m; connection # 2 has 100% compression to yield strength and an operating torque of 16 kN · m. The calculation of the combined load (Fig. 4) for the vertical section showed that the column retains its integrity and does not exceed the permissible loads for both connections. As for the inclined section with a curvature intensity of 1.5 / 10.0 m, the calculated combined load is critical for connection No. 1, because exceeds the compressive load limit.



Рис. 4. Пример. Область допустимых комбинированных нагрузок «осевая нагрузка – давление» для типоразмера 177,8 x 9,19 мм  N 80 TMK UP Centum



Рис. 5. Область допустимых комбинированных нагрузок «осевая нагрузка – крутящий момент» для типоразмера 177,8 x 9,19 мм N 80

Thus, one of the effective methods that allows to solve the problems with loss of stability when descending into horizontal intervals is descending with rotation, in which sliding friction transforms into rolling friction. And it is important for the engineer to correctly determine the criteria for choosing a threaded connection.

Let's highlight the main design features of a threaded connection for running into a directional and horizontal well (Fig. 6):

1. End stop. The end stops, in addition to the sealing function, serve as a limitation of axial movement and perceive torque during the rotation of the casing.

2. The shape of the thread profile. To ensure high strength of the connection under axial and bending loads, hook or wedge threads are used (Fig. 7).

3. Gas-tight metal-to-metal seal. Metal-to-metal seals have one or more seals and are highly leak-tight under both liquid and gas pressure. For reliable sealing, sealing surfaces of conical, spherical or cylindrical shapes are used, which, after make-up of the joint, provide a tight fit with a given diametrical interference.

Depending on the design features of the connection, the maximum operating torque will differ for the connections. For example, in Fig. 8 shows a comparison of the Pro generation connection (TMK UP Centum and TMK UP PF ET) with the Moment generation connection (TMK UP Moment).

The tapered profile of TMK UP Moment threads with progressive lead along the entire length of the joint (Fig. 9) dramatically increases the ability to provide high operating torque, in contrast to the classic premium connections with a trapezoidal profile. Has 100% tensile and compressive efficiency.

PRO series. A line of premium connections that have exceptional resistance to tensile, compressive and bending loads at excessive internal and external pressures: TMK UP ™ CENTUM (Fig. 10) - premium quick-assembly thrust gas-tight. Tested to API 5C5 CAL IV. The bond strength is equal to the strength of the pipe body and provides 100% tensile and compressive efficiency. The metal-to-metal seal and the thread profile ensure high gas tightness under especially difficult operating conditions (extreme combined bending, compressive, tensile loads, torque, aggressive media). Can be used on SAGD projects and for cyclic CSS steam stimulation.



phenomenon of longitudinal stability in horizontal wells and calculating local bending stresses, the following can be concluded:

1. When choosing connections, it is necessary to take into account bending stresses arising from the curvature of the well and taking into account the rigidity of the pipe body.

2. The most effective way to reduce the risks of fracture during reciprocation and rotation of the string, without bringing the string to the design depth, is the use of thrust threaded connections with a compression efficiency of 100%. TMK premium thrust threaded connections differ from GOST and API connections by confirmed bench tests under combined loading and moment loads.

3. To ensure a high operating torque during running with rotation, it is necessary to use special designs of connections with a tapered type of thread profile.



Рис. 6. Ключевые элементы резьбового соединения



Рис. 7. Формы профиля преммальных резьбовых соединений



Рис. 8. Сравнение операционных моментов



Рис. 9. Профиль соединения TMK UP Moment



Рис. 10. TMK UP CENTUM

## Literature

1. Agishev A.R., Rekin S.A., Pavlov A.M., Fedoseev D.A. Application of a Threaded Threaded Connection for Efficient Completions of Horizontal Wells // Drilling and Oil. 2018. No. 10. P. 24–28.

2. Kuru E., Martinez A., Miska S., 1999. "The Buckling Behavior of Pipes and Its Influence on the Axial Force Transfer in Directional Wells," Proceedings, SPE / IADC Drilling Conference, Paper No. SPE / IADC 52840, Amsterdam, Holland.

3. Bending Stress Magnification in Constant Curvature Doglegs With Impact on Drillstring and Casing. Paslay PR, Techaid Corp., and Cernocky EP Shell Development Co. SPE 22547.

4. Rekin S.A., Yanturin A.Sh .; ed. A.Sh. Yanturin. Stability, elastic deformation, wear and operation of drill and casing strings (mechanics of the "string - well - formation" system). Saint Petersburg: Nedra, 2005 (Ufa: Ufa printing plant). 460 s.

## References

1. Agishev AR, Rekin SA, Pavlov AM, Fedoseyev DA Primeneniye upornogo rez'bovogo soyedineniya dlya effektivnogo zakanchivaniya gorizontal'nykh skvazhin [Application of Threaded Threaded Connection for Efficient Completion of Horizontal Wells]. Bureniye i neft [Drilling and oil], 2018, no. 10. pp. 24-28. (In Russian).

2. Kuru E., Martinez A., Miska S. "The Buckling Behavior of Pipes and Its Influence on the Axial Force Transfer in Directional Wells", Proceedings, SPE / IADC Drilling Conference, Paper No. SPE / IADC 52840, 1999 Amsterdam, Holland. (In English).

 

4. Rekin SA, Yanturin AS Stability, elastic deformation, wear-out and operation of drilling and casing strings (mechanics of a "string-wellbore-reservoir" system). SPb .: NEDRA, 2005 (UFA: Printing and Publishing Integrated Work

Comment on this material."

**Site Visitor Comments**

Unofficial Copy Office of Marilyn Burgess District Clerk

Ex. D-3, Page 10 of 10

СФЕРА (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/)  /  ЖУРНАЛ (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/mjournal)
ПУБЛИКАЦИИ (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/publications)
Конструкция резьбовых соединений для заканчивания горизонтальных скважин

# Конструкция резьбовых соединений для заканчивания горизонтальных скважин

**С. А. РЕКИН, А. Р. НУРГАЛЕЕВ, С. А. ЯКУНИН** – ООО «ТМК-Премиум Сервис»
**А. Р. АГИШЕВ, В. В. СЛОБОДИН** – ПАО «ТМК»

*Продуктивные пласты современных разрабатываемых месторождений располагаются все глубже и во все более сложных геологических условиях. Для повышения нефтеотдачи пласта и сокращения общего количества скважин на проекте строятся горизонтальные скважины. Развитие технологии наклонно-направленного и горизонтального бурения привело не только к появлению нового бурового оборудования (роторно-управляемые системы, телеметрия и т.д.), но и разработке новых резьбовых соединений и подходов их расчета для выбора к проекту с учетом жесткости колонны на изгиб и контактных сил взаимодействия колонны со стенкой скважины.*

**Ключевые слова:** ООО «ТМК-Премиум Сервис», резьбовое соединение ТМК UP Moment, ТМК UP Centum, эффективность на сжатие 100%, потеря продольной устойчивости, горизонтальные скважины, локальные изгибные напряжения в области муфты.

В виду того, что запасы «легкой» нефти и газа сокращаются, нефтегазовые компании все больше ведут освоение сложных месторождений. Это приводит к увеличению глубин бурения, бурению горизонтальных скважин и скважин с большим отходом от вертикали, разработке месторождений с аномально высокими пластовыми давлениями.

В 2013-2018 годах доля горизонтального бурения выросла с 21% до 48%, а объемы вертикального бурения снизились на 13%, и эта тенденция сохранится в ближайшем будущем, согласно данным отчета Delloite. Все это приводит к повышению требований к внутрискважинному оборудованию.

При бурении и заканчивании горизонтальных скважин оборудование при спуске и эксплуатации воспринимает комбинированное нагружение. В связи с одновременным воздействием сжимающей нагрузки, нагрузки от изгиба, внутреннего и внешнего давления наиболее опасные сечения находятся в наклонно-направленном интервале (рис. 1).

Выделим критерии, которые влияют на величину эквивалентного напряжения:

- геометрические параметры скважины (внутренний диаметр обсаженного ствола, эффективный диаметр открытого ствола, радиальный зазор между колонной и стенкой скважины, коэффициент трения колонны о породу);
- осевые силы сопротивления перемещению колонны и вращению колонны;

- интенсивность искривления ствола скважины и изгибающий момент;
- вес колонны и влияние контактных сил.

Осевые силы сопротивления колонны возникают из-за осевого перемещения колонны вверх/вниз, как результат трения о стенку скважины. Преодоление этих сил вызывает в колонне:

- повышенные сжимающие усилия в процессе передачи осевой нагрузки нижней части колонны;
- изгибающие нагрузки при прохождении наклонно-направленных участков с большой интенсивностью искривления,
- высокий крутящий момент вращения колонны при спуске с вращением колонны.

Сопротивление движению колонны определяется значением коэффициента трения на данном участке скважины и контактными силами, возникающими между колонной и стенкой скважины (рис. 1) [1].



**Рис. 1. Нагрузки, действующие на колонну в процессе спуска в наклонно-направленном интервале**

Наиболее опасным следствием действия сжимающих нагрузок является локальная потеря продольной устойчивости сначала в форме плоской синусоиды – «синусоидальному баклингу», переходящей по мере увеличения сжимающей нагрузки к виду пространственной спирали – «спиральному баклингу» (рис. 2). Превышение сжимающих усилий сверх критических нагрузок «баклинга» сопровождается прогрессирующим ростом прижимающих усилий в контакте «колонна – стенки скважины», что приводит к заклинке (прихвату) колонны и инструмента в скважине. Наиболее часто «баклинг» наблюдается при бурении и спуске колонны без вращения. При операциях с вращением коэффициенты трения скольжения колонны переходят в коэффициенты трения качения, что позволяет снизить силы сопротивления перемещению колонны вдоль оси скважины, тем самым обеспечивая достижения проектной глубины спуска.

Установлено, что значение критической нагрузки, приводящей к «баклингу» в горизонтальном стволе, прямо зависит от распределенного веса труб в буровом растворе и изгибной жесткости сечения тела трубы [2].

В сжатом состоянии колонна испытывает как сжимающие нагрузки, так и изгибающие нагрузки, а в случае ее освобождения путем расхаживания с вращением при прихвате испытывает, дополнительно, высокие нагрузки при кручении. Действие комбинированных нагрузок «сжатие-изгиб» приводит к локальным изгибающим напряжениям в колонне, которые могут стать критическими для выбранного типоразмера трубы по слабому сечению [3].



**Рис. 2. Моделирование потери устойчивости колонны в Well Plan**

Расчет изгибающих нагрузок требует определения локальных значений кривизны по телу трубы (BSM). Коэффициент BSM (Bending Stress Magnification – усиление напряжения изгиба) является отношением максимального абсолютного значения кривизны тела трубы к кривизне ствола скважины на заданном участке. Произведение расчетного значения BSM на напряжение изгиба $\sigma_b$ определяет напряжения изгиба тела трубы $\sigma_{b\,pipe}$, которые концентрируются ближе к муфтовым соединениям при растяжении (см. рис. 3).



**Рис. 3. Нагрузки, действующие на колонну в процессе ее эксплуатации**

Полученные значения изгибающих напряжений используют в расчете эквивалентных напряжений по фон-Мизесу [2]. Условие прочности по соответствующей теории критерия прочности для напряженных состояний имеет следующий вид:

$$\sigma_{\text{экв}} = \sqrt{\frac{1}{2}[(\sigma_a - \sigma_\theta)^2 + (\sigma_\theta - \sigma_r)^2 + (\sigma_r - \sigma_a)^2]} < \frac{\sigma_{\text{тек}}}{n} \qquad (1)$$

где:

$\sigma_{\text{экв}}$ – эквивалент напряжения по фон Мизесу

$$\sigma_a \approx \frac{Q_{\text{растяг}}}{F} + \sigma_b$$

где:

$\sigma_{b\ pipe}$ – изгибающие напряжения, возникающие за счет кривизны скважины и учета жесткости тела трубы;

$\sigma_\theta$ – напряжения, действующие в тангенсальном (круговом) направлении;

$\sigma_r$ – напряжения, действующие в радиальном направлении;

$\sigma_{\text{тек}}$ – предел текучести данного материала;

$n$ – применяемый запас прочности.

Допустимые значения комбинированных нагрузок описываются эллипсом упругости с учетом локальных изгибающих напряжений (рис. 4).



**Рис. 4. ПРИМЕР. Область допустимых комбинированных нагрузок «осевая нагрузка-давление» для типоразмера 177,8x9,19 мм N80 TMK UP Centum**

Одним из самых уязвимых элементов в обсадной колонне является резьбовое соединение, которое ограничено следующими техническими параметрами:

- эффективность на сжатие в сравнение с телом трубы;
- допустимый изгиб соединения;
- операционный момент.

Поэтому выбор соединения является важным критерием для сохранения целостности колонны и его работоспособности под действием комбинированных нагрузок (рис. 4 и рис. 5).

На рис. 4 показаны области допустимых нагрузок «осевая нагрузка-давление» для вертикального участка (случай отсутствия изгиба – выделено красной областью) и наклонно-направленного участка (случай с изгибом колонны – выделено зеленой областью) для типоразмера колонны 177,8x9,19 мм, группы прочности N80. Согласно результатам расчета, соединения с

эффективностью на сжатие 60% и менее не способны обеспечить сохранение работоспособности соединения. Для рассмотренного случая требуется применение соединения с эффективностью на сжатие 100%, например, TMK UP Centum или TMK UP Moment.

На рис. 5 показаны области допустимых нагрузок «осевая нагрузка – крутящий момент» для вертикального и наклонно-направленного участка. В качестве сравнения выбраны два соединения: соединение №1 имеет 60% сжатия до предела текучести и операционным крутящим моментом 10 кН·м, соединение №2 имеет 100% сжатия до предела текучести и операционным крутящим моментом 16 кН·м. Расчет комбинированной нагрузки (рис. 4) для вертикального участка показал, что колонна сохраняет свою целостность и не превышает допустимые нагрузки для обоих соединений. Что касается наклонно-направленного участка с интенсивностью искривления 1,5°/10 м, то расчетная комбинированная нагрузка является критичной для соединения №1, т.к. превышает предельное значение сжимающей нагрузки. В случае освобождения колонны при заклинке с приложенным операционным моментом 12 кН·м соединение №1 не способно сохранить целостность ввиду превышения предельного операционного крутящего момента (рис. 5).



**Рис. 5. Область допустимых комбинированных нагрузок «осевая нагрузка-крутящий момент» для типоразмера 177,8x9,19 мм N80**

Таким образом, одним из эффективных методов, который позволяет решить проблемы с потерей устойчивости при спуске в горизонтальные интервалы является спуск с вращением, при котором трение скольжения переходит в трение качения. И для инженера важно правильно определить критерии выбора резьбового соединения.

Выделим основные конструктивные особенности резьбового соединения для спуска в наклонно-направленную и горизонтальную скважину (рис. 6):

1. **Торцевой упор.** Торцевые упоры кроме уплотняющей функции, служат ограничением осевого перемещения и воспринимают крутящий момент при вращении обсадной колонны.
2. **Форма профиля резьбы.** Для обеспечения высокой прочности соединения при действии осевой и изгибающей нагрузок применяется крюкообразная или клиновидная резьба. (рис. 7).
3. **Газогерметичное уплотнение «метал-металл».** Соединения с уплотнением металл-металл имеют одно или несколько уплотнений и отличаются высокой герметичностью при давлении как жидкостью, так и газом. Для надежной герметизации применяются уплотнительные поверхности конической, сферической или цилиндрической форм, обеспечивающие после свинчивания соединения плотную посадку с заданным диаметральным натягом.



**Рис. 6. Ключевые элементы резьбового соединения**

**Рис. 7. Формы профиля премиальных резьбовых соединений**

В зависимости от конструктивных особенностей соединения максимальный операционный момент будет отличаться для соединений. Например, на рис. 7 представлено сравнение соединение поколений Pro (TMK UP Centum и TMK UP PF ET) с соединением поколения Moment (TMK UP Moment).



**Рис. 8. Сравнение операционных моментов**

Клиновидный профиль резьбы TMK UP Moment с прогрессирующим шагом по всей длине соединения (рис. 9), что резко увеличивает способность обеспечить высокий операционный момент в отличие от классических премиальных соединений с трапецеидальным профилем. Обладает 100% эффективностью на растяжение и сжатие.



**Рис. 9. Профиль соединения ТМК UP Moment**

## Заключение

По результатам рассмотрения явления продольной устойчивости в горизонтальных скважинах и расчета локальных изгибающих напряжений можно заключить следующее:

- При выборе соединений необходимо учитывать изгибающие напряжения, возникающие за счет кривизны скважины и учета жесткости тела трубы.
- Наиболее эффективным способом снизить риски не доведения колонны до проектной глубины, разрушения при расхаживании и вращении колонны является применение упорных резьбовых соединений с эффективностью на сжатие 100%.
- Премиальные упорные резьбовые соединения ТМК отличаются от соединений ГОСТ и API подтвержденными стендовыми испытаниями при комбинированном нагружении и моментных нагрузках.
- Для обеспечения высокого операционного момента во время спуска с вращением необходимо применение специальных конструкций соединений с клиновидным типом профиля резьбы.

## Приложение

**PRO серия.**
**Линейка премиальных соединений, обладающих исключительной устойчивостью к растягивающим, сжимающим и изгибающим нагрузкам при избыточном внутреннем и наружном давлениях.**
**TMK UP**^**TM** **CENTUM** – быстросборное упорное газогерметичное премиальное соединение. Испытано по стандарту API 5C5 CAL IV. Прочность соединения равна прочности тела трубы и обеспечивает 100% эффективность на растяжение и сжатие. Уплотнение металл-металл и профиль резьбы обеспечивают высокую газогерметичность при особо сложных условиях эксплуатации (предельных комбинированных изгибающих, сжимающих, растягивающих нагрузках, крутящем моменте, агрессивных средах). Может применяться на SAGD проектах и для циклического стимулирования водяным паром CSS.

Unofficial Copy Court of Marilyn Burgess District Clerk



**TMK UP CENTUM**

**ЛИТЕРАТУРА:**

1. А. Р. Агишев, С. А. Рекин, А. М. Павлов – ООО «ТМК-Премиум Сервис», Д. А. Федосеев – ООО «СамараНИПИнефть». Применение упорного резьбового соединения для эффективного заканчивания горизонтальных скважин. Бурение и нефть, 10/2018.

2. Kuru E., Martinez A., and Miska S., 1999, «The Buckling Behavior of Pipes and Its Influence on the Axial Force Transfer in Directional Wells», Proceedings, SPE/IADC Drilling Conference, Paper No. SPE/IADC 52840, Amsterdam, Holland.

3. Bending Stress Magnification in Constant Curvature Doglegs With Impact on Drillstring and Casing. P.R. Paslay, Techaid Corp., and E.P. Cernocky, Shell Development Co. SPE 22547.

4. С. А. Рекин, А. Ш. Янтурин; под ред. А. Ш. Янтурина. Устойчивость, упругая деформация, износ и эксплуатация бурильных и обсадных колонн (механика системы «колонна-скважина-пласт»). Санкт-Петербург: Недра, 2005 (Уфа: Уфимский полиграфический комбинат) – с. 460.

**Скачать статью в формате pdf → (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/upload/articles/p**



## ПАО «ТМК» (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/tmk)

🖥

(https://www.tmk-

group.ru) (https://www.youtube.com/user/CHANNELtmk) (https://twitter.com/TMKgroupRU)

105062, Москва,

ул. Покровка,

д. 40, стр. 2а

☎ +7 (495) 775-76-00

tmk@tmk-group.com (mailto:tmk@tmk-group.com)

www.tmk-group.ru

(https://www.tmk-group.ru/?utm_source=sphera&utm_medium=profile&utm_campaign=tmk)

## Читайте также:

АЛЬЯНС С ПОТРЕБИТЕЛЕМ. КРУПНЕЙШИЙ ПРОИЗВОДИТЕЛЬ ТРУБ ДЕЛАЕТ СТАВКУ НА РАЗВИТИЕ НЕФТЕГАЗОВОГО СЕРВИСА (HTTPS://XN-
-80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2014-2/)

ТЕХНИЧЕСКИЕ ПРОДАЖИ ТМК КАК ИНСТРУМЕНТ ФОРМИРОВАНИЯ РЫНКА (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2014-4/)

ИГОРЬ ПЫШМИНЦЕВ: «ПРИ ОБУСТРОЙСТВЕ СКВАЖИН НОВОГО ТИПА ТРЕБУЕТСЯ ИННОВАЦИОННАЯ ТРУБНАЯ ПРОДУКЦИЯ» (HTTPS://XN-
-80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2014-6/)

ДИЗАЙН КОРПОРАТИВНОЙ КСМК. ПРИНЦИПЫ ПОСТРОЕНИЯ КСМК В ПРОМЫШЛЕННЫХ ХОЛДИНГАХ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2020-3-
4/)

СОТРУДНИКИ ТМК И ГРУППЫ СИНАРА НЕ ПРЕКРАТЯТ КОРПОРАТИВНОЕ ОБУЧЕНИЕ ИЗ-ЗА КОРОНАВИРУСА (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--
P1AI/SOTRUDNIKI-TMK-I-GRUPPI-SINARA-NE-PREKRATYAT-KORPORATIVNOE-OBUCHENIE-IZ-ZA-KORONAVIRUSA/)
02.04.2020

ТМК И ГРУППА СИНАРА ВЫСТУПАЮТ ПАРТНЕРАМИ ЗИМНЕЙ ШКОЛЫ В РАМКАХ ОЛИМПИАДЫ «Я – ПРОФЕССИОНАЛ» (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--
P1AI/TMK-I-GRUPPA-SINARA-VISTUPAYUT-PARTNERAMI-ZIMNEY-SHKOLI-V-RAMKAH-OLIMPIADI-YA--PROFESSIONAL/)
13.02.2020

ИМПОРТОЗАМЕЩЕНИЕ ИЗДЕЛИЙ И ТЕХНОЛОГИЙ ДЛЯ НЕФТЯНОЙ И ГАЗОВОЙ ПРОМЫШЛЕННОСТЕЙ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/PKNM-2017-
1/)

ОПРЕДЕЛЕНИЕ МЕСТА РАСПОЛОЖЕНИЯ ВЫХОДНЫХ ОТВЕРСТИЙ ЭЖЕКЦИОННЫХ НАСАДОК ОТНОСИТЕЛЬНО ПОВЕРХНОСТИ ЗАБОЯ (HTTPS://XN-
-80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN2-2020-5/)

ОСОБЕННОСТИ ТЕХНОЛОГИИ БУРЕНИЯ СКВАЖИН В МНОГОЛЕТНЕМЕРЗЛЫХ ПОРОДАХ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN3-2020-5/)

НАЦИОНАЛЬНЫЕ ТЕХНОЛОГИИ ГЕОЛОГОРАЗВЕДКИ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/ZIVV-2014-4/)

НОВАЯ РОССИЙСКАЯ БУРОВАЯ МАШИНА ВЫХОДИТ НА РЫНОК (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/SDM-2015-2/)

Unofficial Copy Office of Marilyn Burgess District Clerk

БУРОВАЯ УСТАНОВКА ДЛЯ СЕВЕРА НА МТЛБУ – НОВОЕ РЕШЕНИЕ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/SDM-2015-4/)

АНАЛИЗ ЗАКОНОМЕРНОСТЕЙ РАСПРЕДЕЛЕНИЯ СКОРОСТНЫХ ПОТОКОВ И ДАВЛЕНИЙ ПО ВЫСОТЕ ШАРОШЕЧНОГО БУРОВОГО ДОЛОТА (HTTPS://XN-
-80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN2-2016-5/)

СБОРНО-РАЗБОРНОЕ ДОЛОТО БОЛЬШОГО ДИАМЕТРА СО СТАЛЬНЫМ АРМИРОВАННЫМ ВООРУЖЕНИЕМ ДЛЯ РТБ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--
P1AI/GUBKIN-2016-6/)

ЛУКОЙЛ РАЗРАБАТЫВАЕТ ВЕРХНЕЮРСКИЕ ОТЛОЖЕНИЯ С ПОМОЩЬЮ ИМПОРТОЗАМЕЩАЮЩИХ ТЕХНОЛОГИЙ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--
P1AI/LUKOYL-RAZRABATIVAET-VERHNEYURSKIE-OTLOGENIYA-S-POMOSHYU-IMPORTOZAMESHAYUSHIH-TEHNOLOGIY/)
20.11.2020

СОВЕРШЕНСТВОВАНИЕ ГЕОМЕТРИИ ВООРУЖЕНИЯ ШАРОШЕЧНОГО БУРОВОГО СНАРЯДА (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN1-2017-6/)

ЭЛЕКТРОМАГНИТНАЯ РАЗВЕДКА УГЛЕВОДОРОДОВ: НОВЫЕ ГОРИЗОНТЫ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN2-2018-1/)

ИССЛЕДОВАНИЕ ГИДРОДИНАМИКИ ПРОЦЕССА ПРОМЫВКИ ЗАБОЯ ПРИ ИСПОЛЬЗОВАНИИ НАДДОЛОТНОГО КАЛИБРАТОРА-ЭЖЕКТОРА (HTTPS://XN-
-80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN1-2019-5/)

СПЕЦИАЛИСТЫ НЕФТЕЮГАНСКОГО ФИЛИАЛА АО «ССК» УСТАНОВИЛИ РЕКОРД ПО СКОРОСТИ БУРЕНИЯ ДЛЯ ГОРИЗОНТАЛЬНЫХ СКВАЖИН НА ЮЖНОЙ ЧАСТИ
ПРИОБСКОГО МЕСТОРОЖДЕНИЯ (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/SPETSIALISTI-NEFTEYUGANSKOGO-FILIALA-AO-SSK-USTANOVILI-REKORD-PO-
SKOROSTI-BURENIYA-DLYA-GORIZONTALNIH-SKVAGIN-NA-YUGNOY-CHASTI-PRIOBSKOGO-MESTOROGDENIYA/)
16.10.2020

**6/2020**

Unofficial Copy Office of Marilyn Burgess District Clerk



(https://62020.xn--80aaigboe2bzaiqsf7i.xn--p1ai/)

ЧИТАТЬ ОНЛАЙН (HTTPS://62020.XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/)

## КЛУБ СФЕРА НЕФТЬ И ГАЗ

ФИО

email

ПРИССОЕДИНИТЬСЯ



192012, Санкт-Петербург,
пр. Обуховской Обороны, 271



+7 (800) 555-63-65 (tel:88005556365)
+7 (812) 633-30-67 (tel:78126333067)



info@s-ng.ru (mailto:info@s-ng.ru)
sphereoilandgas@mail.ru (mailto:sphereoilandgas@mail.ru)

(https://www.youtube.com/channel/UCupZ43DUbhq8F

(https://www.instagram.com/sphere.oilandgas)

Unofficial Copy Office of Marilyn Burgess District Clerk

## Ex. D-4, Page 12 of 23

SPHERE (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/) / MAGAZINE (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/mjournal)
PUBLICATIONS (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/publications)
Design of threaded connections for horizontal well completion

# Design of threaded connections for horizontal well completion

**S. A. REKIN, A. R. NURGALEEV, S. A. YAKUNIN** - TMK-Premium Service LLC
**A. R. AGISHEV, V. V. SLOBODIN** - TMK PJSC

*The productive strata of modern developed fields are located deeper and in increasingly complex geological conditions. To enhance oil recovery and reduce the total number of wells, horizontal wells are being built on the project. The development of directional and horizontal drilling technology has led not only to the emergence of new drilling equipment (rotary steerable systems, telemetry, etc.), but also to the development of new threaded connections and approaches to their calculation for selection to the project, taking into account the bending stiffness of the string and contact forces of interaction of the string with the borehole wall.*

**Key words:** OOO TMK-Premium Service, TMK UP Moment threaded connection, TMK UP Centum, 100% compression efficiency, buckling, horizontal wells, local bending stresses in the sleeve area.

In view of the fact that reserves of "light" oil and gas are decreasing, oil and gas companies are increasingly developing complex fields. This leads to an increase in drilling depths, drilling of horizontal and extended reach wells, and the development of fields with abnormally high reservoir pressures.

In 2013-2018, the share of horizontal drilling increased from 21% to 48%, while vertical drilling volumes decreased by 13%, and this trend will continue in the near future, according to the Delloite report. All this leads to increased requirements for downhole equipment.

When drilling and completing horizontal wells, the equipment perceives a combined load during running and operation. Due to the simultaneous effect of compressive load, bending load, internal and external pressure, the most dangerous sections are in the obliquely directed interval (Fig. 1).

Let us single out the criteria that affect the value of the equivalent voltage:

- geometrical parameters of the well (inner diameter of the cased hole, effective diameter of the open hole, radial clearance between the string and the borehole wall, the coefficient of friction of the string against the rock);
- axial forces of resistance to column displacement and column rotation;
- borehole curvature intensity and bending moment;
- column weight and influence of contact forces.

Axial string drag forces arise from the up / down axial movement of the string as a result of friction against the borehole wall. Overcoming these forces causes in the column:

- increased compressive forces in the process of transferring the axial load of the lower part of the column;
- bending loads when passing obliquely directed sections with high curvature intensity,
- high rotation torque of the string when running with string rotation.

The resistance to the column movement is determined by the value of the friction coefficient in a given section of the well and by the contact forces arising between the column and the wall of the well (Fig. 1) [1].



**Figure: 1. Loads acting on the string during running in the inclined interval**

The most dangerous consequence of compressive loads is a local loss of longitudinal stability, first in the form of a flat sinusoid - "sinusoidal buckling", which, as the compressive load increases, turns into a spatial spiral - "spiral buckling" (Fig. 2). The excess of the compressive forces in excess of the critical "buckling" loads is accompanied by a progressive increase in the pressing forces in the "column - wellbore wall" contact, which leads to jamming (sticking) of the string and tool in the well. Buckling is most often observed when drilling and running a string without rotation. During operations with rotation, the sliding friction coefficients of the string are converted into rolling friction coefficients, which makes it possible to reduce the resistance forces to the string displacement along the well axis, thereby ensuring that the design running depth is reached.

It has been established that the value of the critical load, leading to "buckling" in a horizontal wellbore, directly depends on the distributed weight of pipes in the drilling fluid and the bending stiffness of the pipe body section [2].

In the compressed state, the column experiences both compressive loads and bending loads, and in the case of its release by swinging with rotation during sticking, it additionally experiences high torsional loads. The action of the combined "compression-bending" loads leads to local bending stresses in the column, which can become critical for the selected standard size of the pipe along the weak section [3].



**Figure: 2. Modeling the buckling of a column in Well Plan**

Calculation of bending loads requires the determination of local values of curvature along the pipe body (BSM). The BSM (Bending Stress Magnification) coefficient is the ratio of the maximum absolute value of the curvature of the pipe body to the curvature of the wellbore in a given area. The product of the calculated BSM value by the bending stress $\sigma_b$ determines the bending stresses of the pipe body $\sigma_{b\,pipe}$, which are concentrated closer to the coupling joints under tension (see Fig. 3).



**Figure: 3. Loads acting on the string during its operation**

The obtained values of bending stresses are used in the calculation of von Mises equivalent stresses [2]. The strength condition according to the corresponding theory of strength criterion for stressed states has the following form:

$$\sigma_{\text{экв}} = \sqrt{\frac{1}{2}[(\sigma_a - \sigma_\theta)^2 + (\sigma_\theta - \sigma_r)^2 + (\sigma_r - \sigma_a)^2]} < \frac{\sigma_{\text{тек}}}{n} \qquad (1)$$

Where:

$\sigma_{eq}$ - von Mises stress equivalent

$$\sigma_a = \frac{Q_{\text{растяг}}}{F} + \sigma_b$$

Where:

$\sigma_{b\ pipe}$ - bending stresses arising from the curvature of the well and taking into account the rigidity of the pipe body;

$\sigma_\theta$ - stresses acting in the tangential (circular) direction;

$\sigma_r$ - stresses acting in the radial direction;

$\sigma_{tech}$ is the yield point of the given material;

$n$ is the applied safety factor.

The permissible values of the combined loads are described by the elasticity ellipse, taking into account local bending stresses (Fig. 4).



**Figure: 4. EXAMPLE. Range of permissible combined axial load-pressure loads for standard size 177.8x9.19 mm N80 TMK UP Centum**

One of the most vulnerable elements in the casing is the threaded connection, which is limited by the following technical parameters:

- compression efficiency compared to pipe body;
- admissible bending of the connection;
- operational moment.

Therefore, the choice of the connection is an important criterion for maintaining the integrity of the string and its operability under the action of combined loads (Fig. 4 and Fig. 5).

In fig. 4 shows the areas of permissible "axial load-pressure" loads for the vertical section (the case of no bending - highlighted in red) and the inclined section (the case with the column bending - highlighted in green) for the column standard size 177.8x9.19 mm, strength group N80. According to the results of the calculation, joints with a compression efficiency of 60% or less are not able to maintain the joint performance. For the case considered, a connection with a compression efficiency of 100% is required, for example, TMK UP Centum or TMK UP Moment.

In fig. 5 shows the areas of admissible loads "axial load - torque" for the vertical and inclined section. Two connections were selected as a comparison: connection # 1 has 60% compression to yield strength and an operating torque of 10 kN-m, connection # 2 has 100% compression to yield strength and an operating torque of 16 kN-m. The calculation of the combined load (Fig. 4) for the vertical section showed that the column retains its integrity and does not exceed the permissible loads for both connections. As for the inclined section with a curvature intensity of 1.5 ° / 10 m, the calculated combined load is critical for connection # 1, because exceeds the compressive load limit.



**Fig. 5. Range of permissible combined loads "axial load-torque" for standard size 177.8x9.19 mm N80**

Thus, one of the effective methods that allows to solve the problems with loss of stability when descending into horizontal intervals is descent with rotation, in which sliding friction turns into rolling friction. And it is important for the engineer to correctly determine the criteria for choosing a threaded connection.

Let's highlight the main design features of a threaded connection for running into a directional and horizontal well (Fig. 6):

1. **End stop.** The end stops, in addition to the sealing function, serve as a limitation of axial movement and perceive torque during the rotation of the casing.
2. **Thread profile shape.** To ensure high strength of the connection under the action of axial and bending loads, hook or wedge-shaped threads are used. (fig. 7).
3. **Gas-tight metal-to-metal seal.** Metal-to-metal sealed joints have one or more seals and are highly leak-tight under both liquid and gas pressure. For reliable sealing, sealing surfaces of conical, spherical or cylindrical shapes are used, which, after making up the connection, provide a tight fit with a given diametrical interference.



**Figure: 6. Key elements of the threaded connection**



**Figure: 7. Profile shapes of premium threaded connections**

Depending on the design features of the connection, the maximum operating torque will differ for the connections. For example, in Fig. 7 shows a comparison of the Pro generation connection (TMK UP Centum and TMK UP PF ET) with the Moment generation connection (TMK UP Moment).



**Figure: 8. Comparison of operating moments**

The tapered profile of TMK UP Moment threads with progressive lead along the entire length of the joint (Fig. 9), which dramatically increases the ability to provide high operating torque, in contrast to the classic premium connections with a trapezoidal profile. Has 100% tensile and compressive efficiency.



**Figure: 9. Connection profile TMK UP Moment**

## Conclusion

Based on the results of considering the phenomenon of longitudinal stability in horizontal wells and calculating local bending stresses, the following can be concluded:

- When choosing connections, it is necessary to take into account bending stresses arising from the curvature of the well and taking into account the rigidity of the pipe body.

- The most effective way to reduce the risks of not bringing the casing to the design depth, failure during reciprocation and rotation of the casing is the use of thrust threaded connections with a compression efficiency of 100%.
- TMK premium thrust threaded connections differ from GOST and API connections by confirmed bench tests under combined loading and moment loads.
- To ensure a high operating torque during running with rotation, it is necessary to use special designs of connections with a wedge-shaped type of thread profile.

## application

**PRO series.**

**A line of premium joints that offer exceptional resistance to tensile, compressive and bending loads at excessive internal and external pressures.**

**TMK UP ™ CENTUM** is a fast-assembly, gas-tight premium connection. Tested to API 5C5 CAL IV. The bond strength is equal to the strength of the pipe body and provides 100% tensile and compressive efficiency. Metal-to-metal sealing and thread profile ensure high gas tightness under especially difficult operating conditions (extreme combined bending, compressive, tensile loads, torque, aggressive media). Can be used on SAGD projects and for cyclic CSS steam stimulation.



**TMK UP CENTUM**

**LITERATURE:**

1. A. R. Agishev, S. A. Rekin, A. M. Pavlov - OOO TMK-Premium Service, D. A. Fedoseev - OOO SamaraNIPIneft. Application of Threaded Joint for Efficient Completion of Horizontal Wells. Drilling and Oil, 10/2018.
2. Kuru E., Martinez A., and Miska S., 1999, "The Buckling Behavior of Pipes and Its Influence on the Axial Force Transfer in Directional Wells", Proceedings, SPE / IADC Drilling Conference, Paper No. SPE / IADC 52840, Amsterdam, Holland.

3. Bending Stress Magnification in Constant Curvature Doglegs With Impact on Drillstring and Casing. PR Paslay, Techaid Corp., and EP Cernocky, Shell Development Co. SPE 22547.

4. S. A. Rekin, A. Sh. Yanturin; ed. A. Sh. Yanturin. Stability, elastic deformation, wear and operation of drill and casing strings (mechanics of the "stri... ...nt) - p. 460.

**Download the article i...**
**p1ai/upload/articles/p...**



**PJSC "TMK" (https://xn--80aaigboe2bzaiqsf7i.xn--p1ai/tmk)**

(https://www.tmk-
group.ru (https://www.(https://tinstagram.com/https://www.facebook.com/TMKgroupRU)

105062, Moscow,
st. Pokrovka,
40, building 2a
☎ +7 (495) 775-76-00
tmk@tmk-group.com (mailto:tmk@tmk-group.com)
www.tmk-group.ru

(https://www.tmk-group.ru/?utm_source=sphera&utm_medium=profile&utm_campaign=tmk)

Read also:

ALLIANCE WITH THE CONSUMER. THE LARGEST PIPE MANUFACTURER RELIES ON THE DEVELOPMENT OF OIL AND GAS SERVICES (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2014-2/)

TMK TECHNICAL SALES AS A MARKET SHAPING TOOL (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2014-4/)

IGOR PYSHMINTSEV: "WHEN ARRANGING A NEW TYPE OF WELLS, INNOVATIVE TUBULAR PRODUCTS ARE REQUIRED" (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2014-6/)

CORPORATE KSMK DESIGN. PRINCIPLES OF BUILDING KSMK IN INDUSTRIAL HOLDINGS (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-2020-3-4/)

TMK AND SINARA GROUP EMPLOYEES WILL NOT STOP CORPORATE TRAINING DUE TO CORONAVIRUS (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/SOTRUDNIKI-TMK-I-GRUPPI-SINARA-NE-PREKRATYAT-KORPORATIVNOE-OBUCHENIE-IZ-ZA-KORONAVIRUSA/)
04/02/2020

TMK AND SINARA GROUP ARE PARTNERS OF THE WINTER SCHOOL IN THE FRAMEWORK OF THE "I AM A PROFESSIONAL" OLYMPIAD (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/TMK-I-GRUPPA-SINARA-VISTUPAYUT-PARTNERAMI-ZIMNEY-SHKOLI-V-RAMKAH-OLIMPIADI-YA--PROFESSIONAL/)
13.02.2020

IMPORT SUBSTITUTION OF PRODUCTS AND TECHNOLOGIES FOR THE OIL AND GAS INDUSTRIES (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/PKNM-2017-1/)

DETERMINATION OF THE LOCATION OF THE OUTLET HOLES OF THE EJECTION NOZZLES RELATIVE TO THE FACE SURFACE (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN2-2020-5/)

FEATURES OF WELL DRILLING TECHNOLOGY IN PERMAFROST (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN3-2020-5/)

NATIONAL GEOLOGICAL EXPLORATION TECHNOLOGIES (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/ZIVV-2014-4/)

NEW RUSSIAN DRILLING MACHINE ENTERS THE MARKET (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/SDM-2015-2/)

DRILLING RIG FOR THE NORTH AT MTLBU - A NEW SOLUTION (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/SDM-2015-4/)

ANALYSIS OF THE PATTERNS OF DISTRIBUTION OF HIGH-SPEED FLOWS AND PRESSURES ALONG THE HEIGHT OF A ROLLER-CONE DRILL BIT (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN2-2016-5/)

DISMOUNTABLE CHISEL OF LARGE DIAMETER WITH STEEL REINFORCED CUTTING STRUCTURE FOR RTB (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN-2016-6/)

LUKOIL DEVELOPS UPPER JURASSIC DEPOSITS USING IMPORT SUBSTITUTION TECHNOLOGIES (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/LUKOYL-RAZRABATIVAET-VERHNEYURSKIE-OTLOGENIYA-S-POMOSHYU-IMPORTOZAMESHAYUSHIH-TEHNOLOGIY/)
11/20/2020

IMPROVEMENT OF THE GEOMETRY OF THE ARMAMENT OF THE ROLLER CONE DRILL (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN1-2017-6/)

ELECTROMAGNETIC PROSPECTING FOR HYDROCARBONS: NEW HORIZONS (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN2-2018-1/)

INVESTIGATION OF THE HYDRODYNAMICS OF THE BOTTOM HOLE WASHING PROCESS WHEN USING THE ABOVE-BIT CALIBRATOR-EJECTOR (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/GUBKIN1-2019-5/)

SPECIALISTS OF THE NEFTEYUGANSK BRANCH OF SSC JSC SET A RECORD FOR DRILLING SPEED FOR HORIZONTAL WELLS IN THE SOUTHERN PART OF THE PRIOBSKOYE FIELD (HTTPS://XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/SPETSIALISTI-NEFTEYUGANSKOGO-FILIALA-AO-SSK-USTANOVILI-REKORD-PO-SKOROSTI-BURENIYA-DLYA-GORIZONTALNIH-SKVAGIN-NA-YUGNOY-CHASTI-PRIOBSKOGO-MESTOROGDENIYA/)
10/16/2020

**6/2020**

Ex. D-4, Page 21 of 23



(https://62020.xn-

-80aaigboe2bzaiqsf7i.xn--p1ai/)

READ ONLINE (HTTPS://62020.XN--80AAIGBOE2BZAIQSF7I.XN--P1AI/)

## CLUB SPHERE OIL AND GAS

Full name

email

JOIN



192012, St. Petersburg,
Obukhovskoy Oborony pr., 271



+7 (800) 555-63-65 (tel:88005556365)
+7 (812) 633-30-67 (tel:78126333067)

info@s-ng.ru (mailto:info@s-ng.ru)
sphereoilandgas@mail.ru (mailto:sphereoilandgas@mail.ru)

(https://www.youtube.com/channel/UCupZ43DUbhq8F

(https://www.instagram.com/sphere_oilandgas/)(https://www.facebook.com/sphereoilandgas)(https://twitter.com/sphereoilandgas)

Ex. D-4, Page 23 of 23

# TMK UP QX TORQ™
## Threaded & Coupled Premium Connection



Unofficial Copy Office of the Trinity River Authority Burgess District Clerk



# TMK UP QX TORQ™

## Threaded & Coupled Premium Connection
### 4 1/2" – 13 5/8"

### Performance and Value

TMK designed the TMK UP™ QX TORQ™ using industry-proven dovetail thread form to optimize performance and maximize torque. Designed with 100% tension efficiency and validated using the stringent ISO 13679 CAL IV industry tests, it gives operators extreme torque and rugged drilling performance. The QX TORQ metal-to-metal seal makes it suitable for liquid or gas production under multiple applications along with excellent top end torque to meet challenging drilling conditions and longer lateral designs common in today's well designs.

### Applications

- Extreme Torque
- Drilling with Casing
- Production Casing
- Production Tubing
- Intermediate Casing
- Liners and Tie-Backs
- Rotating during Installation
- Rotating while Cementing
- Frac Strings
- HPHT

### Global Strength

TMK IPSCO operates as the North American division of TMK. TMK IPSCO is one of the largest North American producers of welded and seamless pipe and premium connections dedicated to serving the oil and gas industry and many industrial markets. TMK IPSCO is committed to being the energy tubular supplier of choice, with state-of-the-art facilities strategically located in key energy-producing areas and practically all the main shale plays. The company's legacy of quality, exceptional customer service and focus on innovation translates into unparalleled value for our customers. Our strength—in product and presence—gives customers a competitive edge, making us the ideal supplier for the oil and gas industry.

For more information on any of the details featured here, please contact: techsales@tmk-ipsco.com.

Unofficial Copy, Office of Marilyn Burgess District Clerk

# TMK UP QX TORQ

**Threaded & Coupled Premium Connection**
4 1/2" – 13 5/8"

### Dovetail Threads

- Increased tension and compression efficiency
- High bending capacity and evenly distributed stresses
- Extreme torque capacity

### Sphere and Sphere Metal-to-Metal Seal

- Exceptional sealability for fracking and gas or liquid production
- Extraordinary performance under combined loading
- Sealability validated using stringent Cal IV testing

### Run-Out Threads

- Low interference run-out threads enhance fatigue life
- Maximizes critical cross-sectional area



Unofficial Copy Office of Marilyn Burgess District Clerk



The diagram shows a design envelope plot with:
- Internal Pressure (top axis)
- External Pressure (bottom axis)
- Compression (left axis)
- Tension (right axis)

Labels on the plot:
- 100% API 5C3 / ISO
- VME
- Connection
- Pipe Body

10120 Houston Oaks Drive
Houston, TX 77064
Tel: 281.949.1023
Toll free: 888.258.2000

www.tmkup.com



# PERFORMANCE DATA

**TORQ® QXW™**  177.80 mm   10.36 mm   P110
**Technical Data Sheet**

## Tubular Parameters

| | | | | | |
|---|---|---|---|---|---|
| Size | 177.80 | mm | Minimum Yield | 758 | MPa |
| Nominal Weight | 43.16 | kg/m | Minimum Tensile | 862 | MPa |
| Grade | P110 | | Yield Load | 4,134 | kN |
| PE Weight | 42.79 | kg/m | Tensile Load | 4,698 | kN |
| Wall Thickness | 10.36 | mm | Min. Internal Yield Pressure | 77.4 | MPa |
| Nominal ID | 157.07 | mm | Collapse Pressure | 58.8 | MPa |
| Drift Diameter | 153.90 | mm | | | |
| Nom. Pipe Body Area | 5,451 | mm² | | | |

## Connection Parameters

| | | |
|---|---|---|
| Connection OD | 200.0 | mm |
| Connection ID | 157.6 | mm |
| Make-Up Loss | 118.1 | mm |
| Critical Section Area | 5,451 | mm² |
| Tension Efficiency | 100.0 | % |
| Compression Efficiency | 100.0 | % |
| Yield Load In Tension | 4,134 | kN |
| Min. Internal Yield Pressure | 77.4 | MPa |
| Collapse Pressure | 58.8 | MPa |
| Uniaxial Bending | 72 | °/30 m |

## Make-Up Torques

| | | |
|---|---|---|
| Min. Make-Up Torque | 29,800 | Nm |
| Opt. Make-Up Torque | 32,500 | Nm |
| Max. Make-Up Torque | 35,300 | Nm |
| Operating Torque | 65,100 | Nm |
| Yield Torque | 81,300 | Nm |

Printed on: December-11-2020

NOTE:
The content of this Technical Data Sheet is for general information only and does not guarantee performance or imply fitness for a particular purpose, which only a competent drilling professional can determine considering the specific installation and operation parameters. Information that is printed or downloaded is no longer controlled by TENARIS and might not be the latest information. Anyone using the information herein does so at their own risk. To verify that you have the latest TENARIS technical information, please contact TENARIS Technical Sales toll-free at 1-888-258-2000.

For Reference Only. Contact Technical Sales for Availability

# PERFORMANCE DATA

**TORQ® QXW™**       9.625 in      47.00 lbs/ft      P110
**Technical Data Sheet**

## Tubular Parameters

| | | | | | |
|---|---|---|---|---|---|
| Size | 9.625 | in | Minimum Yield | 110,000 | psi |
| Nominal Weight | 47.00 | lbs/ft | Minimum Tensile | 125,000 | psi |
| Grade | P110 | | Yield Load | 1,493,000 | lbs |
| PE Weight | 46.16 | lbs/ft | Tensile Load | 1,697,000 | lbs |
| Wall Thickness | 0.472 | in | Min. Internal Yield Pressure | 9,440 | psi |
| Nominal ID | 8.681 | in | Collapse Pressure | 5,300 | psi |
| Drift Diameter | 8.525 | in | | | |
| Nom. Pipe Body Area | 13.572 | in² | | | |

## Connection Parameters

| | | |
|---|---|---|
| Connection OD | 10.625 | in |
| Connection ID | 8.642 | in |
| Make-Up Loss | 5.376 | in |
| Critical Section Area | 13.572 | in² |
| Tension Efficiency | 100.0 | % |
| Compression Efficiency | 100.0 | % |
| Yield Load In Tension | 1,493,000 | lbs |
| Min. Internal Yield Pressure | 9,440 | psi |
| Collapse Pressure | 5,300 | psi |
| Uniaxial Bending | 52 | °/ 100 ft |

## Make-Up Torques

| | | |
|---|---|---|
| Min. Make-Up Torque | 39,900 | ft-lbs |
| Opt. Make-Up Torque | 42,000 | ft-lbs |
| Max. Make-Up Torque | 44,100 | ft-lbs |
| Operating Torque | 80,000 | ft-lbs |
| Yield Torque | 105,000 | ft-lbs |

Printed on: December 14 2020

NOTE:
The content of this Technical Data Sheet is for general information only and does not guarantee performance or imply fitness for a particular purpose, which only a competent drilling professional can determine considering the specific installation and operation parameters. Information that is printed or downloaded is no longer controlled by TENARIS and might not be the latest information. Anyone using the information herein does so at their own risk. To verify that you have the latest TENARIS technical information, please contact TENARIS Technical Sales toll-free at 1-888-258-2000.

For Reference Only. Contact Technical Sales for Availability

# PERFORMANCE DATA

**TORQ® QXW™**
**Technical Data Sheet**   244.48 mm     11.99 mm     P110

## Tubular Parameters

| | | | | | |
|---|---|---|---|---|---|
| Size | 244.48 | mm | Minimum Yield | 758 | MPa |
| Nominal Weight | 69.94 | kg/m | Minimum Tensile | 862 | MPa |
| Grade | P110 | | Yield Load | 6,641 | kN |
| PE Weight | 68.73 | kg/m | Tensile Load | 7,547 | kN |
| Wall Thickness | 11.99 | mm | Min. Internal Yield Pressure | 65.1 | MPa |
| Nominal ID | 220.50 | mm | Collapse Pressure | 36.5 | MPa |
| Drift Diameter | 216.54 | mm | | | |
| Nom. Pipe Body Area | 8,756 | mm² | | | |

## Connection Parameters

| | | |
|---|---|---|
| Connection OD | 269.9 | mm |
| Connection ID | 219.5 | mm |
| Make-Up Loss | 136.5 | mm |
| Critical Section Area | 8,756 | mm² |
| Tension Efficiency | 100.0 | % |
| Compression Efficiency | 100.0 | % |
| Yield Load In Tension | 6,641 | kN |
| Min. Internal Yield Pressure | 65.1 | MPa |
| Collapse Pressure | 36.5 | MPa |
| Uniaxial Bending | 52 | °/30 m |

## Make-Up Torques

| | | |
|---|---|---|
| Min. Make-Up Torque | 54,100 | Nm |
| Opt. Make-Up Torque | 56,900 | Nm |
| Max. Make-Up Torque | 59,800 | Nm |
| Operating Torque | 108,500 | Nm |
| Yield Torque | 142,400 | Nm |

Printed on: December 14 2020

NOTE:
The content of this Technical Data Sheet is for general information only and does not guarantee performance or imply fitness for a particular purpose, which only a competent drilling professional can determine considering the specific installation and operation parameters. Information that is printed or downloaded is no longer controlled by TENARIS and might not be the latest information. Anyone using the information herein does so at their own risk. To verify that you have the latest TENARIS technical information, please contact TENARIS Technical Sales toll-free at 1-888-258-2000.

# PERFORMANCE DATA

**TORQ® SFW™**  5.500 in  17.00 lbs/ft  L80
**Technical Data Sheet**

## Tubular Parameters

| | | | | | |
|---|---|---|---|---|---|
| Size | 5.500 | in | Minimum Yield | 80,000 | psi |
| Nominal Weight | 17.00 | lbs/ft | Minimum Tensile | 95,000 | psi |
| Grade | L80 | | Yield Load | 397,000 | lbs |
| PE Weight | 16.89 | lbs/ft | Tensile Load | 471,000 | lbs |
| Wall Thickness | 0.304 | in | Min. Internal Yield Pressure | 7,740 | psi |
| Nominal ID | 4.892 | in | Collapse Pressure | 6,290 | psi |
| Drift Diameter | 4.767 | in | | | |
| Nom. Pipe Body Area | 4.962 | in² | | | |

## Connection Parameters

| | | |
|---|---|---|
| Connection OD | 5.679 | in |
| Connection ID | 4.848 | in |
| Make-Up Loss | 5.398 | in |
| Critical Section Area | 4.640 | in² |
| Tension Efficiency | 90.0 | % |
| Compression Efficiency | 90.0 | % |
| Yield Load In Tension | 357,000 | lbs |
| Min. Internal Yield Pressure | 7,740 | psi |
| Collapse Pressure | 6,290 | psi |
| Uniaxial Bending | 60 | °/ 100 ft |

## Make-Up Torques

| | | |
|---|---|---|
| Min. Make-Up Torque | 9,700 | ft-lbs |
| Opt. Make-Up Torque | 13,800 | ft-lbs |
| Max. Make-Up Torque | 15,200 | ft-lbs |
| Operating Torque | 21,500 | ft-lbs |
| Yield Torque | 27,000 | ft-lbs |

Printed on: December-14-2020

NOTE:
The content of this Technical Data Sheet is for general information only and does not guarantee performance or imply fitness for a particular purpose, which only a competent drilling professional can determine considering the specific installation and operation parameters. Information that is printed or downloaded is no longer controlled by TENARIS and might not be the latest information. Anyone using the information herein does so at their own risk. To verify that you have the latest TENARIS technical information, please contact TENARIS Technical Sales toll-free at 1-888-258-2000.

Unofficial Copy Office of Marilyn Burgess District Clerk

# PERFORMANCE DATA

**TORQ® SFW™**  139.70 mm   7.72 mm   L80
**Technical Data Sheet**

## Tubular Parameters

| | | | | | |
|---|---|---|---|---|---|
| Size | 139.70 | mm | Minimum Yield | 552 | MPa |
| Nominal Weight | 25.30 | kg/m | Minimum Tensile | 655 | MPa |
| Grade | L80 | | Yield Load | 1,766 | kN |
| PE Weight | 25.13 | kg/m | Tensile Load | 2,097 | kN |
| Wall Thickness | 7.72 | mm | Min. Internal Yield Pressure | 53.4 | MPa |
| Nominal ID | 124.26 | mm | Collapse Pressure | 43.3 | MPa |
| Drift Diameter | 121.08 | mm | | | |
| Nom. Pipe Body Area | 3,202 | mm² | | | |

## Connection Parameters

| | | |
|---|---|---|
| Connection OD | 144.2 | mm |
| Connection ID | 123.1 | mm |
| Make-Up Loss | 137.1 | mm |
| Critical Section Area | 2,993 | mm² |
| Tension Efficiency | 90.0 | % |
| Compression Efficiency | 90.0 | % |
| Yield Load In Tension | 1,589 | kN |
| Min. Internal Yield Pressure | 53.4 | MPa |
| Collapse Pressure | 43.3 | MPa |
| Uniaxial Bending | 60 | °/30 m |

## Make-Up Torques

| | | |
|---|---|---|
| Min. Make-Up Torque | 13,200 | Nm |
| Opt. Make-Up Torque | 18,700 | Nm |
| Max. Make-Up Torque | 20,600 | Nm |
| Operating Torque | 29,200 | Nm |
| Yield Torque | 36,600 | Nm |

Printed on: December-14-2020

NOTE:
The content of this Technical Data Sheet is for general information only and does not guarantee performance or imply fitness for a particular purpose, which only a competent drilling professional can determine considering the specific installation and operation parameters. Information that is printed or downloaded is no longer controlled by TENARIS and might not be the latest information. Anyone using the information herein does so at their own risk. To verify that you have the latest TENARIS technical information, please contact TENARIS Technical Sales toll-free at 1-888-258-2000.

# PERFORMANCE DATA

**TORQ® SFW™**
**Technical Data Sheet**

| | 6.625 in | | 24.00 lbs/ft | | L80 | |

## Tubular Parameters

| | | | | | |
|---|---|---|---|---|---|
| Size | 6.625 | in | Minimum Yield | 80,000 | psi |
| Nominal Weight | 24.00 | lbs/ft | Minimum Tensile | 95,000 | psi |
| Grade | L80 | | Yield Load | 555,000 | lbs |
| PE Weight | 23.60 | lbs/ft | Tensile Load | 659,000 | lbs |
| Wall Thickness | 0.352 | in | Min. Internal Yield Pressure | 7,440 | psi |
| Nominal ID | 5.921 | in | Collapse Pressure | 5,760 | psi |
| Drift Diameter | 5.796 | in | | | |
| Nom. Pipe Body Area | 6.937 | in² | | | |

## Connection Parameters

| | | |
|---|---|---|
| Connection OD | 6.846 | in |
| Connection ID | 5.877 | in |
| Make-Up Loss | 5.761 | in |
| Critical Section Area | 6.504 | in² |
| Tension Efficiency | 90.0 | % |
| Compression Efficiency | 90.0 | % |
| Yield Load In Tension | 499,000 | lbs |
| Min. Internal Yield Pressure | 7,440 | psi |
| Collapse Pressure | 5,760 | psi |
| Uniaxial Bending | 50 | °/ 100 ft |

## Make-Up Torques

| | | |
|---|---|---|
| Min. Make-Up Torque | 15,100 | ft-lbs |
| Opt. Make-Up Torque | 21,600 | ft-lbs |
| Max. Make-Up Torque | 23,800 | ft-lbs |
| Operating Torque | 38,000 | ft-lbs |
| Yield Torque | 48,000 | ft-lbs |

Printed on: December-14-2020

NOTE:

The content of this Technical Data Sheet is for general information only and does not guarantee performance or imply fitness for a particular purpose, which only a competent drilling professional can determine considering the specific installation and operation parameters. Information that is printed or downloaded is no longer controlled by TENARIS and might not be the latest information. Anyone using the information herein does so at their own risk. To verify that you have the latest TENARIS technical information, please contact TENARIS Technical Sales toll-free at 1-888-258-2000.

Unofficial Copy Office of Marilyn Burgess District Clerk

# PERFORMANCE DATA

**TORQ® SFW™**  168.27 mm   8.94 mm   L80
**Technical Data Sheet**

## Tubular Parameters

| | | | | | |
|---|---|---|---|---|---|
| Size | 168.27 | mm | Minimum Yield | 552 | MPa |
| Nominal Weight | 35.72 | kg/m | Minimum Tensile | 655 | MPa |
| Grade | L80 | | Yield Load | 2,469 | kN |
| PE Weight | 35.13 | kg/m | Tensile Load | 2,931 | kN |
| Wall Thickness | 8.94 | mm | Min. Internal Yield Pressure | 51.3 | MPa |
| Nominal ID | 150.39 | mm | Collapse Pressure | 39.7 | MPa |
| Drift Diameter | 147.22 | mm | | | |
| Nom. Pipe Body Area | 4,475 | mm² | | | |

## Connection Parameters

| | | |
|---|---|---|
| Connection OD | 173.9 | mm |
| Connection ID | 149.3 | mm |
| Make-Up Loss | 146.3 | mm |
| Critical Section Area | 4,196 | mm² |
| Tension Efficiency | 90.0 | % |
| Compression Efficiency | 90.0 | % |
| Yield Load In Tension | 2,222 | kN |
| Min. Internal Yield Pressure | 51.3 | MPa |
| Collapse Pressure | 39.7 | MPa |
| Uniaxial Bending | 50 | °/30 m |

## Make-Up Torques

| | | |
|---|---|---|
| Min. Make-Up Torque | 20,500 | Nm |
| Opt. Make-Up Torque | 29,300 | Nm |
| Max. Make-Up Torque | 32,300 | Nm |
| Operating Torque | 51,500 | Nm |
| Yield Torque | 65,100 | Nm |



Printed on: December-14-2020

NOTE:
The content of this Technical Data Sheet is for general information only and does not guarantee performance or imply fitness for a particular purpose, which only a competent drilling professional can determine considering the specific installation and operation parameters. Information that is printed or downloaded is no longer controlled by TENARIS and might not be the latest information. Anyone using the information herein does so at their own risk. To verify that you have the latest TENARIS technical information, please contact TENARIS Technical Sales toll-free at 1-888-258-2000.

1/28/2021 3:57:09 PM
Marilyn Burgess - District Clerk
Harris County
Envelope No: 50141064
By: JONES, PATRICIA D
Filed: 1/28/2021 3:57:09 PM

CAUSE NO. _____-_____

| | | |
|---|---|---|
| ULTRA PREMIUM SERVICES, LLC, | § | IN THE DISTRICT COURT OF |
| IPSCO TUBULARS INC., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| VS. | § | |
| | § | HARRIS COUNTY, TEXAS |
| TUBNAYA METALLURGICHESKAYA | § | |
| KOMPANIYA, | § | ___ JUDICIAL DISTRICT |
| | § | |
| *Defendant.* | | |

## [PROPOSED] TEMPORARY RESTRAINING ORDER

On the date and time stated at the end of this Order, the Court heard Plaintiffs' Application for Temporary Restraining Order. After considering the pleadings, exhibits, all other documents filed in this case and argument of counsel at the hearing, the Court is of the opinion that Plaintiffs' Application for Temporary Restraining Order should be, and is, GRANTED because:

1. Plaintiffs have asserted and demonstrated their causes of action against the Defendant and a probable right to the relief sought under Texas Civil Practice and Remedies Code § 134A.00118 for the misappropriation of Plaintiffs' trade secret information relating to OCTG technology, which Plaintiffs licensed to Defendants under Licensing Agreements that include strict nonuse and confidentiality provisions.

2. Plaintiffs have asserted and demonstrated their causes of action against the Defendant and a probable right to the relief sought for breach of the three Licensing Agreements entered into between Plaintiffs and Defendant, by which Defendant received confidential information relating to OCTG subject to strict nonuse and confidentiality provisions.

3. Plaintiffs will suffer imminent and irreparable harm, including but not limited to: First, the disclosure of their confidential information to third parties in the course of Defendant's creation of a misappropriating line of OCTG products. *Williams v. Compressor Eng'g Corp.*, 704

S.W.2d 469, 471 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) ("threatened disclosure or use of trade secrets . . . constitute irreparable injury as a matter of law"). Second, monetary loss in an amount difficult to quantify. *Universal Health Services, Inc. v. Thompson*, 24 S.W.3d 570, 578 (Tex. App.—Austin 2000, no pet.) (finding irreparable injury when damages are "incapable of calculation"). Third, the loss of customers and market share as a result of Defendant benefitting from Plaintiffs labor- and cost-intensive development process. *Wright v. Sport Supply Group, Inc.*, 137 S.W.3d 289, 293 (Tex. App.—Beaumont 2004, no pet.) (upholding a temporary injunction where plaintiff presented testimony that the impact of an employee's use of confidential customer information is difficult to quantify because it was impossible to ascertain when the customer would be poached). And fourth, the loss of customer goodwill and clientele as a result of customer confusion associating Defendant's products with Plaintiffs' identical (and similarly branded) products. *RenewData Corp. v. Strickler*, No. 03-05-00273-CV, 2006 WL 504998, at *16 (Tex. App.—Austin Mar. 3, 2006, no pet.) ("Because it is difficult to assign a dollar value to loss of customer goodwill and clientele, it constitutes an irreparable injury.").

4.      This Temporary Restraining Order will preserve the status quo of the parties as well as serve the public's interest. The harm to Plaintiffs if this Temporary Restraining Order is not granted outweighs any potential harm to Defendants by the issuance of this Temporary Restraining Order. Granting injunctive relief will also benefit the public's interest.

5.      It is therefore **ORDERED, ADJUDGED,** and **DECREED** that Plaintiffs' Application for Temporary Restraining Order be and is hereby **GRANTED**.

6.      Accordingly, it is therefore **ORDERED** that Defendant Tubnaya Metallurgicheskaya Kompaniya (TMK) is:

a. Prohibited from marketing, testing, advertising, or offering for sale the TMK UP Moment, the TMK UP Moment GT, the TMK UP Moment SFL, and the TMK UP Moment FL;

b. Prohibited from marketing, testing, advertising, or offering for sale any product with the "UP" moniker in its name;

c. Prohibited from disclosing to any person other than an Authorized Licensee Employee, as defined in the Licensing Agreements, any Confidential Information provided or made available by IPSCO;

d. Precluded from using any such Confidential Information for any purpose other than those contemplated in the Licensing Agreements; and

e. Required to protect all such Confidential Information against unauthorized disclosure.

7.      The Clerk shall forthwith, when so requested by Plaintiffs and after Plaintiffs filed the bond or cash in lieu thereof as described below, issue a writ of Temporary Restraining Order in conformity with the laws and the terms of this Order.

8.      It is further **ORDERED** that unless extended by agreement of the parties or changed by further Order of this Court, this Order becomes effective only at such time as Plaintiffs file with the Clerk of the Court a bond or cash in lieu thereof in the amount of $100.

9.      It is further **ORDERED** that Plaintiffs' Application for Temporary Injunction will be heard before this Court on _____ __, 2021 at ____ o'clock ____.

10.     This Order expires no later than 14 days after issuance or when amended by Order of this Court, whichever occurs first.

11.   **SO ORDERED** this __ day of _____, 2021 at ____ o'clock ___.

 

 

_____
**JUDGE PRESIDING**

Unofficial Copy Office of Marilyn Burgess District Clerk